**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COBALT LABORATORIES INC.<br>24840 South Tamiami Trail<br>Bonita Springs, Florida 34134, and<br><br>COBALT PHARMACEUTICALS, INC.<br>6500 Kitimat Road<br>Mississauga, Ontario, Canada, L5N 2B8<br><br>        Plaintiffs,<br>  v.<br><br>FOOD AND DRUG ADMINISTRATION<br>5600 Fishers Lane<br>Rockville, Maryland 20857,<br><br>MICHAEL O. LEAVITT<br>Secretary of Health and Human Services<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201, and<br><br>ANDREW C. VON ESCHENBACH, M.D.<br>Commissioner of Food and Drugs<br>5600 Fishers Lane<br>Rockville, Maryland 20857,<br><br>        Defendants. | Case No. |

## COBALT'S MOTION FOR TEMPORARY RESTRAINING ORDER

Pursuant to Rule 65(b) of the Federal Rules of Civil Procedure and LCvR 65.1,

Cobalt Laboratories Inc. and Cobalt Pharmaceuticals, Inc. ("Cobalt") hereby respectfully move

for a temporary restraining order against the Food and Drug Administration ("FDA"); Michael

O. Leavitt, in his official capacity as Secretary of Health and Human Services; and Andrew C.

von Eschenbach, M.D., in his official capacity as Commissioner of Food and Drugs (collectively,

the "Federal Defendants")—pending briefing, hearing and resolution of a motion for preliminary injunction—as follows:

(a)  Enjoining FDA from approving all other acarbose abbreviated new drug applications ("ANDAs") until natural expiration of Cobalt's statutory right to exclusivity for its acarbose ANDA No. 77-532;

(b)  Requiring FDA to immediately stay and/or withdraw approval of any acarbose ANDA to which the Agency has already granted final approval, including the May 7, 2008 approval of Roxane Laboratories, Inc.'s ("Roxane") acarbose ANDA, until natural expiration of Cobalt's statutory right to 180-day exclusivity; and

(c)  Requiring FDA to immediately order a recall of all acarbose products already shipped and/or sold by Roxane.

In the event the Court denies such relief, Cobalt respectfully moves for immediate emergency relief pending appellate review. Specifically, in the event the Court denies Cobalt's request for emergency injunctive relief, Cobalt respectfully requests immediate entry of a temporary restraining order staying or withdrawing approval of all acarbose ANDAs, except Cobalt's ANDA, pending review by the United States Court of Appeals for the D.C. Circuit of FDA's May 7, 2008 administrative decision, in order to prevent devastating and irreparable harm to Cobalt.

The grounds for this motion are fully set forth in the accompanying Memorandum in support of Cobalt's motion, and the Declarations of William A. Rakoczy, Robert Sanzen and Donna Hillier, filed contemporaneously herewith.

2

Pursuant to LCvR 65.1(a), Cobalt certifies that in advance of this filing, Cobalt informed the Federal Defendants of its intent to seek a temporary restraining order in this matter, as well as the time of the making of the application, and has provided the Federal Defendants with copies of this motion and all supporting papers, including the proposed order. The Federal Defendants have declined to consent to entry of the requested temporary restraining order, and consultation pursuant to LCvR 7(m) has failed to narrow the areas of disagreement.

Dated: May 8, 2008.                     Respectfully submitted,

                                        COBALT LABORATORIES INC. and
                                        COBALT PHARMACEUTICALS INC.


                            By:    _____
                                        One of their attorneys


E. Anthony Figg, D.C. Bar No. 345124
Daniel L. Shores, D.C. Bar No. 495389
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
1425 K Street, N.W.
Suite 800
Washington, D.C. 20005
(202) 783-6040
(202) 783-6031 (facsimile)
efigg@rfem.com

William A. Rakoczy, D.C. Bar No. 489082
Christine J. Siwik
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610
(312) 222-6301
(312) 222-6321 (facsimile)
wrakoczy@rmmslegal.com

*Counsel for Cobalt Laboratories Inc. and*
*Cobalt Pharmaceuticals Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COBALT LABORATORIES INC. )
24840 South Tamiami Trail )
Bonita Springs, Florida 34134, and )
)
COBALT PHARMACEUTICALS, INC. )
6500 Kitimat Road )
Mississauga, Ontario, Canada, L5N 2B8 )
)
          Plaintiffs, )    Case No.
    v. )
)
FOOD AND DRUG ADMINISTRATION )
5600 Fishers Lane )
Rockville, Maryland 20857, )
)
MICHAEL O. LEAVITT )
Secretary of Health and Human Services )
200 Independence Avenue, S.W. )
Washington, D.C. 20201, and )
)
ANDREW C. VON ESCHENBACH, M.D. )
Commissioner of Food and Drugs )
5600 Fishers Lane )
Rockville, Maryland 20857, )
)
          Defendants. )
                                   )

## MEMORANDUM IN SUPPORT OF COBALT'S
## MOTION FOR TEMPORARY RESTRAINING ORDER

William A. Rakoczy, D.C. Bar No. 489082      E. Anthony Figg, D.C. Bar No. 345124
Christine J. Siwik      Daniel L. Shores, D.C. Bar No. 495389
RAKOCZY MOLINO MAZZOCHI SIWIK LLP      ROTHWELL, FIGG, ERNST &
6 West Hubbard Street, Suite 500      MANBECK, P.C.
Chicago, Illinois 60610      1425 K Street, N.W., Suite 800
(312) 222-6301      Washington, D.C. 20005
(312) 222-6321 (facsimile)      (202) 783-6040
wrakoczy@rmmslegal.com      (202) 783-6031 (facsimile)
     efigg@rfem.com
Dated: May 8, 2008

*Counsel for Cobalt Laboratories Inc. and Cobalt Pharmaceuticals, Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ....................................................................................................... 1

BACKGROUND ........................................................................................................ 2

I.    Statutory Background. ...................................................................................... 3

    A.    New Drugs And Patent Listing Requirements. ......................................... 3

    B.    Abbreviated New Drug Applications And Patent Certification
         Requirements. ................................................................................ 3

    C.    First-Filer 180-Day Generic Exclusivity, And The Criticality Of This
         Exclusivity Period To Hatch-Waxman. .................................................. 4

    D.    The Forfeiture Provisions Implicated By FDA's Decision With Respect
         To Cobalt's Exclusivity For Acarbose. .................................................. 7

II.   Factual Background. ......................................................................................... 8

    A.    The NDA Product. ........................................................................... 9

    B.    Cobalt's First-Filed Paragraph IV ANDA For Acarbose. ....................... 10

    C.    FDA Delays Its Review Of Cobalt's ANDA, And Fails To Timely Inspect
         Cobalt's CRO. ............................................................................... 11

    D.    Bayer's Alleged "Delisting" Request. ................................................. 13

    E.    FDA's Request For Comment And Its Late-Night Ambush Of Cobalt .............. 14

ARGUMENT ........................................................................................................... 15

I.    Cobalt Has A Substantial Likelihood Of Success On The Merits Because Finding
    A Forfeiture Of Cobalt's Exclusivity Is Arbitrary, Capricious And Contrary To
    Law. .......................................................................................................... 16

    A.    The Forfeiture Provisions Must Be Construed Consistent With The Statute
         As A Whole, Congress' Purpose, And The Policy For Hatch-Waxman. ............. 16

    B.    No "Failure To Market" Forfeiture Has Occurred. ................................. 19

         1.    FDA's Delay Cannot Cause An Exclusivity Forfeiture. ...................... 20

2.  FDA's Forfeiture Of Cobalt's Exclusivity Based On Bayer's Mere "Request For Patent Delisting" Is Arbitrary, Capricious And Contrary To Law. ....................................................................... 23

a.  FDA's Interpretation Violates The Plain Language Of The Statute. ............................................................................ 24

b.  FDA's Interpretation Runs Afoul Of Congressional Intent And Allows Brand Companies To Manipulate, and Indeed Eliminate, The Generic Exclusivity Incentive. ............................ 26

c.  FDA's Decision Squarely Violates The D.C. Circuit's Ruling In *Ranbaxy v. Leavitt* That Precludes The Agency From Depriving An Applicant Of Exclusivity By Removing A Patent From The Orange Book. ........................ 27

3.  The "Failure To Market" Forfeiture Provision Does Not—And Cannot—Apply Here Because No Subsequent Applicant Had Received Tentative Approval. ............................................................ 29

II.   Cobalt, Without Question, Will Suffer Irreparable Harm If This Court Does Not Enter An Injunction Preventing FDA From Approving Subsequently-Filed Acarbose ANDAs. ............................................................................................. 30

III.  The Requested Injunction Will Not Substantially Harm Any Other Interested Party. ..................................................................................................................... 35

IV.   The Requested Injunction Fosters The Public Interest. ...................................... 35

CONCLUSION ...................................................................................................................... 36

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Apotex, Inc. v. Shalala,*
    53 F. Supp. 2d 454 (D.D.C. 1999) ................................................................. 5, 6

*Bell Atl. Tel. Cos. v. FCC,*
    131 F.3d 1044 (D.C. Cir. 1997) ...................................................................... 17

*Boehringer Ingelheim Corp. v. Shalala,*
    993 F. Supp. 1 (D.D.C. 1997) ........................................................................ 32

*Bracco Diagnostics, Inc. v. Shalala,*
    963 F. Supp. 20 (D.D.C. 1997) ................................................................. 32, 35

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
    467 U.S. 837 (1984) ....................................................................................... 16

*CityFed Fin. Corp. v. Office of Thrift Supervision,*
    58 F.3d 738 (D.C. Cir. 1995) .................................................................... 15, 34

*Cuomo v. United States Nuclear Regulatory Comm'n,*
    772 F.2d 972 (D.C. Cir. 1985) .................................................................. 15, 34

*Davenport v. Int'l Bhd. of Teamsters,*
    166 F.3d 356 (D.C. Cir. 1999) ...................................................................... 15

*Dole v. United Steelworkers of Am.,*
    494 U.S. 26 (1990) ......................................................................................... 16

*Express One Int'l, Inc. v. United States Postal Serv.,*
    814 F. Supp. 87 (D.D.C. 1992) ..................................................................... 33

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ....................................................................................... 16

*In re Barr Labs.,*
    930 F.2d 72 (D.C. Cir. 1991) ...................................................................... 5, 36

*Inwood Labs., Inc. v. Young,*
    723 F. Supp. 1523 (D.D.C. 1989) .......................................................... 24, 25, 26

*Mastro Plastics Corp. v. NLRB,*
    350 U.S. 270 (1956) ....................................................................................... 17

*McCarthy v. Bronson,*
    500 U.S. 136 (1991) ....................................................................................... 16

iii

*MedImmune, Inc. v. Genentech, Inc.,*
   127 S. Ct. 764 (2007) ........................................................................ 6

*Minn. Mining & Mfg. Co. v. Barr Labs, Inc.,*
   289 F.3d 775 (Fed. Cir. 2002) ........................................................ 33

*Mova Pharm. Corp. v. Shalala,*
   140 F.3d 1060 (D.C. Cir. 1998) ................................... 15, 24, 32

*Mova Pharm. Corp. v. Shalala,*
   955 F. Supp. 128 (D.D.C. 1997) .............................................. 30, 35

*Mylan Pharms., Inc. v. Henney,*
   94 F. Supp. 2d 36 (D.D.C. 2000) ................................................ 26

*Mylan Pharms., Inc. v. Shalala,*
   81 F. Supp. 2d 30 (D.D.C. 2000) .................................................. 6

*Mylan Pharms., Inc. v. Thompson,*
   268 F.3d 1323 (Fed. Cir. 2001) .................................................. 33

*Natural Res. Def. Council, Inc. v. Browner,*
   57 F.3d 1122 (D.C. Cir. 1995) .................................................... 17

*Offshore Logistics, Inc. v. Tallentire,*
   477 U.S. 207 (1986) .................................................................... 17

*Public Citizen v. United States Department of Justice,*
   491 U.S. 440 (1989) .................................................................... 17

*Purepac Pharm. Co. v. Thompson,*
   354 F.3d 877 (D.C. Cir. 2004) ................................................. 5, 24

*Purepac Pharmaceutical Co. v. Friedman,*
   162 F.3d 1201 (D.C. Cir. 1998) .................................................. 25

*Ranbaxy Labs. Ltd. v. Leavitt,*
   469 F.3d 120 (D.C. Cir. 2006) ............................................... 26, 28

*Raymen v. United Senior Ass'n,*
   No. 05-486(RBW), 2005 WL 607916 (D.D.C. Mar. 16, 2005) ......... 15

*Rum Creek Coal Sales, Inc. v. Caperton,*
   926 F.2d 353 (4th Cir. 1991) ...................................................... 33

*SmithKline Beecham Corp. v. Apotex Corp.,*
   247 F. Supp. 2d 1011 (N.D. Ill. 2003) ........................................ 3

iv

*Stein Indus., Inc. v. Jarco Indus., Inc.,*
    934 F. Supp. 55 (E.D.N.Y. 1996) .................................................................. 32

*Teva Pharms. USA, Inc. v. Pfizer, Inc.,*
    395 F.3d 1324 (Fed. Cir. 2005) ...................................................................... 6

*Teva Pharms., USA, Inc. v. FDA,*
    182 F.3d 1003 (D.C. Cir. 1999) .............................................................. 19, 26

*TorPharm, Inc. v. Shalala,*
    No. Civ.A. 97-1925(JR), 1997 WL 33472411 (D.D.C. Sept. 15, 1997) ................ 32

*World Duty Free Ams., Inc. v. Summers,*
    94 F. Supp. 2d 61 (D.D.C. 2000) ................................................................... 33

## FEDERAL STATUTES

21 U.S.C. § 355(b)(1) ........................................................................................ 3

21 U.S.C. § 355(c)(2) ........................................................................................ 3

21 U.S.C. § 355(j)(2)(A)(iv) ............................................................................... 4

21 U.S.C. § 355(j)(2)(A)(vii) .............................................................................. 4

21 U.S.C. § 355(j)(2)(A)(vii)(IV) ....................................................................... 4

21 U.S.C. § 355(j)(2)(B) ..................................................................................... 4

21 U.S.C. § 355(j)(3)(F) ................................................................................... 22

21 U.S.C. § 355(j)(5)(B)(iii) ............................................................................... 4

21 U.S.C. § 355(j)(5)(B)(iv) ............................................................................... 4

21 U.S.C. § 355(j)(5)(B)(iv) (2002) .................................................................... 6

21 U.S.C. § 355(j)(5)(B)(iv)(II) (2002) ............................................................. 18

21 U.S.C. § 355(j)(5)(C)(ii) .............................................................................. 29

21 U.S.C. § 355(j)(5)(D)(i) ................................................................................ 7

21 U.S.C. § 355(j)(5)(D)(i)(I) ...................................................................... 8, 29

21 U.S.C. § 355(j)(5)(D)(i)(I)(bb) .............................................................. 20, 29

21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(CC) ............................................................ 24

21 U.S.C. § 355(j)(5)(D)(i)(IV) ................................................................. 8

35 U.S.C. § 271(e)(2)(A) ......................................................................... 4

## FEDERAL REGULATIONS

21 C.F.R. § 314.107(c)(1)(ii) .................................................................. 19

21 C.F.R. § 314.53(e) ............................................................................. 3

## OTHER AUTHORITIES

149 CONG. REC. S15,885 (daily ed. Nov. 25, 2003) .................................. 27

64 Fed. Reg. 42,873 (Aug. 6, 1999) .......................................................... 6

Antonin Scalia, *Judicial Deference to Administrative Interpretations of Law*,
 1989 DUKE L.J. 511 (1989) ...................................................................... 17

Drug Price Competition and Patent Term Restoration Act of 1984,
 Pub. L. No. 98-417, 98 Stat. 1585 (1984) ................................................. 5

Medicare Prescription Drug, Improvement, and Modernization Act of 2003,
 Pub. L. No. 108-173, 117 Stat. 2066 (2003) ............................................. 6

Cobalt respectfully submits this memorandum in support of its motion for a temporary restraining order: (1) enjoining FDA from approving subsequent acarbose abbreviated new drug applications ("ANDAs") during Cobalt's 180-day exclusivity period for its acarbose ANDA No. 77-532; (2) requiring FDA to immediately stay or withdraw approval of any other ANDA to which the Agency has granted final approval, including the approval granted to Roxane Laboratories, Inc. on May 7, 2008; and (3) requiring FDA to order a recall of any acarbose product shipped or sold by Roxane, pending full briefing, hearing and resolution of a preliminary injunction motion.

## INTRODUCTION

Immediate emergency relief is necessary here because of the tactics that the U.S. Food and Drug Administration ("FDA") employed when ruling on Cobalt's right to 180-day generic exclusivity. After 6:00 EDT p.m. last evening (May 7, 2008), without any advanced warning, FDA blindsided Cobalt by faxing its counsel a 14-page administrative ruling advising Cobalt for the first time that Cobalt purportedly had "forfeited" its statutory right to generic exclusivity. At the same time, FDA approved the ANDA of a subsequent generic applicant. The Agency owed Cobalt better.

Back in September 2007, FDA opened a public docket and requested comments on the issue of Cobalt's right to generic exclusivity. Cobalt made two lengthy submissions and had numerous calls with the Agency over the course of several months on this topic. Cobalt repeatedly made clear that it would seek judicial review of any adverse ruling. But knowing that its ruling cannot withstand judicial scrutiny, FDA has attempted to strip Cobalt of the opportunity to obtain meaningful judicial review and relief. The Agency did so by waiting until after close of business to not only advise Cobalt of its adverse administrative ruling, but to tell

1

Cobalt that FDA already had gone ahead and approved one of Cobalt's competitors.[1] Accordingly, absent immediate injunctive relief from this Court, Cobalt's right to generic exclusivity will be eliminated entirely.    This Court should grant that relief to prevent unrecoverable and irreparable harm to Cobalt, and to permit briefing, argument and resolution of a preliminary injunction.    Indeed, such relief is required if this Court, or any court, is to have an opportunity to review FDA's arbitrary, capricious, and unlawful administrative ruling, which raises critical issues of statutory construction—critical both to the generic industry and the consumers that count on that industry to bring affordable medicines to market.

## BACKGROUND

Cobalt indisputably submitted the first application seeking approval to market generic acarbose tablets.  Cobalt's application contained a so-called "paragraph IV certification" to the relevant patent for the branded counterpart, making Cobalt the "first applicant" for this product.  As discussed below, because it filed the first paragraph IV ANDA, Cobalt is statutorily entitled to 180 days of generic marketing exclusivity—exclusivity that Congress created as the reward and incentive for undertaking the risk and expense of mounting the first challenge to the patents protecting branded drug products from generic competition.  Cobalt's exclusivity begins to run upon commercial marketing of its ANDA product.  But because FDA improperly delayed approving Cobalt's ANDA, Cobalt did not launch until today (May 8, 2008) and, consequently, Cobalt's exclusivity has not yet expired.  As a result, FDA cannot lawfully approve any subsequent generic application for this product, but this is precisely what the Agency has done—

---

[1] While FDA's administrative ruling came unannounced to Cobalt, it apparently did not come as a surprise to Roxane.  Cobalt was told by potential customers earlier today that Roxane began entering contracts to sell its generic acarbose product several hours before Cobalt received FDA's administrate ruling.

unlawfully approved one of Cobalt's competitors in violation of Federal Food, Drug, and Cosmetic Act ("FFDCA") and the Administrative Procedure Act ("APA"). Emergency injunctive relief is the only way to obtain meaningful review of this administrative decision, which involves FDA's first interpretation of several aspects of the critical 180-day exclusivity forfeiture provisions, and to prevent irreparable harm to Cobalt.

## I. Statutory Background.

### A. New Drugs And Patent Listing Requirements.

A company seeking to sell an original new drug must file a New Drug Application ("NDA") containing technical data on the composition of the drug, the means for manufacturing it, clinical trial results to establish the safety and efficacy of the drug, and labeling for the use of the drug for which approval is requested. *See* 21 U.S.C. § 355(b)(1). The NDA applicant also must submit information to FDA with respect to any patent that "claims the drug for which the applicant submitted the application or which claims a method of using such drug . . . ." 21 U.S.C. § 355(b)(1); *see also* 21 U.S.C. § 355(c)(2). After approving the NDA, FDA publishes the patent information in the "Orange Book." *See* 21 C.F.R. § 314.53(e).

### B. Abbreviated New Drug Applications And Patent Certification Requirements.

Before 1984, a company seeking to market a generic version of an FDA-approved drug had to repeat the expensive and time-consuming safety and efficacy studies that already were conducted for the NDA drug. *See SmithKline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011, 1018 (N.D. Ill. 2003). In 1984, Congress simplified the procedure for obtaining approval of generic drugs with the Hatch-Waxman Amendments to the FFDCA. Hatch-Waxman permits a company to file an ANDA that relies on information from the NDA. *Id.* at 1018-19.

3

An ANDA applicant must establish, *inter alia*, that its drug product is bioequivalent to the NDA drug. *See* 21 U.S.C. § 355(j)(2)(A)(iv). The ANDA must also include a "certification" to any patent information listed in the Orange Book. *See* 21 U.S.C. § 355(j)(2)(A)(vii). While Hatch-Waxman provides four certification options, only the "paragraph IV certification" is relevant here. With certain exceptions not relevant here, if an ANDA applicant seeks FDA approval to market its drug product before expiration of the Orange-Book listed patent, the applicant must submit a paragraph IV certification to that patent. *See* 21 U.S.C. § 355(j)(2)(A)(vii)(IV). The ANDA applicant must notify the patentee and the NDA-holder of the factual and legal bases for that certification. *See* 21 U.S.C. § 355(j)(2)(B).

Submitting an ANDA containing a paragraph IV certification has two significant consequences. First, submitting a paragraph IV certification constitutes a technical act of infringement, vesting the district courts with subject matter jurisdiction over a patent infringement lawsuit brought by the patentee against the ANDA applicant. *See* 35 U.S.C. § 271(e)(2)(A). If the patentee brings a patent infringement lawsuit within 45 days after receiving the ANDA applicant's notice of its paragraph IV certification, FDA cannot finally approve the ANDA for 30 months. *See* 21 U.S.C. § 355(j)(5)(B)(iii). Second, the first company to submit an ANDA for a drug product containing a paragraph IV certification to any patent listed in the Orange Book is entitled to market its generic product free from generic competition for 180 days. *See* 21 U.S.C. § 355(j)(5)(B)(iv). The 180-day exclusivity period is at the heart of the dispute in this case.

### C.    First-Filer 180-Day Generic Exclusivity, And The Criticality Of This Exclusivity Period To Hatch-Waxman.

The 180-day generic exclusivity period is critical to the purpose of Hatch-Waxman, and to the continued viability of the generic pharmaceutical industry. Congress

recognized this fact in 1984 when creating that incentive in the first place. Congress re-emphasized its importance in 2003 when it created generic exclusivity forfeiture provisions – provisions that protect the first-filer's right to enjoy the benefits Congress intended to flow during this 180-day period.

In 1984, Congress enacted the Hatch-Waxman Amendments to the FFDCA. *See* Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984). Congress passed Hatch-Waxman in order to "make available more low cost generic drugs" to the public. *Apotex, Inc. v. Shalala*, 53 F. Supp. 2d 454, 461 (D.D.C. 1999), *aff'd*, No. 99-5231, 1999 WL 956686 (D.C. Cir. Oct. 8, 1999) (quotation marks and citations omitted). The 180-day exclusivity period is critical to carrying out Congress' goal of "get[ting] generic drugs into the hands of patients at reasonable prices–fast." *In re Barr Labs.*, 930 F.2d 72, 76 (D.C. Cir. 1991).

Congress recognized that challenging the many patents purportedly protecting branded drug products from competition requires generic drug companies to assume considerable risks and costs. But Congress also recognized that the public will never have access to lower-priced generic drugs before the expiration of brand patents unless generic companies challenge the suspect and overbroad patents that commonly prevent immediate generic competition. To encourage such patent challenges, Congress created a *quid pro quo*: expend the resources to mount the first patent challenge in exchange for "the right to sell [the generic] drug without competition for 180 days." *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 879 (D.C. Cir. 2004) (citing 21 U.S.C. § 355(j)(5)(B)(iv)). Congress created the 180-day generic marketing exclusivity period by preventing FDA from approving competing generic products until 180 days

after the earlier of two so-called "triggering" events—"the commercial marketing trigger" and "the court decision trigger". 21 U.S.C. § 355(j)(5)(B)(iv) (2002).[2]

As the courts repeatedly have acknowledged, the 180-day generic exclusivity period is *the sole* incentive that Congress created in order to facilitate its goal of expediting consumer access to lower-priced drug products. *See Teva Pharms. USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324, 1328 (Fed. Cir. 2005) ("This provision provides an economic incentive for generic manufacturers to challenge the validity of listed patents and to 'design around' patents to find alternative, non-infringing forms of patented drugs."), *abrogated on other grounds by MedImmune, Inc. v. Genentech, Inc.*, 127 S. Ct. 764 (2007); *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 33 (D.D.C. 2000) (stating that Congress created the 180-day exclusivity provision to "encourage generic drug makers to incur the potentially substantial litigation costs associated with challenging pioneer drug makers' patents"); *Apotex*, 53 F. Supp. 2d at 461 (noting that the "purpose of the exclusivity incentive and the entire ANDA regime is to make available more low cost generic drugs" (internal quotation and citation omitted)).

FDA itself also has recognized the importance of the generic exclusivity period to the patent challenge process. *See* 64 Fed. Reg. 42,873, 42,877 (Aug. 6, 1999) (acknowledging that the 180-day period is "the incentive created by Congress for ANDA applicants to challenge patents"). Indeed, the fact that Hatch-Waxman cannot carry out Congress' goal of increased access to affordable medicines without a strong 180-day generic exclusivity incentive became all

---

[2] The generic exclusivity provision changed in 2003 when Congress enacted the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (2003) (codified as amended at 21 U.S.C. § 355 and 35 U.S.C. § 271) ("MMA"). The two-trigger statutory scheme governs generic exclusivity for products where the first ANDA containing a paragraph IV certification was submitted prior to December 8, 2003. *See* MMA § 1102(b)(1). The statutory scheme discussed, *infra*, governs ANDAs, like Cobalt's here, where the first paragraph IV was filed after December 8, 2003.

the more clear in 2003 when Congress revisited the 1984 Hatch-Waxman Amendments as part of the MMA. More specifically, Congress expressly revisited the 180-day generic exclusivity incentive when enacting the MMA. Had Congress believed that incentive no longer necessary to encourage companies to challenge suspect and overbroad brand patents, Congress easily could have eliminated it. Some, in fact, encouraged Congress to do precisely that. But Congress did not do so. To the contrary, Congress revised the triggering provisions and enacted a series of so-called "forfeiture" provisions designed to ensure that a first applicant cannot be prematurely or unfairly stripped of its statutory right to generic market exclusivity. *See* 21 U.S.C. § 355(j)(5)(D)(i). The generic exclusivity provisions, including the forfeiture provisions, must be construed against this backdrop.

### D.   The Forfeiture Provisions Implicated By FDA's Decision With Respect To Cobalt's Exclusivity For Acarbose.

On September 26, 2007, FDA published a letter soliciting comments from all acarbose ANDA applicants regarding "how the 180-day generic exclusivity forfeiture provisions at Section 505(j)(5)(D) of the Federal Food, Drug and Cosmetic Act (the Act) apply" to acarbose ANDAs. That letter raised the idea that Cobalt had forfeited its exclusivity under the so-called "failure to market" and "failure to obtain tentative approval" forfeiture provisions. Those provisions read in relevant part:

(D) Forfeiture of 180-day exclusivity period-

(i) Definition of forfeiture event - In this subparagraph, the term "forfeiture event", with respect to an application under this subsection, means the occurrence of any of the following:

(I) *Failure to market* - The first applicant fails to market the drug by the later of-

(aa) the earlier of the date that is-

(AA) 75 days after the date on which the approval of the

7

application of the first applicant is made effective under subparagraph (B)(iii); or

(BB) 30 months after the date of submission of the application of the first applicant; or

(bb) with respect to the first applicant or any other applicant (which other applicant has received tentative approval), the date that is 75 days after the date as of which, as to each of the patents with respect to which the first applicant submitted and lawfully maintained a certification qualifying the first applicant for the 180-day exclusivity period under subparagraph (B)(iv), at least 1 of the following has occurred:

(AA) In an infringement action brought against that applicant with respect to the patent or in a declaratory judgment action brought by that applicant with respect to the patent, a court enters a final decision from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken that the patent is invalid or not infringed.

(BB) In an infringement action or a declaratory judgment action described in subitem (AA), a court signs a settlement order or consent decree that enters a final judgment that includes a finding that the patent is invalid or not infringed.

(CC) The patent information submitted under subsection (b) or (c) is withdrawn by the holder of the application approved under subsection (b).

\* \* \*

(IV) *Failure to obtain tentative approval* - The first applicant fails to obtain tentative approval of the application within 30 months after the date on which the application is filed, unless the failure is caused by a change in or a review of the requirements for approval of the application imposed after the date on which the application is filed.

21 U.S.C. §§ 355(j)(5)(D)(i)(I), (IV) (emphasis added). Although Congress enacted the MMA in 2003, FDA has yet to publish implementing regulations.

## II.    Factual Background.

The facts surrounding FDA's delay in reviewing and approving Cobalt's acarbose ANDA are critical in light of the Agency's stated basis for attempting to strip Cobalt of its right to generic exclusivity. For example, as discussed in detail, FDA's actions (and inactions)

without question delayed Cobalt's approval. Indeed, FDA acknowledges that its actions delayed Cobalt's ability to obtain tentative approval within 30 months of ANDA submission, and thus the Agency found no forfeiture under the tentative approval forfeiture provision. Incredibly, FDA nevertheless turned around and found a forfeiture under the failure to market provision because Cobalt failed to obtain final approval and launch within 30 months of its ANDA submission. The Agency simply cannot forfeit Cobalt's exclusivity when FDA's actions (and inactions) delayed Cobalt's approval, as well as for the other reasons set forth herein.[3]

A.    **The NDA Product.**

The NDA product at issue here is Bayer's prescription medication, Precose® (acarbose) Tablets 25 mg, 50 mg, and 100 mg. FDA first approved Precose® (acarbose) on September 6, 1995, pursuant to NDA No. 20-482, for, among other things, the treatment of type 2 diabetes. (*See* Rakoczy Decl. Ex. A, Precose® Label.)[4] Bayer submitted information to FDA on one patent for listing in the Orange Book in connection with Precose® and NDA No. 20-482: U.S. Patent No. 4,904,769 ("the '769 patent"). (*See id.*, Ex. B, Precose® Electronic Orange Book Listing.) The '769 patent expires on September 6, 2009. (*See id.*) To date (May 8, 2008), the '769 patent remains listed in the Orange Book, and has not been "withdrawn" from that publication by the Agency. (*Id.*) As such, all ANDA applicants seeking to market a generic

---

[3] As discussed below, FDA's actions delayed approval in at least two material ways. First, as the Agency concedes, it changed the approval requirements after Cobalt submitted its ANDA, which delayed Cobalt's approval. Second, the Agency's failure to timely inspect Cobalt's contract research organization also delayed Cobalt's approval. Indeed, based on FDA's interpretation of when the relevant 30-month period begins, FDA's failure to timely inspect this facility is the reason the Agency refused to approve Cobalt's ANDA in time for Cobalt to avoid a forfeiture under FDA's impermissible statutory construction.

[4] "Rakoczy Decl." refers to the Declaration of William A. Rakoczy submitted herewith.

acarbose product prior to expiration of the '769 patent have been—and still are—required to submit a paragraph IV certification to such patent.

### B.    Cobalt's First-Filed Paragraph IV ANDA For Acarbose.

Cobalt began its development of a generic acarbose product in early 2003, with a view toward compiling the information necessary to submit an ANDA. (Rakoczy Decl. Ex. C, Hillier Decl. ¶ 3.)  To that end, Cobalt researched the potential ways to establish bioequivalence ("BE") to the brand product.  As part of that process, with its contract research organization ("CRO"), Cobalt developed a detailed protocol for establishing BE to the NDA product. (*Id.*)

On August 27, 2003, Cobalt formally sought the Agency's confirmation regarding the BE requirements and parameters for an appropriate study to support an ANDA for acarbose. (*See* Rakoczy Decl. Ex. C, Hillier Decl. ¶ 4.)  On March 5, 2004, after hearing nothing from FDA, Cobalt again sought confirmation regarding its BE study, and included an even more detailed protocol from its CRO. (*Id.*)  By January 2005—well over *sixteen* months since its original correspondence—Cobalt had received no response of any kind from FDA. (*See id.* ¶ 5.) On January 10, 2005, Cobalt submitted ANDA No. 77-532 to FDA for acarbose tablets in 25 mg, 50 mg, and 100 mg strengths. (*See id.* ¶ 6.)  Cobalt's ANDA included a paragraph IV certification to the '769 patent, as well as the results of the *in vivo* BE study conducted by Cobalt's CRO—the very same CRO that Cobalt had identified back in August 2003—according to the protocols that Cobalt provided FDA on August 27, 2003, and again on March 5, 2004. (*Id.*)  On January 11, 2005, the day *after* Cobalt submitted its ANDA, Cobalt received a letter from the Agency. (*See id.* ¶ 7.)  The Agency essentially ignored Cobalt's prior BE study design, and instead established and imposed new BE requirements for acarbose.  FDA completely changed the rules of the game *after* the submission of Cobalt's ANDA, and more than sixteen months after Cobalt originally contacted the Agency.

On March 9, 2005, FDA informed Cobalt that its ANDA purportedly was not "sufficiently complete to merit a critical technical review" for several reasons—none of which were related to Cobalt's BE study or CRO.  (*See* Rakoczy Decl. Ex. C, Hillier Decl. ¶ 8.)  On March 18, 2005, Cobalt submitted an amendment to its ANDA that sufficiently addressed all of FDA's concerns.  (*Id.*)  On April 28, 2005, in an "acceptance-for-filing" letter, FDA acknowledged receipt of Cobalt's ANDA, as well as the March 18, 2005 amendment.  (*See id.* ¶ 9.)  FDA further informed Cobalt that the Agency had accepted Cobalt's ANDA for filing and substantive review as of March 22, 2005.  (*Id.*)  This is the first day that a substantially complete ANDA for acarbose, together with a paragraph IV certification, was submitted to FDA.  (*See id.*, Ex. D, 05/07/08 Ltr. from G. Buehler to W. Rakoczy ("Buehler Ltr.") at 2.)

### C.    FDA Delays Its Review Of Cobalt's ANDA, And Fails To Timely Inspect Cobalt's CRO.

On June 30, 2005, FDA issued a BE deficiency to Cobalt.  (*See* Rakoczy Decl. Ex. C, Hillier Decl. ¶ 11.)  The Agency's deficiency never mentioned FDA's January 2005 BE letter, nor did the Agency mention anything about Cobalt's CRO.  (*Id.*)  Cobalt responded to FDA on September 27, 2005 by, *inter alia*, identifying the study protocol and reports from its original ANDA, which clearly identify the CRO that conducted the BE study.  (*Id.*)

After receiving Cobalt's response, FDA said nothing regarding BE for well over a year.  On October 24, 2005, FDA did, however, issue a minor deficiency.  (*See* Rakoczy Decl. Ex. C, Hillier Decl. ¶ 12.)  FDA once again made no mention of its January 2005 letter to Cobalt or any problems or delays in inspecting the facilities identified in Cobalt's ANDA, including its CRO.  (*Id.*)  Cobalt responded to FDA's minor deficiency on February 27, 2006.  (*Id.*)  Cobalt reasonably assumed that FDA would, consistent with its statutory and regulatory obligations, timely conduct any necessary inspections of the facilities identified in Cobalt's ANDA.  (*Id.*)

Cobalt did not hear from FDA again for over a year, until August 8, 2006, when FDA raised the additional study requirements first mentioned its January 6, 2005 correspondence. (*See* Rakoczy Decl. Ex. C, Hillier Decl. ¶ 13.) The Agency, of course, failed to mention that it did not communicate these new BE requirements to Cobalt until *after* Cobalt's CRO conducted the pivotal BE study and *after* Cobalt filed its ANDA. (*Id.*) Nor did FDA acknowledge its failure to raise these new BE requirements in the Agency's earlier June 2005 BE deficiency. (*Id.*) On September 20, 2006, Cobalt responded to FDA's August 8, 2006 letter. (*Id.*) Among other things, Cobalt submitted data on an additional study conducted by its CRO, just as FDA had requested. (*Id.*)

Once again, FDA waited nearly a year to respond back to Cobalt. (*See* Rakoczy Decl. Ex. C, Hillier Decl. ¶ 14.)[5] On June 8, 2007, FDA issued another BE deficiency letter. (*See id.* ¶ 15.) On June 18, 2007, Cobalt promptly requested a telephone conference to discuss the letter. (*See id.* ¶ 16.) On June 28, 2007, representatives of FDA and Cobalt conducted a telephone conference to discuss these issues. (*Id.*) In particular, the parties agreed, among other things, that Cobalt would conduct a new pivotal BE study. (*Id.*) During that call, FDA specifically inquired as to which CRO Cobalt would be using to conduct the new pivotal BE study. (*Id.*) Cobalt responded that it would use the same CRO that conducted the prior two studies, which FDA said would be acceptable. (*Id.*) FDA never stated or otherwise implied that the CRO was not acceptable because it had not been inspected. (*Id.*) Nor did FDA mention that, after more than two years, FDA still had not inspected the CRO. (*Id.*)

---

[5] In the interim, Cobalt made numerous oral contacts to determine the status of the Agency's BE review. (*Id.*) At no time during this period did FDA ever inform Cobalt that the Agency had not inspected Cobalt's CRO, even though the Agency had known about this CRO since at least August 2003, and no later than the submission of Cobalt's ANDA in 2005. (*Id.*)

On September 3, 2007, Cobalt formally responded to FDA's June 8, 2007 BE deficiency. (*See* Rakoczy Decl. Ex. C, Hillier Decl. ¶ 17.) With that response, Cobalt submitted the results from another pivotal BE study conducted by its CRO. (*Id.*) FDA orally confirmed to Cobalt that there were no substantive issues with the new pivotal BE study. (*Id.*) But on September 24, 2007, FDA orally informed Cobalt that the Agency refused to approve Cobalt's ANDA solely because FDA had never inspected Cobalt's CRO, and that such an inspection could not occur for at least another month. (*Id.*)

FDA waited until November 28, 2007 before contacting Cobalt's CRO to arrange for an inspection of its facilities. (*See* Rakoczy Decl. Ex. C, Hillier Decl. ¶ 18.) Surprisingly, FDA requested that such inspection be conducted by telephone rather than in-person. (*Id.*) FDA provided no explanation to Cobalt or to Cobalt's CRO as to why, if an inspection could have been conducted by telephone, the Agency had failed to perform such an inspection in the over two and a half years that Cobalt's ANDA has been pending, much less why FDA had waited over two months to schedule such an inspection since informing Cobalt that an inspection was the only hurdle standing between Cobalt's acarbose ANDA and approval. (*Id.*)

FDA finally conducted its telephone inspection of Cobalt's CRO over five days, December 3-7, 2007. (*See* Rakoczy Decl. Ex. C, Hillier Decl. ¶ 19.) Following the inspection, Cobalt's CRO was informed that the FDA inspector was recommending approval of Cobalt's ANDA. (*Id.*) But on December 17, 2007, FDA's Office of Generic Drugs ("OGD") informed Cobalt that its ANDA still would not receive final approval due to certain issues that the Agency was evaluating relating to all acarbose tablet ANDAs. (*Id.*)

### D.    Bayer's Alleged "Delisting" Request.

On or about April 16, 2007, according to FDA, Bayer allegedly requested that the '769 patent be "delisted" from the Orange Book. (*See* Rakoczy Decl. Ex. E, 9/26/07 Buehler

Ltr.)  By its own admission, FDA failed to publish notice of this delisting request until September 25, 2007.  (*See id.* Ex. D, 5/7/08 Buehler Ltr. at 7.)  FDA repeatedly refused to provide Cobalt with any evidence of such delisting request.  Indeed, FDA still has never provided the requested proof.  Moreover, information concerning the '769 patent remains in the Orange Book and, at least as of the filing of this submission, has not been withdrawn in any fashion. (*See id.* Ex. B, Precose® Electronic Orange Book Listing.)

  **E. FDA's Request For Comment And Its Late-Night Ambush Of Cobalt.**

  On or about September 26, 2007, FDA posted a letter requesting comment on certain 180-day exclusivity forfeiture issues concerning acarbose.  According to FDA:

> As of the date of this letter, which is more than 30 months from March 22, 2005, no first applicant's ANDA has been approved.  Also, on April 16, 2007, Bayer requested that the '769 patent be "delisted" as to Precose, i.e., they withdrew the patent information.  On September 26, 2007, FDA indicated in [the Orange Book] that the request to delist this patent had been submitted on April 16, 2007.

> To determine whether any ANDA referencing Precose is eligible for final approval, the agency must consider how the 180-day generic drug exclusivity forfeiture provisions at section 505(j)(5)(D) of the [FFDCA] apply to this set of facts.  As part of the process for making such a determination, we are seeking your views regarding the applicability of sections 505(j)(5)(D)(i)(IV) -- failure to obtain tentative approval within 30 months -- and 505(j)(5)(D)(i)(I)(aa)(BB) -- failure to market by 30 months.  We also are interested in your views regarding the applicability of section 505(j)(5)(D)(i)(I)(bb)(CC) -- relating to the delisting of a patent.

(*See* Rakoczy Decl. Ex. E, 9/26/07 Buehler Ltr.)

  After sitting on these critical issues for over seven months, on May 7, 2008, FDA waited until after close of business to fax Cobalt's counsel a 14-page administrative ruling stripping Cobalt of its statutory right to generic exclusivity under the failure to market forfeiture provision, but not under the failure to obtain tentative approval provision.  (*See* Rakoczy Decl. ¶ 18.)  At the same time, FDA approved a subsequent applicant, Roxane, that promptly launched its acarbose products during Cobalt's exclusivity.  (*See id.* Ex. F, Roxane Press Release.)  FDA's

decision interprets several aspects of the critical 180-day exclusivity forfeiture provisions for the first time. It is imperative that this Court carefully review and consider these statutory construction rulings because they are fatally flawed and unlawful. If left undisturbed, FDA's impermissible ruling will not only irreparably harm Cobalt, but will destroy the carefully-crafted balance that Congress struck with Hatch-Waxman to the detriment of the generic drug industry and the consumers that rely on that industry.

## ARGUMENT

In this Circuit, to obtain temporary injunctive relief from the Court, Cobalt must demonstrate:

> 1) a substantial likelihood of success on the merits, 2) that it would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction.

*Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (citation omitted); *see also Raymen v. United Senior Ass'n*, No. 05-486(RBW), 2005 WL 607916, at *2 (D.D.C. Mar. 16, 2005) (granting temporary restraining order). These four factors "interrelate on a sliding scale and must be balanced against each other." *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 361 (D.C. Cir. 1999). Thus, while this Court must consider each of these four factors, Cobalt need not prevail on each: "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995); *see also Cuomo v. United States Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985) (concluding that an injunction may issue "with either a high probability of success and some injury, or vice versa"); *Raymen*, 2005 WL 607916, at *2 (the movant "need not prevail on each factor in order to receive injunctive relief").

In this case, each of these factors weighs heavily in Cobalt's favor. First, Cobalt has a strong likelihood of success on the merits. Second, Cobalt unquestionably will suffer irreparable harm if FDA's unlawful decision is not reversed and the approval issued yesterday (May 7) immediately stayed. Third, FDA will not be harmed if required to properly apply the statute, and no subsequent acarbose ANDA applicant can legitimately claim any harm from being excluded from the market until Cobalt enjoys its full rights to exclusivity because these applicants have no right to market during that period. Finally, the public interest will be served by honoring the *quid pro quo* that Congress enacted to encourage companies like Cobalt to challenge patents on brand drugs. Accordingly, Cobalt's request for emergency injunctive relief should be granted.

I.     **Cobalt Has A Substantial Likelihood Of Success On The Merits Because Finding A Forfeiture Of Cobalt's Exclusivity Is Arbitrary, Capricious And Contrary To Law.**

     A.     **The Forfeiture Provisions Must Be Construed Consistent With The Statute As A Whole, Congress' Purpose, And The Policy For Hatch-Waxman.**

When construing the exclusivity forfeiture provisions, this Court must be faithful to Congressional intent, *both based on the statute's plain language, as well as its purpose and intent. See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) ("If the intent of Congress is clear, that is the end of the matter . . . ."). The Supreme Court itself has cautioned that reviewing courts must look not only to the plain text, "but look to the provisions of the whole law, and to its object and policy" as well. *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 35 (1990) (citation and internal quotation marks omitted); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (internal quotations and citation omitted)), *aff'g*, 153 F.3d 155 (4th Cir. 1998); *McCarthy v. Bronson*, 500 U.S. 136, 139 (1991) (recognizing that

"statutory language must always be read in its proper context"); *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 220-21 (1986); *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 285 (1956) (rejecting literal interpretation of words read in complete isolation from their context in the Act); *Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997) ("The literal language of a provision taken out of context cannot provide conclusive proof of congressional intent, any more than a word can have meaning without context to illuminate its use.").

Indeed, in *Public Citizen v. United States Department of Justice*, the Supreme Court made clear that "reliance on the plain language . . . alone is not entirely satisfactory." 491 U.S. 440, 452 (1989). The Court explained:

> Even though, as Judge Learned Hand said, "the words used, even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing," nevertheless "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." Looking beyond the naked text for guidance is perfectly proper when the result it apparently decrees is difficult to fathom or where it seems inconsistent with Congress' intention, since the plain-meaning rule is "rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists."

*Id.* at 454-55 (citations omitted). Consequently, policy evaluation is important because considering the policy behind a statute routinely "shed[s] new light on congressional intent, notwithstanding statutory language that appears superficially clear." *Natural Res. Def. Council, Inc. v. Browner*, 57 F.3d 1122, 1127 (D.C. Cir. 1995) (citation and quotation marks omitted); *see also* Antonin Scalia, *Judicial Deference to Administrative Interpretations of Law*, 1989 DUKE L.J. 511, 515 (1989) (stating that "[p]olicy evaluation is . . . part of the traditional judicial tool-kit that is used in applying the first step of *Chevron*," adding that courts should look "not merely

17

[to the] text and legislative history but also, quite specifically, [to a] consideration of policy consequences").

A review of Hatch-Waxman's purpose, language and context makes clear that Congress intended the 180-day exclusivity period to incentivize early generic competition because generic competition is the only way to bring affordable medicines to market. But the only way that the 180-day exclusivity period operates as an incentive is if it truly provides the first-filer with a period of marketing exclusivity. Congress understood this and, consistent with its express intent, used language to carry out this goal. Consequently, it should not come as a surprise that the courts (and FDA) have recognized that the generic exclusivity provision must be interpreted and enforced:

- "in a manner consistent with 'the statute's interest in affording market access and incentives for both generic and non-generic makers,' and to maintain 'an incentive for the parties to fulfill the purposes of Hatch-Waxman'"; and

- to "avoid interpreting Hatch-Waxman so the decision on whether a generic applicant is entitled to exclusivity rests entirely in the patent holder's hands."

(Rakoczy Decl. Ex. G, FDA 02/06/01 Admin. Ruling in Docket No. 2000P-1446, at 5 (quoting *Mylan Pharms., Inc. v. Henney*, 94 F. Supp. 2d 36, 53-54 (D.D.C. 2000), *vacated as moot by*, *Pharmachemie B.V. v. Barr Labs., Inc.*, 276 F.3d 627 (D.C. Cir. 2002))).

In fact, FDA, as well as the courts, repeatedly have interpreted Hatch-Waxman's exclusivity provisions to effectuate Congress' purpose and intent, even where such interpretation went beyond the purportedly "plain language" of the statutory provision. For instance, as originally enacted, Hatch-Waxman provided that exclusivity will only be triggered by a court decision finding the patent-in-suit "invalid or not infringed." 21 U.S.C. § 355(j)(5)(B)(iv)(II) (2002). Despite the seemingly clear nature of the plain language, both FDA and the courts have held a court decision of patent unenforceability to be a triggering decision. *See* 21 C.F.R.

§ 314.107(c)(1)(ii); *see also Teva Pharms., USA, Inc. v. FDA*, 182 F.3d 1003, 1009 (D.C. Cir. 1999). Similarly, FDA interprets the generic exclusivity provision to allow for the "selective waiver" of that exclusivity, despite the fact that the plain language of the exclusivity provision says nothing about such waivers. (*See* Rakoczy Decl. Ex. H, FDA 07/02/04 Admin. Ruling in Docket No. 2004P-0227.) FDA does so in order to effectuate Congress' intent that the first-filer benefit from its market exclusivity, concluding that the exclusivity provision must be construed in a manner "favorable to those for whom a statutory benefit is chiefly intended." (*Id.* at 6-7.) As FDA recognized, "[a]llowing waiver and relinquishment helps maintain the value of the exclusivity for the beneficiary, strengthening the incentive to challenge patents and, thereby, promote competition." (*Id.* at 9.) Significantly, FDA further acknowledged:

> Where, as here, statutory language compelling government action has the effect of benefiting specific private entities (in this case, granting 180 days of marketing exclusivity to eligible ANDA applicants), *judicial precedent . . . supports inferring from silence a legislative intent to allow an alternative course of action more favorable to the beneficiary of the government act . . . .*

(*Id.* at 4 (emphasis added)).

Applying the well-established principles of statutory construction here, no forfeiture event has occurred, and FDA cannot approve a subsequent ANDA for acarbose until Cobalt's exclusivity expires.

**B.    No "Failure To Market" Forfeiture Has Occurred.**

Under a proper and lawful analysis of the failure to market provision, Cobalt has not forfeited its exclusivity, and FDA's finding to the contrary is arbitrary, capricious and contrary to law, for at least the following reasons:

- First, by FDA's own admission, the Agency's actions (and inaction) prevented Cobalt from being able to launch its generic product by the date FDA has declared the relevant forfeiture date.

- Second, information on the '769 patent has not been, and cannot lawfully be, "withdrawn" from the Orange Book.

- Third, the second prong of the failure to market forfeiture provision, relating to patent dispute resolution and delisting, comes into play if, and only if, a subsequent acarbose ANDA applicant has received tentative approval. *See* 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb) (introductory clause). By FDA's own admission, no subsequent ANDA applicant had tentative approval at the time FDA found Cobalt's exclusivity to be forfeit.

## 1.    FDA's Delay Cannot Cause An Exclusivity Forfeiture.

FDA cannot lawfully forfeit Cobalt's exclusivity under the failure to market provision because, as the Agency readily admits, its delay prevented Cobalt from entering the market in time. Any other result turns the statute on its head and unlawfully runs afoul of the statutory text and Congressional intent.

The tentative approval forfeiture provision of § 355(j)(5)(D)(i)(IV) provides that exclusivity may be forfeited if the applicant fails to obtain tentative approval "unless the failure is caused by a change in or a review of the requirements for approval of the application imposed after the date on which the application is filed." Why? To prevent penalizing ANDA applicants when FDA changes, or considers changing, the rules of the game. This is precisely what occurred here. By FDA's own admission, FDA changed and/or reviewed the BE requirements for acarbose, and communicated those requirements to Cobalt only after Cobalt already conducted its pivotal BE study and submitted its ANDA. Significantly, by FDA's own admission, the Agency's action delayed Cobalt's ability to obtain tentative approval by September 22, 2007.[6] (*See* Rakoczy Decl. Ex. D, 5/7/08 Buehler Ltr. at 11.) Consequently, by

---

[6] FDA calculated September 22, 2007 under its impermissible interpretation of when the 30-month period referenced in both the failure to obtain tentative approval and failure to market forfeiture provisions begins. (*Compare* Rakoczy Decl. Ex. N, 10/17/07 Rakoczy Ltr. at 15-17, *with* Rakoczy Decl. Ex. D, 5/7/08 Buehler Ltr. at 11-12). Cobalt reserves the right to fully brief this issue.

FDA's own admission, its actions delayed Cobalt's ability to obtain the final approval needed to commercially launch product by September 22, 2007. Yet, FDA found Cobalt's exclusivity to be forfeit because Cobalt did not receive final approval and launch by this date. FDA's decision simply cannot stand.

According to FDA, the 30-month period referenced in section (I)(aa)(BB) of the failure to market provision starts running from the same date as the 30-month period referenced in section (IV) of the tentative approval provision. (*See* Rakoczy Decl. Ex. D, 5/7/08 Buehler Ltr. at 6 & n.10; 9-10 & n.15.) Applying that interpretation here, FDA calculated the relevant date under both provisions to be September 22, 2007. (*Id.*) FDA concedes that "because FDA changed the requirements for the bioequivalence study," Cobalt could not obtain tentative approval by September 22, 2007 and, as a result, that Cobalt did not forfeit exclusivity under the failure to obtain tentative approval provision. (*Id.* at 11.) For FDA to turn around and find that Cobalt forfeited because it failed to obtain final approval and launch its product by the same date is arbitrary, capricious and unlawful. There simply is no lawful, let alone logical, basis for FDA to find otherwise. This is particularly true given that FDA's ruling barely scratches the surface of the approval delays caused by the Agency's failure to carry out its statutory obligations.

As of September 22, 2007, FDA withheld approval of Cobalt's ANDA solely because the Agency had failed to timely conduct an inspection that it deemed necessary for receiving such approval. (*See* Rakoczy Decl. Ex. C, Hillier Decl. ¶ 17.) Specifically, according to FDA, Cobalt's acarbose ANDA was approvable, but for an inspection of Cobalt's CRO—an inspection that FDA, and FDA alone, is charged with initiating and conducting. (*Id.*) FDA delayed inspecting the CRO for over *two and a half years*, even though it has known about this CRO since at least August 2003, and no later than submission of Cobalt's ANDA. (*See id.*

21

¶¶ 17-19.) FDA's admitted delays and failure to timely inspect the CRO violated not only the

Agency's statutory mandate for reviewing and approving ANDAs, but also FDA's own internal

policies and procedures. FDA cannot lawfully find that Cobalt forfeited its exclusivity by failing

to launch by September 22, 2007 when, by FDA's own admission, the only reason Cobalt could

not launch is because the Agency failed to carry out an inspection that FDA alone is charged

with doing.

The result is all the more egregious and unlawful given the fact that FDA should

not have withheld Cobalt's approval based upon this inspection. In the FFDCA, Congress

specifically directed that "[n]o action by the reviewing division may be delayed because of the

unavailability of information from or action by field personnel unless the reviewing division

determines that a delay is necessary to assure the marketing of a safe and effective drug." 21

U.S.C. § 355(j)(3)(F). The message and mandate from Congress is clear—approvals should not

be held up by things like inspections, and certainly not by FDA's failure to follow its own

statutory obligations and procedures for initiating and completing such routine inspections.[7]

---

[7] Additionally, the Agency has developed and published its own Compliance Program Guidance
Manual (CPGM) specifically for inspections of CROs that conduct BE studies for ANDAs (*See*
Rakoczy Decl. Ex. I, FDA CPGM, Compliance Program 7348.001 – Bioresearch Monitoring:
Human Drugs – In Vivo Bioequivalence). According to FDA's CPGM, "*[f]acilities where
bioequivalence studies are conducted are to be inspected under this compliance program.*" (*Id.*
at 5 (emphasis added)). Additionally, FDA's Office of Generic Drugs ("OGD")—which is
charged with reviewing and approving ANDAs—has developed and published its own Manual
of Policies and Procedures (MAPP) governing "Inspections of Clinical Facilities and Analytical
Laboratories Conducting Bioequivalence Studies in ANDAs." (*See* Rakoczy Decl. Ex. J, MAPP
5210.7 (Dec. 15, 2000)). OGD's MAPP emphasizes the importance of BE studies to approval of
an ANDA, and sets forth the policies and procedures for identifying when an inspection of a
CRO is necessary and should be initiated. (*See id.* at 1-3.) Most pertinent here, OGD must
request "a routine inspection of clinical facilities or analytical laboratories conducting BE studies
included in an unapproved ANDA if: A clinical facility or analytical testing site is identified in
the ANDA that has no inspection history". (*Id.* at 3.) The process for initiating the inspection
begins when the ANDA is accepted for filing: "*[w]hen an ANDA is accepted for filing,*" OGD
must determine if any of the inspection criteria in this MAPP apply. (*Id.* at 4 (emphasis added)).

FDA's administrative ruling tries to diminish the importance of the inspection issue. (*See* Rakoczy Decl. Ex. D, 5/7/08 Buehler Ltr. at 3.) The Agency's efforts fail because FDA cannot avoid the fact that but for its delay inspecting Cobalt's CRO, Cobalt would have obtained the approval needed to avoid a forfeiture under FDA's interpretation of this provision. The purpose of the forfeiture provisions is to ensure that ANDA applicants actively work towards approval and do not wait indefinitely to launch their products. Congress most assuredly did not enact these provisions to punish first applicants for delays at the Agency, nor can these forfeiture provisions be lawfully construed in a manner that leads to such an absurd result. Indeed, any other result turns the statute on its head, and leads to impermissibly inconsistent and absurd results. It would penalize first applicants by causing numerous exclusivity forfeitures based on circumstances within FDA's control, but which clearly are outside the first applicant's control.[8] Accordingly, FDA's decision to forfeit Cobalt's exclusivity unlawfully runs contrary to the statute and Congressional intent.

**2.     FDA's Forfeiture Of Cobalt's Exclusivity Based On Bayer's Mere "Request For Patent Delisting" Is Arbitrary, Capricious And Contrary To Law.**

Under FDA's interpretation, a mere "request for patent delisting" by the NDA-holder constitutes the "withdrawal" of patent information under § 355(j)(5)(D)(i)(I)(bb)(CC) that triggers a forfeiture event (*see* Rakoczy Decl. Ex. D, 5/7/08 Buehler Ltr. at 7 n.13)—regardless

---

If so, OGD must issue an inspection request and take the necessary steps to initiate an inspection of the facility by field personnel. (*Id.* at 4-5.)

[8] Consider, for example, the significant approval delays and backlogs that FDA already is experiencing due to increased ANDA filings and decreased Agency resources. FDA had a backlog of over 1,100 ANDAs at the end of fiscal year 2006, compared to 780 for 2005 and just 374 for 2001. (*See* Rakoczy Decl. Ex. K, CHAIN DRUG REVIEW 4-23-07, vol. 29, issue 8, *available at* 2007 WLNR 11400759.) By June 2007, the backlog of pending ANDAs reached nearly 1,300 applications. (*See id.*, Ex. L, CHAIN DRUG REVIEW 8-20-07, vol. 29, issue 14, *available at* 2007 WLNR 16535267.)

of whether the information is actually withdrawn from the Orange Book, and regardless of whether FDA provides any timely notice of such delisting request to the interested first applicant. FDA's interpretation violates the plain language of the statute; runs afoul of Congressional intent by allowing brand companies to manipulate, if not eliminate, the exclusivity incentive; and ignores binding D.C. Circuit precedent.

**a.    FDA's Interpretation Violates The Plain Language Of The Statute.**

First, and most importantly, construing this provision to include the mere "request for patent delisting" impermissibly runs afoul of and conflicts with the plain language of the statute. The provision, on its face, requires that "[t]he patent information submitted under subsection (b) or (c) [be] *withdrawn* by the holder of the application approved under subsection (b)." 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(CC) (emphasis added). It says nothing about a mere "request for patent delisting," such as Bayer made here. A significant and material substantive difference exists between asking to have patent information delisted and actually having that information withdrawn. FDA cannot ignore this clear language and material distinction. *See Mova*, 140 F.3d at 1068-74 (rejecting and invalidating FDA's interpretation of the 180-day exclusivity provisions in light of explicit statutory language to the contrary); *Purepac Pharm.*, 354 F.3d at 884-85 (refusing to grant deference to FDA's action when it is "irreconcilable with the language and intent of the FDCA").

This is true even where the result seems "absurd" to the Agency because "the delay of approval of subsequent ANDAs will never end." *Inwood Labs., Inc. v. Young*, 723 F. Supp. 1523, 1527 (D.D.C. 1989). In *Inwood*, FDA sought to condition generic exclusivity on whether the first-filer had been sued for patent infringement. *Id.* at 1525. The Agency argued that such a statutory interpretation was necessary because it was the only way to avoid a situation

24

where the first applicant's exclusivity delayed approval of all subsequent applications. *Id.* at 1527. The court rejected FDA's interpretation, stating that although "th[e] problem warrants consideration by Congress," it "does not give the FDA or this Court a license to read into the present, clear language of section 355(j)([5])(B)(iv)(I) a requirement of a suit for patent infringement that is simply not there." *Id.* The D.C. Circuit echoed this conclusion a decade later in *Purepac Pharmaceutical Co. v. Friedman*, 162 F.3d 1201 (D.C. Cir. 1998). In that case, it was once again argued that FDA should require an infringement suit as a condition for receiving generic exclusivity. *Id.* at 1204. Once again, it was further argued that such a requirement is necessary to prevent approval delays for subsequent ANDA filers:

> If a first applicant is never sued for patent infringement, it is possible that neither of two "triggers" for the running of the 180 days of market exclusivity— commercial marketing or a judicial decision—would ever occur. Without a lawsuit there would be no judicial decision. If the applicant never begins marketing its product, the 180 days would never run and all later generic applicants would be barred from bringing their products to market.

*Id.* at 1205. The D.C. Circuit rejected this as a basis for deviating from the plain language of the statute, which does not require the first-filer to be sued for patent infringement in order to obtain the generic exclusivity incentive. *Id.* at 1204-05.

Here again, the plain language of that statute requires that the patent information be actually withdrawn from the Orange Book, not merely the submission of a request for patent delisting. FDA has not even attempted to support its contrary interpretation. The fact is, FDA cannot lawfully override the plain language even if it believes that the plain language will lead to approval delays for subsequent ANDA filers. Had Congress intended for a mere delisting request to satisfy this provision, it easily could have said so. That Congress did not do so speaks volumes about Congressional intent which, as discussed below, is fully consistent with its plain language.

25

b.    **FDA's Interpretation Runs Afoul Of Congressional Intent And Allows Brand Companies To Manipulate, and Indeed Eliminate, The Generic Exclusivity Incentive.**

Second, FDA cannot permissibly construe § 355(j)(5)(D)(i)(I)(bb)(CC) as being satisfied by the mere "request for patent delisting" because doing so would run afoul of Congressional intent—such an interpretation would impermissibly allow brand companies to manipulate, and indeed eliminate, the generic exclusivity incentive altogether. Under FDA's interpretation, a brand company admittedly could unilaterally trigger a forfeiture event at any time, and completely control and manipulate whether a first applicant ever enjoys exclusivity.

Congress could not possibly have contemplated or intended this absurd result. Congress created the generic exclusivity incentive to encourage generic companies to undertake the considerable risk and expense of challenging brand patents. In the MMA, Congress sought to strengthen, not weaken, that incentive. It certainly never intended to give brand companies the power to manipulate and eliminate that critical incentive entirely. Indeed, the D.C. Circuit already has rejected an interpretation of the generic exclusivity period under which "the patent holder could manipulate the system" as, among other things, inconsistent with Congressional intent. *Teva*, 182 F.3d at 1009; *id.* at 1011. Other courts have consistently reached the same conclusion, rejecting an FDA "interpretation [that] places the decision as to whether a generic manufacturer will be entitled to exclusivity entirely in the hands of the patent holder". *Mylan Pharms.*, 94 F. Supp. 2d at 54; *see also Ranbaxy Labs. Ltd. v. Leavitt*, 469 F.3d 120, 125-26 (D.C. Cir. 2006) (rejecting FDA policy that "allows an NDA holder, by delisting its patent, to deprive the generic applicant of a period of marketing exclusivity"); *Inwood Labs.*, 723 F. Supp. at 1527 (striking down FDA's statutory interpretation because "[b]y subjecting the exclusivity entitlement to the caprices of the patent holder, the FDA's interpretation would seem to affect

adversely the incentives that Congress sought to create in providing for 180 days of exclusivity for the manufacturers of generic drugs.").

So, too, should this Court.[9]

        **c.**     **FDA's Decision Squarely Violates The D.C. Circuit's Ruling In *Ranbaxy v. Leavitt* That Precludes The Agency From Depriving An Applicant Of Exclusivity By Removing A Patent From The Orange Book.**

FDA's decision also runs afoul of the D.C. Circuit's decision in *Ranbaxy Labs. Ltd. v. Leavitt*, 469 F.3d 120 (D.C. Cir. 2006), *aff'g*, 459 F. Supp. 2d 1 (D.D.C. 2006). There, in connection with the drug simvastatin, FDA removed two patents from the Orange Book after ANDA applicants had submitted applications containing paragraph IV certifications to those patents, thus qualifying those applicants for exclusivity. After removing the patents from the Orange Book, FDA determined that the applicants were no longer entitled to exclusivity. FDA justified its decision by citing to a regulation that permitted the Agency to remove patents unless litigation ensued as a result of the paragraph IV certification. Because there was no litigation over the two simvastatin patents, the Agency concluded that it could remove them from the Orange Book, even though doing so would deprive the first applicants of their statutory right to 180-day generic exclusivity. The first applicants brought suit challenging FDA's decision.

Both the district court and the D.C. Circuit struck down the Agency's decision to delist the simvastatin patents and deprive the first-filers of exclusivity as arbitrary, capricious and unlawful agency action. In so ruling, the D.C. Circuit recognized, among other things, that

---

[9] In fact, Congress expressly enacted provisions, such as the declaratory judgment provisions, as part of the MMA precisely to prevent brand manipulation of the generic exclusivity period. *See* 149 CONG. REC. S15,885 (daily ed. Nov. 25, 2003) (statement of Sen. Kennedy) ("[W]hen generic applicants are blocked by a first generic applicant's 180-day exclusivity, the brand drug company could choose not to sue those other generic applicants so as to delay a final court decision that could trigger the 'failure to market' provision and force the first generic to market.").

FDA's delisting policy "diminishes the incentive for a manufacturer of generic drugs to challenge a patent listed in the Orange Book in the hope of bringing to market a generic competitor for an approved drug without waiting for the patent to expire," and that the Agency may not lawfully "change the incentive structure adopted by the Congress, for the agency is bound 'not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes.'" *Ranbaxy*, 469 F.3d at 126 (quoting *MCI Telecomms. Corp. v. AT & T Co.*, 512 U.S. 218, 231 n.4 (1994)).

FDA's decision here squarely violates the binding principles in *Ranbaxy* by depriving Cobalt of exclusivity and diminishing the incentive to challenge listed patents. FDA's attempt to distinguish *Ranbaxy* on the ground that it was a pre-MMA decision rings hollow. (*See* Rakoczy Decl. Ex. D, 5/7/08 Buehler Ltr. at 8.) The binding principles enunciated by the D.C. Circuit in *Ranbaxy*, which had everything to do with preserving the incentives enacted by Congress, are no less applicable here. (*See also* Rakoczy Decl. Ex. O, 11/6/07 Rakoczy Ltr.). If anything, FDA's conduct here is all the more egregious where the patent information was never actually taken out of the Orange Book, and FDA did not even provide notice of this purported delisting request to Cobalt until over 5 months after receiving it.[10]  By forfeiting Cobalt's exclusivity based on a mere request for patent delisting, the Agency has not only impermissibly

---

[10]  In fact, despite Cobalt's repeated requests, FDA has not provided any evidence of Bayer's alleged delisting request, which allegedly was submitted by Bayer back in April 2007, or over a year ago.  As such, neither Cobalt nor this Court can confirm the existence of such a request, much less evaluate whether it was a proper request that satisfies the statutory criteria for delisting.  As a matter of fundamental due process, FDA cannot deprive a company of its statutory entitlement to exclusivity based on the contents of a supposed delisting request that the Agency will not even divulge, and which Cobalt was never even given notice of until after the forfeiture of its exclusivity.  The opportunity for abuse of process is manifest.  For this reason alone, applying this provision here is unlawful.

changed the incentive structure adopted by the Congress, but opened the door to eliminating it altogether.

      Nor is it true (or an answer to *Ranbaxy*), as FDA suggests, that 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(CC) is applicable to "all patent withdrawals," regardless of how they come about, including a voluntary request for patent delisting. (*See* Rakoczy Decl. Ex. D, 5/7/08 Buehler Ltr. at 8-9.) As FDA well knows, the MMA provides for one, and only one, mechanism for delisting and withdrawing patent information from the Orange Book for a patent to which an applicant has submitted a paragraph IV certification; namely, a delisting counterclaim filed in patent litigation against the brand company seeking a court order that the patent be delisted. *See* 21 U.S.C. § 355(j)(5)(C)(ii). In these circumstances, a court may order that the patent be delisted. These are precisely, and indeed the only, circumstances under which the withdrawal provision in 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(CC) comes into play. When these provisions are read together, as they must be, it is clear that Congress intended to trigger a forfeiture in these limited circumstances, and not whenever a brand company feels like doing so. FDA's interpretation, on the other hand, reads the withdrawal provision in § 355(j)(5)(D)(i)(I)(bb)(CC) in a vacuum without regard for the remainder of the MMA, and destroys the carefully crafted symmetry of these provisions.

    **3.**    **The "Failure To Market" Forfeiture Provision Does Not—And Cannot—Apply Here Because No Subsequent Applicant Had Received Tentative Approval.**

      A "failure to market" forfeiture takes place on the "later of" two specific events. 21 U.S.C. § 355(j)(5)(D)(i)(I). The second prong of that provision requires a subsequent ANDA filer to have received "tentative" ANDA approval. *Id.* § 355(j)(5)(D)(i)(I)(bb). As FDA buries in a footnote of its administrative ruling, no subsequent applicant for acarbose had tentative approval at the time FDA issued its forfeiture decision. (Rakoczy Decl. Ex. D, 5/7/08 Buehler

Ltr. at 6 n.11.)  The lack of tentative approval by a subsequent filer means no forfeiture under this provision is possible under the plain and ambiguous language.

**II.    Cobalt, Without Question, Will Suffer Irreparable Harm If This Court Does Not Enter An Injunction Preventing FDA From Approving Subsequently-Filed Acarbose ANDAs.**

The courts have long-recognized that "the earliest generic drug manufacturer in a specific market has a distinct advantage over later entrants." *Mova Pharm. Corp. v. Shalala*, 955 F. Supp. 128, 131 (D.D.C. 1997).  Indeed, this is precisely the reason that Congress created an "officially sanctioned head start" in the form of the 180-day generic exclusivity provision— because such a head start is the only way to provide the incentive needed for companies to challenge suspect drug patents.  *Id.*

Many benefits flow to the first generic market entrant.  The first entrant, for example, satisfies the immediate market demand for a generic product by filling the distribution channels, thereby achieving significant sales revenue that a subsequent entrant does not achieve. (Rakoczy Decl. Ex. M, Sanzen Decl. ¶ 7.)  The first entrant also has the opportunity to capture significant market share over time by entering into longer term contracts with drug wholesalers, chain pharmacies, hospitals, and other pharmaceutical purchasers, which results in long-term revenue.  (*Id.* ¶ 8.)  These opportunities are far more abundant for the first entrant than for each subsequent entrant.  (*Id.*)  Additionally, almost all customers practice "a right of first refusal" process, which allows the first entrant to maintain the business on a specific product even after subsequent manufacturers launch, thereby guaranteeing a long term revenue stream and dominant market share for the product. (*Id.*)  Moreover, most customers typically carry only one generic product.  (*Id.*)  Thus, obtaining these long term contracts is essential to maintaining some market share once subsequent generic products enter the market.  Again, the opportunities are far

more abundant for the first entrant and are presented less and less for each subsequent entrant. (*Id.*)

Cobalt estimates that, with exclusivity, it will generate sales of about $9 million during the 180-day exclusivity period. (Rakoczy Decl. Ex. M, Sanzen Decl. ¶ 12.) Cobalt also estimates that it will be able to capture significant market share during the exclusivity period, which will result in a higher market share after that period expires. (*Id.*) Moreover, Cobalt estimates that if it receives the 180-day exclusivity period, and Bayer does not market a so-called "authorized generic" in the first full year after the 180-day exclusivity period, Cobalt projects new revenues of more than $1.6 million and that it will capture a significant amount of the total acarbose market. (*Id.* ¶ 16.)[11] If, however, other acarbose ANDAs are permitted to remain on the market during Cobalt's exclusivity, as Roxane already is, the exclusivity advantages that Congress intended Cobalt to have will be destroyed.

If deprived of exclusivity, Cobalt believes that its profitability and market share will plummet dramatically. (Rakoczy Decl. Ex. M, Sanzen Decl. ¶ 5.) Once multiple generic companies enter the market, profitability drops often as much as 90% within the first few months. (*Id.* ¶ 9.) Indeed, Cobalt projects that, if other subsequent ANDAs are allowed to market during Cobalt's exclusivity, Cobalt's revenues will amount to no more than about $276,000 for the first full year of generic marketing. (*Id.* ¶ 17.) Moreover, the loss of any part of the 180 days of exclusivity due to entry of a new generic product will cause significant revenue losses beyond just the sales lost to the new entrant. (*Id.* ¶¶ 9-10.) These losses diminish the resources of smaller drug companies such as Cobalt, and thus make it more difficult and less

---

[11] An "authorized generic" is a product manufactured under the brand company's NDA, but marketed under its generic name to compete with the true generic ANDA product. Even if Bayer launches an authorized generic, Cobalt projects revenues exceeding $646,000 over the same period. (*Id.* ¶ 16.)

attractive to develop new generic products. (*Id.* ¶¶ 10-11.) And the difficulty in developing new products is compounded when a generic drug company cannot be certain that it will receive exclusivity even when it files the first paragraph IV ANDA. (*Id.* ¶ 10.)

Given these realities, it is not surprising that the courts have long-recognized that the loss of the advantages flowing from market exclusivity constitutes significant, and often irreparable, harm. *See Mova*, 140 F.3d at 1067 n.6 (confirming that Mova's loss of its "officially sanctioned head start . . . suffices to show a severe economic impact to Mova," for purposes of satisfying the irreparable harm standard (internal quotation omitted)); *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 29 (D.D.C. 1997) (stating that "there is a significant economic advantage to receiving first approval and being the first company to enter the market, an advantage that can never be fully recouped through money damages or by 'playing catch-up'" and that a loss of market share to competitors establishes irreparable harm); *Boehringer Ingelheim Corp. v. Shalala*, 993 F. Supp. 1, 2 (D.D.C. 1997) (recognizing that losing "the advantage of being the first to market" amounts to significant harm for purposes of balancing hardships); *TorPharm, Inc. v. Shalala*, No. Civ.A. 97-1925(JR), 1997 WL 33472411, at *4 (D.D.C. Sept. 15, 1997) (recognizing that "early market entry is critical to success in the [relevant pharmaceutical] market because competitors will vie for a small number of long-term contracts"); *Stein Indus., Inc. v. Jarco Indus., Inc.*, 934 F. Supp. 55, 58 (E.D.N.Y. 1996) (finding irreparable harm and granting preliminary injunction where sales of patented products would lead to sales of other products).

Further, even if Cobalt could be compensated by money damages (it cannot), Cobalt cannot recover its significant losses from FDA for refusing to grant the exclusivity to which Cobalt is statutorily entitled. *See Minn. Mining & Mfg. Co. v. Barr Labs, Inc.*, 289 F.3d

32

775, 777 (Fed. Cir. 2002) (recognizing no private cause of action created under Hatch-Waxman); *Mylan Pharms., Inc. v. Thompson,* 268 F.3d 1323, 1332 (Fed. Cir. 2001) (same). This fact further compounds the irreparable nature of the harm that Cobalt will suffer if this Court does not grant injunctive relief. *See World Duty Free Ams., Inc. v. Summers,* 94 F. Supp. 2d 61, 67 (D.D.C. 2000) (stating that the "significant losses are further compounded by the fact that such losses are not likely to be recovered given the" nature of the movant's business); *Express One Int'l, Inc. v. United States Postal Serv.,* 814 F. Supp. 87, 91 (D.D.C. 1992) (finding irreparable harm supported where "[t]he *non-recoverable* monetary losses [movant] faces are therefore real and present" and damages exist "for which there is no recourse"); *Rum Creek Coal Sales, Inc. v. Caperton,* 926 F.2d 353, 361 (4th Cir. 1991) (recognizing injunctive relief favored where, among other things, "[n]o other form of redress appears available").

The 180-day generic exclusivity period also involves several very important intangible benefits. (*See* Rakoczy Decl. Ex. M, Sanzen Decl. ¶ 18.) Being the first-filer and obtaining the 180-day exclusivity period is a significant and important part of Cobalt's overall business plan. (*Id.*) In many instances, the majority of revenue that a company earns on a generic product will be generated during that exclusivity period. (*Id.*) The money made during this period is used, among other things, to fund research and development of new products, including funding new patent challenges. (*Id.*) Thus, loss of exclusivity can negatively impact future opportunities. And as noted, this is one of Cobalt's only first-filer opportunities that the company is counting on for the development of future generic products. The loss of this opportunity could destroy much of Cobalt's future pipeline. (*Id.*)

Further, being the first filer also provides the ability to foster good will with customers by providing them a generic product that no one else offers; the ability to form

relationships with new customers as the only provider of the generic product; the ability to cement those relationships prior to entry of a new generic product; and improved market position and prestige. (*See* Rakoczy Decl. Ex. M, Sanzen Decl. ¶ 19.) As a new company, Cobalt has limited opportunities and distribution, since customers do not want to open up new accounts with new companies. (*Id.* ¶ 20.) But an exclusive first-filer opportunity like acarbose gives Cobalt full distribution—customers will want a new generic product like acarbose that they cannot get anywhere else. (*Id.*) Therefore, this exclusive opportunity opens up channels that were not otherwise available to Cobalt. This opportunity goes well beyond just sales of this particular product—it gives Cobalt visibility, opportunities to bid on future products, and credibility that will provide long-term benefits, future growth and sustainability. (*Id.*)

Cobalt's well-deserved image as an important supplier of generic pharmaceuticals has been established due to its ability to bring lower cost alternatives of important pharmaceuticals to the market. (*See* Rakoczy Decl. Ex. M, Sanzen Decl. ¶ 21.) If Cobalt loses its sole exclusivity for its generic acarbose product, Cobalt will lose that prestige and its business reputation will be severely and irreparably be damaged. (*Id.*) In the end, as a relatively new and small company, Cobalt has had very few first-filer opportunities. Cobalt must therefore capitalize on this opportunity now, or else risk never having the necessary resources to secure and enjoy the exclusivity again.

Finally, even if Cobalt were not facing irreparable harm (it certainly is as a result of Roxane's commercial launch), the injunction should still issue in light of Cobalt's significant likelihood of success on the merits: "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *CityFed*, 58 F.3d at 747; *accord Cuomo*, 772 F.2d at 974 (finding injunction appropriate where there is "either a high

34

probability of success and some injury, or vice versa"). Because Cobalt has demonstrated a significant likelihood of success on the merits, and will undoubtedly suffer injury for which it cannot be recompensed, this Court should grant Cobalt's motion.

**III.     The Requested Injunction Will Not Substantially Harm Any Other Interested Party.**

Others will not be substantially harmed if this Court grants Cobalt's request for injunctive relief. The FDA has no commercial stake in the outcome of this lawsuit. Indeed, FDA's only legitimate interest concerns the proper interpretation and implementation of the FFDCA. Accordingly, injunctive relief requiring FDA to follow the clearly expressed intent of Congress will not harm FDA.

The same is true for all other acarbose ANDA filers. At the time that they prepared and filed their ANDAs, all filers knew that the statute awarded exclusivity to another ANDA applicant. Consequently, each and every ANDA filer knew that approval of its product necessarily would be delayed by the 180-day generic exclusivity period. Thus, subsequent ANDA filers cannot legitimately claim any harm other than the loss of a windfall due to FDA's unlawful forfeiture provision interpretation, particularly since FDA's interpretation is so obviously contrary to the plain language of the statute. Accordingly, the balance of harms clearly favors Cobalt. *See Mova*, 955 F. Supp. at 131 (concluding that the significant likelihood of success on the merits outweighed any harm suffered by the subsequent ANDA applicant).

**IV.     The Requested Injunction Fosters The Public Interest.**

Finally, the public interest would be served by an injunction in this case. The public has a considerable interest in the faithful application of the law. *See Mova*, 955 F. Supp. at 131; *accord Bracco*, 963 F. Supp. at 30 ("Requiring [FDA] to act lawfully is . . . very much in the public interest."). Moreover, Congress already has determined what is in the public interest—encouraging challenges to brand-name patented drug monopolies through the reward of

180-day generic exclusivity. Because generic exclusivity is the only incentive Congress created for companies to challenge drug patents, a statutory interpretation that destroys or diminishes the value of that exclusivity necessarily will cause generic companies to forego new patent challenges. Fewer patent challenges will, in turn, harm the public by forcing consumers to pay unnecessarily high prices for drug products, in direct contravention of Congressional intent. *See In re Barr Labs.*, 930 F.2d at 76 (observing that Congress designed Hatch-Waxman "to get generic drugs into the hands of patients at reasonable prices–fast."). Thus, as with all of the other factors, the public interest weighs in favor of granting Cobalt's motion for immediate injunctive relief.

<u>**CONCLUSION**</u>

Cobalt, therefore, has a strong likelihood of succeeding on the merits of its suit against FDA. Furthermore, Cobalt will be irreparably harmed if any other ANDA applicant is permitted to continue to encroach on any of Cobalt's 180 days of exclusivity. This harm can be prevented only by enjoining FDA from granting final approval to any generic acarbose ANDA until Cobalt's exclusivity period has expired and the Agency is immediately required to stay or withdraw any and all previously-granted approvals until expiration of Cobalt's exclusivity. The Court therefore should enjoin FDA from forfeiting Cobalt's exclusivity and approving any subsequent acarbose ANDAs until the natural expiration of such exclusivity, and require FDA to immediately stay or withdraw the approval of any and all other acarbose ANDAs. The Court also should require FDA to order a recall of all acarbose product sold or shipped by Roxane during Cobalt's exclusivity period. This order should remain in place until this Court has the opportunity to rule on a fully-briefed preliminary injunction motion.

Dated:  May 8, 2008.                    Respectfully submitted,

                                        COBALT LABORATORIES INC. and
                                        COBALT PHARMACEUTICALS, INC.

                                        By:  _____
                                             One of their attorneys

E. Anthony Figg, D.C. Bar No. 345124
Daniel L. Shores, D.C. Bar No. 495389
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
1425 K Street, N.W.
Suite 800
Washington, D.C.  20005
(202) 783-6040
(202) 783-6031 (facsimile)
efigg@rfem.com

William A. Rakoczy, D.C. Bar No. 489082
Christine J. Siwik
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, IL 60610
(312) 222-6301
(312) 222-6321 (facsimile)
wrakoczy@rmmslegal.com

*Counsel for Cobalt Laboratories Inc. and
Cobalt Pharmaceuticals, Inc.*

**CERTIFICATE OF SERVICE**

I, the undersigned, HEREBY CERTIFY that on this 8th day of May 2008, a true and correct copy of: (a) Cobalt's Motion for Temporary Restraining Order; (b) Memorandum in Support of Cobalt's Motion for Temporary Restraining Order; (c) Proposed Order; (d) Certificate of Counsel Pursuant to Local Rule 65.1(a); (e) Declaration of William A. Rakoczy and all exhibits thereto; and all other papers filed in this matter were served via hand delivery and electronic mail upon the following:

> Gerald Kell
> Senior Trial Counsel
> Office of Consumer Litigation
> Civil Division
> US Department of Justice
> PO Box 386
> Washington, DC 20044
> gerald.kell@usdoj.gov
> *Counsel for the Federal Defendants*

> _____
> *Counsel for Cobalt Laboratories Inc. and
> Cobalt Pharmaceuticals Inc.*

# Declaration of William A. Rakoczy

*In support of Cobalt's Motion for
Temporary Restraining Order*

## Exhibit A

NDA 20-482/S-015
Page 3

# PRECOSE®
### (acarbose tablets)

08753825, R.3                                                    11/04

## DESCRIPTION

PRECOSE® (acarbose tablets) is an oral alpha-glucosidase inhibitor for use in the management of type 2 diabetes mellitus. Acarbose is an oligosaccharide which is obtained from fermentation processes of a microorganism, *Actinoplanes utahensis*, and is chemically known as *O*-4,6-dideoxy- 4-[[(1*S*,4*R*,5*S*,6*S*)-4,5,6-trihydroxy-3-(hydroxymethyl)-2-cyclohexen-1-yl]amino]- α-D-glucopyranosyl-(1 → 4)-*O*-α-D-glucopyranosyl-(1 → 4)-D-glucose. It is a white to off-white powder with a molecular weight of 645.6. Acarbose is soluble in water and has a pK$_a$ of 5.1. Its empirical formula is C$_{25}$H$_{43}$NO$_{18}$ and its chemical structure is as follows:



PRECOSE® is available as 25 mg, 50 mg and 100 mg tablets for oral use. The inactive ingredients are starch, microcrystalline cellulose, magnesium stearate, and colloidal silicon dioxide.

## CLINICAL PHARMACOLOGY

Acarbose is a complex oligosaccharide that delays the digestion of ingested carbohydrates, thereby resulting in a smaller rise in blood glucose concentration following meals. As a consequence of plasma glucose reduction, PRECOSE® reduces levels of glycosylated hemoglobin in patients with type 2 diabetes mellitus. Systemic non-enzymatic protein glycosylation, as reflected by levels of glycosylated hemoglobin, is a function of average blood glucose concentration over time.

**Mechanism of Action:** In contrast to sulfonylureas, PRECOSE® does not enhance insulin secretion. The antihyperglycemic action of acarbose results from a competitive, reversible inhibition of pancreatic alpha-amylase and membrane-bound intestinal alpha-glucoside hydrolase enzymes. Pancreatic alpha-amylase hydrolyzes complex starches to oligosaccharides in the lumen of the small intestine, while the membrane-bound intestinal alpha-glucosidases hydrolyze oligosaccharides, trisaccharides, and disaccharides to glucose and other monosaccharides in the brush border of the small intestine. In diabetic patients, this enzyme inhibition results in a delayed glucose absorption and a lowering of postprandial hyperglycemia.

Because its mechanism of action is different, the effect of PRECOSE® to enhance glycemic control is additive to that of sulfonylureas, insulin or metformin when used in combination. In addition, PRECOSE® diminishes the insulinotropic and weight-increasing effects of sulfonylureas.

Acarbose has no inhibitory activity against lactase and consequently would not be expected to induce lactose intolerance.

NDA 20-482/S-015
Page 4

## Pharmacokinetics:

**Absorption:** In a study of 6 healthy men, less than 2% of an oral dose of acarbose was absorbed as active drug, while approximately 35% of total radioactivity from a $^{14}C$-labeled oral dose was absorbed. An average of 51% of an oral dose was excreted in the feces as unabsorbed drug-related radioactivity within 96 hours of ingestion. Because acarbose acts locally within the gastrointestinal tract, this low systemic bioavailability of parent compound is therapeutically desired. Following oral dosing of healthy volunteers with $^{14}C$-labeled acarbose, peak plasma concentrations of radioactivity were attained 14-24 hours after dosing, while peak plasma concentrations of active drug were attained at approximately 1 hour. The delayed absorption of acarbose-related radioactivity reflects the absorption of metabolites that may be formed by either intestinal bacteria or intestinal enzymatic hydrolysis.

**Metabolism:** Acarbose is metabolized exclusively within the gastrointestinal tract, principally by intestinal bacteria, but also by digestive enzymes. A fraction of these metabolites (approximately 34% of the dose) was absorbed and subsequently excreted in the urine. At least 13 metabolites have been separated chromatographically from urine specimens. The major metabolites have been identified as 4-methylpyrogallol derivatives (i.e., sulfate, methyl, and glucuronide conjugates). One metabolite (formed by cleavage of a glucose molecule from acarbose) also has alpha-glucosidase inhibitory activity. This metabolite, together with the parent compound, recovered from the urine, accounts for less than 2% of the total administered dose.

**Excretion:** The fraction of acarbose that is absorbed as intact drug is almost completely excreted by the kidneys. When acarbose was given *intravenously,* 89% of the dose was recovered in the urine as active drug within 48 hours. In contrast, less than 2% of an *oral dose* was recovered in the urine as active (i.e., parent compound and active metabolite) drug. This is consistent with the low bioavailability of the parent drug. The plasma elimination half-life of acarbose activity is approximately 2 hours in healthy volunteers. Consequently, drug accumulation does not occur with three times a day (t.i.d.) oral dosing.

**Special Populations:** The mean steady-state area under the curve (AUC) and maximum concentrations of acarbose were approximately 1.5 times higher in elderly compared to young volunteers; however, these differences were not statistically significant. Patients with severe renal impairment (Clcr < 25 mL/min/1.73m$^2$) attained about 5 times higher peak plasma concentrations of acarbose and 6 times larger AUCs than volunteers with normal renal function. No studies of acarbose pharmacokinetic parameters according to race have been performed. In U.S. controlled clinical studies of PRECOSE® in patients with type 2 diabetes mellitus, reductions in glycosylated hemoglobin levels were similar in Caucasians (n=478) and African-Americans (n=167), with a trend toward a better response in Latinos (n=132).

**Drug-Drug Interactions:** Studies in healthy volunteers have shown that PRECOSE® has no effect on either the pharmacokinetics or pharmacodynamics of nifedipine, propranolol, or ranitidine. PRECOSE® did not interfere with the absorption or disposition of the sulfonylurea glyburide in diabetic patients. PRECOSE® may affect digoxin bioavailability and may require dose adjustment of digoxin by 16% (90% confidence interval: 8-23%), decrease mean $C_{max}$ of digoxin by 26% (90% confidence interval: 16-34%) and decreases mean trough concentrations of digoxin by 9% (90% confidence limit: 19% decrease to 2% increase). (See **PRECAUTIONS, Drug Interactions**).

The amount of metformin absorbed while taking PRECOSE® was bioequivalent to the amount absorbed when taking placebo, as indicated by the plasma AUC values. However, the peak plasma level of metformin was reduced by approximately 20% when taking PRECOSE® due to a slight delay in the absorption of metformin. There is little if any clinically significant interaction between PRECOSE® and metformin.

NDA 20-482/S-015
Page 5

# CLINICAL TRIALS

**Clinical Experience from Dose Finding Studies in Type 2 Diabetes Mellitus Patients on Dietary Treatment Only:** Results from six controlled, fixed-dose, monotherapy studies of PRECOSE® in the treatment of type 2 diabetes mellitus, involving 769 PRECOSE®-treated patients, were combined and a weighted average of the difference from placebo in the mean change from baseline in glycosylated hemoglobin (HbA1c) was calculated for each dose level as presented below:

### Table 1

| Mean Placebo-Subtracted Change in HbA1c in Fixed-Dose Monotherapy Studies | | | |
|---|---|---|---|
| Dose of PRECOSE* | N | Change in HbA1c % | p-Value |
| 25 mg t.i.d. | 110 | -0.44 | 0.0307 |
| 50 mg t.i.d. | 131 | -0.77 | 0.0001 |
| 100 mg t.i.d. | 244 | -0.74 | 0.0001 |
| 200 mg t.i.d.** | 231 | -0.86 | 0.0001 |
| 300 mg t.i.d.** | 53 | -1.00 | 0.0001 |

\*    PRECOSE® was statistically significantly different from placebo at all doses. Although there were no statistically significant differences among the mean results for doses ranging from 50 to 300 mg t.i.d., some patients may derive benefit by increasing the dosage from 50 to 100 mg t.i.d.

\*\*   Although studies utilized a maximum dose of 200 or 300 mg t.i.d., the maximum recommended dose for patients < 60 kg is 50 mg t.i.d.; the maximum recommended dose for patients > 60 kg is 100 mg t.i.d.

Results from these six fixed-dose, monotherapy studies were also combined to derive a weighted average of the difference from placebo in mean change from baseline for one-hour postprandial plasma glucose levels as shown in the following figure:

NDA 20-482/S-015
Page 6

### Figure 1



*   PRECOSE® was statistically significantly different from placebo at all doses with respect to effect on one-hour postprandial plasma glucose.
**  The 300 mg t.i.d. PRECOSE® regimen was superior to lower doses, but there were no statistically significant differences from 50 to 200 mg t.i.d.

**Clinical Experience in Type 2 Diabetes Mellitus Patients on Monotherapy, or in Combination with Sulfonylureas, Metformin or Insulin:** PRECOSE® was studied as monotherapy and as combination therapy to sulfonylurea, metformin, or insulin treatment. The treatment effects on HbA1c levels and one-hour postprandial glucose levels are summarized for four placebo-controlled, double-blind, randomized studies conducted in the United States in Tables 2 and 3, respectively. The placebo-subtracted treatment differences, which are summarized below, were statistically significant for both variables in all of these studies.

Study 1 (n=109) involved patients on background treatment with diet only. The mean effect of the addition of PRECOSE® to diet therapy was a change in HbA1c of -0.78%, and an improvement of one-hour postprandial glucose of -74.4 mg/dL.

In Study 2 (n=137), the mean effect of the addition of PRECOSE® to maximum sulfonylurea therapy was a change in HbA1c of -0.54%, and an improvement of one-hour postprandial glucose of -33.5 mg/dL.

In Study 3 (n=147), the mean effect of the addition of PRECOSE® to maximum metformin therapy was a change in HbA1c of -0.65%, and an improvement of one-hour postprandial glucose of -34.3 mg/dL.

Study 4 (n=145) demonstrated that PRECOSE® added to patients on background treatment with insulin resulted in a mean change in HbA1c of -0.69%, and an improvement of one-hour postprandial glucose of -36.0 mg/dL.

A one year study of PRECOSE® as monotherapy or in combination with sulfonylurea, metformin or insulin treatment was conducted in Canada in which 316 patients were included in the primary efficacy analysis (Figure 2). In the diet, sulfonylurea and metformin groups, the mean decrease in HbA1c produced by the addition of PRECOSE® was statistically significant at six months, and this effect was persistent at one year. In the PRECOSE®-treated patients on insulin, there was a statistically significant reduction in HbA1c at six months, and a trend for a reduction at one year.

NDA 20-482/S-015
Page 7

## Table 2: Effect of Precose® on HbA1c

| Study | Treatment | HbA1c (%)[a] | | Treatment Difference | p-Value |
|---|---|---|---|---|---|
| | | Mean Baseline | Mean change from baseline[b] | | |
| 1 | Placebo Plus Diet | 8.67 | +0.33 | — | — |
| | PRECOSE 100 mg t.i.d. Plus Diet | 8.69 | -0.45 | -0.78 | 0.0001 |
| 2 | Placebo Plus SFU[c] | 9.56 | +0.24 | — | — |
| | PRECOSE 50-300[d] mg t.i.d. Plus SFU[c] | 9.64 | -0.30 | -0.54 | 0.0096 |
| 3 | Placebo Plus Metformin[e] | 8.17 | +0.08[g] | — | — |
| | PRECOSE 50-100 mg t.i.d. Plus Metformin[e] | 8.46 | -0.57[g] | -0.65 | 0.0001 |
| 4 | Placebo Plus Insulin[f] | 8.69 | +0.11 | — | — |
| | PRECOSE 50-100 mg t.i.d. Plus Insulin[f] | 8.77 | -0.58 | -0.69 | 0.0001 |

[a] HbA1c Normal Range: 4–6%

[b] After four months treatment in Study 1, and six months in Studies 2, 3, and 4

[c] SFU, sulfonylurea, maximum dose

[d] Although studies utilized a maximum dose of up to 300 mg t.i.d., the maximum recommended dose for patients ≤ 60 kg is 50 mg t.i.d.; the maximum recommended dose for patients > 60 kg is 100 mg t.i.d.

[e] Metformin dosed at 2000 mg/day or 2500 mg/day

[f] Mean dose of insulin 61 U/day

[g] Results are adjusted to a common baseline of 8.33%

NDA 20-482/S-015
Page 8

### Table 3: Effect of Precose® on Postprandial Glucose

| Study | Treatment | One-Hour Postprandial Glucose (mg/dL) | | | |
| | | Mean Baseline | Mean change from baseline[a] | Treatment Difference | p-Value |
| --- | --- | --- | --- | --- | --- |
| 1 | Placebo Plus Diet | 297.1 | +31.8 | — | — |
| | PRECOSE 100 mg t.i.d. Plus Diet | 299.1 | -42.6 | -74.4 | 0.0001 |
| 2 | Placebo Plus SFU[b] | 308.6 | +6.2 | — | — |
| | PRECOSE 50-300[c] mg t.i.d. Plus SFU[b] | 311.1 | -27.3 | -33.5 | 0.0017 |
| 3 | Placebo Plus Metformin[d] | 263.9 | +3.3[f] | — | — |
| | PRECOSE 50-100 mg t.i.d. Plus Metformin[d] | 283.0 | -31.0[f] | -34.3 | 0.0001 |
| 4 | Placebo Plus Insulin[e] | 279.2 | +8.0 | — | — |
| | PRECOSE 50-100 mg t.i.d. Plus Insulin[e] | 277.8 | -28.0 | -36.0 | 0.0178 |

[a] After four months treatment in Study 1, and six months in Studies 2, 3, and 4
[b] SFU, sulfonylurea, maximum dose
[c] Although studies utilized a maximum dose of up to 300 mg t.i.d., the maximum recommended dose for patients ≤ 60 kg is 50 mg t.i.d.; the maximum recommended dose for patients > 60 kg is 100 mg t.i.d.
[d] Metformin dosed at 2000 mg/day or 2500 mg/day
[e] Mean dose of insulin 61 U/day
[f] Results are adjusted to a common baseline of 273 mg/dL

### Figure 2



**Figure 2:** Effects of PRECOSE® ( ■ ) and Placebo ( ● ) on mean change in HbA1c levels from baseline throughout a one-year study in patients with type 2 diabetes mellitus when used in combination with: (A) diet alone; (B) sulfonylurea; (C) metformin; or (D) insulin. Treatment differences at 6 and 12 months were

tested: * p < 0.01; # p = 0.077.

## INDICATIONS AND USAGE

PRECOSE®, as monotherapy, is indicated as an adjunct to diet to lower blood glucose in patients with type 2 diabetes mellitus whose hyperglycemia cannot be managed on diet alone. PRECOSE® may also be used in combination with a sulfonylurea when diet plus either PRECOSE® or a sulfonylurea do not result in adequate glycemic control. Also, PRECOSE® may be used in combination with insulin or metformin. The effect of PRECOSE® to enhance glycemic control is additive to that of sulfonylureas, insulin, or metformin when used in combination, presumably because its mechanism of action is different.

In initiating treatment for type 2 diabetes mellitus, diet should be emphasized as the primary form of treatment. Caloric restriction and weight loss are essential in the obese diabetic patient. Proper dietary management alone may be effective in controlling blood glucose and symptoms of hyperglycemia. The importance of regular physical activity when appropriate should also be stressed. If this treatment program fails to result in adequate glycemic control, the use of PRECOSE® should be considered. The use of PRECOSE® must be viewed by both the physician and patient as a treatment in addition to diet, and not as a substitute for diet or as a convenient mechanism for avoiding dietary restraint.

## CONTRAINDICATIONS

PRECOSE® is contraindicated in patients with known hypersensitivity to the drug and in patients with diabetic ketoacidosis or cirrhosis. PRECOSE® is also contraindicated in patients with inflammatory bowel disease, colonic ulceration, partial intestinal obstruction or in patients predisposed to intestinal obstruction. In addition, PRECOSE® is contraindicated in patients who have chronic intestinal diseases associated with marked disorders of digestion or absorption and in patients who have conditions that may deteriorate as a result of increased gas formation in the intestine.

## PRECAUTIONS

### General

**Hypoglycemia:** Because of its mechanism of action, PRECOSE® when administered alone should not cause hypoglycemia in the fasted or postprandial state. Sulfonylurea agents or insulin may cause hypoglycemia. Because PRECOSE® given in combination with a sulfonylurea or insulin will cause a further lowering of blood glucose, it may increase the potential for hypoglycemia. Hypoglycemia does not occur in patients receiving metformin alone under usual circumstances of use, and no increased incidence of hypoglycemia was observed in patients when PRECOSE® was added to metformin therapy. Oral glucose (dextrose), whose absorption is not inhibited by PRECOSE®, should be used instead of sucrose (cane sugar) in the treatment of mild to moderate hypoglycemia. Sucrose, whose hydrolysis to glucose and fructose is inhibited by PRECOSE®, is unsuitable for the rapid correction of hypoglycemia. Severe hypoglycemia may require the use of either intravenous glucose infusion or glucagon injection.

**Elevated Serum Transaminase Levels:** In long-term studies (up to 12 months, and including PRECOSE® doses up to 300 mg t.i.d.) conducted in the United States, treatment-emergent elevations of serum transaminases (AST and/or ALT) above the upper limit of normal (ULN), greater than 1.8 times the ULN, and greater than 3 times the ULN occurred in 14%, 6%, and 3%, respectively, of PRECOSE®-treated patients as compared to 7%, 2%, and 1%, respectively, of placebo-treated patients. Although these differences between treatments were statistically significant, these elevations were asymptomatic, reversible, more common in females, and, in general, were not associated with other evidence of liver dysfunction. In addition, these serum transaminase elevations appeared to be dose related. In US studies including PRECOSE® doses up to the maximum approved dose of 100 mg t.i.d., treatment-emergent elevations of AST and/or ALT at any level of severity were similar between PRECOSE®-treated patients and placebo-treated patients (p ≥ 0.496).

In approximately 3 million patient-years of international post-marketing experience with PRECOSE®, 62 cases of serum transaminase elevations > 500 IU/L (29 of which were associated with jaundice) have been reported. Forty-one of these 62 patients received treatment with 100 mg t.i.d. or greater and 33 of 45 patients for whom weight was reported weighed < 60 kg. In the 59 cases where follow-up was recorded, hepatic abnormalities improved or resolved upon discontinuation of PRECOSE® in 55 and were unchanged in two. A few cases of fulminant hepatitis with fatal outcome have been reported; the relationship to acarbose is unclear.

**Loss of Control of Blood Glucose:** When diabetic patients are exposed to stress such as fever, trauma, infection, or surgery, a temporary loss of control of blood glucose may occur. At such times, temporary insulin therapy may be necessary.

**Information for Patients:** Patients should be told to take PRECOSE® orally three times a day at the start (with the first bite) of each main meal. It is important that patients continue to adhere to dietary instructions, a regular exercise program, and regular testing of urine and/or blood glucose.

PRECOSE® itself does not cause hypoglycemia even when administered to patients in the fasted state. Sulfonylurea drugs and insulin, however, can lower blood sugar levels enough to cause symptoms or sometimes life-threatening hypoglycemia. Because PRECOSE® given in combination with a sulfonylurea or insulin will cause a further lowering of blood sugar, it may increase the hypoglycemic potential of these agents. Hypoglycemia does not occur in patients receiving metformin alone under usual circumstances of use, and no increased incidence of hypoglycemia was observed in patients when PRECOSE® was added to metformin therapy. The risk of hypoglycemia, its symptoms and treatment, and conditions that predispose to its development should be well understood by patients and responsible family members. Because PRECOSE® prevents the breakdown of table sugar, patients should have a readily available source of glucose (dextrose, D-glucose) to treat symptoms of low blood sugar when taking PRECOSE® in combination with a sulfonylurea or insulin.

If side effects occur with PRECOSE®, they usually develop during the first few weeks of therapy. They are most commonly mild-to-moderate gastrointestinal effects, such as flatulence, diarrhea, or abdominal discomfort, and generally diminish in frequency and intensity with time.

**Laboratory Tests:** Therapeutic response to PRECOSE® should be monitored by periodic blood glucose tests. Measurement of glycosylated hemoglobin levels is recommended for the monitoring of long-term glycemic control.

PRECOSE®, particularly at doses in excess of 50 mg t.i.d., may give rise to elevations of serum transaminases and, in rare instances, hyperbilirubinemia. It is recommended that serum transaminase levels be checked every 3 months during the first year of treatment with PRECOSE® and periodically thereafter. If elevated transaminases are observed, a reduction in dosage or withdrawal of therapy may be indicated, particularly if the elevations persist.

NDA 20-482/S-015
Page 11

**Renal Impairment:** Plasma concentrations of PRECOSE® in renally impaired volunteers were proportionally increased relative to the degree of renal dysfunction. Long-term clinical trials in diabetic patients with significant renal dysfunction (serum creatinine > 2.0 mg/dL) have not been conducted. Therefore, treatment of these patients with PRECOSE® is not recommended.

**Drug Interactions:** Certain drugs tend to produce hyperglycemia and may lead to loss of blood glucose control. These drugs include the thiazides and other diuretics, corticosteroids, phenothiazines, thyroid products, estrogens, oral contraceptives, phenytoin, nicotinic acid, sympathomimetics, calcium channel-blocking drugs, and isoniazid. When such drugs are administered to a patient receiving PRECOSE®, the patient should be closely observed for loss of blood glucose control. When such drugs are withdrawn from patients receiving PRECOSE® in combination with sulfonylureas or insulin, patients should be observed closely for any evidence of hypoglycemia.

Patients Receiving Sulfonylureas or Insulin: Sulfonylurea agents or insulin may cause hypoglycemia. PRECOSE® given in combination with a sulfonylurea or insulin may cause a further lowering of blood glucose and may increase the potential for hypoglycemia. If hypoglycemia occurs, appropriate adjustments in the dosage of these agents should be made. Very rarely, individual cases of hypoglycemic shock have been reported in patients receiving PRECOSE® therapy in combination with sulfonylureas and/or insulin.

Intestinal adsorbents (e.g., charcoal) and digestive enzyme preparations containing carbohydrate-splitting enzymes (e.g., amylase, pancreatin) may reduce the effect of PRECOSE® and should not be taken concomitantly.

PRECOSE® has been shown to change the bioavailability of digoxin when they are coadministered, which may require digoxin dose adjustment. (See **CLINICAL PHARMACOLOGY, Drug-Drug Interactions**).

**Carcinogenesis, Mutagenesis, and Impairment of Fertility:** Eight carcinogenicity studies were conducted with acarbose. Six studies were performed in rats (two strains, Sprague-Dawley and Wistar) and two studies were performed in hamsters.

In the first rat study, Sprague-Dawley rats received acarbose in feed at high doses (up to approximately 500 mg/kg body weight) for 104 weeks. Acarbose treatment resulted in a significant increase in the incidence of renal tumors (adenomas and adenocarcinomas) and benign Leydig cell tumors. This study was repeated with a similar outcome. Further studies were performed to separate direct carcinogenic effects of acarbose from indirect effects resulting from the carbohydrate malnutrition induced by the large doses of acarbose employed in the studies. In one study using Sprague-Dawley rats, acarbose was mixed with feed but carbohydrate deprivation was prevented by the addition of glucose to the diet. In a 26-month study of Sprague-Dawley rats, acarbose was administered by daily postprandial gavage so as to avoid the pharmacologic effects of the drug. In both of these studies, the increased incidence of renal tumors found in the original studies did not occur. Acarbose was also given in food and by postprandial gavage in two separate studies in Wistar rats. No increased incidence of renal tumors was found in either of these Wistar rat studies. In two feeding studies of hamsters, with and without glucose supplementation, there was also no evidence of carcinogenicity.

Acarbose did not induce any DNA damage *in vitro* in the CHO chromosomal aberration assay, bacterial mutagenesis (Ames) assay, or a DNA binding assay. *In vivo*, no DNA damage was detected in the dominant lethal test in male mice, or the mouse micronucleus test.

Fertility studies conducted in rats after oral administration produced no untoward effect on fertility or on the overall capability to reproduce.

NDA 20-482/S-015
Page 12

## Pregnancy:

**Teratogenic Effects:** Pregnancy Category B. The safety of PRECOSE® in pregnant women has not been established. Reproduction studies have been performed in rats at doses up to 480 mg/kg (corresponding to 9 times the exposure in humans, based on drug blood levels) and have revealed no evidence of impaired fertility or harm to the fetus due to acarbose. In rabbits, reduced maternal body weight gain, probably the result of the pharmacodynamic activity of high doses of acarbose in the intestines, may have been responsible for a slight increase in the number of embryonic losses. However, rabbits given 160 mg/kg acarbose (corresponding to 10 times the dose in man, based on body surface area) showed no evidence of embryotoxicity and there was no evidence of teratogenicity at a dose 32 times the dose in man (based on body surface area). There are, however, no adequate and well-controlled studies of PRECOSE® in pregnant women. Because animal reproduction studies are not always predictive of the human response, this drug should be used during pregnancy only if clearly needed. Because current information strongly suggests that abnormal blood glucose levels during pregnancy are associated with a higher incidence of congenital anomalies as well as increased neonatal morbidity and mortality, most experts recommend that insulin be used during pregnancy to maintain blood glucose levels as close to normal as possible.

**Nursing Mothers:** A small amount of radioactivity has been found in the milk of lactating rats after administration of radiolabeled acarbose. It is not known whether this drug is excreted in human milk. Because many drugs are excreted in human milk, PRECOSE® should not be administered to a nursing woman.

**Pediatric Use:** Safety and effectiveness of PRECOSE® in pediatric patients have not been established.

**Geriatric Use:** Of the total number of subjects in clinical studies of PRECOSE® in the United States, 27 percent were 65 and over, while 4 percent were 75 and over. No overall differences in safety and effectiveness were observed between these subjects and younger subjects. The mean steady-state area under the curve (AUC) and maximum concentrations of acarbose were approximately 1.5 times higher in elderly compared to young volunteers; however, these differences were not statistically significant.

## ADVERSE REACTIONS

**Digestive Tract:** Gastrointestinal symptoms are the most common reactions to PRECOSE®. In U.S. placebo-controlled trials, the incidences of abdominal pain, diarrhea, and flatulence were 19%, 31%, and 74% respectively in 1255 patients treated with PRECOSE® 50-300 mg t.i.d., whereas the corresponding incidences were 9%, 12%, and 29% in 999 placebo-treated patients. In a one-year safety study, during which patients kept diaries of gastrointestinal symptoms, abdominal pain and diarrhea tended to return to pretreatment levels over time, and the frequency and intensity of flatulence tended to abate with time. The increased gastrointestinal tract symptoms in patients treated with PRECOSE® are a manifestation of the mechanism of action of PRECOSE® and are related to the presence of undigested carbohydrate in the lower GI tract.

If the prescribed diet is not observed, the intestinal side effects may be intensified. If strongly distressing symptoms develop in spite of adherence to the diabetic diet prescribed, the doctor must be consulted and the dose temporarily or permanently reduced.

**Elevated Serum Transaminase Levels:** See PRECAUTIONS.

**Other Abnormal Laboratory Findings:** Small reductions in hematocrit occurred more often in PRECOSE®-treated patients than in placebo-treated patients but were not associated with reductions in hemoglobin. Low serum calcium and low plasma vitamin $B_6$ levels were associated with PRECOSE® therapy but are thought to be either spurious or of no clinical significance.

NDA 20-482/S-015
Page 13

**Post Marketing Adverse Event Reports:**
Additional adverse events reported from worldwide post marketing experience include hypersensitive skin reactions (e.g. rash, erythema, exanthema and uticaria), edema, ileus/subileus, jaundice and/or hepatitis and associated liver damage (See **PRECAUTIONS**.)

## OVERDOSAGE

Unlike sulfonylureas or insulin, an overdose of PRECOSE® will not result in hypoglycemia. An overdose may result in transient increases in flatulence, diarrhea, and abdominal discomfort which shortly subside. In cases of overdosage the patient should not be given drinks or meals containing carbohydrates (polysaccharides, oligosaccharides and disaccharides) for the next 4-6 hours.

## DOSAGE AND ADMINISTRATION

There is no fixed dosage regimen for the management of diabetes mellitus with PRECOSE® or any other pharmacologic agent. Dosage of PRECOSE® must be individualized on the basis of both effectiveness and tolerance while not exceeding the maximum recommended dose of 100 mg t.i.d. PRECOSE® should be taken three times daily at the start (with the first bite) of each main meal. PRECOSE® should be started at a low dose, with gradual dose escalation as described below, both to reduce gastrointestinal side effects and to permit identification of the minimum dose required for adequate glycemic control of the patient.

During treatment initiation and dose titration (see below), one-hour postprandial plasma glucose may be used to determine the therapeutic response to PRECOSE® and identify the minimum effective dose for the patient. Thereafter, glycosylated hemoglobin should be measured at intervals of approximately three months. The therapeutic goal should be to decrease both postprandial plasma glucose and glycosylated hemoglobin levels to normal or near normal by using the lowest effective dose of PRECOSE®, either as monotherapy or in combination with sulfonylureas, insulin or metformin.

**Initial Dosage:** The recommended starting dosage of PRECOSE® is 25 mg given orally three times daily at the start (with the first bite) of each main meal. However, some patients may benefit from more gradual dose titration to minimize gastrointestinal side effects. This may be achieved by initiating treatment at 25 mg once per day and subsequently increasing the frequency of administration to achieve 25 mg t.i.d.

**Maintenance Dosage:** Once a 25 mg t.i.d. dosage regimen is reached, dosage of PRECOSE® should be adjusted at 4-8 week intervals based on one-hour postprandial glucose or glycosylated hemoglobin levels, and on tolerance. The dosage can be increased from 25 mg t.i.d. to 50 mg t.i.d. Some patients may benefit from further increasing the dosage to 100 mg t.i.d. The maintenance dose ranges from 50 mg t.i.d. to 100 mg t.i.d. However, since patients with low body weight may be at increased risk for elevated serum transaminases, only patients with body weight > 60 kg should be considered for dose titration above 50 mg t.i.d. (see **PRECAUTIONS**). If no further reduction in postprandial glucose or glycosylated hemoglobin levels is observed with titration to 100 mg t.i.d., consideration should be given to lowering the dose. Once an effective and tolerated dosage is established, it should be maintained.

**Maximum Dosage:** The maximum recommended dose for patients ≤ 60 kg is 50 mg t.i.d. The maximum recommended dose for patients > 60 kg is 100 mg t.i.d.

**Patients Receiving Sulfonylureas or Insulin:** Sulfonylurea agents or insulin may cause hypoglycemia. PRECOSE® given in combination with a sulfonylurea or insulin will cause a further lowering of blood glucose and may increase the potential for hypoglycemia. If hypoglycemia occurs, appropriate adjustments in the dosage of these agents should be made.

NDA 20-482/S-015
Page 14

## HOW SUPPLIED

PRECOSE® is available as 25 mg, 50 mg or 100 mg round, unscored tablets. Each tablet strength is white to yellow-tinged in color. The 25 mg tablet is coded with the word "PRECOSE" on one side and "25" on the other side. The 50 mg tablet is coded with the word "PRECOSE" and "50" on the same side. The 100 mg tablet is coded with the word "PRECOSE" and "100" on the same side. PRECOSE® is available in bottles of 100 and 50 mg strength in unit dose packages of 100.

|  | Strength | NDC | Tablet Identification |
|---|---|---|---|
| Bottles of 100: | 25 mg | 0026-2863-51 | PRECOSE  25 |
|  | 50 mg | 0026-2861-51 | PRECOSE  50 |
|  | 100 mg | 0026-2862-51 | PRECOSE  100 |
| Unit Dose Packages of 100: | 50 mg | 0026-2861-48 | PRECOSE  50 |

**Do not store above 25°C (77°F). Protect from moisture. For bottles, keep container tightly closed.**

 **Bayer HealthCare**

Bayer Pharmaceuticals Corporation 400 Morgan Lane
West Haven, CT 06516
Made in Germany

Rx Only

| 08753825, R.3 | 11/04 | Bay g 5421 | PRECOSE®/5202/0/8/USA-13 |
|---|---|---|---|
| 12573 | ©2004 Bayer Pharmaceuticals Corporation | | Printed in U.S.A. |

# Declaration of William A. Rakoczy

*In support of Cobalt's Motion for*
*Temporary Restraining Order*

## Exhibit B

Active Ingredient Search                                                    Page 1 of 1

**Active Ingredient Search Results from "OB_Rx" table for query on "acarbose."**

| Appl No | TE Code | RLD | Active Ingredient | Dosage Form; Route | Strength | Proprietary Name | Applicant |
|---------|---------|-----|-------------------|--------------------|----------|------------------|-----------|
| 020482  |         | No  | ACARBOSE          | TABLET; ORAL       | 100MG    | PRECOSE          | BAYER PHARMS |
| 020482  |         | No  | ACARBOSE          | TABLET; ORAL       | 25MG     | PRECOSE          | BAYER PHARMS |
| 020482  |         | No  | ACARBOSE          | TABLET; ORAL       | 50MG     | PRECOSE          | BAYER PHARMS |

Return to Electronic Orange Book Home Page

---

FDA/Center for Drug Evaluation and Research
Office of Generic Drugs
Division of Labeling and Program Support
Update Frequency:
   Orange Book Data - **Monthly**
   Generic Drug Product Information & Patent Information - **Daily**
   Orange Book Data Updated Through March, 2008
   Patent and Generic Drug Product Data Last Updated: May 07, 2008

Orange Book Detail Record Search

Page 1 of 2

**Search results from the "OB_Rx" table for query on "020482."**

| | |
|---|---|
| Active Ingredient: | ACARBOSE |
| Dosage Form;Route: | TABLET; ORAL |
| Proprietary Name: | PRECOSE |
| Applicant: | BAYER PHARMS |
| Strength: | 50MG |
| Application Number: | 020482 |
| Product Number: | 001 |
| Approval Date: | Sep 6, 1995 |
| Reference Listed Drug | No |
| RX/OTC/DISCN: | RX |
| TE Code: | |
| Patent and Exclusivity Info for this product: | View |

| | |
|---|---|
| Active Ingredient: | ACARBOSE |
| Dosage Form;Route: | TABLET; ORAL |
| Proprietary Name: | PRECOSE |
| Applicant: | BAYER PHARMS |
| Strength: | 100MG |
| Application Number: | 020482 |
| Product Number: | 002 |
| Approval Date: | Sep 6, 1995 |
| Reference Listed Drug | No |
| RX/OTC/DISCN: | RX |
| TE Code: | |
| Patent and Exclusivity Info for this product: | View |

| | |
|---|---|
| Active Ingredient: | ACARBOSE |
| Dosage Form;Route: | TABLET; ORAL |
| Proprietary Name: | PRECOSE |
| Applicant: | BAYER PHARMS |
| Strength: | 25MG |
| Application Number: | 020482 |
| Product Number: | 004 |
| Approval Date: | May 29, 1997 |
| Reference Listed Drug | No |
| RX/OTC/DISCN: | RX |
| TE Code: | |
| Patent and Exclusivity Info for this product: | View |

Return to Electronic Orange Book Home Page

FDA/Center for Drug Evaluation and Research
Office of Generic Drugs

Division of Labeling and Program Support
Update Frequency:
    Orange Book Data – **Monthly**
    Generic Drug Product Information & Patent Information – **Daily**
    Orange Book Data Updated Through March, 2008
    Patent and Generic Drug Product Data Last Updated: May 07, 2008

Patent and Exclusivity Search Results                                Page 1 of 1

**Patent and Exclusivity Search Results from query on Appl No 020482 Product 001 in the OB_Rx list.**

## Patent Data

| Appl No | Prod No | Patent No | Patent Expiration | Drug Substance Claim | Drug Product Claim | Patent Use Code | Delist Requested |
|---------|---------|-----------|-------------------|----------------------|--------------------|-----------------|------------------|
| 020482  | 001     | 4904769   | Sep 6, 2009       |                      |                    |                 | Y                |

## Exclusivity Data

**There is no unexpired exclusivity for this product.**

Additional information:

1. Patents are published upon receipt by the Orange Book Staff and may not reflect the official receipt date as described in 21 CFR 314.53(d)(5).
2. Patents listed prior to August 18, 2003 are flagged with method of use claims only as applicable and submitted by the sponsor. These patents may not be flagged with respect to other claims which may apply
3. Patent number 4904769 listed on all products of NDA 20482 Precose (Acarbose) was requested to be delisted by the sponsor on 4/16/2007. This patent has remained listed because, under Section 505(j)(5)(D) (i) of the Act, a first applicant may retain eligibility for 180-day exclusivity based on a paragraph IV certification to this patent for a certain period.

View a list of all patent use codes
View a list of all exclusivity codes

Return to Electronic Orange Book Home Page

FDA/Center for Drug Evaluation and Research
Office of Generic Drugs
Division of Labeling and Program Support
Update Frequency:
    Orange Book Data - **Monthly**
    Generic Drug Product Information & Patent Information - **Daily**
    Orange Book Data Updated Through March, 2008
    Patent and Generic Drug Product Data Last Updated: May 07, 2008

# Declaration of William A. Rakoczy

*In support of Cobalt's Motion for*
*Temporary Restraining Order*

# Exhibit C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| COBALT LABORATORIES INC.<br>24840 South Tamiami Trail<br>Bonita Springs, Florida 34134, and<br><br>COBALT PHARMACEUTICALS, INC.<br>6500 Kitimat Road<br>Mississauga, Ontario, Canada, L5N 2B8<br><br>Plaintiffs,<br><br>v.<br><br>FOOD AND DRUG ADMINISTRATION<br>5600 Fishers Lane<br>Rockville, Maryland 20857,<br><br>MICHAEL O. LEAVITT<br>Secretary of Health and Human Services<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201, and<br><br>ANDREW C. VON ESCHENBACH, M.D.<br>Commissioner of Food and Drugs<br>5600 Fishers Lane<br>Rockville, Maryland 20857,<br><br>Defendants. | Case No. |

## DECLARATION OF DONNA HILLIER

I, DONNA HILLIER, declare as follows:

1.    I am the Director of Regulatory Affairs of Cobalt Pharmaceuticals Inc., and have held that or similar positions for approximately 7 years.  Cobalt Pharmaceuticals Inc. is the manufacturing affiliate of Cobalt Laboratories, Inc.  For convenience and clarity, I refer to them collectively as "Cobalt."  I have personal knowledge of the facts set forth herein, or believe them to be true based on my experience in the pharmaceutical industry and information I have

received in the course of my duties, and am competent to testify as to the same. I respectfully submit this declaration in support of Cobalt's motion for temporary restraining order.

2.      Before beginning work at Cobalt, I worked in the pharmaceutical industry for over 9 years in various regulatory affairs functions.    Through my experience in the pharmaceutical industry, I have gained an understanding of and am well familiar with the generic drug review and approval process at FDA's Office of Generic Drugs. I am also familiar with the facts regarding the submission and review of Cobalt's ANDA for generic acarbose tablets.

**A.      Cobalt's First-Filed Paragraph IV ANDA For Acarbose.**

3.      Cobalt began its development of a generic acarbose product in early 2003, with a view toward compiling the information necessary to submit an ANDA. As part of that effort, Cobalt researched the potential ways to establish bioequivalence ("BE") to the brand product (Bayer's Precose® tablets).    As part of that process, with its contract research organization ("CRO"), Cobalt developed a detailed protocol for establishing BE to the brand product.

4.      On August 27, 2003, Cobalt formally sought the Agency's confirmation regarding the BE requirements and parameters for an appropriate study to support an ANDA for generic acarbose. Specifically, Cobalt provided FDA with a detailed, 21-page protocol for the BE study design developed by Cobalt's CRO. But more than six months passed without any word from FDA. On March 5, 2004, Cobalt again sought confirmation regarding its BE study, and included an even more detailed protocol from its CRO. Like its previous submission, Cobalt clearly and unambiguously identified its CRO and the CRO's clinical study site.

5.      By January 2005—well over sixteen months since its original correspondence— Cobalt had received no response of any kind from FDA. Having heard nothing from the Agency for over sixteen months, which was more than ample time for the Agency to review and analyze

Cobalt's submission, Cobalt reasonably assumed that its proposed BE protocol and study design was appropriate, and thus proceeded with its ANDA submission.

6.    On January 10, 2005, Cobalt submitted ANDA No. 77-532 to FDA for generic acarbose tablets in 25 mg, 50 mg, and 100 mg strengths. Cobalt's ANDA included a so-called "paragraph IV certification" to the only patent listed in FDA's "Orange Book" in connection with Bayer's Precose® tablets. Cobalt's ANDA also included the results of the *in vivo* BE study conducted by Cobalt's CRO—the very same CRO that Cobalt had identified back in August 2003. Cobalt's CRO conducted the BE study according to the protocols that Cobalt provided FDA on August 27, 2003, and again on March 5, 2004. The identity and location of Cobalt's CRO has not changed since Cobalt's original controlled correspondence in August 2003. Cobalt expected that FDA would, and indeed relied upon the Agency to, undertake and discharge its review obligations by doing whatever was necessary to complete its review of the BE study, including any necessary inspections of the CRO and its facilities.

7.    On January 11, 2005, the day after Cobalt submitted its ANDA, and over sixteen months after Cobalt sought FDA's confirmation regarding BE requirements for acarbose, Cobalt received a letter from the Agency purporting to respond to Cobalt's controlled correspondence sent August 27, 2003, and March 5, 2004. The Agency essentially ignored Cobalt's prior BE study design, and instead established and imposed new BE requirements for acarbose. In particular, FDA stated that, before conducting an actual pivotal BE study, Cobalt should first conduct a specified additional BE study. FDA's correspondence completely changed the approval requirements after the submission of Cobalt's ANDA, and more than sixteen months after Cobalt originally contacted the Agency.

3

8.    On March 9, 2005, in a "refuse to receive" letter, FDA informed Cobalt that its ANDA purportedly was not "sufficiently complete to merit a critical technical review" for several reasons—none of which were related to Cobalt's BE study or CRO. FDA's letter did not mention the additional BE requirements imposed by the Agency after Cobalt filed its ANDA. Nor did FDA take issue with Cobalt's pivotal BE study or its CRO. On March 18, 2005, Cobalt submitted an amendment to its ANDA that sufficiently addressed all of FDA's concerns. As part of its response, Cobalt again identified the CRO that conducted its BE study.

9.    On April 28, 2005, in an "acceptance for filing" letter, FDA acknowledged receipt of Cobalt's ANDA, as well as the March 18, 2005 amendment. FDA further informed Cobalt that the Agency had accepted Cobalt's ANDA for filing and substantive review as of March 22, 2005. This is the first day that a substantially complete ANDA for acarbose, together with a paragraph IV certification, was submitted to FDA. Accordingly, Cobalt is the "first applicant" entitled to the 180-day generic marketing exclusivity for all strengths of this product that will not start until Cobalt first commercially markets.

10.    On May 12, 2005, Cobalt sent the requisite notice of its ANDA and paragraph IV certification to Bayer AG, the owner of the '769 patent, and Bayer Pharmaceuticals Corporation, the holder of the approved NDA for the brand product, Precose® tablets. Bayer Pharmaceuticals and Bayer AG received Cobalt's Paragraph IV Notice on May 16 and 17, 2005, respectively.

**B.    FDA Delays Its Review Of Cobalt's ANDA, And Fails To Inspect Cobalt's CRO.**

11.    On June 30, 2005, FDA issued a BE deficiency to Cobalt. That letter did not mention FDA's prior January 2005 BE letter to Cobalt, nor did the Agency mention anything about Cobalt's CRO. Cobalt responded to FDA on September 27, 2005 by, *inter alia,*

4

identifying the study protocol and reports from its original ANDA, which clearly identify the CRO that conducted the BE study.

12.    After receiving Cobalt's response, FDA said nothing regarding BE for well over a year. On October 24, 2005, FDA did, however, issue a minor deficiency, asking, among other things, that Cobalt acknowledge that the "firms referenced in your application should be in compliance with cGMP at the time of approval." While acknowledging the earlier BE deficiency, FDA once again made no mention of its January 2005 letter to Cobalt or any problems or delays in inspecting the facilities identified in Cobalt's ANDA, including its CRO. Cobalt responded to FDA's minor deficiency on February 27, 2006, and acknowledged that "firms referenced in the ANDA should be in compliance with cGMP at the time of approval." Cobalt, again, assumed that FDA would conduct any necessary inspections of the facilities identified in Cobalt ANDA. Cobalt had no reason to suspect that FDA would fail to timely inspect its CRO.

13.    When FDA finally followed up on its June 2005 BE deficiency on August 8, 2006, FDA stated that Cobalt had failed to conduct the additional study that FDA first required in its January 6, 2005 correspondence. The Agency failed to mention that it did not communicate these new BE requirements to Cobalt until after Cobalt's CRO conducted the pivotal BE study and after Cobalt filed its ANDA. Nor did FDA acknowledge its failure to raise these new BE requirements in the Agency's June 2005 BE deficiency, or that the Agency would be unable to complete an inspection of Cobalt's CRO in a timely manner. On September 20, 2006, Cobalt responded to FDA's August 8, 2006 BE deficiency. Among other things, Cobalt submitted data on a study conducted by its CRO, as FDA had requested.

14.     Once again, FDA waited over a year to respond back to Cobalt regarding BE issues. In the interim, Cobalt repeatedly contacted FDA to determine the status of the Agency's BE review. At no time during this period did FDA ever inform Cobalt that the Agency had not inspected Cobalt's CRO, even though the Agency had known about this CRO since at least August 2003.

15.     On June 8, 2007, FDA issued another BE deficiency letter. FDA again faulted Cobalt for not performing the additional study that FDA did not require until after submission of Cobalt's ANDA. While Cobalt did, in fact, conduct the required study, FDA rejected it because Cobalt's CRO did not conduct it before the pivotal BE study submitted with Cobalt's ANDA. Cobalt, however, could not have carried out the study FDA required for the first time on January 11, 2005 before the pivotal BE study because FDA did not impose that requirement until after Cobalt submitted its ANDA. FDA faulted Cobalt for not performing the additional study before its pivotal BE study, even though Cobalt could not possibly have known it was required to perform such a study in the first place. FDA's June 8, 2007 deficiency letter further stated that Cobalt should either reformulate its product entirely, or repeat all BE studies. FDA never stated that the studies were unacceptable because the Agency had not inspected Cobalt's CRO.

16.     On June 18, 2007, Cobalt promptly requested a telephone conference to discuss the Agency's June 8, 2007 BE deficiency. On June 28, 2007, representatives of FDA and Cobalt conducted a telephone conference to discuss these issues. In particular, the parties agreed, among other things, that Cobalt would conduct a new pivotal BE study. During that call, FDA specifically inquired as to which CRO Cobalt would be using to conduct the new pivotal BE study. Cobalt responded that it would use the same CRO that conducted the prior two studies. FDA replied that using the same CRO would be acceptable. FDA never stated or otherwise

6

implied that the CRO was not acceptable because it had not been inspected. Nor did FDA mention that, after more than two years, FDA still had not inspected the CRO.

17.    On September 3, 2007, Cobalt formally responded to FDA's June 8, 2007 BE deficiency. With that response, Cobalt submitted the results from another pivotal BE study conducted by its CRO. Those results (like the results contained in its original ANDA) demonstrate that Cobalt's proposed product is bioequivalent to the reference brand product. FDA has orally confirmed to Cobalt that there are no substantive issues with the new pivotal BE study. However, on September 24, 2007, FDA nonetheless orally informed Cobalt that it would not approve Cobalt's ANDA *solely* because FDA had never inspected Cobalt's CRO in the over two and a half year period that the application was pending, and that such an inspection could not occur for at least another month.

C.    **FDA Finally Inspects Cobalt's CRO But Subjects Cobalt's ANDA To Still Further Delays.**

18.    On November 28, 2007, Cobalt learned that FDA had contacted Cobalt's CRO to arrange an inspection of the CRO's facilities by telephone, rather than in-person. At no time did FDA inform Cobalt or its CRO why, if an inspection could be handled by phone, had the Agency not conducted such an inspection in the more than two and a half years that had passed since Cobalt's ANDA had been accepted for filing.

19.    FDA finally conducted its telephone inspection of Cobalt's CRO over the course of five days, from December 3-7, 2007. Following the inspection, Cobalt's CRO was informed that the FDA inspector was recommending that the BE study was acceptable. However, on December 17, 2007, FDA's Office of Generic Drugs ("OGD") informed Cobalt that its ANDA still would not receive final approval due to certain issues that the Agency was evaluating relating to all acarbose tablet ANDAs. Specifically, OGD indicated that FDA's Office of Chief

Counsel ("OCC") had instructed OGD to refrain from issuing final approval to any acarbose tablet ANDA, including Cobalt's, in light of a Citizen Petition filed by Cobalt on November 9, 2007, which requested that the Agency refuse to grant final approval to any acarbose tablet ANDA that did not contain the necessary *in vivo* bioequivalence studies, such as those conducted by Cobalt at FDA's request, and that FDA refrain from granting any *in vivo* bioequivalence waivers for acarbose tablet ANDAs. OGD gave no explanation as to why Cobalt's ANDA, which contained the requisite BE studies, was being held up during the Agency's review of the Petition.

20.    On December 19, 2007, Cobalt spoke with OCC regarding the status of Cobalt's acarbose ANDA. OCC informed Cobalt that the Agency was reviewing all acarbose ANDAs and evaluating the adequacy of each applicant's BE studies, including Cobalt's, and that FDA would not issue any approvals until its evaluation was complete. OCC confirmed that Cobalt's ANDA was subject to the Agency's review process and further delay of Agency approval despite having conducted additional BE studies in accordance with FDA's recommendations *and* having been informed by the FDA inspector that, from a biostudy perspective, Cobalt's BE study was acceptable.

**D.    Cobalt's Submissions in Response to FDA's Solicitation for Comments.**

21.    On September 26, 2007, FDA solicited comments from all acarbose ANDA applicants on the applicability of certain statutory forfeiture provisions to the 180-day generic exclusivity period associated with acarbose tablets. Cobalt made two separate submissions in response to FDA's request on October 17, 2007, explaining why Cobalt's 180-day exclusivity has not been forfeited. The facts set forth in those submissions are true and correct to the best of

my knowledge and belief. The exhibits submitted with those submissions are also true and accurate to the best of my knowledge and belief.

22.    On November 6, 2007, Cobalt submitted supplemental comments to FDA to address forfeiture arguments made by another company. As with Cobalt's initial comments, the facts set forth in that submission are true and correct to the best of my knowledge and belief. The exhibits submitted with that submission also are true and accurate to the best of my knowledge and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 21, 2007

DONNA HILLIER

# Declaration of William A. Rakoczy

*In support of Cobalt's Motion for
Temporary Restraining Order*

## Exhibit D



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Food and Drug Administration
Rockville, MD 20857

William A. Rakoczy, Esq.
Rakoczy, Molino, Mazzochi & Siwik, LLP
6 West Hubbard St.
Suite 500
Chicago, IL 60610

Dear Mr. Rakoczy:

This letter addresses the eligibility of Cobalt Pharmaceuticals, Inc. (Cobalt) for 180-day exclusivity for acarbose tablets, for which it has submitted abbreviated new drug application (ANDA) No. 77-532. We are responding to issues raised in submissions to the Food and Drug Administration (FDA) from Cobalt and others (see attached listing) regarding the applicability to this ANDA of the exclusivity and forfeiture provisions in section 505(j) of the Federal Food, Drug, and Cosmetic Act (FDCA or Act).[1] The statutory provisions at issue were enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (the MMA), Pub. L. 108-173, 117 Stat. 2066 (Dec. 8, 2003).

After considering the facts and applicable law, we have concluded that Cobalt was eligible for 180-day exclusivity for acarbose tablets as a first applicant, but for the reason described below, has forfeited that eligibility. Because no applicant is eligible for 180-day exclusivity, FDA may approve any ANDA for acarbose tablets that is otherwise eligible for approval.

    I.    Factual Background

        A.    Bayer's New Drug Application for Precose

Precose 25-mg and 50-mg tablets were approved on September 6, 1995. The 100-mg strength of Precose tablets was approved on May 29, 1997. Bayer submitted U.S. Patent No. 4,904,769 (the '769 patent) to FDA for listing in FDA's *Approved Drug Products with Therapeutic Equivalence Evaluations* (the Orange Book) for all strengths of Precose tablets. On April 16, 2007, Bayer requested that the '769 patent be delisted from the Orange Book.[2] On September 25, 2007, FDA published the request for delisting in the Orange Book.

---

[1] You have requested that FDA explain Cobalt's eligibility for 180-day exclusivity and the application of the forfeiture provisions to its ANDA. As we have previously stated, it is FDA's practice to make decisions on eligibility for 180-day exclusivity in the context of specific ANDAs that are otherwise eligible for approval. This approach is necessary because of the many factors that may influence eligibility for exclusivity up to the time an application is ready for approval (e.g., patent expiration, patent delisting, failure to obtain a tentative approval within 30 months, withdrawal of ANDA) and could thus render a premature eligibility determination incorrect. When the agency makes an approval decision with respect to an ANDA, it will inform an applicant affected by exclusivity that, for example, it is (1) a first applicant and entitled to exclusivity, (2) a first applicant that has forfeited its exclusivity, (3) eligible only for a tentative approval because one or more first applicants are eligible for 180-day exclusivity, or (4) eligible for approval because a first applicant has forfeited its exclusivity. Today, FDA is approving ANDAs held by Cobalt and by Roxane Laboratories, Inc. (Roxane) for acarbose tablets; therefore, we are explaining our conclusions regarding 180-day exclusivity for these products.

[2] By letter dated April 11, 2007, to FDA's Drug Information Service Branch, Cobalt raised questions regarding the patent information that was published in the Orange Book for Precose. Pursuant to 21 CFR 314.53(f), Cobalt

B.     Cobalt's Abbreviated New Drug Application for Acarbose Tablets

Cobalt's ANDA was initially stamped as received by the FDA document room on January 14, 2005. FDA reviewed the application to determine whether it was sufficiently complete to permit a substantive review, as described under 21 CFR 314.101(b). On March 9, 2005, FDA refused to receive Cobalt's ANDA for several reasons, which were enumerated in a letter to the company. On March 22, 2005, FDA received Cobalt's response to the refusal to receive letter, and the ANDA was found acceptable for filing, with a receipt date of March 22, 2005. The Cobalt ANDA contained a paragraph IV certification to the '769 patent, which is the only patent at issue in this matter. Cobalt was the first applicant to submit an ANDA referencing Precose that contained a paragraph IV certification to a patent listed for that drug. Cobalt provided notice of its paragraph IV certification to the NDA holder and patent owner, as required. No patent infringement action was initiated by the NDA holder or patent owner within the 45-day period following receipt of Cobalt's notice of paragraph IV certification. On October 17, 2007, Cobalt brought a declaratory judgment action against the patent owner and NDA holder (*Cobalt Pharmaceuticals Inc. v. Bayer Aktiengesellschaft*, No. 07CV5875 (N.D. Ill. filed Oct. 17, 2007)). The court granted Cobalt's notice of voluntary dismissal, without prejudice, on February 20, 2008.[3]

Cobalt's ANDA contained in vivo bioequivalence studies, which had been conducted before Cobalt received FDA's bioequivalence recommendations.[4] The bioequivalence recommendations for acarbose were sent by FDA to Cobalt on January 6, 2005, and contained information related to both in vivo and in vitro methodologies. The bioequivalence data Cobalt submitted with its ANDA were deficient. Over the course of its consideration of Cobalt's ANDA, the agency sent Cobalt a number of letters describing deficiencies in the application. Cobalt responded to these deficiencies. The last step of the application review involved

---

disputed the accuracy of the Precose patent information and requested that FDA require the New Drug Application (NDA) holder (Bayer) to correct the patent information to reflect the grant of a patent term extension to the '769 patent which extended the patent expiration date from February 27, 2007, to September 6, 2009. On April 12, 2007, FDA's Office of Drug Information forwarded a redacted copy of Cobalt's correspondence to Bayer and requested a prompt response. On April 16, 2007, Bayer informed FDA that the assignee of interest of the '769 patent, Bayer Healthcare AG, had filed a statutory disclaimer under 35 U.S.C. 253, disclaiming all issued claims of the '769 patent, and that the filed disclaimer had been published by the USPTO on February 27, 2007. Bayer further stated that "[i]n view of this disclaimer, the NDA-holder Bayer Pharmaceuticals Corporation hereby requests that the '769 patent be de-listed from the Orange Book."

[3] We note that Cobalt initiated its declaratory judgment action regarding the '769 patent well after the PTO had published the disclaimer to all claims of the '769 patent by its assignee and on the same day that it submitted its first comment to the docket established by FDA on September 26, 2007, regarding certain legal/regulatory issues that pertain to generic drug applications for acarbose tablets.

[4] On September 5, 2003, Cobalt had written to the Office of Generic Drugs (OGD) seeking guidance on the development of bioequivalence criteria for acarbose tablets. Acarbose is a non-systemically absorbed oligosaccharide that reversibly inhibits α-glucosidases. Its mechanism of action is not by means of systemic absorption, rather its antihyperglycemic action is by means of enzyme inhibition in the intestines. Conventional bioequivalence criteria for systemically absorbed products therefore would not apply to acarbose. Because of these factors, and due to other priorities, OGD did not provide bioequivalence guidance for acarbose until January 6, 2005. ANDA applicants are not required to await product-specific guidance from FDA before they begin their bioequivalence studies; however, the information provided in such guidance may be useful to the applicant and prevent the need for additional studies should those conducted by the applicant not be acceptable for establishing bioequivalence.

inspection of the Australian facility used by Cobalt to conduct the bioequivalence studies, which had not previously been inspected and which FDA did not plan to inspect until it had determined that the studies conducted at the facility were otherwise acceptable to support approval of the ANDA. On December 11, 2007, after conducting an off-site data audit, FDA determined that the Australian facility used by Cobalt was acceptable.[5]

On October 24, 2007, Cobalt submitted an "Emergency Petition for Stay of Action" requesting that FDA stay approval of any subsequent ANDAs for acarbose tablets until Cobalt's 180-day exclusivity expires (Docket 2007P-0414).[6] Sixteen days later, on November 9, 2007, Cobalt submitted a Citizen Petition and another Emergency Petition for Stay of Action challenging as inadequate and inappropriate the in vitro bioequivalence recommendations FDA had provided to Cobalt in January 2005, and requesting the agency stay approvals of all ANDAs until they contain adequate in vivo bioequivalence data (Docket 2007P-0448).[7] These November 2007 petitions appear to have been based on the assumption that other ANDA applicants had chosen to conduct in vitro bioequivalence studies, rather than in vivo bioequivalence studies such as those conducted by Cobalt.

The issues raised in Cobalt's petition triggered a reassessment of appropriate in vitro and in vitro bioequivalence methodologies for acarbose tablets. This assessment was conducted by staff from the Office of Generic Drugs and from the Office of Clinical Pharmacology with input from the Division of Metabolism and Endocrine Products. While it reviewed the question whether the methods used by Cobalt and other applicants were adequate to establish bioequivalence for acarbose, FDA delayed approval of the acarbose ANDAs. FDA determined, as required by section 505(q) of the Act, that such a delay was necessary to protect the public health. The agency has completed its review of the bioequivalence issues, and is responding to your petitions on that issue in a separate letter. Because both in vitro and in vivo methods may be appropriate for establishing bioequivalence for acarbose products, FDA may approve Cobalt's ANDA and ANDAs containing appropriate in vitro bioequivalence data.

## II.    Abbreviated New Drug Applications and 180-day Exclusivity

Under the Drug Price Competition and Patent Term Restoration Act of 1984 (Hatch-Waxman Amendments), an NDA applicant must submit information for each patent that claims the drug or method of using the drug that is the subject of the NDA and for which "a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the

---

[5] OGD requests an inspection of clinical facilities or analytical laboratories conducting BE studies included in an unapproved ANDA if there is a question about the quality or integrity of the data submitted in an ANDA; or if a clinical facility or analytical testing site is identified in the ANDA that has no inspection history, was classified "official action indicated" on its last inspection, or has not been inspected within the past 3 years; or a clinical facility and/or analytical laboratory is performing a non-conventional BE study for which it has never been inspected (e.g., a study using pharmacodynamic endpoints to assess bioequivalence). The inspection of the Australian facility was necessitated by the fact that it had no inspection history as well as the non-conventional nature of the BE study.

[6] The docket number was changed to FDA-2007-P-0249 as a result of FDA's transition to its new docketing system (Regulations.gov) in January 2008.

[7] The docket number was changed to FDA-2007-P-0418 as a result of FDA's transition to its new docketing system (Regulations.gov) in January 2008.

manufacture, use, or sale of the drug" (sections 505(b)(1) and (c)(2) of the Act). FDA publishes this patent information in the Orange Book.

An applicant must include in its ANDA one of the following certifications with respect to each patent for the listed drug it references:

>  (I)  that such patent information has not been filed (a paragraph I certification),
>  (II)  that such patent has expired (a paragraph II certification),
>  (III)  of the date on which such patent will expire (a paragraph III certification), or
>  (IV)  that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted (a paragraph IV certification).

Section 505(j)(2)(A)(vii).[8]  See also 21 CFR 314.94(a)(12)(i)(A).  An applicant submitting a paragraph IV certification to a listed patent must provide the NDA holder and the patent owner notice of its patent certification, including a description of the legal and factual basis for its assertion that the patent is invalid or not infringed (section 505(j)(2)(B) of the Act).  If the NDA holder or patent owner initiates a patent infringement action against the ANDA applicant within 45 days of receiving the required notice, approval of the ANDA generally will be stayed for 30 months from the date of the notice or such shorter or longer time as the court might order (section 505(j)(5)(B)(iii) of the Act).

The MMA exclusivity provisions, like those in the Hatch-Waxman Amendments, provide the first applicant(s) to submit a paragraph IV certification challenging a patent — and thus undertake the risk of litigation — an incentive in the form of the opportunity to be the only generic drug manufacturer to compete with the innovator for a 180-day period.  The requirements for obtaining and retaining this 180-day exclusivity period are described at sections 505(j)(5)(B)(iv) and 505(j)(5)(D) of the Act.

Section 505(j)(5)(D) describes a significant new feature of 180-day exclusivity under the MMA in the form of a set of conditions under which an ANDA applicant loses — or forfeits — eligibility for 180-day exclusivity.  These are the provisions at issue in this matter.

> A.    Cobalt's Eligibility for 180-day Exclusivity

Cobalt's ANDA 77-532 was the first ANDA that contained a paragraph IV certification to a listed patent for Precose.  Because this ANDA was submitted after December 8, 2003, 180-day exclusivity for ANDAs referencing Precose is governed by section 505(j)(5)(D) of the FDCA, as amended by Title XI of the MMA (see section 1102(b) of the MMA).  FDA has not yet promulgated regulations implementing these new statutory provisions; until it does so, it will regulate directly from the statute in determining whether ANDA applicants are entitled to exclusivity.

---

[8] The Act provides only one circumstance in which an ANDA applicant need not certify to a listed patent: "if with respect to the listed drug referred to in clause (I) information was filed under subsection (b) or (c) of this section for a method of use patent which does not claim a use for which the applicant is seeking approval under this subsection," the applicant can submit "a statement that the method of use patent does not claim such a use" (referred to as a "section viii statement") (section 505(j)(2)(A)(viii)); see also 21 CFR 314.94(a)(12)(iv)).

The MMA established a new set of forfeiture events under which an applicant previously eligible for 180-day exclusivity could lose that eligibility. These provisions are quite complex and, because of the value of 180-day exclusivity, are of substantial interest to regulated industry. In recognition of this interest, and to obtain the benefit of comment from interested parties on the interpretation and application of the new provisions in specific factual settings, we are establishing public dockets to receive comments on certain MMA issues. Because of the complex regulatory issues related to Cobalt's eligibility for exclusivity, we solicited comments on the matter from acarbose ANDA applicants and established a public docket to receive comments from other interested persons.[9] In considering the applicability of the MMA forfeiture and exclusivity provisions to the acarbose ANDAs, we have considered the views of Cobalt and the other parties submitting comments.

### B.    Forfeiture of Exclusivity

After considering the Cobalt ANDA in light of the MMA forfeiture provisions, we have determined that ANDA 77-532 for acarbose tablets is no longer eligible for 180-day exclusivity. The Act provides that the 180-day exclusivity period described in section 505(j)(5)(B)(iv) "shall be forfeited by a first applicant if a forfeiture event occurs with respect to that first applicant" (section 505(j)(5)(D)(ii) of the Act). Cobalt has forfeited its exclusivity because a forfeiture event as to the '769 patent has occurred under section 505(j)(5)(D)(i)(I) of the Act ("Failure to Market"). We also have analyzed forfeiture of Cobalt's exclusivity under section 505(j)(5)(D)(i)(IV) of the Act ("Failure to Obtain Tentative Approval"). This letter discusses the application of each provision in turn.

### 1.    Cobalt has Forfeited Exclusivity for Failure to Market

Under section 505(j)(5)(D)(i)(I) of the Act, a forfeiture event arises whenever any of the following occurs:

(I) FAILURE TO MARKET .--The first applicant fails to market the drug by the
    later of—
  (aa)    the earlier of the date that is—
        (AA)  75 days after the date on which the approval of the application of
             the first applicant is made effective under subparagraph (B)(iii); or
        (BB)  30 months after the date of submission of the application of the
             first applicant; or
  (bb)    with respect to the first applicant or any other applicant (which other
        applicant has received tentative approval), the date that is 75 days after the
        date as of which, as to each of the patents with respect to which the first
        applicant submitted and lawfully maintained a certification qualifying the

---

[9] Comments were initially submitted to OGD in response to OGD's correspondence # 07-1254 of September 26, 2007 (attached), which had solicited comment on legal and regulatory issues. The public docket was assigned docket number 2007N-0417. The docket number was changed to FDA-2007-N-0445 as a result of FDA's transition to its new docketing system (Regulations.gov) in January 2008. FDA has used a similar process to solicit comments on exclusivity issues related to granisitron hydrochloride injection (Docket 2007N-0389) and ramipril capsules (Docket 2007N-0382).

first applicant for the 180-day exclusivity period under subparagraph (B)(iv), at least 1 of the following has occurred:

  (AA)  In an infringement action brought against that applicant with respect to the patent or in a declaratory judgment action brought by that applicant with respect to the patent, a court enters a final decision from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken that the patent is invalid or not infringed.

  (BB)  In an infringement action or a declaratory judgment action described in subitem (AA), a court signs a settlement order or consent decree that enters a final judgment that includes a finding that the patent is invalid or not infringed.

  (CC)  The patent information submitted under subsection (b) or (c) is withdrawn by the holder of the application approved under subsection (b).

Section 505(j)(5)(D)(i)(I).

Application of these forfeiture provisions requires a series of analyses based on the timing of specific events. The statute directs that a forfeiture event occurs when the first applicant fails to market the drug by the later of two dates. One of these dates is calculated under item (aa) by determining the earlier of a date that is either 75 days after the first applicant's ANDA is approved (subitem (AA)) or 30 months after the date of submission of the first applicant's ANDA (subitem (BB)).[10] Cobalt's ANDA is being approved on May 7, 2008; the 75 day period would expire on July 21, 2008. Cobalt submitted a substantially complete ANDA containing a paragraph IV certification on March 22, 2005; 30 months from that was September 22, 2007. September 22, 2007 is earlier than July 21, 2008. Therefore, September 22, 2007, controls for the analysis of item (aa).

The statute directs that we look to the later of the dates under items (aa) and (bb) of section 505(j)(5)(D)(i)(I). Item (bb) states that the occurrence of at least one of the enumerated events as to a first applicant or any other applicant[11] will begin a 75-day period leading to possible

---

[10] Section 505(j)(5)(D)(i)(I)(aa)(BB) states that the 30-month period should be calculated from the date of "the submission of the application of the first applicant." In applying the MMA 180-day exclusivity provisions, FDA considers the date an ANDA containing a paragraph IV certification is submitted to be the date the ANDA is "received" pursuant to 21 CFR 314.101(b). Both this regulation, and the definition of "first applicant" at section 505(j)(5)(B)(iv)(II)(bb) of the Act, require that the ANDA containing the paragraph IV certification be substantially complete, meaning it is sufficiently complete to permit a substantive review. When an ANDA containing a paragraph IV certification is determined, upon review, to have been substantially complete as of the day it was submitted to FDA, it will be deemed to have been received as of the date it was submitted (i.e., date-stamped by the appropriate FDA mail-room). When OGD sends the applicant a refusal to receive letter describing the additional information that must be submitted to render an ANDA substantially complete, the ANDA is deemed received on the day the information necessary to find the application substantially complete was submitted.

[11] Item (bb) looks to the occurrence of any of the enumerated events "with respect to the first applicant or any other applicant (which other applicant has received tentative approval)." This language reasonably anticipates that a first applicant will not forfeit its exclusivity unless another applicant has met the technical and scientific requirements for approval of its ANDA. There are, however, applications not eligible for tentative approval (i.e., because there are no unexpired patents, 30-month stay, or exclusivity) that may otherwise be ready for final approval. As to these applications — for which there are no barriers to marketing but the first applicant's eligibility for 180-day

forfeiture of exclusivity. These events include, very generally, when a court enters a final decision that the patent is invalid or not infringed, a court signs a settlement order or consent decree entering final judgment that includes a finding that the patent is invalid or not infringed, or the patent information for the listed drug is withdrawn by the NDA holder. To date, no action for infringement of the '769 patent has been brought against Cobalt or any subsequent applicant. As noted in the background on Cobalt's ANDA above, on October 17, 2007, Cobalt filed an action for declaratory judgment of non-infringement and invalidity of the '769 patent. This case has been voluntarily dismissed without prejudice. No court has entered a final judgment of invalidity or non-infringement, and no court has signed a settlement order or consent decree entering final judgment of invalidity or non-infringement. Therefore, neither of the litigation-related events factor into the forfeiture analysis. In this case, the relevant event under section 505(j)(5)(D)(i)(I)(bb) of the Act is that the NDA holder for Precose requested on April 16, 2007, that the '769 patent be delisted from the Orange Book. This triggered the start of the 75-day period under section 505(j)(5)(D)(i)(I)(bb)(CC) of the Act, which begins when the patent information submitted to the agency is withdrawn by the holder of the NDA.

On April 16, 2007, FDA received a letter from Bayer Pharmaceuticals Corporation advising the Agency that all issued claims of the '796 patent had been disclaimed by the patent assignee of interest.[12] Accordingly, Bayer requested that the '796 patent be delisted from the Orange Book for the Precose NDA 20-482. The request for patent delisting was noted in the Orange Book on September 25, 2007.[13] Under section 505(j)(5)(D)(i)(I)(bb) of the Act, the applicable date for calculating whether a failure to market forfeiture event has occurred is 75 days after the patent information is withdrawn by the NDA holder. In this case, the date that is 75 days after the NDA holder withdrew the information on the '796 patent, i.e., April 16, 2007, was June 30, 2007.

Forfeiture under section 505(j)(5)(D)(i)(I) of the Act occurs if a first applicant fails to market by the later of the dates under item (aa) or (bb). The September 22, 2007, date under section 505(j)(5)(D)(i)(I)(aa) is the later date, therefore it is the date that controls. Cobalt forfeited its

---

exclusivity — forfeiture of a first applicant's exclusivity will have the effect of permitting immediate approval and marketing of generic products. Therefore, in applying section 505(j)(5)(D)(i)(I), the agency will look both to whether there are other applicants that have received tentative approval and whether there are other applicants that have met the requirements for approval under section 505(j) and would be eligible for final approval with the forfeiture of the first applicant's exclusivity. We note, for example, that Roxane's ANDA for acarbose was not eligible for tentative approval on the basis of a 30-month stay or (upon withdrawal of the '769 patent) an unexpired patent blocking final approval.

[12] See footnote 2.

[13] The publication of the request for patent delisting in the Orange Book was accompanied by an annotation reading "Patent number 4904769 listed on all products of NDA 20482 Precose (Acarbose) was requested to be delisted by the sponsor on 4/16/2007. This patent has remained listed because, under section 505(j)(5)(D)(i) of the Act, a first applicant may retain eligibility for 180-day exclusivity based on a paragraph IV certification to this patent for a certain period." Because immediate removal of patent information from the Orange Book upon withdrawal of the patent information by the NDA holder could result in ANDA applicants withdrawing corresponding patent certifications prematurely and thus undermining a first applicant's exclusivity, FDA will leave information related to withdrawn patents in the Orange Book until it has determined that any related 180-day exclusivity has expired. In this case, the patent information was retained in the Orange Book until the agency could resolve these complex issues and respond to Cobalt's questions regarding its eligibility for 180-day exclusivity. We interpret the NDA holder's request for patent delisting to constitute withdrawal of the patent information under section 505(j)(5)(D)(i)(I)(bb)(CC) of the Act.

180-day exclusivity on September 22, 2007, because it did not begin to market its acarbose product by that date.[14]

We have considered and rejected the argument made in comments to FDA's docket that eligibility for 180-day exclusivity following the NDA holder's voluntary withdrawal of its patent should be governed not by the MMA forfeiture provisions, but by the rule established in *Ranbaxy Labs., Ltd. v. Leavitt*, 469 F.3d 120 (D.C. Cir. 2006). *Ranbaxy* held that FDA may not condition the delisting of a patent on the existence of patent litigation, and thus deprive an ANDA applicant that had submitted the first ANDA to contain a paragraph IV certification of a period of marketing exclusivity for which it would otherwise be eligible (see 469 F.3d at 125-26). These comments argue that the forfeiture event described in section 505(j)(5)(D)(i)(I)(bb)(CC) of the Act applies only if the withdrawal of a patent is pursuant to the process described at section 505(j)(5)(C)(ii) of the Act. Section 505(j)(5)(C)(ii) contemplates that, as a result of a counterclaim by the ANDA applicant in patent infringement litigation, a court may issue an order requiring that patent information be corrected or deleted. Only in that situation, the argument goes, would the withdrawal of patent information trigger the statutory forfeiture provision.

We do not find this argument persuasive. First, the Ranbaxy court noted that the decisions rendered by the FDA and the district court had been made pursuant to the Act "as it stood before the MMA and, because the MMA was not made retroactive ... this decision is also geared to the Act pre-MMA" (469 F.3d at 122). Therefore, the court did not purport to render a decision on patent delisting and exclusivity under the MMA. The effect of patent delisting on eligibility for 180-day exclusivity is expressly addressed by the plain language of section 505(j)(5)(D)(i)(I) of the Act. We agree with the comment that, if a patent were withdrawn by the NDA holder as a result of a counterclaim by an ANDA applicant, a first applicant's continued eligibility for 180-day exclusivity would be governed by section 505(j)(5)(D)(i)(I); however, the scope of the patent delisting forfeiture provision is much broader. Section 505(j)(5)(D)(i)(I)(bb)(CC) applies to more than just those patents withdrawn as a result of a counterclaim; on its face, it applies when "[t]he patent information ... is withdrawn by the holder of the [NDA]." Therefore, FDA reads the plain language of 505(j)(5)(D)(i)(I)(bb)(CC) to apply whenever a patent is withdrawn (or requested to be "delisted") by the NDA holder.

That section 505(j)(5)(D)(i)(I)(bb) of the Act is broadly applicable to all patent withdrawals is apparent from the text of the provision. Unlike subitems (AA) and (BB) of section 505(j)(5)(D)(i)(I)(bb), which begin with "[i]n an infringement action ...," and thus anticipate events occurring in the context of litigation, subitem (CC) contains no prefatory language suggesting that it applies only in the context of infringement litigation. Moreover, subitem (CC) does not refer to section 505(j)(5)(C)(ii) of the Act, i.e., the counterclaim provision, nor does section 505(j)(5)(C)(ii) refer to subitem (CC). Because subitem (CC) is not limited by its terms

---

[14] Even if FDA were to calculate the forfeiture event under section 505(j)(5)(D)(i)(I)(bb) of the Act from the date the delisting of the '796 patent information was published (which we do not believe is supported by the statutory language), Cobalt would still forfeit exclusivity. If the agency were to use the September 25, 2007, publication date as the date the patent was withdrawn, the date that is 75 days later is December 9, 2007. This date under item (bb) is later than the September 22, 2007 date under item (aa); therefore the later date as between items (aa) and (bb) would be December 9, 2007. Cobalt did not market its acarbose product by December 9, 2007, so even under this analysis, it has forfeited 180-day exclusivity.

to a particular context in which the patent withdrawal occurs, it applies whenever an NDA holder withdraws a patent.

In addition to being consistent with the plain language of section 505(j)(5)(D)(i)(I) of the Act, there are a number of additional considerations that support the application of the statutory forfeiture provisions whenever a patent is withdrawn by the NDA holder. The forfeiture provisions are structured such that, even if a patent is withdrawn as a direct result of an ANDA applicant's counterclaim seeking such withdrawal, the first applicant will have only the period contemplated under the appropriate "failure to market" period of section 505(j)(5)(D)(i)(I) within which to begin commercial marketing and use its exclusivity. Given this time-limited period of eligibility for exclusivity even when the patent delisting is a direct result of an ANDA applicant's efforts, it would make little sense to provide a potentially longer period of eligibility for exclusivity (i.e., until the first applicant's exclusivity has been triggered and run or the patent expires) when the NDA holder withdraws the patent voluntarily or for reasons unrelated to an ANDA applicant's counterclaim in patent litigation (e.g., because of a decision by the patent owner or NDA holder that the patent does not claim the approved drug product or its use, or as part of an FTC settlement). Therefore, FDA sees no basis for applying the forfeiture provision of 505(j)(5)(D)(i)(I) only in cases when a patent is withdrawn pursuant to an ANDA applicant's counterclaim in a patent infringement case.

> 2.    Cobalt has not Forfeited under the Failure to Obtain Tentative
>        Approval Forfeiture Provision

The MMA also established that an ANDA applicant forfeits exclusivity if it fails to obtain a tentative approval within a given period of time. Under this provision, a forfeiture event occurs when:

> [t]he first applicant fails to obtain tentative approval of the application
> within 30 months after the date on which the application is filed, unless
> the failure is caused by a change in or a review of the requirements for
> approval of the application imposed after the date on which the
> application is filed.

section 505(j)(5)(D)(i)(IV).

A "first applicant" is "an applicant that, on the first day on which a substantially complete application containing a [paragraph IV certification] is submitted for approval of a drug, submits a substantially complete application that contains and lawfully maintains a [paragraph IV certification]" (section 505(j)(5)(B)(iv)(II)(bb) of the Act). The term "tentative approval" means notification to an applicant by FDA that an ANDA "meets the requirements of [505(j)(2)(A)], but cannot receive effective approval because there is [a patent or period of exclusivity protecting the listed drug]" (section 505(j)(5)(B)(iv)(II)(dd) of the Act).

To calculate the start of the 30-month period under this forfeiture provision, it is reasonable to use the date that qualifies the applicant as a first applicant for 180-day exclusivity purposes: the date the ANDA is sufficiently complete to permit a substantive review.[15] A first applicant's

---

[15] We note that, in contrast, the failure to market provision at section 505(j)(5)(D)(i)(I)(aa)(BB) of the Act calculates the 30-month period from the date of "submission," rather than the date the application is "filed." The exclusivity

9

ANDA must be a "substantially complete application" (section 505(j)(5)(B)(iv)(II)(bb)).  A "substantially complete application" is an application that "on its face is sufficiently complete to permit substantive review and contains all the information required by [section 505(j)(2)(A)]" (section 505(j)(5)(B)(iv)(II)(cc)).  The first applicant's submission of an ANDA that is determined to be sufficiently complete to permit review establishes eligibility for the benefits of 180-day exclusivity, and carries with it the requirement that — to maintain that eligibility — the first applicant must work diligently to obtain a tentative approval before the 30-month period expires.

Cobalt's ANDA was sufficiently complete to permit review and was received[16] on March 22, 2005.  Therefore, the date that would be used to calculate both whether Cobalt was a first applicant for 180-day exclusivity purposes and the date from which the 30-month forfeiture period would begin to run is March 22, 2005, as that is the date upon which the ANDA both contained a paragraph IV certification and was determined to be substantially complete.  The 30-month period began on March 22, 2005, and ended on September 22, 2007.  Cobalt had not received either a tentative approval or an approval as of that date.

The failure to obtain tentative approval provision requires that an applicant obtain a tentative approval within 30 months after the date on which the application is filed, unless that failure is "caused by a change in or a review of the requirements for approval of the application imposed after the date on which the application is filed" (section 505(j)(5)(D)(i)(IV)).  Congress has recently clarified this provision in the FDA Amendments Act, Pub. L. 110-85, 121 Stat. 823 (Sept. 27, 2007) (FDAAA), in which it provided that for an applicant eligible for 180-day exclusivity (such as Cobalt), if "approval of the application was delayed because of a petition, the 30-month period under such subsection is deemed to be extended by a period of time equal to the period beginning on the date on which the Secretary received the petition and ending on the date of final agency action on the petition (inclusive of such beginning and ending dates) ...." (section 505(q)(1)(G) of the Act).[17]  We note that no petition related to acarbose was submitted until November 9, 2007, when Cobalt itself submitted a citizen petition and petition for stay regarding the appropriate methodology for establishing bioequivalence for acarbose products.

provisions appear to use the terms "submit" and "file" interchangeably; there is no evidence that Congress intended a difference in meaning between these latter two terms.  Because both terms are used in the context of "first applicant" status, we will interpret the terms to refer to the time that the agency has determined ANDA to be sufficiently complete to permit substantive review.  If we interpreted the term "submission" in this context to mean the date the ANDA is date-stamped by FDA, regardless of whether the application is found to have been reviewable, an applicant whose ANDA cannot be reviewed without the submission of additional information would find its failure to market period under section 505(j)(5)(D)(i)(I)(aa)(BB) to have begun to run even before the agency could begin a substantive review of the application.

[16] FDA's regulations use the term "filed" in the context of the processing and review of new drug applications (NDAs); in the context of ANDAs, FDA uses the term "received" or "received for substantive review" to refer to the action described in the Act as filing (see 21 CFR 314.101).

[17] FDAAA further clarifies that section 505(j)(5)(D)(i)(IV) gives a first applicant 30 months in which to obtain either tentative approval or approval.  Section 505(q)(1)(G) of the Act, added by FDAAA, provides that as to a first applicant's ANDA, if "*approval* of the application was delayed because of a petition, the 30-month period under such subsection [section 505(j)(5)(D)(i)(IV)] is deemed to be extended by a period of time equal to the period beginning on the date on which the Secretary received the petition and ending on the date of final agency action on the petition ..." (emphasis added).  Thus, section 505(j)(5)(D)(i)(IV) also applies when the first applicant is eligible for a final approval, but not for a tentative approval.  The absence of patent or exclusivity protection that would necessitate a tentative — rather than final — approval, does not exempt a first applicant from the requirement that it show that its application meets the scientific and technical requirements of 505(j) within 30 months of filing.

After reviewing Cobalt's ANDA, we have concluded that a change in bioequivalence requirements resulted in a delay in obtaining a tentative approval.[18] Cobalt's failure to obtain a tentative approval within 30 months was caused — in part — by the agency's change in or review[19] of the bioequivalence requirements; specifically, by a change in the reference listed drug[19] against which Cobalt was to conduct its bioequivalence study. Orange Book Preface at x-xi. Throughout the relevant period, FDA identified the 100-mg strength tablet in the Orange Book as the drug product to be used in a bioequivalence study. Cobalt initially conducted its bioequivalence study using that strength of the drug, but was informed by FDA on August 8, 2006, that its in vivo bioequivalence using the 100 mg strength was not acceptable. After further study by Cobalt, it relied upon a different strength of acarbose tablets for its in vivo bioequivalence study. This change in requirements for bioequivalence data necessitated a longer review of the Cobalt ANDA.[20] Therefore, because FDA changed the requirements for the bioequivalence study, Cobalt did not forfeit its exclusivity pursuant to section 505(j)(5)(D)(i)(IV) of the Act.

3.    The 30-Month Periods in Sections 505(j)(5)(D)(i)(I) and (IV) do not Begin to Run with Receipt of the First Applicant's Notice Letter

You assert that FDA must interpret the two 30-month periods described in the MMA forfeiture provisions as beginning not from the date the application is submitted or filed, but rather from the date the NDA holder and patent owner receive the first applicant's notice of paragraph IV certification. Cobalt's argues that this reading alone is consistent with congressional intent. We disagree. As we have stated elsewhere in this response, although there is some ambiguity created by the use of the term "submission" in section 505(j)(5)(D)(i)(I)(aa)(BB) and "filed" in section 505(j)(5)(D)(i)(IV) to identify what appears to have been intended to be the same event, that ambiguity can be easily resolved in a manner that is both consistent with the agency's use of these terms in the review of ANDAs and with the statutory scheme. You ask that you forgo this reading — one that reasonably reconciles the provisions — in favor of an interpretation entirely unmoored from statutory language. Congress, you assert, did not intend the 30-month periods to run from the date the first applicant's application is complete and FDA may begin its review; rather you would have it begin possibly months later, with receipt of notice of a paragraph IV certification.

---

[18] Under section 505(j)(5)(D)(i)(IV), exclusivity is forfeited "unless" there has been a review of or change in requirements that has delayed approval or tentative approval of the ANDA. The statute does not permit either FDA or an ANDA applicant to comb through the ANDA review records and decide whether, had the review been conducted differently, the application could have received an approval or tentative approval before the forfeiture occurred. The review order for the very large number of ANDAs, amendments, and supplements is established through internal policies and established practice. In 2007, for example, with a total staff of approximately 210, OGD issued approval, tentative approval, not approvable, or refuse to receive letters on 1,893 ANDAs, in addition to approving or not approving 3,429 chemistry supplements. OGD does not give preferential treatment to ANDAs that are eligible for 180-day exclusivity and are, therefore, subject to the potential forfeiture of that exclusivity. To do so would draw scarce resources away from the review of other applications that may, for example, have been submitted earlier and have been waiting longer in the review queue.

[19] A reference listed drug (RLD) means the listed drug identified by FDA as the drug product upon which an applicant relies in seeking approval of its abbreviated application (see 21 CFR 314.3(b)).

[20] Applicants who waited to conduct their bioequivalence studies until they had received FDA's recommendations used a methodology that permitted use of the 100 mg RLD identified in the Orange Book.

11

You are correct that the 30-month stay period in section 505(j)(5)(B)(iii) begins with the receipt of notice of a paragraph IV certification; however, there is nothing in the statutory language or the way the stay of approval and forfeiture provisions interrelate that necessitates the significant divergence from the statutory text that you suggest. When Congress intended to measure events from the receipt of notice of paragraph IV certification, it specifically said so. Section 505(j)(5)(B)(iii) of the Act states that if a patent infringement action is initiated within the 45-day period following notice of a paragraph IV certification "the approval shall be made effective upon the expiration of the thirty-month period beginning on the date of the receipt of the notice provided under paragraph (2)(B)(i) or such shorter or longer period as the court may order...." Moreover, the result of interpreting the statute as written, i.e., possibly different dates for termination of the 30-month stay and the running of a forfeiture period, are not absurd, as is suggested by Cobalt.

### III.    Conclusion

After consideration of the Cobalt ANDA, the applicable law, and the comprehensive and thoughtful comments submitted by interested parties, we have concluded that Cobalt was eligible for 180-day exclusivity for the '769 patent, but that exclusivity was forfeited under the failure to market forfeiture provisions at section 505(j)(5)(D)(i)(I) of the Act. Because Cobalt has forfeited 180-day exclusivity, FDA may approve any ANDA for acarbose tablets that is otherwise ready to be approved.

Sincerely,

Gary Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research

Attachments

cc:    Docket No. FDA-2007-P-0249
       Docket No. FDA-2007-N-0445

## Correspondence on 180-Day Exclusivity Issues for Acarbose Tablets

April 11, 2007: Letter from William Rakoczy to Gary Buehler, Director, Center for Drug Evaluation and Research (CDER) and Sheldon Bradshaw, Associate General Counsel/FDA Chief Counsel.

April 11, 2007: Letter from William Rakoczy to Drug Information Services Branch and Mary Ann Holovac, Director, Drug Information, CDER.

April 16, 2007: Letter from Barbara Shimel, Director, Patents & Licensing, Bayer Health Care to Mary Ann Holovac.

June 4, 2007: Letter from William Rakoczy to Elizabeth Dickinson, Office of Chief Counsel.

September 26, 2007: Letter from Gary Buehler to ANDA Applicants.

September 28, 2007: Letter from Elizabeth Ernst, Director, DRA-Multisource Products, Roxane Laboratories, Inc. to Gary Buehler.

October 8, 2007: Letter from Sean Mahoney, Intellectual Property Counsel, Upsher-Smith Laboratories, Inc. to Cecelia Parise, Office of Generic Drugs.

October 16, 2007: Letter from Marc Goshko Executive Director, Teva Parenteral Medicines to Gary Buehler.

October 17, 2007: Letter from William Rakoczy and Christine Siwik to Gary Buehler.

October 17, 2007: Letter from William Rakoczy and Christine Siwik to Gary Buehler.

October 26, 2007: Letter from Mark Shaw, Vice-President, Regulatory Affairs and Compliance, Impax Laboratories, Inc. to Gary Buehler.

November 6, 2007: Letter from William Rakoczy and Christine Siwik to Gary Buehler.

November 13, 2007: Letter from Brian Malkin, Frommer, Lawrence & Haug LLP to Cecelia Parise, Office of Generic Drugs.

December 3, 2007: Letter from Mark Shaw to Division of Dockets Management and Gary Buehler.

March 24, 2008: Letter from William Schultz and Andrew Goldfarb, Zuckerman Spaeder LLP to ANDA 78-470.

(Note: Some of these submissions were made as controlled correspondence to ANDAs that were not approved at the time of submission. Therefore they were not included in the public dockets.)

MAY. 7. 2008  6:21PM    CDER/OGD/TO                                      NO. 3410  P. 16



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Food and Drug Administration
Rockville, MD 20857

**SENT VIA TELEFAX**

Reference Number: OGD #07-1254

Dear ANDA Applicant:

We are writing to solicit comment on certain legal/regulatory issues that pertain to generic drug applications for Acarbose Tablets. This letter is being sent to all applicants with pending abbreviated new drug applications (ANDAs) for Acarbose Tablets, and is being posted on FDA's web-site at http://www.fda.gov/cder/ogd/index.htm#New.

The reference listed drug (RLD) for Acarbose Tablets is Precose Tablets, the new drug application (NDA) held by Bayer Pharmaceuticals (Bayer). There is one patent listed for Acarbose Tablets, U.S. Patent No. 4,904,769 (the '769 patent), which expires on September 6, 2009. As you probably are aware, for it appears on the "Paragraph IV list" on FDA's website, at least one ANDA for Acarbose Tablets containing a paragraph IV certification was received by the agency on March 22, 2005. By virtue of this filing, at least one applicant became eligible for 180-day generic drug exclusivity.

As you know, the agency makes determinations regarding 180-day exclusivity only when it is in the position to either approve an application that may be eligible for 180-day exclusivity, or to act on a subsequent applicant's ANDA as to which final approval may be delayed by another application's eligibility for exclusivity.

As of the date of this letter, which is more than 30 months from March 22, 2005, no first applicant's ANDA has been approved. Also, on April 16, 2007, Bayer requested that the '769 patent be "delisted" as to Precose, i.e., they withdrew the patent information. On September 26, 2007, FDA indicated in its "Approved Drug Products with Therapeutic Equivalence Evaluations" (the Orange Book), available on FDA's website at http://www.accessdata.fda.gov/scripts/cder/ob/docs/patexclnew.cfm?Appl_No=020482&Product_No=001&table1=OB_Rx, that the request to delist this patent had been submitted on April 16, 2007.

To determine whether any ANDA referencing Precose is eligible for final approval, the agency must consider how the 180-day generic drug exclusivity forfeiture provisions at section 505(j)(5)(D) of the Federal Food, Drug, and Cosmetic Act (the Act) apply to this set of facts. As part of the process for making such a determination, we are seeking your views regarding the applicability of sections 505(j)(5)(D)(i)(IV) -- failure to obtain tentative approval within 30 months -- and 505(j)(5)(D)(i)(I)(aa)(BB) -- failure to market by 30 months. We also are interested in your views regarding the applicability of section 505(j)(5)(D)(i)(I)(bb)(CC) -- relating to the delisting of a patent.

We are asking that you submit your comments to us by close of business on Wednesday, October 10, 2007.  Please include the OGD Reference Number listed above in your correspondence.

If you have any questions regarding this correspondence, please contact Cecelia M. Parise, Regulatory Policy Advisor to the Director, Office of Generic Drugs, at 240-276-9310.

Sincerely,

Gary J. Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research

This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.

/s/
----------------------------
Robert L. West
9/26/2007 10:39:25 AM
for Gary Buehler

**This is a representation of an electronic record that was signed electronically and
this page is the manifestation of the electronic signature.**

/s/
-----------------------
Gary Buehler
5/7/2008 06:11:59 PM

# Declaration of William A. Rakoczy

*In support of Cobalt's Motion for*
*Temporary Restraining Order*

## Exhibit E



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Food and Drug Administration
Rockville, MD 20857

*rec'd 10/27/07*

**SENT VIA TELEFAX**

Reference Number: OGD #07-1254

Dear ANDA Applicant:

We are writing to solicit comment on certain legal/regulatory issues that pertain to generic drug applications for Acarbose Tablets. This letter is being sent to all applicants with pending abbreviated new drug applications (ANDAs) for Acarbose Tablets, and is being posted on FDA's web-site at http://www.fda.gov/cder/ogd/index.htm#New.

The reference listed drug (RLD) for Acarbose Tablets is Precose Tablets, the new drug application (NDA) held by Bayer Pharmaceuticals (Bayer). There is one patent listed for Acarbose Tablets, U.S. Patent No. 4,904,769 (the '769 patent), which expires on September 6, 2009. As you probably are aware, for it appears on the "Paragraph IV list" on FDA's website, at least one ANDA for Acarbose Tablets containing a paragraph IV certification was received by the agency on March 22, 2005. By virtue of this filing, at least one applicant became eligible for 180-day generic drug exclusivity.

As you know, the agency makes determinations regarding 180-day exclusivity only when it is in the position to either approve an application that may be eligible for 180-day exclusivity, or to act on a subsequent applicant's ANDA as to which final approval may be delayed by another application's eligibility for exclusivity.

As of the date of this letter, which is more than 30 months from March 22, 2005, no first applicant's ANDA has been approved. Also, on April 16, 2007, Bayer requested that the '769 patent be "delisted" as to Precose, i.e., they withdrew the patent information. On September 26, 2007, FDA indicated in its "Approved Drug Products with Therapeutic Equivalence Evaluations" (the Orange Book), available on FDA's website at http://www.accessdata.fda.gov/scripts/cder/ob/docs/patexclnew.cfm?Appl_No=020482&Product_No=001 &table1=OB_Rx, that the request to delist this patent had been submitted on April 16, 2007.

To determine whether any ANDA referencing Precose is eligible for final approval, the agency must consider how the 180-day generic drug exclusivity forfeiture provisions at section 505(j)(5)(D) of the Federal Food, Drug, and Cosmetic Act (the Act) apply to this set of facts. As part of the process for making such a determination, we are seeking your views regarding the applicability of sections 505(j)(5)(D)(i)(IV) -- failure to obtain tentative approval within 30 months -- and 505(j)(5)(D)(i)(I)(aa)(BB) -- failure to market by 30 months. We also are interested in your views regarding the applicability of section 505(j)(5)(D)(i)(I)(bb)(CC) -- relating to the delisting of a patent.

*2007N-0417*                                                                          *LET 1*

We are asking that you submit your comments to us by close of business on Wednesday, October 10, 2007.  Please include the OGD Reference Number listed above in your correspondence.

If you have any questions regarding this correspondence, please contact Cecelia M. Parise, Regulatory Policy Advisor to the Director, Office of Generic Drugs, at 240-276-9310.

Sincerely,


Gary J. Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

/s/
----------------------
Robert L. West
9/26/2007 10:39:25 AM
for Gary Buehler

# Declaration of William A. Rakoczy

*In support of Cobalt's Motion for*
*Temporary Restraining Order*

## Exhibit F

print  e-mail  link      RSS  Technorati  Blog Search  share it  blog it

## Roxane Laboratories, Inc. Announces the Launch of Acarbose Tablets

COLUMBUS, Ohio, May 7 /PRNewswire/ -- Roxane Laboratories, Inc. announced today the approval of their Abbreviated New Drug Application for Acarbose Tablets, 25mg, 50mg, and 100mg. The product is available in bottles of 100 tablets for all strengths as well as Unit Dose Blisters for the 50mg strength and is available for immediate shipment to wholesalers and pharmacies nationwide.

(Logo: http://www.newscom.com/cgi-bin/prnh/20070410/CLTU122LOGO )

Roxane Laboratories' Acarbose Tablets are AB rated to PRECOSE(R) (acarbose). Annual sales of PRECOSE(R) (acarbose) Tablets are approximately $35 Million(1).

Full prescribing information for Acarbose Tablets is available on the Roxane Laboratories website at http://www.Roxane.com or upon request by calling Roxane Laboratories Technical Product Information at 1.800.962.8364.

About Roxane Laboratories, Inc.

Roxane Laboratories is located in Columbus, OH in a modern 500,000 square foot manufacturing and laboratory facility. The facility spans 70 acres and currently employs over 1,000 people. Currently, Roxane Laboratories markets over 75 medications in nearly 250 package sizes, focusing on an expanding line of Multisource pharmaceutical products including: bulk and unit-dose liquids and solids; coated, sustained-release and controlled-release tablets; nasal sprays, cytotoxics and CII narcotics.

Roxane Laboratories, Inc. is a subsidiary of Boehringer Ingelheim Corporation, based in Ridgefield, CT and a member of the Boehringer Ingelheim group of companies.

About Boehringer Ingelheim

Boehringer Ingelheim Corporation based in Ridgefield, CT, is the US headquarters to seven subsidiaries and a member of the Boehringer Ingelheim group of companies.

The Boehringer Ingelheim group is one of the world's 20 leading pharmaceutical companies. Headquartered in Ingelheim, Germany, it operates globally with 135 affiliates in 47 countries and approximately 39,800 employees. Since it was founded in 1885, the family-owned company has been committed to researching, developing, manufacturing and marketing novel products of high therapeutic value for human and veterinary medicine.

In 2007, Boehringer Ingelheim posted net sales of US $15.0 billion (10.9 billion euro) while spending approximately one-fifth of net sales in its largest business segment, Prescription Medicines, on research and development.

For more information on Boehringer Ingelheim, please visit http://us.boehringer-ingelheim.com .

    (1) IMS MAT dollar sales ending 06/2007

    PRECOSE(R) is a registered trademark of Bayer Pharmaceuticals
Corporation


SOURCE Roxane Laboratories, Inc.

_____


 back to top

**Related links:**
* **http://www.Roxane.com**
* **http://us.boehringer-ingelheim.com**
**Photo Notes:**
NewsCom: **http://www.newscom.com/cgi-bin/prnh/20070410/CLTU122LOGO**
AP Archive: **http://photoarchive.ap.org**
PRN Photo Desk, **photodesk@prnewswire.com**

POWERED BY
Technorati ♺ **Blogs Discussing This News Release**
_____

Issuers of news releases and not PR Newswire are solely responsible for the accuracy of the content.
Terms and conditions, including restrictions on redistribution, apply.
Copyright © 1996-2008 PR Newswire Association LLC. All Rights Reserved.
A United Business Media company.

# Declaration of William A. Rakoczy

*In support of Cobalt's Motion for*
*Temporary Restraining Order*

## Exhibit G



**DEPARTMENT OF HEALTH & HUMAN SERVICES**          Public Health Service

_____

Food and Drug Administration
4542  '01  FEB 22  A9.37   Rockville MD 20857

Deborah A. Jaskot                                    FEB  6 2001
Senior Director, Regulatory Affairs
Teva Pharmaceuticals USA, Inc.
1510 Delp Drive
Kulpsville, PA  19443

Re: Docket No. 00P-1446/CP1

Dear Ms. Jaskot:

This responds to your citizen petition dated August 9, 2000, requesting the Food and Drug
Administration (FDA) to determine (1) that the abbreviated new drug application (ANDA)
submitted by Mylan Pharmaceuticals, Inc. (Mylan), for 30-milligram (mg) nifedipine extended-
release tablets (ANDA 75-108) is not eligible for 180-day exclusivity or (2) that such exclusivity
has expired. Either determination would permit FDA to immediately approve any subsequent
ANDA for the same drug. No comments were submitted to the petition docket. For the reasons
stated below, your petition is granted.

**I.      BACKGROUND**

The 1984 Drug Price Competition and Patent Term Restoration Act, otherwise known as the
Hatch-Waxman Amendments or Hatch-Waxman, includes a provision giving 180 days of
marketing exclusivity to the first generic drug applicant to challenge a listed patent for the
innovator drug. This provision, found at section 505(j)(5)(B)(iv) of the Federal Food, Drug, and
Cosmetic Act (the statute or Act),[1] has been the subject of considerable litigation and
administrative review in recent years, as the courts, industry, and FDA have sought to interpret it
in a way that is consistent both with the text and with the legislative goals underlying Hatch-
Waxman. A series of federal court decisions beginning with *Mova Pharmaceutical Corp. v.
Shalala*, 140 F.3d 1060, 1065 (D.C. Cir. 1998), *Granutec, Inc. v. Shalala*, No. 97-1873 and No.
97-1874, 1998 U.S. App. LEXIS 6685 (4th Cir. Apr. 3, 1998), and *Purepac v. Friedman*, 162
F.3d 1201 (D.C. Cir. 1998), and including the recent D.C. Circuit opinion in *Teva
Pharmaceuticals USA, Inc. v. FDA*, 182 F.3d 1003 (D.C. Cir. 1999)(*Teva I*), describe acceptable
interpretations of the 180-day exclusivity provision, identify potential problems in implementing
the statute, and establish certain principles to be used by the Agency in interpreting the statute.

In light of court decisions finding certain FDA regulations inconsistent with the statute, the
Agency proposed new regulations in August 1999 to implement the 180-day exclusivity. Since
that time, many comments have been submitted, and there have been additional court decisions

_____

[1] 21 U.S.C. 355(j)(5)(B)(iv).

OOP-1446                                              RAV1

Re: Docket No. 00P-1446/CP1

further interpreting the 180-day exclusivity provision. The Agency has not yet published a final rule on 180-day exclusivity. As described in the June 1998 guidance for industry entitled *180-Day Generic Drug Exclusivity Under the Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act*, (1998 Guidance), until new regulations are in place, FDA will address on a case-by-case basis those 180-day exclusivity issues not addressed by the existing regulations. Your petition describes a situation not addressed by FDA's current regulations and thus must be resolved by direct reference to the statute.[2]

## II.    THE FACTS

The ANDAs at issue in your petition are for 30-mg extended-release nifedipine tablets. The reference listed drug for these ANDAs is Pfizer's Procardia XL (nifedipine extended-release tablets, 30 mg) (NDA 19-684). At the time ANDAs were submitted for this drug, there were five patents listed for Procardia in the *Approved Drug Products With Therapeutic Equivalence Evaluations* (Orange Book).[3]   Mylan submitted the first ANDA 75-108 (submitted 4/8/97, received 5/27/97) with a paragraph IV patent certification challenging all five of the listed patents. Other ANDA applicants also submitted certifications challenging the listed patents. As a result of its certification and notice to the NDA holder (Pfizer) and patent owner (Bayer AG), Mylan was sued for patent infringement in the U.S. District Court for the Western District of PA on July 18, 1997. Mylan notified FDA of the filing of this lawsuit and final approval of the Mylan ANDA was delayed for 30 months. The 30-month stay expired before a decision was rendered in the Mylan/Pfizer patent litigation. FDA gave Mylan final approval to market its 30-mg extended-release nifedipine tablets on December 17, 1999.

Although its ANDA was approved over a year ago, Mylan has not marketed the nifedipine tablets approved in its application. Instead, Mylan announced on March 2, 2000, it had entered into a settlement with Pfizer. The settlement terminated the patent infringement litigation before the district court issued a decision.[4]   Under the terms of the agreement, Mylan obtained a license to market three strengths of Pfizer's extended-release nifedipine tablets, rather than the Mylan product approved by FDA on December 17, 1999. Mylan has not amended its patent certification as a result of the settlement.

---

[2] *Teva I* describes FDA's responsibilities in regulating directly from the statute. Specifically, the court cautions that the Agency must explain the basis for its application of the statute, and interpret the statute to avoid absurd results and to further congressional intent (182 F.3d at 1011).

[3] U.S. Patent Nos. 5,264,446 (expires 11/23/2010), 4,783,337 (expires 9/16/2003), 4,765,989 expires (9/16/03), 4,612,008 (expires 9/16/03) and 4,327,725 (expires 11/25/00).

[4] Shortly after Mylan and Pfizer settled their patent dispute, the patent owner, Bayer AG, and Mylan also settled their dispute, and those claims were dismissed by order entered in 97-CV-1309 on March 22, 2000, in the U.S. District Court for the Western District of PA.

Re: Docket No. 00P-1446/CP1

The question you raise in your petition is whether Mylan is eligible for exclusivity, and if so, whether the exclusivity has already been triggered. If Mylan is eligible for exclusivity and that exclusivity has not begun to run, subsequent applicants will have to wait until the end of exclusivity triggered either by Mylan's marketing or by a court decision in litigation over this drug product finding the patent invalid or not infringed, or until the patent expires. Once the exclusivity has run its 180-day course, subsequent ANDAs may be approved.

You state that because Mylan settled its litigation with Pfizer and is no longer challenging the patent, Mylan no longer qualifies for 180-day exclusivity (Petition at 2). In the alternative, you propose that FDA find Mylan eligible for exclusivity, and that the exclusivity began either on the effective date of the Mylan/Pfizer agreement, or on the date Mylan began to market the licensed nifedipine tablets (Id.). As more fully described below, FDA finds that both positions have merit. Under either position, there is no longer a 180-day exclusivity bar to approval of ANDAs for 30-mg extended-release nifedipine tablets.

## III.    STATUTE AND REGULATIONS

The 180-day generic drug exclusivity provision is one component of the complex patent listing and certification scheme included in the Hatch-Waxman Amendments. These amendments balance the dual goals of encouraging and protecting innovation in drug development and expediting the approval of low-cost generic drugs. The Hatch-Waxman Amendments require innovator companies to submit information on patents claiming the approved drug product (section 505(b)(1) and (c)(2)). FDA publishes this information in the Orange Book. An ANDA must include a patent certification to each patent listed in the Orange Book for the innovator drug. There are four types of patent certification. The two certifications relevant to your petition are a *paragraph III* certification, which seeks approval of the ANDA on the date the patent expires, and a *paragraph IV* certification, which states that the "patent is invalid or will not be infringed by the manufacture, use, or sale of the [drug described in the ANDA]" (section 505(j)(2)(A)(vii)).

The filing of a paragraph IV certification (1) indicates that the ANDA applicant seeks to market its product before the expiration of a listed patent and (2) begins a process in which issues of patent protection may be resolved in patent litigation. The ANDA applicant notifies the NDA holder and patent owner that the ANDA applicant has submitted an ANDA and of the grounds for its belief that the generic drug will not infringe the listed patent(s) (section 505(j)(2)(B)(i) and (ii)). The NDA holder and patent owner then have 45 days to file a suit for patent infringement against the ANDA applicant (section 505(j)(5)(B)(iii)). If such a suit is filed, FDA cannot approve the ANDA for 30 months (or a shorter or longer period ordered by the court) (Id.).

The 180-day exclusivity acts as an incentive for the first ANDA applicant to challenge a listed patent. The statutory provision establishing this exclusivity reads:

3

Re: Docket No. 00P-1446/CP1

If the application contains a [paragraph IV certification] and is for a drug for which a previous application has been submitted under this subsection containing[5] such a certification, the application shall be made effective not earlier than one hundred eighty days after —

(I) the date the Secretary receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application, or

(II) the date of the decision of the court in action described in clause (ii) holding the patent which is the subject of the certification to be invalid or not infringed,

whichever is earlier.

(section 505(j)((5)(B)(iv))

Only an application containing a paragraph IV certification may be eligible for exclusivity. FDA regulations contain a provision at 21 CFR 314.94(a)(12)(viii) stating that an applicant may amend its patent certification, and if it does so, the application will no longer be considered to contain the previous certification. Under certain circumstances, an ANDA applicant is required to amend its patent certification if the patent is determined to be infringed or if the applicant discovers the submitted certification is no longer correct. If an applicant changes from a paragraph IV certification to a paragraph III certification, the ANDA will no longer be eligible for exclusivity (94 F. Supp.2d at 54-56).

## IV.    DISCUSSION

In the absence of applicable regulations governing this situation, FDA has interpreted the statute given the facts of this matter and taking into account the purposes of the statute. FDA has determined that Mylan's actions have rendered it ineligible for 180-day exclusivity. Alternatively, FDA has determined that any 180-day period of exclusivity has already expired. Either interpretation leads to the same conclusion — that there is no longer a 180-day exclusivity obstacle to FDA approval of subsequent ANDAs for 30-mg extended-release nifedipine tablets.

The facts in this case are similar to those in *Mylan*, 94 F. Supp.2d at 40-42. In *Mylan*, Barr Laboratories submitted the first ANDA with a paragraph IV certification for the drug tamoxifen. The innovator sued Barr as a result of its paragraph IV certification, and Barr won the case at the district court level. Before an appeal was complete, Barr and the innovator entered into an agreement under which Barr obtained a payment from the innovator and a license to market the innovator's tamoxifen product. The patent infringement litigation was dismissed, and Barr

---

[5] The public law version of this provision substituted the word *continuing* for the term *containing*. In *Mylan*, the court determined that such substitution was a "scrivener's error" and "the word 'continuing' was intended to be the word 'containing.'" (*Mylan Pharmaceuticals, Inc. v. Henney*, 94 F. Supp.2d 36 (D.D.C. 2000)).

4

Re: Docket No. 00P-1446/CP1

amended its patent certification from a paragraph IV to a paragraph III. The Barr ANDA is not eligible for approval until the patent expires in August 2002. On these facts, the court found two grounds for immediate approval of tamoxifen ANDAs subsequent to Barr. First, the court held that the district court decision, although later vacated, began the running of Barr's exclusivity under section 505(j)(5)(B) (*Id.* at 54). Second, the court found that under FDA's regulation at 21 CFR 314.94(a)(12)(viii) governing amendments to patent certifications, Barr's change from a paragraph IV certification to a paragraph III certification rendered it ineligible for exclusivity (*Id.* at 56-57).

In the course of reaching its decision, the *Mylan* court identified three factors to consider in interpreting the 180-day exclusivity provision of Hatch-Waxman. First, the statute is to be interpreted in a manner consistent with "the statute's interest in affording market access and incentives for both generic and non-generic makers," and to maintain "an incentive for the parties to fulfill the purposes of Hatch-Waxman" (94 F. Supp.2d at 53). Second, FDA should avoid an interpretation that excessively favors the first generic and the innovator parties' "anticompetitive hold" over the drug. The court observed that "Hatch-Waxman intended to provide an incentive for drug companies to explore new drugs, not a market 'windfall' for crafty, albeit industrious, market players" (*Id.*). Finally FDA should avoid interpreting Hatch-Waxman so the decision on whether a generic applicant is entitled to exclusivity rests entirely in the patent holder's hands (*Id.* at 54).

With these principles in mind, the Agency has looked to the statute to determine when subsequent ANDAs for 30-mg extended-release nifedipine tablets may be approved. Specifically, FDA must determine the effect of the dismissal of patent infringement litigation before a court decision and after approval of an ANDA. FDA must also determine whether the marketing of Pfizer's product, in lieu of Mylan's own, has any effect on exclusivity. Under well-established principles of administrative law, FDA has discretion in addressing these questions where the statute does not directly address the issues presented (*Chevron, USA, Inc v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984); *Christensen v. Harris County*, 120 S. Ct. 1655, 1662-63 (2000); 1998 Guidance at 4).

A.    Mylan Is No Longer Eligible for Exclusivity

The Agency has reviewed these circumstances and determined that, consistent with the language of the statute, in the absence of an applicable regulation,[6] and applying the factors identified by the courts in *Mylan* and *Teva I*, the Mylan/Pfizer settlement effectively changed Mylan's patent

---

[6] FDA regulations regarding patent certifications do not specifically address the circumstances here. The regulations require an ANDA applicant to change its certification from a paragraph IV to a paragraph III when patent litigation determines the patent is infringed. The regulations also require an applicant to amend its certification if, before the ANDA is approved, the applicant learns that the certification is incorrect. The regulations say nothing about amending a patent certification that becomes inaccurate — other than with a finding of infringement — after an ANDA is approved.

Re: Docket No. 00P-1446/CP1

certification from a paragraph IV to a paragraph III, and thus Mylan has lost its eligibility for exclusivity.

The generic drug approval provisions of the Act contemplate certain events resulting from the filing of a paragraph IV certification. Once an ANDA applicant notifies the NDA holder and patent owner it is challenging a listed patent, one of two things can happen: either the 45-day period lapses without the filing of a lawsuit and the ANDA can be approved immediately under section 505(j)(5)(B)(iii), or the ANDA applicant is sued for patent infringement and the 30-month stay described in section 505(j)(5)(B)(iii) goes into effect. The statute describes the patent litigation as having two possible results: the court decides the patent is invalid or not infringed, or the court decides the patent has been infringed (section 505(j)(5)(B)(iii)(I)–(III)). The statute provides for court decisions made before or after the 30-month period expires and with or without the approval of the ANDA and marketing of the generic product. But the statute appears to contemplate that there will be a decision on the patent status of the drug and does not identify what to do if the litigation is settled without a court decision on the patent. Because the outcome of patent litigation affects the accuracy of a patent certification and thus eligibility for exclusivity, FDA must determine the effect of this settlement on Mylan's patent certification.[7]

The Mylan/Pfizer settlement resulted in the dismissal of the patent infringement litigation, and in Mylan's marketing of a nifedipine product under a license from Pfizer. Details of the settlement have not been made public, so the agency must rely in making its decision on the limited information that is publicly available and, more importantly, upon the parties' actions. Mylan is no longer participating in litigation intended to prove that its product will not infringe the listed patent.[8] Moreover, despite the fact that its ANDA has been approved for more than a year, Mylan has never marketed its own ANDA product. These facts lead FDA to presume that Mylan believes the product described in its ANDA may infringe the listed patent and is therefore waiting until patent expiry before marketing its own product. The appropriate certification for a company that has chosen to wait until a listed patent expires before marketing is a paragraph III certification stating the date of patent expiration. Because FDA considers Mylan's actions in settling the litigation and marketing Pfizer's nifedipine product to have effectively changed Mylan's certification from a paragraph IV to a paragraph III, and because applicants who change from a paragraph IV to a paragraph III are no longer eligible for 180-day exclusivity, Mylan has

---

[7] The Agency addressed the issue of settlements of patent litigation in the proposed rule and declined to adopt an approach in which ANDA applicants would be required to notify FDA of settlements that would either render the first applicant ineligible for exclusivity or begin the running of exclusivity. Instead, FDA proposed to adopt a triggering period approach. (See 64 FR 42873 at 42880; August 6, 1999.) FDA has not issued final regulations addressing these issues. Therefore, the Agency is relying on a case-by-case approach to particular situations presented and regulating directly from the statute as necessary. FDA's approach to the 180-day exclusivity issues presented in your petition during this interim period should not affect the rulemaking process (*Teva Pharmaceuticals, USA, Inc. v. FDA*, 2000 WL 1838303 (D.C. Cir. 2000)(*Teva II*)).

[8] This fact alone is not necessarily dispositive on the question of whether — as stated in a paragraph IV certification — the patent "is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which [Mylan's ANDA] was submitted" (section 505(j)(5)((A)(vii)(IV)).

Re: Docket No. 00P-1446/CP1

lost its eligibility for exclusivity. This interpretation is consistent with the principles articulated by the *Mylan* court; it avoids perpetuating the first generic and innovator parties' "anti-competitive hold" over the drug and allows market access to other generic manufacturers.

**B.   Mylan's Exclusivity Started to Run with Its Commercial Marketing of the Innovator's Product.**

Alternatively, you ask FDA to consider the "deal" struck by Mylan and Pfizer as "commercial marketing" that begins the running of exclusivity under section 505(j)(5)(B)(iv)(I). According to your interpretation, exclusivity would have begun either on March 2, 2000, the day the settlement was announced, or when Mylan began to market nifedipine under the license from Pfizer. FDA believes a compelling argument can be made that commercial marketing began when Mylan began marketing Pfizer's product. The Chairman, CEO, and President of Mylan noted in the March 2, 2000, press release describing the settlement that "we are pleased with this agreement, which positions Mylan as the first company to offer its customers generic extended-release nifedipine products." Mylan thus believed it was beginning the marketing of a generic drug, which is the event described in the statute as beginning the running of exclusivity.

There are two events that can start the running of exclusivity. As set out above, the exclusivity will begin with the first of either the date of a court decision finding the patent invalid or not infringed or "the date the Secretary receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application" (section 505(j)(5)(B)(iv)). One issue for FDA, then, is whether the ANDA applicant's marketing of the innovator's drug as a generic constitutes "commercial marketing of the drug under the previous application." Another consideration is whether such an interpretation would be consistent with the goals of 180-day exclusivity. FDA believes both that Mylan's marketing of the Pfizer drug was commercial marketing that began the exclusivity period and that such an interpretation is fully consistent with the goals of Hatch-Waxman.

FDA's interpretation of the "commercial marketing" trigger is governed by the court's approach to the analogous situation in *Teva I*. In that case, the court looked to the practical effect of the statutory terms in the court decision trigger at section 505(j)(5)((B)(iv)(II) in determining what interpretation was appropriate. The court observed that the term *holding* in that provision was used to describe a court action that has preclusive effect on the innovator's right to pursue a patent infringement action, and because a preclusive finding was contemplated by the statute, a dismissal for lack of subject matter jurisdiction was a court decision triggering the beginning of exclusivity. Any other conclusion would have produced absurd results (182 F.3d at 1009). Similarly, in the present case the Agency has determined that the commercial marketing trigger is intended to give the first ANDA applicant with a paragraph IV certification the opportunity to market a generic version of the innovator's drug with no competition for 180 days. Whether Mylan markets the product approved in its ANDA or the product approved in Pfizer's NDA is of little import to the statutory scheme; Mylan has begun commercial marketing of generic

7

Re: Docket No. 00P-1446/CP1

nifedipine. Permitting Mylan to market nifedipine without triggering the beginning of exclusivity would be inconsistent with the intent of the statutory scheme.

Finally, with respect to those Congress intended to benefit, marketing the drug approved in the Pfizer NDA or the drug approved in the Mylan ANDA has the same effect. The benefit intended by the 180-day exclusivity provision is two-fold. First, as is clear in the legislative history, the consuming public is intended to benefit from ANDA approvals through the prompt availability of lower cost generic drugs. Second, ANDA applicants who speed the availability of generic drugs by challenging patents are given the opportunity to reap the economic benefit of limited competition for a period of 180 days. Interpreting Mylan's marketing of the Pfizer product as beginning the running of exclusivity sets a finite limit on the delay in true market competition for this nifedipine product. Moreover, such an interpretation gives Mylan exactly what the statute seemed to intend — 180 days to reap the economic benefits of being Pfizer's sole competition. To permit Mylan to continue to market a nifedipine product without beginning the exclusivity would harm the consuming public by denying access to multiple safe and effective generic nifedipine products ready for final approval. It would also give Mylan (and Pfizer) a windfall clearly not intended by Congress. According to FDA records, Mylan began marketing the 30-mg extended-release nifedipine tablets under the license from Pfizer approximately 10 months ago, on March 28, 2000. Therefore, Mylan has received the full measure of the intended benefit under Hatch-Waxman.

## V.    CONCLUSION

For the reasons stated above, your petition is granted. Under either of the approaches described, there is no longer a 180-day exclusivity obstacle to FDA approval of subsequent ANDAs for 30-mg extended-release nifedipine tablets.

Sincerely yours,

Janet Woodcock, M.D.
Director
Center for Drug Evaluation and Research

# Declaration of William A. Rakoczy

*In support of Cobalt's Motion for
Temporary Restraining Order*

## Exhibit H

 **DEPARTMENT OF HEALTH & HUMAN SERVICES**

Food and Drug Administration
Rockville MD 20857

JUL  2 2004

Bert W. Rein
William A. McGrath
Wiley Rein & Fielding LLP
1776 K Street, N.W.
Washington, D.C.  20006

Re:  Docket No. 2004P-0227/CP1

Dear Messrs. Rein and McGrath:

This letter responds to your citizen petition dated May 11, 2004 (Petition), submitted on behalf of Pfizer Inc (Pfizer). In the Petition, you ask that the Food and Drug Administration (FDA or the Agency):  (1) acknowledge that the market exclusivity ("180-day exclusivity") awarded under section 505(j)(5)(B)(iv) of the Federal Food, Drug, and Cosmetic Act (the Act) (21 U.S.C. 355(j)(5)(B)(iv)) cannot be waived; (2) deny any request for the Agency to issue a final approval for abbreviated new drug applications (ANDAs) 75-435 and 75-827 submitted by Teva Pharmaceutical Industries, Ltd. (Teva), or for any other ANDAs for gabapentin capsules or tablets, until the expiration of the 180-day exclusivity period applicable to the ANDA held by Purepac Pharmaceutical Co. (Purepac) for gabapentin capsules; and (3) deny any other requests for transfer or waiver of the statutory bar "set forth in section 505(j)(5)(B)(iv)". Petition at 2. This letter also considers the comments, dated June 4, 2004, submitted on behalf of Teva and Purepac (Comments).[1]

As discussed below, the Agency's legal interpretation and practice have long permitted both waiver and relinquishment of 180-day exclusivity.  This practice:  (1) is based on a permissible statutory construction as acknowledged by the courts, (2) is consistent with the Agency's long-standing allowance of waiver and relinquishment of other forms of market exclusivity,

---

[1] The Petition does not request, and this response does not provide, an Agency interpretation of section 505(j)(5)(B)(iv) as amended by the Access to Affordable Pharmaceuticals provisions at Title XI of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA), Pub. L. No. 108-173, 117 Stat. 2066 (December 8, 2003).  See Petition at n.1.  As the Petition indicates, the MMA made a number of changes to the statutory scheme in section 505(j) governing 180-day exclusivity, including providing for forfeiture of the exclusivity.  See 21 U.S.C. 355(j) (2004).  However, the relevant Title XI provisions concerning 180-day exclusivity apply only to drug products for which the first ANDA containing a paragraph IV certification to a listed patent (see section I.A *infra* explaining the certification process) was submitted after December 8, 2003.  See MMA, section 1102(b)(1), 117 Stat. 2066, 2460 (2003).  Accordingly, the non-amended version of section 505(j)(5)(B)(iv) governs 180-day exclusivity for gabapentin and is referred to throughout this response, unless otherwise indicated.  The Agency has not yet assessed whether the changes made by the MMA should result in a different approach to waiver or relinquishment for those applications subject to the new exclusivity provisions.  The Agency requested public comment regarding the need for regulatory action to address the amendments Title XI makes to section 505.  See 69 FR 9982, March 3, 2004 (comments were due by May 3, 2004).

(3) promotes marketplace competition among pharmaceuticals in furtherance of the objectives of the 1984 Drug Price Competition and Patent Term Restoration Act (Hatch-Waxman amendments), and (4) is consistent with FDA's role in regulating the public health as opposed to competitive business arrangements. In short, in the absence of a specific statutory directive to do so, we see no reason to prevent these private arrangements, which are not barred by the Act.

Petitioner argues, to the contrary, that (1) the plain meaning of the statutory language precludes waiver, (2) the courts demand such a reading, (3) waiver of other exclusivities is distinguishable, and (4) permitting waiver of 180-day exclusivity would create an incentive to file ANDAs to obtain a marketable waiver "asset." For the reasons presented below, we do not find these arguments persuasive.

FDA is a public health agency. We generally do not interfere with business arrangements of private parties unless there is a particular defined public health impact or the arrangement otherwise directly contravenes the Act. In the absence of a specific statutory mandate to deny parties the ability to contract with one another, FDA generally sees no reason to, and does not, restrict these business dealings.

Accordingly, the Agency denies the petitioned requests.

**I.     Waiver and Relinquishment of 180-Day Exclusivity Are Permissible Under the Act**

      **A.     180-Day Exclusivity**

An NDA holder must identify for inclusion with the listing for its approved drug in *Approved Drug Products with Therapeutic Equivalence Evaluations* (the Orange Book), patents claiming this "listed" drug or a method of using it. *See* section 505(b)(1) of the Act (21 U.S.C. 355(b)(1)). An ANDA applicant must include with its application a certification regarding each of these patents for the listed drug product upon which the ANDA relies. Specifically, an ANDA applicant must make one of the following four certifications (named for the statutory paragraph establishing each):

- Patent information has not been filed with the agency ("paragraph I");
- The patent has expired ("paragraph II");
- The date the patent will expire ("paragraph III"); or
- The patent is invalid, not infringed by the ANDA applicant's product, or unenforceable ("paragraph IV").[2]

An applicant need not certify to patents claiming uses for which the applicant is not seeking approval. *See* section 505(j)(2)(A)(viii) of the Act (21 U.S.C. 355(j)(2)(A)(viii)).

---

[2] 21 U.S.C. 355(j)(2)(A)(vii); 54 FR 28,872, 28,885-88, July 10, 1989. Section 505(b)(2)(A) establishes equivalent certification requirements for applications submitted under section 505(b)(2) (21 U.S.C. 355(b)(2)), but the 180-day exclusivity provisions do not apply to these applications. *See* 21 U.S.C. 355(b)(2)(A), 355(j)(5)(B)(iv).

As described in Agency regulations and guidances, section 505(j)(5)(B)(iv) of the Act provides that an ANDA applicant is eligible for 180-day exclusivity if (1) the applicant includes in its application a paragraph IV certification challenging the validity or applicability to its product of a listed patent, and (2) the applicant is first to submit a paragraph IV certification to that patent. As interpreted by the Agency and the courts, exclusivity with respect to a patent is triggered by the earlier of (1) a court decision of non-infringement or invalidity of the patent, or (2) commercial marketing of the drug by an ANDA applicant eligible to receive 180-day exclusivity. 21 U.S.C. 355(j)(5)(B)(iv); 21 C.F.R. 314.107(c); *Granutec Inc. v. Shalala*, 139 F.3d 889, 1998 WL 153410 (4th Cir. 1998) (unpublished table opinion) (holding that 180-day exclusivity is not triggered solely by a ruling in favor of an applicant eligible for the exclusivity). Because exclusivity can be triggered by a court decision or by the commercial marketing of another applicant who shares exclusivity, it may begin to run before an eligible ANDA applicant can market its own product.[3]

Section 505(j)(5)(B)(iv) of the Act states:

> If the application contains a certification described in subclause (IV) of paragraph (2)(A)(vii) and is for a drug for which a previous application has been submitted under this subsection [containing] such a certification, the application *shall be made effective not earlier than one hundred and eighty days after*—

> (I)    the date the Secretary receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application, or

> (II)    the date of a decision of a court . . . holding the patent which is the subject of the certification to be invalid or not infringed,

> whichever is earlier.[4]  (emphasis added)

---

[3] 21 U.S.C. 355(j)(5)(B)(iv); 21 C.F.R. 314.107(c). Multiple ANDA applicants can be eligible for 180-day exclusivity if they each submit a paragraph IV certification on the first day that any applicant submits a paragraph IV certification to the patent. In other words, multiple ANDA applicants can potentially share 180-day exclusivity as to the same patent. *See* FDA guidance for industry on *180-Day Exclusivity When Multiple ANDAs Are Submitted on the Same Day* (July 2003) (all FDA guidances are available on the Internet at http://www.fda.gov/cder/guidance/index.htm). Similarly, shared exclusivity can arise because different ANDA applicants are first to submit paragraph IV certifications to different patents for the same drug. *See* Letter from Gary Buehler, Director, Office of Generic Drugs, to Diane Servello, Andrx Pharmaceuticals, Inc. (Nov. 16, 2002) (available on the FDA Web site at http://www.fda.gov/cder/ogd/shared_exclusivity.htm); *Apotex Inc. v. FDA*, No. 04-0605 (D.D.C. June 3, 2004), *appeal pending* No. 04-5211 (D.C. Cir.). Waiver and relinquishment are permitted in these situations as well.

[4] Courts reviewing the statute have commented that the word "continuing" reflects a typographical error and should be "containing." *See, e.g., Purepac Pharm. Co. v. Friedman,* 162 F.3d 1201, 1203 n.3 (D.C. Cir. 1998); *Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060, 1064 n.3 (D.C. Cir. 1998).

3

### B.    Ambiguity of Statutory Language

The apparently mandatory statutory language *"shall* be made effective not earlier than . . ."
(emphasis added) in section 505(j)(5)(B)(iv) presents as a threshold question whether the Agency
has discretion to interpret the provision to permit waiver or relinquishment of the 180-day
exclusivity conferred.  If a statute is ambiguous or silent, the implementing agency may base its
interpretation on a permissible construction. *See Mova,* 140 F.3d at 1067 (citing *Chevron U.S.A.
Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843 (1984)).

The section can reasonably be considered ambiguous on the issue of waiver and relinquishment.
Although the provision compels the Agency to delay approval of subsequent applications, it has
the effect of conferring a specific benefit (marketing exclusivity) upon specific private entities
(eligible ANDA applicants).  As a result, it is not clear whether the statute requires the Agency to
impose this 180-day delay without exception, or only unless an alternate approach (*e.g.,* waiver
or relinquishment) would better serve the beneficiary of the exclusivity.  By binding the Agency
to impose this delay, the statute ensures that the Agency will provide the specific beneficiary
with the specific benefit.  Although the provision could reasonably be interpreted to preclude the
Agency from curtailing or withholding the benefit even if the beneficiary were to prefer such a
course of action, the plain meaning does not compel that conclusion.  Rather, the provision could
also be interpreted to establish a default compelling the Agency to confer the benefit, *unless* a
beneficiary prefers to limit or relinquish it.

The section also can reasonably be viewed as silent on the question of waiver and
relinquishment.  Plainly, it does not expressly address the permissibility of either.  Furthermore,
waiver (or relinquishment) in this context presents a somewhat special case for statutory
construction.  Where, as here, statutory language compelling government action has the effect of
benefiting specific private entities (in this case, granting 180 days of marketing exclusivity to
eligible ANDA applicants), judicial precedent, as discussed below, supports inferring from
silence a legislative intent to allow an alternative course of action more favorable to the
beneficiary of the government act (such as permitting eligible ANDA applicants to waive or
relinquish the exclusivity).

### C.    Agency Permitted Waiver and Relinquishment of 180-Day Exclusivity and
###        Judicial Acknowledgement

Since first considering the question in 1997 with regard to a request by Genpharm to waive its
exclusivity for ranitidine hydrochloride (a treatment for acid reflux disease) in favor of Granutec
(*see Boehringer Ingelheim Corp. v. Shalala,* 993 F. Supp. 1, 2 (D.D.C. 1997), FDA has
consistently interpreted section 505(j)(5)(B)(iv) of the Act to permit both waiver and
relinquishment of 180-day exclusivity benefits.  In a proposed rule published in August 1999, the
Agency described its practice and proposed regulations to codify it. (The Agency subsequently
withdrew the proposal on unrelated grounds; *see* 67 FR 66,593, 66,594, November 1, 2002
(explaining Agency decision to withdraw the proposed rule in light of subsequent court decisions
at odds with portions of the proposal unrelated to waiver or relinquishment of exclusivity)).  As
explained in that notice, an ANDA applicant who has obtained 180-day exclusivity may
relinquish its exclusivity entirely or selectively waive the exclusivity in favor of a single ANDA,

or multiple ANDAs, containing a paragraph IV certification. Before the exclusivity period has been triggered, an applicant may only relinquish its exclusivity; after the exclusivity has been triggered, it may be selectively waived.[5]

The Agency has permitted many ANDA applicants to waive or relinquish 180-day exclusivity. These waivers have led to approvals of ANDAs for ranitidine, ibuprofen, terazosin, verapamil, omeprazole, bupropion, calcitriol, and metformin.

As to Purepac, it has obtained 180-day exclusivity by having been the first applicant to challenge one of the listed patents for gabapentin. *See Purepac Pharm. Company v. Thompson*, 354 F.3d 877, 881-83 (D.C. Cir. 2004). Teva has ANDAs that are tentatively approved for gabapentin tablets and capsules that include a paragraph IV certification to the same patent challenged by Purepac. *Id.* at 882-83. Accordingly, once Purepac's exclusivity has begun to run with a court decision or commercial marketing, long-standing Agency policy and practice would permit Purepac to selectively waive its 180-day exclusivity to permit approval and marketing of gabapentin by Teva (or any other otherwise eligible applicant with a gabapentin ANDA).

No court that has addressed the issue has questioned the practice of permitting waiver and relinquishment of 180-day exclusivity. Indeed, the district court for the District of Columbia upheld the practice in *Boehringer*, 993 F. Supp. at 2. The court addressed a motion filed by

---

[5] *See* 64 FR 42,873, 42,881, August 6, 1999. The Agency has limited the availability of selective waiver in this manner based on two factors: (1) the extent to which the right to block approval of subsequent ANDAs has actually "vested" in an ANDA applicant and (2) Agency concern that permitting selective waiver before exclusivity is triggered could lead to the "commercialization" of the first applicant "seat." Such an approach might encourage applicants to submit only marginally adequate ANDAs solely to obtain the economic benefit of waiving the exclusivity as to an applicant with a more viable ANDA.

Regarding "vesting," there are many reasons why an ANDA applicant might lose its eligibility before the exclusivity period has been triggered. For instance, the applicant could withdraw its ANDA containing the paragraph IV certification, the patent could expire necessitating a change to a paragraph II certification to that effect, or the applicant could lose or settle its patent litigation resulting in the change to a paragraph III certification (which signals that the applicant is not seeking approval until after the patent expires). *See* 21 U.S.C. 355(b)(2)(A), (j)(2)(A)(vii); 21 C.F.R. 314.94(a)(12)(viii). Each of these situations has arisen, and in each case the first applicant has lost its claim to exclusivity. *See, e.g., Mylan Pharms. Inc. v. Henney*, 94 F. Supp. 2d 36, 56-58 (D.D.C. 2002) (amendment from a paragraph IV to a paragraph III certification terminated eligibility for 180-day exclusivity under Agency regulations), *vacated as moot*, 276 F.3d 627 (D.C. Cir. 2002); *Dr. Reddy's Labs., Inc. v. Thompson*, 302 F. Supp. 2d 340, 350-58 (D.N.J. 2003) (180-day exclusivity lost upon patent expiration compelling the applicant to amend a paragraph IV to a paragraph II certification for the patent).

As to potential "gaming," if the first applicant could selectively waive its exclusivity at any time, the Agency could reasonably expect the development of a "market" for 180-day exclusivity, with a resulting increase in ANDAs submitted solely to claim exclusivity. Although these ANDAs might never qualify for approval, FDA would nonetheless have to review them as substantially complete, thus potentially wasting limited Agency resources.

Although FDA has stated that it does not consider exclusivity to be a property right that transfers separately and apart from an application (59 FR 50,338, 50,359, October 3, 1994), the Agency could foresee being drawn into complex private disputes regarding the economic and competitive impacts of a selective waiver "right" that is never "perfected" because the first applicant loses eligibility for that exclusivity. In short, FDA believes that by permitting selective waiver only once the exclusivity is triggered, it can prevent "gaming" of exclusivity, avoid unnecessary exclusivity disputes, and still maintain exclusivity as an adequate incentive and reward.

Boehringer to obtain a temporary restraining order to undo the Genpharm waiver permitting approval of Granutec's ranitidine hydrochloride (noted above). In its decision, the court acknowledged that the provision "does contain mandatory language" but concluded that that language did not speak to the permissibility of waiver. The court found that "[t]he statute is simply silent on the point, and certainly does not clearly express a statutory policy precluding waivers."[6] Two other courts have expressly recognized the legitimacy of the practice.[7] A fourth court has implicitly acknowledged its permissibility.[8]

As noted above, waiver of a mandate for a government agency to grant a benefit to a private entity presents a somewhat distinct question of statutory construction. Here, FDA does not simply interpret statutory language intended to achieve a regulatory intent. We interpret language intended to benefit specific private entities. See Mova, 140 F.3d at 1074-75. Accordingly, it is reasonable and appropriate for the Agency to take into consideration the interests and preferences of these entities, particularly to allow them to decide whether and to what extent to use the proffered benefit.

In interpreting equivalent, facially mandatory language in other contexts, courts have supported waiver in the absence of some affirmative indication of Congressional intent to preclude it, where the statutory mandate implicates a private benefit and waiver would not be inconsistent with legislative intent or the public interest.[9] Further, case law supports construction favorable to

---

[6] 993 F. Supp. at 2. As discussed below, we disagree with petitioner's interpretation of the decision of the Court of Appeals for the District of Columbia Circuit in *Mova Pharmaceutical Corp. v. Shalala* as rejecting the rationale of the *Boehringer* decision. The court's holding did not preclude the Agency from interpreting the statute to address gaps or ambiguous language (*see* 140 F.3d at 1067).

[7] *See Dr. Reddy's*, 302 F. Supp. 2d at 350 (relying on Dr. Reddy's "entitlement under the law" to sell to another ANDA holder Dr. Reddy's exclusivity derived from a paragraph IV certification with respect to one patent, to conclude that a judicial finding that Dr. Reddy's product infringed a different patent did not moot judicial review of the Agency's 180-day exclusivity regulations); *Granutec*, 1998 WL 153410 at *9, 10 (concluding that loss of opportunity to market "does not strip exclusivity of all value . . . the ability to waive exclusivity in favor of another generic manufacturer can be quite lucrative," and holding that a subsequent ANDA applicant had not violated the period of exclusivity at issue because the exclusivity holder had "waived its exclusivity" with regard to that applicant).

[8] *See Valley Drug Co. v. Geneva Pharms., Inc.*, 344 F.3d 1294, 1310 n.23 (11th Cir. 2003) (noting that "it seems reasonable to assume" that a portion of the payments made by a brand drug company to a generic drug company under an agreement that, in part, required the generic not to waive its 180-day exclusivity, were made in return for that commitment not to waive exclusivity).

[9] *See, e.g., New York v. Hill*, 528 U.S. 110, 116-17 (2000) (holding defense counsel's agreement to a trial date outside the time period required by Article III of the Interstate Agreement on Detainers constituted a waiver of the requirement, the court found that a right conferred on a private party which also affects the public interest can be waived if its waiver does not "contravene the statutory policy"); *United States v. Mezzanatto*, 513 U.S. 196, 200-01 (1995) (holding waiver of exclusionary provisions of a plea agreement permissible unless entered into unknowingly or involuntarily, the court based its analysis on the presumption, to which "we instead have adhered," (citing criminal and civil rights cases), that waiver is available absent some affirmative indication of Congressional intent to preclude it).

those for whom a statutory benefit is chiefly intended.[10]  In addition, courts have considered evidence of legislative intent, the nature and objective of the act as a whole, the relative benefit and harm to the public interest of alternate interpretations, and a comparison of the results to which each construction would lead.[11]

### D.    Plain Meaning Counter-Argument Fails

Pfizer asserts the Agency does not have discretion to permit waiver because the "plain meaning" of section 505(j)(5)(B)(iv) of the Act is clear.  We disagree.  Pfizer attempts to rely upon the *Mova* decision, among others, to support a plain meaning argument against the Agency's interpretation of the section, and to challenge the continued validity of the *Boehringer* decision that supports this Agency policy.  The Petition quotes language from *Mova* and other courts to the effect that the specific statutory language at issue must be applied as written without regard for the statutory scheme as a whole or the legislative objectives.  *See* Petition at 5, 8.  We do not dispute whether a "plain meaning" approach is appropriate.  However, we do not believe the approach need be applied in as crabbed a fashion as the petitioner suggests.[12]  Rather, courts

---

[10] *See, e.g., Brock v. Pierce County,* 476 U.S. 253, 261-62 (1986) (holding that the Secretary of Labor did not lose the authority to recover misused funds under the Comprehensive Employment and Training Act by failing to make a final determination within 120 days even though the statute stated that he "shall" make the determination within that time period, relying, in part, on the fact that a contrary conclusion would "prejudice individual complainants seeking to enforce their rights under CETA"); *Ralpho v. Bell,* 569 F.2d 607, 626-28 (D.C. Cir. 1977) (finding to be directory (as opposed to mandatory) a provision of the Micronesian Claim Act stating that the Micronesian Claims Commission "shall wind up its affairs . . . not later than three years after . . . the time for filing claims . . . ," the court looked to the "fundamental motivations for the congressional action," the congressional "design" as evidenced by the "mischief to be remedied" and contemporaneous statements, and a construction "that bestows the benefits of the Act on those for whom it was chiefly intended").

[11] *See, e.g., Brock,* 476 U.S. at 262-63 (basing its holding (*see supra* n.10) upon considerations of (1) injury to an underlying public interest in protection of the public fisc, (2) lack of evidence of Congressional intent to harm that interest, and (3) legislative history reflecting a desire to enhance agency efforts to address misuse of funds); *Conoco, Inc. v. Skinner,* 970 F.2d 1206, 1225-26 (3d Cir. 1992) (finding permissible a Maritime Administration interpretation of the phrase "shall be deemed a citizen" with respect to the operation of corporations as common carriers under the Shipping Act, the court relied upon the interpretive standard that whether "shall" should be construed as directory or mandatory is dependent on an examination of Congressional intent, including consideration of related statutory language); *United States v. St. Regis Paper Co.,* 355 F.2d 688, 691 (2d Cir. 1966) (holding to be jurisdictional (mandatory) the statutory requirement that the Federal Trade Commission "shall certify the facts" to the Attorney General if the Commission has reason to believe anyone is subject to a Commission cease and desist order, relying on the principle of statutory construction that whether "shall" should be construed as directory or jurisdictional is dependent on an examination of Congressional intent, including consideration of related statutory language, and also upon comparison of the results to which each statutory construction would lead); *Holbrook v. United States,* 284 F.2d 747, 752 (9th Cir. 1960) (holding the written consent of the Commissioner of the Internal Revenue Service not indispensable to the validity of a tax collection waiver, the court relied upon the principle of statutory construction that consideration should be given to the comparative results of the constructions in the absence of direct evidence of legislative intent).

[12] We note as well that petitioner's attempt to rely on this narrow application of "plain meaning" seems at odds with petitioner's support for, and policy arguments in favor of, current Agency practice that allows waiver of other marketing exclusivities, a practice based on Agency interpretation of parallel statutory language in other provisions of the Act.  *See* section II.B *infra.*

seeking the plain meaning of a statutory provision consider statutory context, structure, and purpose, among other things.[13]

In *Mova*, the court did not base its holding on a facial reading of the language at issue in isolation, nor did it conclude that the Agency could not interpret statutory language in light of the larger statutory framework or the Act's objectives. 140 F.3d at 1067-68. Rather, the court concluded that the Agency could not interpret a statutory provision so as to nullify or be inconsistent with statutory language. In short, the court held that the specific interpretation adopted by the Agency could not "be reconciled" with the language of the statute.

The *Mova* court considered an Agency regulation implementing section 505(j)(5)(B)(iv) of the Act. The regulation required that the ANDA applicant eligible for 180-day exclusivity must win in court (have the patent found invalid or not infringed) to maintain its eligibility for the exclusivity (a "successful defense" standard). *See* 21 C.F.R. 314.107(c)(1) (1998). The court concluded that the Agency could have adopted a more narrowly tailored interpretation to effectuate its goal (of not allowing a first applicant to benefit from the exclusivity if the applicant either was not sued for patent infringement or was found infringing) and that the Agency's interpretation was inconsistent with the language of section 505(j)(5)(B)(iv). *Mova*, 140 F.3d at 1074. First, the court concluded that, by permitting approval of subsequent ANDAs before either trigger for 180-day exclusivity had been satisfied, the Agency's successful defense standard inappropriately stripped a first applicant of the exclusivity benefit "simply because the first applicant's [patent infringement] litigation has not yet come to a successful conclusion." *Id.* at 1069. Second, the court concluded that the Agency's interpretation nullified the commercial marketing trigger provided in the statute. The court reasoned that because an eligible ANDA applicant could not satisfy the successful defense standard unless it had won a patent infringement suit, the standard precluded triggering of the exclusivity, even if the applicant began marketing its product, until the applicant had won in court. *Id.* at 1069-70.

Such challenges cannot successfully be made to the Agency's interpretation of section 505(j)(5)(B)(iv) as permitting waiver and relinquishment of 180-day exclusivity. The interpretation does not nullify or conflict with other statutory language. In fact, as discussed below, the Agency has consistently interpreted equivalent statutory language in other marketing exclusivity provisions to permit waiver and relinquishment. As to the *Mova* court's particular concern with approval of subsequent applicants before any exclusivity trigger had been satisfied, as noted above, the reason the court gave for its concern was unfairness to the eligible applicant that had not yet been able to satisfy the Agency's successful defense standard and, thereby, trigger the exclusivity. In contrast, the Agency's allowing eligible applicants to relinquish or waive the exclusivity enables them to exercise the exclusivity as they deem most beneficial. Further, permitting complete relinquishment prior to the triggering of the exclusivity (the Agency does permit selective waiver before exclusivity is triggered as discussed above) cannot be considered irreconcilable with the language of section 505(j)(5)(B)(iv), providing for a 180-

---

[13] Statutory construction is a "holistic endeavor" in which the court examines not the "isolated context" of one subsection of a statute but "the remainder of the statutory scheme." *United Savings Ass'n v. Timbers of Inwood Forest Associates*, 484 U.S. 365, 371 (1988); see also *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.").

day delay before approval of subsequent ANDA applicants, when viewed in the context of the larger statutory framework. Since *Mova*, the courts have established that amending the patent certification from paragraph IV to paragraph III, as provided for under Agency regulations, would have this same effect—loss of exclusivity benefits. *See Mylan*, 94 F. Supp. 2d at 56-58.

Further, the Agency's interpretation comports with the objective of section 505(j)(5)(B)(iv) and of the Hatch-Waxman amendments as a whole. As the *Mova* court stated, section 505(j)(5)(B)(iv) is intended to encourage patent challenges to promote marketplace competition. 140 F.3d at 1074-75. Allowing waiver and relinquishment helps maintain the value of the exclusivity for the beneficiary, strengthening the incentive to challenge patents and, thereby, promote competition.

The other decisions upon which Pfizer attempts to rely similarly also do not compel a "plain meaning" reading inconsistent with the Agency's interpretation of section 505(j)(5)(B)(iv) as permitting waiver and relinquishment of 180-day exclusivity.[14]

**II.    Waiver and Relinquishment of 180-Day Exclusivity Is Consistent with Permitting Waiver of Other Forms of Marketing Exclusivity**

**A.    Equivalent Language of Other Market Exclusivity Provisions**

The statutory language stating that subsequent ANDAs "shall not be made effective earlier than . . ." parallels in construction and effect three other statutory marketing exclusivity provisions. These provisions provide that: (1) "no [subsequent] application may be submitted" for review of a drug product containing a new chemical entity for five years after the initial approval of a product containing that new chemical entity (new chemical entity exclusivity);[15] (2) the Agency "may not make the approval effective" for a product that depends upon new clinical data for three years after the approval of the initial product for which those data were submitted (new clinical investigation exclusivity);[16] and (3) the Agency cannot accept or approve, as appropriate, a product for an additional six months after these other exclusivities (or patent protection) would

---

[14] The court in *Teva Pharmaceuticals, USA, Inc. v. FDA* (182 F.3d 1003 (D.C. Cir. 1999)), in fact, relied, in part on the ambiguity of the statutory language at issue, "court decision," in finding arbitrary and capricious the Agency's interpretation of the language as excluding a dismissal of a declaratory judgment action). 182 F.3d at 1009. In *Granutec*, the court, like the D.C. Circuit in *Mova*, found invalid the Agency's "successful defense" interpretation, concluding that adding the requirement neither interpreted the statute nor filled a gap. 1998 WL 153410 at *7. However, the court also expressly acknowledged the availability of waiver. *Id.* at *9, 10; *see* note 7 *supra*. In *Torpharm, Inc. v. Shalala*, 1997 WL 33472411 at *1 (D.D.C. Sept. 5, 1997) (unpublished opinion), a district court found the Agency's interpretation of "the court" (to mean a court from which no appeal "can be or has been taken") unsupportable in light of other uses of the same term in the statute. In contrast, the Agency's interpretation here comports with its long-standing interpretation of equivalent statutory language to permit waiver of other forms of market exclusivity established in the Act. *See* section II.B *infra*.

[15] 21 U.S.C. 355(c)(3)(D)(ii) ("no application . . . may be submitted . . . before the expiration of five years  ."), (j)(5)(D)(ii) ("no application may be submitted . . . before the expiration of five years . . . "); 21 C.F.R. 314.108(b)(2).

[16] 21 U.S.C. 355(c)(3)(D)(iii), (iv), (j)(5)(D)(iii) (all stating in pertinent part, "the Secretary may not make the approval . . . effective before the expiration of three years . . ."); 21 C.F.R. 314.108(b)(4),(5).

ordinarily end with respect to the product when the product's sponsor has submitted pediatric studies (pediatric exclusivity).[17]

### B.    Equivalent Agency Practice

The Agency has a long-standing and consistent practice of permitting waiver and relinquishment of these three forms of marketing exclusivity as well, as a means to best effectuate the underlying legislative objectives.[18]  Congress intended 180-day exclusivity to encourage patent challenges to promote competition for pharmaceuticals, in accordance with one fundamental objective of the Hatch-Waxman amendments.  *See Mova*, 140 F.3d at 1074-75.  New chemical entity and new clinical investigation exclusivity were intended to promote the other fundamental objective of the amendments, and a fundamental objective of the Food and Drug Administration Modernization Act of 1997 with respect to pediatric exclusivity, to encourage pharmaceutical innovation.[19]

The first waiver requests submitted to the Agency after passage of the Hatch-Waxman amendments came from innovator companies wishing to waive new clinical investigation and new chemical entity exclusivity to permit approval of specific ANDAs.  For example, in 1988, the Agency allowed Stuart Pharmaceuticals to waive new clinical investigation exclusivity to permit approval of an ANDA for atenolol submitted by ICI Pharmaceuticals Group.  The Agency also permitted Ciba-Geigy Corp. to waive new chemical entity exclusivity in 1993 to permit review and approval of an ANDA for diclofenac sodium submitted by Geneva Pharmaceuticals,

---

[17] 21 U.S.C. 355a(a), (c) (extending unexpired patent or other market exclusivities by six months).  These three bars to review and approval do not apply to subsequent full NDAs (which are applications that include all the data necessary to support approval without reference to any data or information the sponsor does not own or to which it does not have a right of reference).  *See id.*; 21 U.S.C. 355(c)(D), (j)(5)(D).

[18] The Agency notes that section 527 of the Act, which establishes an exclusivity period for the marketing of drugs for rare diseases and conditions ("orphan drug" exclusivity), expressly provides for the holder of the exclusivity to consent to approval of other applications during the exclusivity period.  *See* 21 U.S.C. 360cc(b)(2); 21 C.F.R. 316.31(a)(3).  Orphan drug exclusivity, however, was addressed through separate legislation to deal with a separate legislative concern from those addressed by the Hatch-Waxman amendments.  In contrast, the provisions addressing 180-day, new chemical entity, new clinical investigation, and pediatric exclusivity all arise from or relate to the Hatch-Waxman amendments and, where silent or ambiguous, are appropriately interpreted collectively and consistently in light of the overall structure and purpose of those amendments.  *See Apotex, Inc. v. Thompson*, 347 F.3d 1335, 1352 (Fed. Cir. 2003) ("Deference is due to an administrative agency's regulations particularly when the subject matter of the regulatory authority is a 'highly detailed' regulatory program to which the agency has brought its 'specialized expertise,' . . . a characterization that aptly describes the FDA's role in the context of the regulatory scheme created pursuant to the Hatch-Waxman Act"); *Granutec*, 1998 WL 153410 at *9 (deferring to the Agency's interpretation of the "complicated legislative [Hatch-Waxman] framework that reflects a considered balance of competing statutory goals").

[19] Pub. L. No. 105-115.  *See* Drug Price Competition and Patent Term Restoration Act, House Report No. 98-857, Part I 15 (stating that Title II of the act created new incentives for increased pharmaceutical research and development expenditures); Statement of Senator Orrin Hatch, 130 Cong. Rec. S 10503-04 (daily ed. Aug. 10, 1984) (explaining that new chemical entity and new clinical investigation exclusivity would compensate for the time and money expended for product testing and review); Food and Drug Administration Modernization and Accountability Act of 1997:  Report from the Committee on Labor and Human Resources of the U.S. Senate (Oct. 6, 1997) 3 (explaining that the legislation would create incentives to test the safety and efficacy of drugs for children).

Inc. The preamble to the 1994 implementing regulations for the Hatch-Waxman amendments described this practice and expressly recognized the permissibility of waiver of new chemical entity and new clinical investigation exclusivity (*see* 59 FR at 50,539). Subsequently, in 2002, the Agency permitted Bristol-Myers Squibb Company to waive both pediatric exclusivity and new clinical investigation exclusivity, to allow immediate approval of ANDAs for metformin and buspirone bearing pediatric labeling.

### C.     Exclusivity Provisions Not Distinguishable

You assert that waiver and relinquishment should be permitted for new chemical and new clinical investigation exclusivity under section 505(j)(5)(D) of the Act but not for 180-day exclusivity under section 505(j)(5)(B)(iv) because 180-day exclusivity is not tied to any property right, while these other forms of exclusivity relate to underlying, marketable proprietary data (Petition at 9). There is no basis in the statutory language for drawing such a distinction. Just as section 505(j)(5)(B)(iv) states that the application "shall be made effective not earlier than . . .", section 505(j)(5)(D) provides that "no application may be submitted . . . before the expiration of five years" (regarding new chemical entity exclusivity) (21 U.S.C. 355(j)(5)(D)(ii)) and "the Secretary may not make the approval . . . effective before the expiration of three years" (regarding new clinical investigation exclusivity) (21 U.S.C. 355(j)(5)(D)(iii), (iv)).[20] As discussed above, all of these provisions may permissibly be interpreted to provide for waiver and relinquishment.

Further, FDA does not consider this distinction relevant as a policy matter. The Agency allows waiver of all three of these forms of exclusivity, and of pediatric exclusivity, to ensure that the beneficiary of the exclusivity (whether an innovator that has invested in research and development for a new chemical entity, new clinical indication, or pediatric use, or an ANDA applicant that has challenged a listed patent) is able to realize as fully as possible the benefit Congress intended to confer as an incentive for the activity. Waiver and relinquishment do not depend upon the existence of a property right in the exclusivity or on a relationship between the exclusivity and some other property interest. *See* 59 FR at 50,359.

Petitioner also argues that allowing waiver of 180-day exclusivity would encourage the submission of ANDA applications to realize a "lucrative 'waiver' asset." Petition at 10. As discussed at note 5 *supra*, the Agency agrees that a potential for abuse exists. Partly for this reason, the Agency has adopted a policy permitting relinquishment, but not selective waiver, before the triggering of eligibility. However, in the absence of evidence to the contrary, we do not believe that the speculative potential for abuse outweighs the demonstrable, pro-competitive benefits of allowing waiver and relinquishment.[21] *See* section III *infra*.

---

[20] *See also* 21 U.S.C. 355(c)(3)(D)(iii), (iv).

[21] *See* 59 FR at 50,359. As Teva and Purepac note, in any event, ANDA applicants, like NDA holders, have commercially marketable assets to sell or license relating to their drug products. *See* Comments at 15.

We also note, with regard to 180-day exclusivity, that precluding waiver could be expected primarily to benefit the innovator, rather than other ANDA applicants or the public through increased competition and lower prices. Yet, the provision was intended to benefit ANDA applicants, not innovators, to promote competition consistent with a

III.    **Relinquishment and Waiver of 180-Day Exclusivity Promote the Purpose of the Exclusivity—to Encourage Patent Challenges and Increase Marketplace Competition**

As noted above, the Hatch-Waxman amendments reflect two fundamental legislative goals: continued pharmaceutical innovation and enhanced competition in the pharmaceutical marketplace. In granting 180-day exclusivity, Congress intended to reward patent challenges based on non-infringement or invalidity to promote the latter of these basic legislative objectives— enhanced marketplace competition. *See Pharmachemie B.V. v. Barr Labs., Inc.*, 276 F.3d 627, 629 (D.C. Cir. 2002); *Mova*, 140 F.3d at 1074-75. If waiver and relinquishment were not permissible, the value of 180-day exclusivity would be significantly reduced and, in some cases, could be eliminated.[22] This would diminish the effectiveness of this incentive to challenge patents. Further, market access for subsequent ANDA holders could be substantially delayed, potentially for years. Consequently, marketplace competition could be anticipated to develop more slowly, a result that would be inconsistent with this legislative objective.

As noted above, the Agency has permitted waiver and relinquishment of 180-day exclusivity on multiple occasions, facilitating approvals of subsequent ANDAs that might otherwise have been significantly delayed. Petitioner offers no evidence to suggest that permitting waiver and relinquishment undermines the objectives of the Hatch-Waxman regime. Permitting waiver and relinquishment allows the private entities concerned to arrange, to their mutual best advantage and to the benefit of the public health, for more rapid introduction of competition to the pharmaceutical marketplace. The Agency sees no reason to interfere with these pro-competitive business arrangements.

IV.    **Conclusion**

FDA has concluded that waiver and relinquishment of 180-day exclusivity are permitted under section 505(j)(5)(B)(iv) of the Act; this practice is consistent with the Agency's permitting

---

fundamental objective of the Hatch-Waxman amendments. *See Mova*, 140 F.3d at 1074-75. As a policy matter, therefore, this outcome would be inconsistent with the purpose of the provision and this basic legislative objective.

[22] For example, an ANDA applicant might be eligible for exclusivity based on certifications with respect to more than one patent. If the applicant were to lose the patent infringement suit for one patent, it would no longer be eligible for exclusivity with respect to that patent, and would not be able to market its product during the term of that patent (without infringing the patent). *See* 21 C.F.R. 314.94(a)(12)(viii)(A). However, the applicant would still have eligibility with respect to the other patent(s). Depending on whether or not there is a court decision finding the other patent(s) invalid or not infringed, and thus beginning the exclusivity period, the eligible ANDA applicant (which cannot market its own product) might relinquish or selectively waive exclusivity, permitting FDA to approve one or more ANDAs for the drug product.

Another example would be an eligible applicant ("Applicant A") that is still in patent litigation when the exclusivity period is triggered either by a court decision finding that another ANDA applicant's product is not infringing or, in the case of multiple eligible applicants as described in note 3 *supra*, by another eligible applicant's commercial marketing. In both of these situations, the exclusivity period might expire before Applicant A could market its product.

waiver and relinquishment of new chemical entity, new clinical investigation, and pediatric exclusivity; and waiver and relinquishment of 180-day exclusivity advance a fundamental objective of the Hatch-Waxman amendments by promoting competition in the pharmaceutical marketplace. The Agency sees no reason to alter its existing policy. We see no compelling public health consideration and no specific statutory mandate to interfere with these private business arrangements. For all these reasons, the Agency denies your requests.

Sincerely yours,

William K. Hubbard
Associate Commissioner
 for Policy and Planning

13

# Declaration of William A. Rakoczy

*In support of Cobalt's Motion for*
*Temporary Restraining Order*

# Exhibit I

| FOOD AND DRUG ADMINISTRATION COMPLIANCE PROGRAM GUIDANCE MANUAL | PROGRAM | 7348.001 |
|---|---|---|

### CHAPTER 48 – BIORESEARCH MONITORING: HUMAN DRUGS

| SUBJECT: | IMPLEMENTATION DATE |
|---|---|
| IN VIVO BIOEQUIVALENCE | **10/01/99** |
| | COMPLETION DATE |
| | Continuing |

| DATA REPORTING | |
|---|---|
| PRODUCT CODES | PROGRAM ASSIGNMENT CODES |
| Product coding not required for biopharmaceutical analytical and clinical establishment types. | 48001    Human Drugs (Use for both foreign and domestic inspections) |

### FIELD REPORTING REQUIREMENTS

One copy of each EIR and all exhibits covering clinical testing and analytical testing will be forwarded to the GLP and Bioequivalence Investigations Branch (GBIB), Division of Scientific Investigations (DSI), HFD-48, for final classification. When the clinical and analytical portions of a study have been performed at separate locations, separate reports should be prepared and submitted for each site. Completion of Attachment B is required for each study and for each study site subjected to inspection. Also complete Part I & II of Attachment A for clinical facilities, and Parts I and III of Attachment A for analytical facilities.

The District should immediately notify GBIB (via e-mail, FAX, or telephone) of any significant adverse information related to a firm that could affect the agency's new product approval decisions.

| FOOD AND DRUG ADMINISTRATION COMPLIANCE PROGRAM GUIDANCE MANUAL | PROGRAM | 7348.001 |
|---|---|---|

## PART I - BACKGROUND

Bioequivalence studies are generally performed to support Abbreviated New Drug Applications (ANDAs) and New Drug Applications (NDAs). In ANDAs, approvals of generic versions of innovator drug products are normally based on results of bioequivalence studies. In NDAs, bioequivalence studies are frequently conducted to link the to-be-marketed formulation(s) with the clinical trial formulation(s), and to support approval of a new formulation or a new route of administration of a marketed drug.

The Bioequivalence Regulations (21 CFR 320) of January 7, 1977 and the amendments of April 28, 1992, April 28, 1993, and January 5, 1999, stated the requirements for submission of in vivo bioavailability and bioequivalence data as a condition of marketing a new (i.e., new chemical compound; new formulation, new dosage form, or new route of administration of a marketed drug) or generic drug. 21 CFR 320 also provided general guidance concerning the design and conduct of bioavailability/bioequivalence studies. However, it should be noted that bioequivalence studies conducted to support ANDAs involve testing of already approved drug entities and therefore, generally do not require an investigational new drug application (IND)*. The Food and Drug Administration (FDA) does not require bioequivalence studies on pre-1938 drug products.

Bioequivalence studies involve both a **clinical component and an analytical component**. The objective of a typical bioequivalence study is to demonstrate that the test and reference products achieve a similar pharmacokinetic profile in plasma, serum and/or urine. Bioequivalence studies usually involve administration of test and reference drug formulations to 18-36 normal healthy subjects, but patients with a target disease may also be used. Formulations to be tested are administered either as a single dose or as multiple doses. Sometimes formulations can be labeled with a radioactive component to facilitate subsequent analysis. In a bioequivalence study, serial samples of biologic fluid (plasma, serum, or urine) are collected just before and at various times after dose administration. These samples are later analyzed for drug and/or metabolite concentrations. The study data are used in subsequent pharmacokinetic analyses to establish bioequivalence.

This program will cover both the clinical and analytical components of bioequivalence studies. In some situations the clinical and analytical facilities for a study may be part of the same

---

*However, sponsors of generic drugs need to file INDs when studies involve a route of administration or dosage level or use in a patient population or other factor that significantly increases the risks (or decreases the acceptability of the risks) associated with the use of the drug product [21 CFR 312.2(b)(iii)].

FOOD AND DRUG ADMINISTRATION                    PROGRAM          7348.001
COMPLIANCE PROGRAM GUIDANCE MANUAL

organization and therefore may be covered by one District. In other situations, the two facilities
may be located in different Districts. For the purpose of this program, the District where the
clinical facility is located will be referred to as the Clinical Component District, and the District
where the analytical facility is located will be referred to as the Analytical Component District.

FOOD AND DRUG ADMINISTRATION
COMPLIANCE PROGRAM GUIDANCE MANUAL

PROGRAM

| 7348.001 |

### PART II - IMPLEMENTATION

### OBJECTIVES

1.  To verify the quality and integrity of scientific data from bioequivalence studies submitted to the Center for Drug Evaluation and Research (CDER);

2.  To ensure that the rights and welfare of human subjects participating in drug testing are protected; and

3.  To ensure compliance with the regulations (21 CFR 312, 320, 50, and 56) and promptly follow-up on significant problems, such as research misconduct or fraud.

### PROGRAM MANAGEMENT INSTRUCTIONS

A.  Coverage

1.   Clinical Facilities[**]

Clinical facilities conduct bioequivalence studies (including screening, dosing, monitoring of subjects' safety, etc.) in order to obtain biological specimens (e.g., plasma, serum, urine) for analysis of drug and/or drug metabolite concentrations.

Facilities that conduct bioequivalence studies in human research subjects for pharmacodynamic measurements (i.e., clinical or pharmacological effects) are also included.

2.   Analytical Facilities[**]

---

[**]It is important to draw distinctions between a clinical laboratory, a clinical facility, and an analytical facility. A clinical laboratory generally uses blood and/or urine to conduct medical screening or diagnostic tests such as blood counts (CBC), liver function tests (ALT, AST) or kidney function (BUN, creatinine clearance, etc.) tests. Clinical laboratories are usually certified under programs based on the Clinical Laboratories Improvement Act (42 USC 263a), and are not routinely inspected by the FDA. A clinical laboratory may be visited during a bioequivalence study audit to confirm that reported screening or diagnostic laboratory work was indeed performed. The clinical facility and the analytical facility as described above are the laboratories that will be routinely inspected under this program.

FOOD AND DRUG ADMINISTRATION                          PROGRAM
COMPLIANCE PROGRAM GUIDANCE MANUAL                                  | 7348.001 |

Analytical facilities analyze biological specimens collected in bioequivalence studies and other human clinical studies for drug and/or metabolite concentrations to measure the absorption and disposition of the drug.

3.    Clinical and Analytical Investigators

The clinical investigator in a bioequivalence study is involved in the screening and dosing of human subjects, and will ordinarily be a physician. Ph.D. clinical pharmacologists and Pharm.D.'s are acceptable if a physician is available to cover medical emergencies. The clinical investigator may also perform pharmacodynamic measurement(s) and evaluation activities of clinical or pharmacological endpoints.

The analytical investigator in a bioequivalence study is the scientist in the analytical facility responsible for assay development and validation, and analyses of biological specimens, e.g., Scientific Director or Laboratory Director.

B.   Process

Facilities where bioequivalence studies are conducted are to be inspected under this compliance program. The inspection should include a review of the clinical and analytical testing procedures plus an audit of source data from one or more specified studies.

Assignments under this program are of two basic categories:

1.    Directed Data Audit - Covers studies and/or facilities in which gross problems/inadequacies are suspected (including, but not limited to research misconduct, or fraud). Such assignments require rapid evaluation and resolution.

2.    Routine Data Audit - Covers (1) pivotal studies under current review in the Divisions of Pharmaceutical Evaluation I (HFD-860), II (HFD-870), or III (HFD-880) in the Office of Clinical Pharmacology and Biopharmaceutics (HFD-850); and (2) bioequivalence studies supporting the approval of a generic product.

Assignments will be issued by the GLP and Bioequivalence Investigations Branch (GBIB, HFD-48) to the field. For each assignment, a scientific reviewer in GBIB with expertise in chemical assays, bioavailability/bioequivalence, biopharmaceutics, pharmacokinetics or pharmacodynamics will (1) assist the field in coordinating and as necessary conducting the inspection; (2) provide technical guidance and on-site support to the field as necessary; and (3) serve as the liaison between the field investigator(s) and the Review Divisions in CDER.

FOOD AND DRUG ADMINISTRATION                    PROGRAM
COMPLIANCE PROGRAM GUIDANCE MANUAL                          7348.001

GBIB will generate assignments under this program based on information provided by the
Review Divisions in CDER. GBIB will send assignment memos to the Director of the
Investigations Branch in the appropriate District office(s) (for domestic inspections), or the
Division of Emergency and Investigational Operations, International Operations Group (for
foreign inspections).

The assignment memo will include the following information:

  (a) NDA/ANDA number
  (b) Name of the drug
  (c) Name of the sponsor
  (d) Study/protocol number(s)
  (e) Title of each study identified for inspection
  (f) Address(es) of the clinical and analytical facilities
  (g) Instructions on inspectional areas
  (h) Deadline(s) such as preferred date for completion of inspection, Review
  Division action goal date, or the user fee goal date, etc.
  (i) The name of the GBIB contact.

After a field investigator has been assigned, background material (including source data from the
specific study(ies)) will be forwarded to the field investigator. In the event that a clinical or
analytical facility designated for inspection is found to be located elsewhere, the district should
contact GBIB immediately in order to redirect the assignment.

For all inspections in which a Form FDA-483 is issued, a copy of the Form FDA-483 should be
forwarded by facsimile to the GBIB contact or the Branch Chief of GBIB.

FOOD AND DRUG ADMINISTRATION      PROGRAM    | 7348.001 |
COMPLIANCE PROGRAM GUIDANCE MANUAL

## PART III - INSPECTIONAL

## OPERATIONS

### A. Inspectional

A complete inspection report under this compliance program consists of inspectional findings covering:

(1) Clinical testing, which includes the adequacy of facilities and procedures utilized by the clinical investigator along with a data audit of the specific study(ies) identified by GBIB; and

(2) Analytical testing, which includes the adequacy of the facilities, equipment, personnel, and methods and procedures utilized at the analytical facility including an audit of the method validation and analytical data for the study(ies) identified by GBIB.

Attachment A provides guidance on the clinical and analytical portions of the inspection report. Attachment B, Bioequivalence Testing Report Summary, must be completed for each study audited. In cases where the clinical and analytical facilities are not in the same location, each inspection team will complete the appropriate parts of Attachment A for the facility inspected. Close communication among all parties is critical in cases where two different inspectional teams are involved in the coverage of a study.

Attachment A identifies the information that must be obtained to determine if the facility is operating in a satisfactory manner. The inspection should be sufficient to describe the usual practices for each point identified in Attachment A and to review the appropriate documents related to the adequacy of the equipment and methods used to obtain data. Each FDA investigator should develop additional information as the facts evolve (subject to the limitations in B and D below).

A full narrative report of any deviations from existing regulations is required. Deviation(s) must be documented sufficiently to support legal or administrative action. For example, any records containing data that are inconsistent with data submitted to FDA should be copied and the investigator should identify the discrepancy. Generally, serious violations will require more extensive documentation. Discuss the situation with your supervisor and the appropriate Center contact prior to embarking on this type of coverage.

### B. Investigational

FOOD AND DRUG ADMINISTRATION
COMPLIANCE PROGRAM GUIDANCE MANUAL

PROGRAM

7348.001

If inspections of institutional review boards and/or clinical laboratories are indicated, contact your supervisor and GBIB contact for guidance prior to initiating the inspection.

C. Refusals

If access to, or copying of records is refused for any reason, promptly contact your supervisor so that the GBIB contact can be advised of the refusal. Send follow-up information via EMS to GBIB, and ORO contacts. Follow the same procedure when it becomes evident that delays by the firm constitute a de facto refusal. [See also Inspection Operations Manual, Section 514.]

If actions by the firm take the form of a partial refusal for inspection of documents or areas to which FDA is entitled under the law, call attention to 301(e) and (f) and 505(k)(2) of the FD&C Act; if the refusal persists, telephone your supervisor and the GBIB contact for instructions.

If the proper course of action to deal with a refusal cannot be resolved expeditiously by GBIB or ORO, GBIB will notify the Bioresearch Program Coordinator (HFC-230).

D. Findings

1. If you encounter serious problems with the data, methodology, quality control practices, etc., continue the originally assigned inspection, but contact GBIB for advice on possibly expanding the inspection. GBIB will determine if an in-depth inspection, involving additional bioequivalence studies, should be initiated.

2. If you encounter questionable or suspicious records and are unable to review or copy them immediately and have reason to preserve their integrity by officially sealing them, contact your supervisor immediately for instructions. Procedures exist for your District to clear this type of action by telephone with the ORA/Bioresearch Program Coordinator (HFC-230). See Inspection Operations Manual, Section 453.5.

3. Issuance of a Form FDA-483, Inspectional Observations, is appropriate when (1) practice at the clinical site deviates from the standards for conduct of a clinical study as set forth in 21 CFR 312 and 320 and 361, (2) practice at the analytical site deviates from the standards of laboratory practices as set forth in 21 CFR 320, and (3) discrepancies have occurred between source data and reported data in the case report forms. Items that need to be checked for compliance to study standards are provided in Attachment A. Examples of noncompliance to study standards at the clinical and analytical sites are listed in Part V of this guidance. Observed deficient practices should be discussed with the responsible officials.

FOOD AND DRUG ADMINISTRATION                    PROGRAM      7348.001
COMPLIANCE PROGRAM GUIDANCE MANUAL

E.    Clinical and Analytical Facilities

      Generally, unannounced visits to the clinical or analytical investigator will be
      impractical. Appointments to inspect may be made by telephone, but the time interval
      until the actual inspection should be kept as short as possible. Any undue delay of the
      inspection on the part of the clinical or analytical investigator should be reported
      immediately to GBIB. In the event that an unannounced visit becomes necessary, this
      will be addressed and clearly stated in the inspection assignment memo sent to the
      appropriate District office(s).

      Inspection of clinical and analytical facilities should include review of the practices,
      qualifications of personnel, and procedures utilized during conduct of the clinical study
      and analytical testing. The clinical and analytical data provided by the GBIB should be
      compared with the records at the clinical and analytical study sites. Analytical testing
      procedures, including controls, should be reviewed by the GBIB scientist or FDA field
      chemist for scientific soundness with relation to the data submitted in the NDA/ANDA.

F.    Instructions for Data Audits

      See Attachment A for guidance.

OTHER REQUIREMENTS

A.    All Headquarters and Field units are encouraged to recommend any sponsor(s), or
      clinical or analytical facility to the GBIB for inspection. All recommendations should
      include:

      1.    Establishment name and address.
      2.    If known, the name of the drug(s) being investigated and the NDA or ANDA
            number(s).
      3.    Why the inspection should be made.

B.    State and local inspectors do not ordinarily participate in inspections conducted under
      this program. If State/local officials make such requests, clearance must be obtained in
      advance from DSI.

TECHNICAL SUPPORT-INSPECTION TEAMS

See Inspection Operations Manual, Section 502.4 for guidance on team inspections. The District

FOOD AND DRUG ADMINISTRATION                    PROGRAM        ┌─────────────┐
COMPLIANCE PROGRAM GUIDANCE MANUAL                            │  7348.001   │
                                                             └─────────────┘

performing the inspection should use District or Regional experts whenever possible. The use of
field chemists and microbiologists on the inspection team is strongly recommended when their
expertise in the analytical methodology, equipment quality control, or adequacy of laboratory
records is identified in the assignment. A member from the Bioequivalence Team in GBIB may
participate in domestic and foreign inspections where expertise in pharmacokinetic and/or
pharmacodynamic data analysis is needed, when complex scientific issues are involved, or when
a field chemist/microbiologist is not participating in the analytical portion of a bioequivalence
study inspection. For a Bioequivalence Assignment where an on-site Analytical Audit is
requested, a field chemist or GBIB scientist must accompany the investigator.

## ESTABLISHMENT INSPECTION REPORT (EIR) FORMAT

The format of the EIR should be based on each section in Attachment A that is pertinent to the
inspected facility. EIRs of facilities under this program will not normally be abbreviated.
Where appropriate "negative", "not applicable", and "narrative" responses to points in
Attachment A, should be documented and/or explained. Some of these responses will be clear
enough that documentation/explanation is not necessary. Complete a separate Attachment B for
each bioequivalence study and for each site audited. If a GBIB scientist participated in an
inspection, the GBIB scientist should prepare the section of the EIR which he or she audited
during the inspection.

**Reports involving serious violative findings such as research misconduct or fraud should
focus on the violative conditions, rather than the routine reporting set forth in Attachment
A.**

## SAMPLE COLLECTION

Since November 8, 1990, clinical investigators have been required to retain samples from the test
and reference drug products actually used in bioequivalence studies they performed. Routine
collection of these samples from bioequivalence testing facilities is anticipated under CP
7346.832, Pre-Approval Inspections/Investigations. In the event that samples have not been
previously collected under CP 7346.832, the District office is responsible for collecting the
samples (related to the study identified in the assignment) at the time of the bioequivalence
inspection. The task of sample collection will be clearly identified in the inspection assignment
memo. Please see PART IV - ANALYTICAL for sample size to be collected.

FOOD AND DRUG ADMINISTRATION
COMPLIANCE PROGRAM GUIDANCE MANUAL          PROGRAM          7348.001

## PART IV - ANALYTICAL

Routine analytical work is anticipated for this compliance program (See preceding sections).

Collected study retention samples will be sent to the Division of Drug Testing and Applied Analytical Development, St. Louis, MO for screening. The sample size should be sufficient to allow the FDA laboratory to perform all of the release tests required in the ANDA, NDA, or supplemental applications five times. If the clinical investigator is not sure of the amount that constitutes the "five times quantity," the clinical investigator should contact the study sponsor. The clinical facility must provide a written assurance (e.g.,an affidavit) that the retained samples are representative of those used in the specific bioavailability/bioequivalence study, and that they were stored under conditions specified in accompanying records.

FOOD AND DRUG ADMINISTRATION    PROGRAM    7348.001
COMPLIANCE PROGRAM GUIDANCE MANUAL

## PART V - REGULATORY/ADMINISTRATIVE STRATEGY

Field investigators should send a copy of any EIR and supporting exhibits that document possible violations of the FD&C Act or other federal statutes to the District Compliance Branch (DCB) at the same time as the report is sent to GBIB, HFD-48. The DCB should review the EIR and discuss with HFD-48 coordination of follow-up regulatory or administrative actions, as appropriate.

GBIB will evaluate all EIRs for biopharmaceutical, clinical, and analytical significance, and assign a final classification to each EIR. After final review and classification, DSI will issue follow-up letters and provide copies to ORO (HFC-132) and the District(s) involved. If serious misconduct is found, a Warning Letter and/or other administrative actions (e.g., informing the sponsor that the study is not acceptable in support of ANDA or NDA; disqualification of clinical investigator or CRO that conducted the study) would be taken by DSI to the responsible CRO or sponsor. ORA would not normally recommend any regulatory actions unless requested by the Center.

## CLINICAL TESTING

Examples of non-compliance:

1. Subjects not receiving the test or reference drug formulation according to the study randomization codes.

2. Biological samples compromised by improper identification, handling or storage.

3. Failure to report adverse experiences, such as vomitting, and diarrhea, which may affect absorption and elimination of drugs.

4. Inadequate drug accountability records.

5. Inadequate medical supervision and coverage.

6. Significant problems/protocol deviations/adverse events not reported to the sponsor.

7. Failure to adhere to the inclusion/exclusion criteria of the approved protocol.

8. Inadequate or missing informed consent for participating subjects.

9. Any other situation in which the health and welfare of the subjects are compromised.

FOOD AND DRUG ADMINISTRATION                    PROGRAM          | 7348.001 |
COMPLIANCE PROGRAM GUIDANCE MANUAL

## ANALYTICAL TESTING

Examples of non-compliance:

1. Inconsistencies between data reported to FDA and at the site.

2. Inadequate or missing validation of assay methodology with respect to specificity (related chemicals, degradation products, metabolites), linearity, sensitivity, precision, and reproducibility.

3. Failure to employ standard, scientifically sound quality control techniques, such as use of appropriate standard curves and/or analyte controls that span the range of subjects' analyte levels.

4. Failure to include all data points, not otherwise documented as rejected for a scientifically sound reason, in determination of assay method precision, sensitivity, accuracy, etc.

5. Samples are allowed to remain for prolonged periods of time without proper storage.

6. Failure to maintain source data, e.g. source data written on scrap paper and/or discarded in trash after transferring to analytical documents.

7. Lack of objective standard for data acceptance of calibration standards, quality controls, etc.

8. Unskilled personnel conducting analytical procedures.

9. No documentation of analytical findings.

10. Inadequate or no written procedures for drug sample receipt and handling.

11. Inadequate or missing standard operating procedures.

Note: The above are not all-inclusive lists of examples of clinical and analytical noncompliance.

# Declaration of William A. Rakoczy

*In support of Cobalt's Motion for*
*Temporary Restraining Order*

# Exhibit J

MANUAL OF POLICIES AND PROCEDURES

CENTER FOR DRUG EVALUATION AND RESEARCH          MAPP 5210.7

## Office of Generic Drugs

### Inspections of Clinical Facilities and Analytical Laboratories Conducting Bioequivalence Studies Submitted in ANDAs

## CONTENTS

PURPOSE
BACKGROUND
REFERENCES
DEFINITIONS
POLICY
RESPONSIBILITIES and PROCEDURES
EFFECTIVE DATE

## PURPOSE

- This MAPP outlines policies and procedures to use in (1) identifying when to request inspections of clinical facilities or analytical laboratories associated with bioequivalence (BE) studies and (2) applying inspection information to the review of abbreviated new drug applications (ANDAs).

## BACKGROUND

- In vivo BE studies are used to support the approval of many ANDAs. To help ensure that these studies are reliable, the Office of Generic Drugs (OGD) needs information on the inspection status of clinical facilities and analytical laboratories where the studies are conducted.

- OGD requests information on the compliance status of relevant clinical facilities and laboratories from the Good Laboratory Practice (GLP)/ Bioequivalence Branch (GBIB), Division of Scientific Investigations (DSI), Office of Medical Policy.

- GBIB assigns inspections to FDA's Office of Regulatory Affairs (ORA). Led by ORA field staff, inspections are conducted as described in the FDA Compliance Program Guidance Manual (CPGM), Compliance Program 7348.001 – Bioresearch Monitoring – In Vivo Bioequivalence. GBIB may also participate in inspections to provide scientific expertise.

MANUAL OF POLICIES AND PROCEDURES

CENTER FOR DRUG EVALUATION AND RESEARCH                    MAPP 5210.7

## REFERENCES

- 21 CFR part 54, Financial Disclosure by Clinical Investigators

- 21 CFR part 314, Applications for FDA Approval to Market a New Drug

- 21 CFR part 320, Bioavailability and Bioequivalence Requirements

- The Federal Food, Drug, and Cosmetic Act, Section 505(k)(2)

- FDA Compliance Program Guidance Manual (CPGM), Compliance Program 7348.001 – Bioresearch Monitoring – In Vivo Bioequivalence

## DEFINITIONS

- **Analytical Laboratory:**  A facility used by a pharmaceutical sponsor or contract research organization to determine the nature and proportionate quantities of the constituents of a compound for an in vivo BE study.  An analytical laboratory typically completes an assay to determine the drug concentration in body fluids.

- **Bioresearch Monitoring (BIMO) Goal Date (or Inspection Summary Goal Date):**  The date by which the OGD Division of Bioequivalence (DBE) project manager anticipates a review of the inspection results from DSI.  This date is determined in consultation with DSI staff and includes time to assess the inspection results.

- **BIMO Program:**  The program responsible for FDA oversight of clinical and nonclinical studies conducted in support of marketing applications.

- **Clinical Facility:**  A site where patients or subjects are examined and observed during an in vivo BE study.

- **Compliance Classification:**  The compliance status of an inspection. Inspections can be classified as:

  - **No Action Indicated (NAI).**  No objectionable conditions or practices were found during the inspection.

  - **Voluntary Action Indicated (VAI).**  Objectionable conditions or practices that represented departures from the regulations were found, but were correctable by voluntary action.

MANUAL OF POLICIES AND PROCEDURES

CENTER FOR DRUG EVALUATION AND RESEARCH                    MAPP 5210.7

- **Official Action Indicated (OAI).** Objectionable conditions or practices were found that represented significant departures from the regulations and could require administrative or regulatory sanctions.

- **Directed Inspection:** An inspection based on substantive information suggesting scientific misconduct, major human subject protection violations, or compromised BE data.

- **FDA Compliance Program Guidance Manual (CPGM), Compliance Program 7348.001: Bioresearch Monitoring -- In Vivo Bioequivalence:** The program describing the procedures used by FDA staff in performing inspections of BE studies.

- **Good Laboratory Practice and Bioequivalence Investigations Branch (GBIB):** The unit within the Division of Scientific Investigations responsible for assigning and/or performing inspections of facilities conducting BE and nonclinical studies.

- **Routine Inspection:** An inspection to determine the compliance of a clinical facility or analytical laboratory with U.S. regulations. Typically there is no prior indication of misconduct, human subject protection problems, or suspect data.

## POLICY

- OGD requests that GBIB initiate a *routine inspection* of clinical facilities or analytical laboratories conducting BE studies included in an unapproved ANDA if:

  - A clinical facility or analytical testing site is identified in the ANDA that has no inspection history, was classified OAI on its last inspection, or has not been inspected within the past 3 years.

  - A clinical facility and/or analytical laboratory is performing a nonconventional BE study for which it has never been inspected by DSI (e.g., a study using pharmacodynamic endpoints to assess bioequivalence).

- OGD requests a *directed inspection* of a facility if there is a question about the quality or integrity of the data submitted in an ANDA. Instances of suspect data may include missing data points, errors in calculation, or inadequate documentation.

MANUAL OF POLICIES AND PROCEDURES

CENTER FOR DRUG EVALUATION AND RESEARCH                    MAPP 5210.7

## RESPONSIBILITIES and PROCEDURES

### Regulatory Support Branch Project Manager

- When an ANDA is accepted for filing, determines if any of the inspection criteria in this MAPP apply.  If so, notifies the bioequivalence project manager.

### Bioequivalence Project Manager

- Consults with the GBIB reviewers to identify analytical laboratories and clinical facilities that should be inspected.

- Prepares a memorandum to GBIB identifying the sites to be inspected, the reasons for the request, the BIMO goal date, and any additional information. This memorandum can be forwarded electronically to expedite the request.

- Monitors the status of inspection requests, obtains status information from GBIB, and alerts DBE management of any delays or potential problems.

- With the assistance of the DBE support staff, enters information into OGD's Study and Analytical Testing Sites (SATS) database.

- Updates OGD's Master Queue System and notifies the chemistry project manager of inspection request.

- Informs DBE management and the chemistry project manager of inspection results, and distributes the GBIB inspection summary memorandum and any other pertinent information.

- If a facility has been found in violation for a specific ANDA, checks other ANDAs (approved and unapproved) containing information from the same facility.  Advises the Regulatory Support Branch to screen pending ANDAs for the suspect facility.

- Works with chemistry project managers to prepare necessary correspondence.

### Chemistry Project Manager

- Monitors status of requested audits for pending ANDAs.

- Works with bioequivalence project managers to provide timely, accurate information for OGD approval meetings and correspondence.

### Division of Scientific Investigations

MANUAL OF POLICIES AND PROCEDURES

CENTER FOR DRUG EVALUATION AND RESEARCH                    MAPP 5210.7

- Provides the bioequivalence project manager and DBE reviewer with inspection history of facility to be inspected.

- Initiates an inspection assignment to ORA field staff.

- Participates in inspections to provide scientific expertise, as necessary.

- Provides DBE project manager with status reports on pending inspections, as requested.

- Provides DBE project manager with an inspection summary memorandum by the BIMO goal date.

- Recommends acceptance or nonacceptance of study data based on inspection results or any other applicable factors (e.g., compliance history of the facility).

- Provides quarterly updates to the Director, DBE, on the number of inspections requested and conducted (including percentage of work plan allotment).

- Ensures inspection planning and prioritization in accordance with ORA work plan and available resources in GLP/Bioequivalence Branch.

**DBE Reviewer, Team Leader, and Division Director**

- Identify and request directed inspection, with supervisory concurrence.

- Assess inspection information during review of applications and documents.

**EFFECTIVE DATE**

This MAPP is effective upon date of publication.

# Declaration of William A. Rakoczy

*In support of Cobalt's Motion for
Temporary Restraining Order*

## Exhibit K

Westlaw.

NewsRoom

4/23/07 CHAINDREV 244

Page 1

4/23/07 Chain Drug Rev. 244
2007 WLNR 11400759

Chain Drug Review
COPYRIGHT 2007 Racher Press, Inc.

April 23, 2007

Volume 29; Issue 8

OGD under pressure. (Food and Drug Administration. Office of generic drugs)

PHOENIX -- Funding remains a major issue for the Food and Drug Administration's office of generic drugs (OGD) as the unit struggles to find resources to attract an ever-increasing workload. OGD director Gary Buehler made that assessment at the recent annual meeting of the Generic Pharmaceutical Association (GPhA) here.

"The high number of (abbreviated new drug) applications (ANDAs) is expected to continue in the future, and applicable science and related applications will become more and more complex," he said.

In the agency's 2006 fiscal year OGD received 793 ANDAs and granted approvals to 510 products versus respective totals of 766 and 467 the year before.

With the rise in applications has come a corresponding increase in review periods. In 2005 the median approval time was 16.3 months, but increased to 16.6 months last year.

Still, that was significantly below the 18.9-month median approval time in 2000.

The backlog of pending ANDA applications is also accelerating. At the end of fiscal 2006 OGD had a backlog of 1,172 ANDAs versus 780 for 2005 and a comparatively low 374 at the conclusion of the 2001 fiscal year.

Buehler also lamented financial constraints that have limited the number of new hires at the OGD and that restricted both overtime and travel--noting that his own trip to the GPhA convention had won approval only days before the Phoenix conference began.

The regulatory official also noted that user fees for the generic drug industry are under consideration as an option for increasing resources.

But GPhA president and chief executive officer Kathleen Jaeger has noted that user fees for the industry as proposed by President Bush would not serve as a "magic bullet" to bringing generic drugs to market more expeditiously unless other barriers--including frivolous citizen petitions--are tackled.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

4/23/07 CHAINDREV 244                                                    Page 2

Buehler also discussed the influx of citizen petitions and the burdens they are placing on the system. He noted that proposals to change the approach the agency takes to such documents are under consideration.

"We recognize that citizen petitions are a major issue for the industry," acknowledged Buehler.

Although additional personnel and resources are key to improving the ANDA review application process, Buehler pointed out that other steps are being taken to bring generic drugs to market in a more timely fashion. For instance, certain ANDA applications may be identified at the time of their submission for expedited review, particularly first-time generic products for which there are no blocking patents or other exclusivities.

In addition, the agency and GPhA technical committees have held discussions on ways to improve ANDA submissions. "We intend to continue our interaction with GPhA and the industry to enhance cooperation," commented Buehler.

Median Approval Times Measured From Date of Receipt

(ANDA Originals)

Months

| 2000 | 18.9 |
| 2001 | 18.4 |
| 2002 | 18.3 |
| 2003 | 17.3 |
| 2004 | 16.3 |
| 2005 | 16.3 |
| 2006 | 16.6 |

Source: Food and Drug Administration.

Note: Table made from bar graph.

----- INDEX REFERENCES -----

NEWS SUBJECT: (Economics & Trade (1EC26))

INDUSTRY: (Drugs (1DR89); Pharmaceuticals Regulatory (1PH03); Pharmaceuticals & Biotechnology (1PH13); Prescription Drugs (1PR52))

REGION: (USA (1US73); Americas (1AM92); North America (1NO39))

Language: EN

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

4/23/07 CHAINDREV 244                                          Page 3

OTHER INDEXING:  (ANDA; ANDA ORIGINALS; GENERIC PHARMACEUTICAL ASSOCIATION; GPHA;
MEDIAN APPROVAL TIMES MEASURED; OGD)  (Buehler; Bush; Drug; Gary Buehler; Kathleen
Jaeger)  (United States. Food and Drug Administration. Office of Generic Drugs
(Management)); United States. Food and Drug Administration. Office of Generic Drugs
(Finance))  (Trade)  (Business (BUSN); Pharmaceuticals and cosmetics industries
(DRUG); Retail industry (RETL))  (Management dynamics (200); Financial management
(250))  (United States (1USA))

Word Count: 602
4/23/07 CHAINDREV 244
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

# Declaration of William A. Rakoczy

*In support of Cobalt's Motion for
Temporary Restraining Order*

# Exhibit L

Westlaw.                                                    NewsRoom

8/20/07 CHAINDREV 120                                       Page 1

8/20/07 Chain Drug Rev. 120
2007 WLNR 16535267

Chain Drug Review
COPYRIGHT 2007 Racher Press, Inc.

August 20, 2007

Volume 29; Issue 14

Generics slowed in FDA logjam. (ANNUAL REPORT OF RETAIL PHARMACY: GENERICS) (Food
amd Drug Administration) (Report)

NEW YORK -- A backlog in the government approval process is slowing the flow of
generic drugs to the nation's pharmacies.

Despite a federal law requiring that generic drugs be reviewed within 180 days,
the actual median approval time for generic drug applications is more than 16
months. In June the FDA had a backlog of 1,291 pending applications, up from 780
at the end of 2005.

The result is higher drug prices for consumers, according to consumer advocates
and industry experts. The average retail price of a brand-name drug in 2006 was
$111.02, the National Association of Chain Drug Stores has found, while the
average price of a generic drug was $32.23.

The Generic Pharmaceutical Association (GPhA) states that generics represent 63%
of the total prescriptions dispensed in the United States but only about 20% of
all dollars spent on prescription drugs. The association estimates that a 1%
increase in the use of generics in America would cut the nation's collective
health care bill by about $4 billion a year.

The approval process backlog has been attributed in part to inadequate resources
at the FDA's Office of Generic Drugs (OGD).

"OGD's workload currently overwhelms its resources, and the gap will only
increase over the next few years as billions of dollars in brand drug products
come off patent," noted a GPhA statement. "Substantial additional resources are
needed for OGD to avoid losing further ground, let alone if it is going to make
progress toward reducing and ultimately eliminating the backlog."

To address that problem last month the U.S. House Appropriations Subcommittee on
Agriculture voted to approve a $5 million funding increase for the OGD.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

"Even this modest increase will enhance OGD's ability to fulfill its important mission," said GPhA president and chief executive officer Kathleen Jaeger in applauding the move. "With a larger budget, OGD will be able to hire more reviewers and process generic drug applications in a timelier manner, which will bring safe, effective and affordable generics to consumers sooner."

The measure was being considered by the full House as this article went to press, and a similar bill was before a Senate subcommittee.

The FDA Revitalization Act, also due to be voted on as this article went to press, addresses a number of other issues that are delaying the availability of new generic medications in the United States, according to a spokeswoman for the GPhA.

One such issue involves citizen petitions. The GPhA argues that some brand name pharmaceutical companies--or their lawyers or representatives--routinely file citizen petitions regarding pending Abbreviated New Drug Applications (ANDA) with the FDA on the eve of the agency's granting approval to a generic drug. The FDA then typically delays ANDA approval until the issue underlying the citizen petition is thoroughly resolved.

"That can hold up the approval process anywhere from a couple of days to a couple of years, depending on the issues that are raised," the spokeswoman notes.

A study of citizen petitions filed between 2000 and 2005 found that 76% of them were found to have no merit. The GPhA contends that most are filed at the last minute simply as a delaying tactic and has proposed a system in which a generic drug approval is not linked to the resolution of a citizen petition.

Instead the petition would be dealt with separately. The move would encourage the early submission of legitimate citizen petitions while weeding out some of the frivolous ones, the GPhA contends.

The GPhA has also urged the FDA to require petitioners to provide full disclosure of conflicts of interest, including the petitioner's financial interests in the submission or approval of the petition. Other proposals include requiring strict adherence to a policy of responding to citizen petitions within 180 days and implementation of, or significant improvement to, a system that would track citizen petitions through the investigation and response process.

A bigger issue--which may be included in the current bill or may have to wait for separate legislation in the fall--involves creating an abbreviated FDA approval pathway for biogenerics.

Biopharmaceuticals, medicines derived from living cells and other natural sources, have become valuable treatments for such conditions as cancer, multiple sclerosis and heart attacks. The market for these medications is growing at nearly twice the rate of that for traditional medications.

But the potential of these drugs is blunted by their high cost, according to the GPhA, which notes that treatment with the colon cancer drug Avastin costs $100,900 per year. A study by the California Public Employees Retirement System found that,

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

on average, its spending on biotech products was at least $55 per day, versus just $2 per day for traditional medications.

The approval of generic equivalents for biopharmaceutical drugs could result in significant savings for consumers and the nation's healthcare system as a whole. A study released by the Pharmaceutical Care Management Association found that biogenerics would save the Medicare Part B program alone about $14 billion over 10 years.

A white paper released by the FDA and published in the April 13, 2007, online edition of Nature Reviews Drug Discovery indicated that the agency has the ability to evaluate biogenerics to ensure they have the same efficacy and safety as innovator biopharmaceuticals, GPhA says. According to GPhA, the FDA admits that it uses a flexible, scientifically-based, case-by-case approach for approving biopharmaceuticals.

"The FDA has stated on the record that it can approve biopharmaceutical medicines on a case-by-case basis using scientific tests it determines are best to ensure safety," Jaeger said when the white paper came out. "This is great news for patients who are demanding access to more affordable versions of these medicines."

The GPhA contends that the FDA must be given the flexibility to determine the appropriate tests to demonstrate comparability, and that depending on what is known about a product, preclinical or clinical testing may not be necessary.

"The science exists to ensure safety," Jaeger said earlier this year. "It's now up to Congress to approve a clear and effective abbreviated approval pathway without needless barriers that will delay timely access to these affordable lifesaving medicines."

Leading Generics Companies by U.S. Sales

| COMPANY | DOLLAR SALES (in millions) | % CHANGE VS. YEAR AGO | MARKET SHARE |
|---|---|---|---|
| Teva | $5,551 | +20.3 | 37% |
| Sandoz (Novartis) | 2,634 | +9.6 | -2% |
| Mylan | 2,145 | +7.8 | 7% |
| Watson | 1,832 | +6.7 | 11% |
| Greenstone (Pfizer) | 1,585 | +5.8 | 120% |
| Apotex | 1,521 | +5.5 | 163% |
| Par | 1,209 | +4.4 | 14% |
| Barr Labs (incl Pliva) | 907 | +3.3 | 8% |

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

8/20/07 CHAINDREV 120                                                          Page 4

| Boehringer Ingelheim | 906 | +3.3 | 33% |
| Hospira | 653 | +2.4 | 7% |

Source: IMS Health, National Sales Perspectives, December 2006

---- INDEX REFERENCES -----

COMPANY: ESPERION THERAPEUTICS INC; SANDOZ AG; PFIZER INC; NATIONAL ASSOCIATION OF
CHAIN DRUG STORES; PHARMACEUTICAL CARE MANAGEMENT ASSOCIATION; PFIZER; AGRICULTURE
ONLINE; SANDOZ

NEWS SUBJECT:  (Legal (1LE33); Government (1GO80); Economics & Trade (1EC26))

INDUSTRY:  (I.T. (1IT96); Pharmaceuticals Regulatory (1PH03); Generic Drugs
(1GE93); Pharmaceuticals & Biotechnology (1PH13); Biopharmaceuticals (1BI13);
Healthcare Regulatory (1HE04); I.T. in Pharmaceuticals Research & Development
(1IT97); Drugs (1DR89); I.T. in Government (1IT22); I.T. Vertical Markets (1IT38);
Drug Approval Process (1DR91); I.T. Regulatory (1IT67); I.T. in Pharmaceuticals
(1IT99); Drug Discovery & Development Process (1DR41); Prescription Drugs (1PR52))

REGION:  (Americas (1AM92); North America (1NO39); USA (1US73))

Language:  EN

OTHER INDEXING:  (AGRICULTURE; ANDA; BOEHRINGER; CALIFORNIA PUBLIC EMPLOYEES;
CONGRESS; DOLLAR; DRUG APPLICATIONS; FDA; GENERIC PHARMACEUTICAL ASSOCIATION;
GPHA; GREENSTONE; LEADING GENERICS COMPANIES; NATIONAL ASSOCIATION OF CHAIN DRUG
STORES; NATIONAL SALES PERSPECTIVES; NATURE REVIEWS DRUG DISCOVERY; OGD; PFIZER;
PHARMACEUTICAL CARE MANAGEMENT ASSOCIATION; SANDOZ; SENATE; US HOUSE
APPROPRIATIONS SUBCOMMITTEE; US SALES)  (Apotex 1; Barr Labs; Hospira; Jaeger;
Kathleen Jaeger; Mylan 2; Par 1; Substantial; Teva; Watson 1)  (United States.
Food and Drug Administration (Reports); Drugs (Reports); Pharmaceutical industry
(Reports))  (Trade)  (Business (BUSN); Pharmaceuticals and cosmetics industries
(DRUG); Retail industry (RETL))

PRODUCT: Drugs & Pharmaceuticals; Pharmaceutical Preparations; Metabolic Agents;
Metabolic Agents NEC; Drugs; Pharmaceutical preparations; Pharmaceutical and
Medicine Manufacturing; Pharmaceutical Preparation Manufacturing2830000; 2834000;
2834190; 2834199

SIC: 2830; 2834

NAICS CODE: 3254; 325412

Word Count: 1403
8/20/07 CHAINDREV 120
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

# Declaration of William A. Rakoczy

*In support of Cobalt's Motion for*
*Temporary Restraining Order*

# Exhibit M

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COBALT LABORATORIES INC.      )
24840 South Tamiami Trail      )
Bonita Springs, Florida 34134, and   )

COBALT PHARMACEUTICALS, INC.  )
6500 Kitimat Road         )
Mississauga, Ontario, Canada, L5N 2B8 )

       Plaintiffs,      )     Case No.
  v.          )

FOOD AND DRUG ADMINISTRATION  )
5600 Fishers Lane         )
Rockville, Maryland 20857,     )

MICHAEL O. LEAVITT      )
Secretary of Health and Human Services )
200 Independence Avenue, S.W.   )
Washington, D.C. 20201, and    )

ANDREW C. VON ESCHENBACH, M.D. )
Commissioner of Food and Drugs   )
5600 Fishers Lane         )
Rockville, Maryland 20857,     )

       Defendants.     )

## DECLARATION OF ROBERT SANZEN

     I, ROBERT SANZEN, declare as follows:

   1.    I am the President of Cobalt Laboratories, Inc. ("Cobalt") and have held that

position for just under 2 years. I have personal knowledge of the facts set forth herein, or believe

them to be true based on my experience in the pharmaceutical industry and information I have

received in the course of my duties, and am competent to testify as to the same. I respectfully submit this declaration in support of Cobalt's motion for temporary restraining order.

2.    Cobalt is a relatively new and small company that markets, sells and distributes prescription generic drugs. In the short time that Cobalt has been operating in the United States, the Company has earned a strong and well-deserved reputation in the industry and with its customers as a dependable provider of quality, lower-priced generic medicines—a reputation that depends, in part, on Cobalt's ability to challenge brand patents and bring first-time generics to market.

3.    I have worked in the pharmaceutical industry for 35 years in various sales and marketing functions. Through my extensive experience in the pharmaceutical industry generally, and my work with generic pharmaceuticals specifically, I have gained an understanding of market dynamics, as well as industry custom and practice. I am also well aware of and familiar with the considerable value of the so-called 180-day generic marketing exclusivity, together with the devastating and unrecoverable losses that a company suffers when that exclusivity is wrongfully taken away.

4.    On January 10, 2005, Cobalt filed an abbreviated new drug application ("ANDA") for Acarbose Tablets, which I understand to be the first U.S. application for generic Acarbose Tablets in the 25 mg, 50 mg, and 100 mg strengths that contains a so-called paragraph IV challenge to Bayer's Acarbose patent. By virtue of that submission, it is my understanding that Cobalt is entitled by law to the critical 180-day exclusivity for this product.

5.    Cobalt will suffer significant and unrecoverable harm, both tangible and intangible, if any other Acarbose Tablet ANDA applicant begins marketing its generic Acarbose Tablet product before Cobalt's launch or before expiration of Cobalt's 180-day generic

exclusivity period. These losses could, and likely would, severely impact Cobalt's ability to effectively compete in the ultra-competitive generic industry.

6.    Cobalt devoted significant financial and human resources to preparing, filing, and prosecuting its Acarbose ANDA. When Cobalt committed its resources to this ANDA and filed it with FDA, Cobalt believed that it would be the first company to enter the market with a generic Acarbose Tablet product and would receive a full 180-day period of exclusivity. Loss of its right to market free from generic competition would cause Cobalt considerable tangible and intangible harm.

**I.    Tangible Harm To Cobalt If An Injunction Does Not Issue.**

7.    Based on my experience, it is widely recognized and accepted in the pharmaceutical industry that the generic company that first offers a generic manufactured product has a significant advantage over later market entrants. For example, due to its 180-day exclusivity, the first entrant fills the entire immediate demand for a generic product (which results in significant sales revenue from product needed to immediately fill the distribution channels). Subsequent ANDA filers do not typically receive the extra revenues from filling the distribution channels.

8.    The first entrant also has the opportunity to enter into longer term contracts with drug wholesalers, chain pharmacies, hospitals, and other pharmaceutical purchasers (which results in long-term revenue). Each subsequent filer has fewer opportunities for these long term contracts. Additionally, almost all of these customers give the incumbent generic manufacturer an opportunity to maintain the business via a "right of first refusal" on a specific product when subsequent generic manufacturers launch the product. Moreover, most customers typically carry only one generic product. Thus, obtaining these long term contracts is essential to maintaining

3

some market share once subsequent generic products enter the market. The opportunities are far more abundant for the first entrant and are presented less and less for each subsequent entrant.

9.    Once multiple generic companies launch their generic products, the profitability of the product drops drastically, often as much as 90% within the first month. Thus, the loss of any part of the 180 days of exclusivity due to entry of a new generic product will cause significant revenue losses beyond just the sales lost to the new entrant.

10.    These losses diminish the resources of smaller drug companies such as Cobalt and accordingly make it more difficult and less attractive to develop new generic products. And the difficulty in developing new products is compounded when a generic drug company cannot be certain before filing an ANDA whether it will be entitled to exclusivity due to events that might occur after the filing.

11.    As a relatively new and small company, Cobalt has had very few exclusive or "first-filer" opportunities like Acarbose. Cobalt must therefore capitalize on this opportunity now, or else risk never having the necessary resources to secure and enjoy the exclusivity again.

12.    Cobalt estimates that with exclusivity, it will generate sales of about $9 million during the 180-day exclusivity period. Cobalt also estimates that it will be able to capture significant market share during the exclusivity period, which will result in a higher market share after the exclusivity period expires.

13.    If forced to forfeit its exclusivity and therefore launch its product concurrent with or after other ANDA applicants, Cobalt will lose both considerable sales and market share. This is also true if another ANDA applicant is allowed to market prior to expiration of Cobalt's 180-day generic exclusivity period. Significantly, Cobalt will never recover or make those sales that

are lost to another generic company once such sales occur—in effect, the bell cannot be un-rung once another competitor intrudes upon Cobalt's exclusivity.

14.    Cobalt's lost sales would be compounded by the fact that if forced to launch with others, Cobalt will have to sell its product at a much lower price than it would if Cobalt's generic Acarbose Tablet was the only generic product. Based on prior experience, Cobalt would expect that the price of generic Acarbose Tablets could drop more than 50% upon entry of a second generic product.

15.    Additionally, if another generic product launches before Cobalt's product, Cobalt will never be able to attain the market share it would have attained as the first entrant. Even if the generic product launches after Cobalt's product, Cobalt would lose market share among the generic products which would be very difficult, and in some cases impossible, to recover.

16.    Based on Cobalt's past experience and its research into the market for Acarbose, if Cobalt receives the 180-day exclusivity period and Bayer does not market its own unbranded product, in the first full year after the 180-day exclusivity period, Cobalt projects that it will sell over 21 million tablets of generic Acarbose in the above noted strengths for new revenues of more than $1.6 million. Even if Bayer authorizes a competing generic product, Cobalt projects revenues exceeding $640,000 over the same period.

17.    But if Cobalt does not receive 180-day exclusivity, and if other generic companies that filed subsequent ANDAs enter the market at or before Cobalt's entry, Cobalt projects that it will sell no more than about 3.7 million tablets during that same period for revenues of no more than about $276,600. These projections show that exclusivity not only generates greater sales and revenue during the exclusivity period itself, but long-term as well. The loss of these tangible benefits is completely unrecoverable.

**II.    Intangible Harm To Cobalt If An Injunction Does Not Issue.**

18.    In my experience, there also are several very important intangible benefits associated with 180-day generic exclusivity.  Being the first-filer and obtaining the 180-day exclusivity period is a significant and important part of Cobalt's overall business plan.  In many instances, the majority of revenue that a company earns on a generic product will be generated during that exclusivity period.  The money made during this period is used, among other things, to fund research and development of new products, including funding new patent challenges.  Thus, loss of exclusivity can negatively impact future opportunities.  And as noted, this is one of Cobalt's only first-filer opportunities that the company is counting on for the development of future generic products.  The loss of this opportunity could destroy much of Cobalt's future pipeline.

19.    Being the first-filer also provides the ability to foster good will with customers by providing them a generic product that no one else offers; the ability to form relationships with new customers as the only provider of the generic product; the ability to cement those relationships prior to entry of a new generic product; and improved market position and prestige.

20.    As a new company, it is also important to note that Cobalt has limited opportunities and distribution, since customers do not want to open up new accounts with new companies.  But an exclusive first-filer opportunity like Acarbose gives Cobalt full distribution—customers will want a new generic product like Acarbose that they cannot get anywhere else.  Therefore, this exclusive opportunity opens up channels that were not otherwise available to Cobalt.  This opportunity goes well beyond just sales of this particular product—it gives Cobalt visibility, opportunities to bid on future products, and credibility that will provide long-term benefits, future growth and sustainability.

6

21.     Cobalt's well-deserved image as an important supplier of generic pharmaceuticals also has been established due to its ability to bring lower cost alternatives of important pharmaceuticals to the market.

22.     If Cobalt loses its sole exclusivity for its generic Acarbose product, Cobalt will lose all of these intangible benefits and opportunities, resulting in severe and irreparable harm and damage to Cobalt's business, reputation, and ability to effectively compete in the industry.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on December /ℓ , 2007

ROBERT SANZEN

8

# Declaration of William A. Rakoczy

*In support of Cobalt's Motion for
Temporary Restraining Order*

# Exhibit N



RAKOCZY
MOLINO
MAZZOCHI
SIWIK LLP

6 WEST HUBBARD STREET
SUITE 500
CHICAGO, IL 60610
www.rmmslegal.com

312-527-2157 main phone
312-527-4205 main fax

William A. Rakoczy
312.222.6301 telephone
312.222.6321 facsimile
wrakoczy@rmmslegal.com

Christine J. Siwik
312.222.6304 Direct Phone
312.222.6324 Direct Fax
csiwik@rmmslegal.com

October 17, 2007

**VIA FEDEX AND E-MAIL**

Gary Buehler
Director, Office of Generic Drugs
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
HFD-600, Metro Park North 4
7500 Standish Place, Room 286
Rockville, MD 20855
gary.buehler@fda.hhs.gov

Re:     **Comments Regarding Cobalt's 180-Day Exclusivity For Acarbose Tablets (Reference Number: OGD #07-1254)**

**Emergency Petition For Stay Of Agency Action Under 21 C.F.R. § 10.35(e)**

Dear Mr. Buehler:

On behalf of Cobalt Laboratories Inc. and Cobalt Pharmaceuticals Inc. ("Cobalt"), we respectfully submit these comments in response to FDA's letter (OGD #07-1254), dated September 26, 2007, soliciting comments from all acarbose ANDA applicants regarding "how the 180-day generic exclusivity forfeiture provisions at Section 505(j)(5)(D) of the Federal Food, Drug and Cosmetic Act (the Act) apply" to acarbose ANDAs.

In sum, for the reasons discussed below, the forfeiture provisions do not and cannot apply here, and thus no subsequent applicant can be approved before the natural expiration of the 180-day exclusivity to which Cobalt is statutorily entitled. For the same reasons, Cobalt hereby petitions for an emergency stay of Agency action and approval of all subsequent acarbose ANDAs in order to prevent devastating and irreparable harm to Cobalt and its Congressionally-mandated exclusivity.

Gary Buehler
Director, Office of Generic Drugs
October 17, 2007
Page 2

## I.    Introduction.

Cobalt indisputably submitted the first ANDA for acarbose tablets with a so-called "paragraph IV certification" to the only Orange Book-listed patent: U.S. Patent No. 4,904,769 ("the '769 patent")—for which information remains listed in the Orange Book, as it lawfully must. As such, Cobalt is the "first applicant" entitled by statute to the critical 180-day generic marketing exclusivity that Congress created as a reward and incentive for undertaking the risk and expense of launching the first challenge to a listed patent. Cobalt's exclusivity begins to run upon commercial marketing of its ANDA product. But because FDA has improperly delayed approving Cobalt's ANDA, Cobalt has not yet launched. Thus, Cobalt has not yet triggered its exclusivity, and thus FDA cannot lawfully approve any subsequent paragraph IV ANDA for this product. Any attempt by FDA to approve a subsequent ANDA in the face of Cobalt's exclusivity would be arbitrary, capricious and contrary to law, in violation of both the Federal Food, Drug, and Cosmetic Act ("FFDCA") and the Administrative Procedure Act ("APA").

FDA now seeks comments from all acarbose ANDA applicants on the question of whether Cobalt has somehow forfeited its exclusivity. In particular, according to FDA, the Agency purportedly seeks such comments because: (1) more than 30 months have passed since the Agency received Cobalt's ANDA as acceptable for filing on March 22, 2005; and (2) the NDA-holder, Bayer, allegedly requested that the '769 patent be "delisted" from the Orange Book. FDA seeks comments regarding the application of the so-called "failure to market" and "failure to obtain tentative approval" forfeiture provisions to these facts. Resolution of these issues is quite simple: there has been no forfeiture of Cobalt's exclusivity under these "facts." Any conclusion to the contrary is arbitrary, capricious, and contrary to law for at least the following reasons:

First, FDA's request for comment is premature because the 30-month periods referenced in the failure to market and tentative approval forfeiture provisions have not expired. The Agency must construe the 30-month period referenced in these provisions to be the 30-month period commencing on receipt of the first-filer's paragraph IV notice letter, i.e., the notice provided under § 355(j)(2)(B). For this reason alone, neither the "failure to market" nor "failure to obtain tentative approval" forfeiture provisions has yet to come into play.

Second, the second prong of the failure to market forfeiture provisions, relating to patent dispute resolution and delisting, only comes into play if a subsequent ANDA applicant has received tentative approval. See 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb) (introductory clause). No acarbose ANDA applicant has tentative approval, which renders this entire provision inapplicable at present. Indeed, the absence of tentative approval should moot any Agency consideration of the provision at this time.

Third, information on the '769 patent has not been "withdrawn" from the Orange Book, as required by statute. FDA cannot lawfully conclude otherwise. As an initial matter, FDA has provided no evidence that Bayer has submitted a "delisting" request. Indeed, FDA has

Gary Buehler
Director, Office of Generic Drugs
October 17, 2007
Page 3

refused Cobalt's requests for such information. Without it, Cobalt cannot possibly evaluate whether such a request even exists, much less whether it satisfies the statutory requirements for delisting. For this reason alone, FDA cannot potentially forfeit Cobalt's exclusivity based on information that the Agency refuses to provide. But even if there had been a delisting request from Bayer, it would be irrelevant to the forfeiture analysis because, as even FDA concedes, such patent information remains in the Orange Book. Because information on the '769 patent has not been "withdrawn" from the Orange Book, this forfeiture provision does not apply. Any other result or interpretation would not only violate the plain language of the statute, but also would lead to absurd results that Congress could not possibly have contemplated or intended.

Fourth, the failure to market forfeiture provision is inapplicable for yet one more independent reason: on-going litigation over the '769 patent. Cobalt has initiated a declaratory judgment suit under the MMA in order, among other things, to obtain patent certainty. There has been no ruling on the merits of this litigation and thus FDA cannot lawfully find a forfeiture of Cobalt's exclusivity under the failure to market provision.

Finally, the failure to obtain tentative approval forfeiture provision does not apply here because, among other things: (1) the facts of this case fall squarely within Congress' expressly mandated exception to this forfeiture provision; and (2) FDA cannot lawfully forfeit Cobalt's exclusivity where, as here, the Agency's own delays caused and contributed to the current lack of tentative approval.

## II.    Background.

The public material facts regarding Cobalt's ANDA, which the Agency must consider in its analysis, are as follows.

### A.    RLD: Precose® (Acarbose) Tablets 25 mg, 50 mg, and 100 mg.

The reference listed drug at issue here is Bayer's prescription medication, Precose® (Acarbose) Tablets 25 mg, 50 mg, and 100 mg—a complex oligosaccharide of microbial origin. FDA first approved Precose® (Acarbose) on September 6, 1995, pursuant to NDA No. 20-482, for, among other things, the treatment of type 2 diabetes.

### B.    The '769 Patent Remains Listed In The Orange Book.

Bayer submitted information to FDA on one patent for listing in the Orange Book in connection with Precose® and NDA No. 20-482: the '769 patent. The '769 patent, which issued from the U.S. Patent and Trademark Office on February 27, 1990, expires on September 6, 2009. To date, as FDA concedes, information on the '769 patent remains listed in the Orange Book, and has not been "withdrawn" by FDA. As such, all ANDA applicants seeking to market a generic acarbose product prior to expiration of the '769 patent have been required to submit a paragraph IV certification to such patent. Any future ANDA applicants seeking to market such a

Gary Buehler
Director, Office of Generic Drugs
October 17, 2007
Page 4

product also would have to submit a paragraph IV certification to that patent in order to receive
FDA approval prior to patent expiration.

C.    **Cobalt Seeks Guidance From FDA Regarding The Bioequivalence
       Requirements For Acarbose, Which The Agency Ignores For Almost *Sixteen*
       Months.**

       Cobalt began its development of a generic acarbose product in early 2003, with a
view toward compiling the information necessary to submit an ANDA. As part of that effort,
Cobalt researched the potential ways to establish bioequivalence ("BE") to the brand product.
Accordingly, with its contract research organization ("CRO"), Cobalt developed a detailed
protocol for establishing BE to the reference brand product.

       In a letter dated August 27, 2003, Cobalt formally sought the Agency's
confirmation regarding the BE requirements and parameters for an appropriate study to support
an ANDA for acarbose. With that controlled correspondence, Cobalt included a detailed 21-
page protocol for the BE study design developed by its CRO, which Cobalt identified by name.

       Over six months passed without any word from FDA regarding Cobalt's request
for confirmation on the BE requirements for acarbose. On March 5, 2004, Cobalt submitted
additional controlled correspondence to FDA. Cobalt again sought confirmation regarding its
BE study, and included an even more detailed protocol from its CRO for a BE study for
acarbose. Like its previous submission, Cobalt clearly and unambiguously identified the CRO
and clinical study site.

       By January 10, 2005—well over *sixteen* months since its original
correspondence—Cobalt had received no response of any kind from FDA. Having heard nothing
from the Agency for over *sixteen* months, which was more than ample time for the Agency to
review and analyze Cobalt's submission, Cobalt reasonably assumed that its CRO's proposed
protocol and study design was appropriate, and proceeded with its ANDA submission.

D.    **Cobalt Submits The *First* Paragraph IV ANDA For Acarbose Tablets And
       Secures 180-Day Exclusivity.**

       On January 10, 2005, Cobalt submitted ANDA No. 77-532 to FDA for Acarbose
Tablets in 25 mg, 50 mg, and 100 mg strengths. Cobalt's ANDA included a paragraph IV
certification to the listed '769 patent, under 21 U.S.C. § 355(j)(2)(A)(vii)(IV), stating that such
patent would not be infringed by the manufacture, use, or sale of Cobalt's proposed acarbose
product. Cobalt's ANDA also included the results of the *in vivo* BE study conducted by Cobalt's
CRO—the very same CRO that Cobalt had identified in its controlled correspondence over
*sixteen* months before that time in August 2003. The CRO conducted the BE study according to
the protocols proposed in Cobalt's prior controlled correspondence from August 29, 2003, and
March 5, 2004.

Gary Buehler
Director, Office of Generic Drugs
October 17, 2007
Page 5

Once again, Cobalt's ANDA clearly identified the CRO that conducted the BE study at its facility and study site. The identity and location of Cobalt's CRO has not changed since Cobalt's original controlled correspondence in August 2003. Cobalt reasonably expected that FDA would undertake and discharge its review obligations by doing whatever was necessary to complete its review of the BE study, including any necessary inspections of the CRO and its facilities. FDA is, of course, obligated by statute and regulation to conduct such inspections, and indeed FDA's own internal procedures require that the Agency review the compliance standing of all facilities referenced in an ANDA and initiate an inspection by field personnel upon receiving an ANDA that is acceptable for filing, if any such facility has not been previously inspected. And the FFDCA prohibits FDA from delaying action on an ANDA precisely because of the unavailability of information or action by field personnel responsible for such inspections. *See* 21 U.S.C. § 355(j)(3)(F) ("No action by the reviewing division may be delayed because of the unavailability of information from or action by field personnel unless the reviewing division determines that a delay is necessary to assure the marketing of a safe and effective drug.").

E.     **FDA Changes And Reviews The BE Requirements For Acarbose *After* The Submission Of Cobalt's ANDA.**

On January 11, 2005, the day *after* Cobalt submitted its ANDA and over *sixteen months after* Cobalt sought FDA's confirmation regarding BE requirements for acarbose, Cobalt received a letter from the Agency, purporting to respond to Cobalt's controlled correspondence sent August 27, 2003, and March 5, 2004. In that correspondence, FDA essentially ignored Cobalt's prior study design and effectively established and imposed new BE requirements for acarbose.

FDA's correspondence completely changed the rules of the game, together with the approval requirements, *after* the submission of Cobalt's ANDA, and more than sixteen months after Cobalt originally contacted the Agency. The additional study, for example, was not required at the time Cobalt filed. Had FDA responded to Cobalt before sixteen months had elapsed, Cobalt could and would have performed the study requested by FDA before submitting its ANDA. Ultimately, as FDA fully is aware, Cobalt nonetheless conducted, via its CRO, the study requested by FDA. But, of course, as the Agency also is aware, Cobalt did so only to have the Agency reject it.

F.     **FDA Accepts Cobalt's ANDA For Filing With No Mention Of Its CRO Or The New BE Study Requirements.**

In a "Refuse to Receive" letter dated March 9, 2005, FDA informed Cobalt that its ANDA purportedly was not "sufficiently complete to merit a critical technical review" for several reasons—none of which were related to Cobalt's BE study and CRO. Incredibly, FDA's letter did not even mention the additional BE requirements imposed by the Agency in the letter Cobalt received after filing its ANDA. Nor did FDA take issue with Cobalt's BE study or its CRO. Had FDA believed that Cobalt's ANDA was devoid of a sufficient BE study to support

Gary Buehler
Director, Office of Generic Drugs
October 17, 2007
Page 6

approval, it should have said so before accepting Cobalt's application, not over a year later. The fact is, however, that FDA said nothing about substantive BE issues in its initial communication, despite the fact that FDA had imposed entirely new requirements in its January correspondence.

On March 18, 2005, Cobalt submitted an amendment to its ANDA that sufficiently addressed all of FDA's concerns. Notably, as part of its response, Cobalt again identified by name the CRO that conducted its BE study.

In an "acceptance-for-filing" letter dated April 28, 2005, FDA acknowledged receipt of Cobalt's ANDA dated January 10, 2005, as well as the subsequent amendment dated March 18, 2005. FDA further informed Cobalt that the Agency had accepted Cobalt's ANDA for filing and substantive review as of March 22, 2005. This is the first day that a substantially complete ANDA for acarbose, together with a paragraph IV certification, was submitted to FDA. Accordingly, Cobalt was and is the "first applicant" and thus is statutorily entitled to the 180-day generic marketing exclusivity for all strengths of this product. That exclusivity will not be triggered until first commercial marketing by Cobalt. *See* 21 U.S.C. § 355(j)(5)(B)(iv)(I).

On May 12, 2005, pursuant to 21 U.S.C. § 355(j)(2)(B), Cobalt sent the requisite notice of its ANDA and paragraph IV certification to Bayer AG, the owner of the '769 patent, according to the records of the U.S. Patent and Trademark Office; and Bayer Pharmaceuticals Corporation, the holder of approved NDA No. 20-482. That letter included an offer of confidential access to Cobalt's ANDA. Bayer Pharmaceuticals and Bayer AG received Cobalt's Paragraph IV Notice on May 16 and 17, 2005, respectively. Bayer did not sue Cobalt within 45 days from the date it received this notice.

**G.    FDA Delays Its BE Review Of Cobalt's ANDA And Admittedly Fails To Inspect Cobalt's CRO.**

On June 30, 2005, FDA issued its first BE deficiency to Cobalt. *Notably, FDA did not even mention anything about its prior BE letter to Cobalt, nor did the Agency mention anything about Cobalt's CRO.* Cobalt duly responded to FDA on September 27, 2005. In its response, Cobalt, *inter alia*, identified the study protocol and reports from its original ANDA, which clearly identify the CRO that conducted the study.

After receiving Cobalt's response, FDA said nothing regarding *BE for well over a year*. On October 24, 2005, FDA did, however, issue a minor deficiency. While acknowledging the earlier BE deficiency, FDA once again made no mention of its January 2005 letter to Cobalt or any problems or delays in inspecting the facilities identified in Cobalt's ANDA, including its CRO, to ensure cGMP compliance. Cobalt duly responded to FDA's minor deficiency on February 27, 2006, and acknowledged that "firms referenced in the ANDA should be in compliance with cGMP at the time of approval." Cobalt, of course, reasonably assumed that FDA would, consistent with its statutory and regulatory obligations, conduct any necessary inspections of the facilities identified in its ANDA. Cobalt could not possibly have known, or had any reason to suspect, that FDA would fail to timely inspect the CRO.

Gary Buehler
Director, Office of Generic Drugs
October 17, 2007
Page 7

As noted above, FDA did not follow up on its June 2005 BE deficiency for over a year, until August 8, 2006. At that time, FDA stated, with no shortage of irony, that Cobalt had failed to conduct the studies that FDA required in its January 6, 2005 correspondence. The Agency, not surprisingly, failed to mention that it did not communicate these new BE requirements to Cobalt until *after* its CRO conducted Cobalt's pivotal BE study and after the submission of Cobalt's ANDA. FDA was, therefore, attempting to enforce the new BE requirements, imposed only after the submission of Cobalt's ANDA, after ignoring those new BE requirements in its initial BE communications with Cobalt. This communication never mentioned anything about inspecting Cobalt's CRO, that such an inspection would be required before approval of Cobalt's ANDA, or that the Agency would be unable to complete such an inspection in a timely manner.

On September 20, 2006, Cobalt duly responded to FDA's August 8, 2006 BE deficiency. Among other things, Cobalt submitted data on a study conducted by its CRO, just as FDA requested. And, again, Cobalt's response repeatedly identified by name the CRO that performed both the original pivotal BE study, as well as the subsequent required study.

Once again, FDA waited over a year to respond back to Cobalt regarding BE issues. In the interim, Cobalt made numerous oral contacts to determine the status of the Agency's BE review. At no time during this period did FDA ever inform Cobalt that the Agency had not inspected the CRO (or even initiated the process for an inspection), even though the Agency knew about the CRO since at least August 2003, and no later than the submission of Cobalt's ANDA in January 2005.

On June 8, 2007, FDA issued another BE deficiency letter. On June 18, 2007, Cobalt promptly requested a telephone conference to discuss the Agency's June 8, 2007 BE deficiency. On June 28, 2007, representatives of FDA and Cobalt conducted a telephone conference to discuss these issues. During that call, FDA specifically inquired which CRO Cobalt would be using to conduct the new pivotal BE study, and expressly encouraged Cobalt to use the same CRO that had conducted the previous two studies. FDA never stated or otherwise implied that Cobalt's CRO was not acceptable because it had not been inspected. Nor did FDA bother to mention that, after well more than two years, FDA had still not inspected that CRO (or for that matter, even initiated the process for requesting and conducting such an inspection, as FDA was required to do).

H.    **Cobalt Demonstrates That Its Proposed Product Is Bioequivalent To The Brand,** *But FDA Still Fails To Inspect Cobalt's CRO After More Than Two Years.*

On September 3, 2007, Cobalt formally responded to FDA's June 8, 2007 BE deficiency. With that response, Cobalt submitted the results from another pivotal BE study conducted by its CRO, just as FDA had requested. Those results (like the results contained in its original ANDA) demonstrate that Cobalt's proposed product is bioequivalent to the reference

Gary Buehler
Director, Office of Generic Drugs
October 17, 2007
Page 8

brand product. FDA has orally confirmed to Cobalt that there are no substantive issues with the new pivotal BE study.

But on September 24, 2007, FDA nonetheless orally informed Cobalt that it would not approve Cobalt's ANDA solely because the CRO had never been inspected in the over two and a half year period that the application was pending, and that such an inspection could not occur for at least another month. FDA did so even though the ANDA had been pending for over two and a half years; even though FDA knew about the identity of Cobalt's CRO, which had performed all three BE studies, since August 2003; and even though FDA itself had never bothered to initiate an inspection as it is required to do, even after the application was acceptable for filing.

**I.      Bayer's Alleged De-Listing Request.**

On or about April 16, 2007, according to FDA, Bayer allegedly requested that that the '769 patent be "delisted" from the Orange Book. FDA, to date, has refused to provide Cobalt with any evidence of such delisting request. Moreover, information concerning the '769 patent remains in the Orange Book and has not to date been withdrawn in any fashion. Indeed, FDA itself concedes that the patent information "remain[s] listed" in the Orange Book.

**J.      FDA's Request for Comment.**

On or about September 26, 2007, FDA posted a letter on its website requesting comment on certain 180-day exclusivity forfeiture and Orange Book patent "delisting" issues concerning acarbose. According to FDA's September 26, 2007 letter:

> As of the date of this letter, which is more than 30 months from March 22, 2005, no first applicant's ANDA has been approved. Also, on April 16, 2007, Bayer requested that the '769 patent be "delisted" as to Precose, i.e., they withdrew the patent information. On September 26, 2007, FDA indicated in [the Orange Book] that the request to delist this patent had been submitted on April 16, 2007.

> To determine whether any ANDA referencing Precose is eligible for final approval, the agency must consider how the 180-day generic drug exclusivity forfeiture provisions at section 505(j)(5)(D) of the [FDC Act] apply to this set of facts. As part of the process for making such a determination, we are seeking your views regarding the applicability of sections 505(j)(5)(D)(i)(IV) — failure to obtain tentative approval within 30 months — and 505(j)(5)(D)(i)(I)(aa)(BB) — failure to market by 30 months. We also are interested in your views regarding the applicability of section 505(j)(5)(D)(i)(I)(bb)(CC) — relating to the delisting of a patent.

Gary Buehler
Director, Office of Generic Drugs
October 17, 2007
Page 9

FDA's letter requests that comments be submitted to the Agency by October 10, 2007, which
FDA later extended to October 17, 2007.

**III.    No "Forfeiture Event" Has Occurred With Respect To This Product.  Cobalt Is
Entitled To 180-Day Exclusivity That Blocks All Other Acarbose ANDAs Until The
Expiration Of Cobalt's Exclusivity.**

FDA has solicited comments on whether a so-called "forfeiture event" has
occurred that would allow FDA to approve subsequent acarbose applicants notwithstanding
Cobalt's exclusivity.  Simply put, no such forfeiture event has occurred with respect to acarbose.
Cobalt's exclusivity remains intact and continues to block all subsequent acarbose ANDA
applicants.

**A.    The 180-Day Generic Exclusivity Provision Is Critical To Carrying Out The
Purpose Of Hatch-Waxman, And FDA Must Construe The Forfeiture
Provisions Consistent With The Statute As A Whole, As Well As Consistent
With Congress' Purpose And Policy.**

**1.    FDA's Request For Comment On Important Issues Of Statutory
Construction.**

As discussed above, FDA has requested comment on the so-called "failure to
market" and "failure to obtain tentative approval" forfeiture provisions.  Those provisions read in
relevant part:

(D) Forfeiture of 180-day exclusivity period-

(i) Definition of forfeiture event - In this subparagraph, the term "forfeiture
event", with respect to an application under this subsection, means the
occurrence of any of the following:

(I) *Failure to market* - The first applicant fails to market the drug by the
later of-

(aa) the earlier of the date that is-

(AA) 75 days after the date on which the approval of the
application of the first applicant is made effective under
subparagraph (B)(iii); or

(BB) 30 months after the date of submission of the application of
the first applicant; or

(bb) with respect to the first applicant or any other applicant (which

Gary Buehler
Director, Office of Generic Drugs
October 17, 2007
Page 10

other applicant has received tentative approval), the date that is 75 days after the date as of which, as to each of the patents with respect to which the first applicant submitted and lawfully maintained a certification qualifying the first applicant for the 180-day exclusivity period under subparagraph (B)(iv), at least 1 of the following has occurred:

(AA) In an infringement action brought against that applicant with respect to the patent or in a declaratory judgment action brought by that applicant with respect to the patent, a court enters a final decision from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken that the patent is invalid or not infringed.

(BB) In an infringement action or a declaratory judgment action described in subitem (AA), a court signs a settlement order or consent decree that enters a final judgment that includes a finding that the patent is invalid or not infringed.

(CC) The patent information submitted under subsection (b) or (c) is withdrawn by the holder of the application approved under subsection (b).

\* \* \*

(IV) *Failure to obtain tentative approval* - The first applicant fails to obtain tentative approval of the application within 30 months after the date on which the application is filed, unless the failure is caused by a change in or a review of the requirements for approval of the application imposed after the date on which the application is filed.

21 U.S.C. §§ 355(j)(5)(D)(i)(I), (IV) (emphasis added).

The Agency's request obviously raises several issues of statutory construction relating to these provisions and the 180-day exclusivity period as a whole. Resolution of these statutory construction issues likely will have a profound impact on the generic pharmaceutical industry, as well as the consumers and taxpayers that rely upon that industry to bring affordable generic medicines to market. Consequently, the significance of the 180-day generic exclusivity period must be closely examined before addressing these issues.

Gary Buehler
Director, Office of Generic Drugs
October 17, 2007
Page 11

    **2.    The Criticality Of The 180-Day Generic Exclusivity Period To Hatch-Waxman As A Whole.**

        The 180-day generic exclusivity period is critical to the purpose of Hatch-Waxman, and to the continued viability of the generic pharmaceutical industry. Congress recognized this fact in 1984 when creating that incentive in the first place. Congress re-emphasized its importance in 2003 when it created generic exclusivity forfeiture provisions – provisions that protect the first-filer's right to enjoy the benefits Congress intended to flow during this 180-day period.

        In 1984, Congress enacted the Hatch-Waxman Amendments to the FFDCA. *See* Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984). Congress passed Hatch-Waxman in order to "make available more low cost generic drugs" to the public. *Apotex, Inc. v. Shalala*, 53 F. Supp. 2d 454, 461 (D.D.C.), *aff'd*, No. 99-5231, 1999 WL 956686 (D.C. Cir. Oct. 8, 1999) (quotation marks and citations omitted). The 180-day exclusivity period is critical to carrying out Congress' goal of "get[ting] generic drugs into the hands of patients at reasonable prices–fast." *In re Barr Labs.*, 930 F.2d 72, 76 (D.C. Cir. 1991).

        Congress recognized that challenging the many patents purportedly protecting branded drug products from competition requires generic drug companies to assume considerable risks and costs. But Congress also recognized the public will never have access to lower-priced generic drugs before the expiration of brand patents unless generic companies challenge the suspect and overbroad patents that commonly prevent immediate generic competition. To encourage such patent challenges, Congress created a *quid pro quo*: expend the resources to mount the first patent challenge in exchange for "the right to sell [the generic] drug without competition for 180 days." *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 879 (D.C. Cir. 2004) (citing 21 U.S.C. § 355(j)(5)(B)(iv)). Congress created the 180-day generic marketing exclusivity period by preventing FDA from approving competing generic products until 180 days after the earlier of two so-called "triggering" events:

        (iv) If the application contains a certification described in subclause (IV) of paragraph (2)(A)(vii) [*i.e.*, a paragraph IV certification] and is for a drug for which a previous application has been submitted under this subsection continuing [*sic*] such a certification, the application shall be made effective not earlier than one hundred and eighty days after—

        (I) the date the Secretary receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application ["the commercial marketing trigger"], or

        (II) the date of a decision of a court in an action described in clause (iii) holding the patent which is the subject of the certification to be invalid or not infringed ["the court decision trigger"],

Gary Buehler
Director, Office of Generic Drugs
October 17, 2007
Page 12

whichever is earlier.

21 U.S.C. § 355(j)(5)(B)(iv).[1]

As the courts repeatedly have acknowledged, the 180-day generic exclusivity period is *the sole* incentive that Congress created in order to facilitate its goal of expediting consumer access to lower-priced drug products. *See Teva Pharms. USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324, 1328 (Fed. Cir. 2005) ("This provision provides an economic incentive for generic manufacturers to challenge the validity of listed patents and to 'design around' patents to find alternative, non-infringing forms of patented drugs."), *abrogated on other grounds by MedImmune, Inc. v. Genentech, Inc.*, 127 S. Ct. 764 (2007); *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 33 (D.D.C. 2000) (stating that Congress created the 180-day exclusivity provision to "encourage generic drug makers to incur the potentially substantial litigation costs associated with challenging pioneer drug makers' patents"); *Apotex*, 53 F. Supp. 2d at 461 (noting that the "purpose of the exclusivity incentive and the entire ANDA regime is to make available more low cost generic drugs.").

FDA itself also has recognized the importance of the generic exclusivity period to the patent challenge process. *See* 64 Fed. Reg. 42873, 42877 (Aug. 6, 1999) (acknowledging that the 180-day period is "the incentive created by Congress for ANDA applicants to challenge patents"). Indeed, the fact that Hatch-Waxman cannot carry out Congress' goal of increased access to affordable medicines without a strong 180-day generic exclusivity incentive became all the more clear in 2003 when Congress revisited the 1984 Hatch-Waxman Amendments. *See* Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (2003) ("the MMA").

As part of the MMA, Congress expressly revisited the 180-day generic exclusivity incentive. Had Congress believed that incentive no longer necessary to encourage companies to challenge suspect and overbroad brand patents, Congress easily could have eliminated the incentive. Indeed, some encouraged Congress to do precisely that. But Congress, of course, did not do so. To the contrary, Congress revised the triggering provisions and enacted a series of forfeiture provisions designed to ensure that a first-filer cannot be prematurely or unfairly stripped of its statutory right to generic market exclusivity. *See* 21 U.S.C. § 355(j)(5)(D)(i). FDA must construe the generic exclusivity provisions, including the forfeiture provisions, with all this in mind.

Here, of course, FDA concedes, as it must, that Cobalt submitted the first substantially complete ANDA for acarbose tablets that contains—and has lawfully maintained—a paragraph IV certification to the '769 patent, which remains listed in the Orange Book. As

---

[1] This provision governs generic exclusivity for products where the first ANDA containing a paragraph IV certification was submitted prior to December 8, 2003. *See* Medicare Prescription Drug, Improvement, and Modernization Act of 2003 § 1102(b)(1), Pub. L. No. 108-173, 117 Stat. 2066 (2003) (codified as amended at 21 U.S.C. § 355 and 35 U.S.C. § 271).

Gary Buehler
Director, Office of Generic Drugs
October 17, 2007
Page 13

such, Cobalt is the undisputed "first applicant" that is statutorily entitled to the Congressionally-mandated 180-day exclusivity for all strengths of acarbose. *See* 21 U.S.C. § 355(j)(5)(B)(iv). This exclusivity will not be triggered until first commercial marketing by Cobalt. *See id.* By statute, FDA may not approve any subsequent acarbose ANDAs until Cobalt's exclusivity has expired. *See id.* To date, Cobalt has not yet commercially marketed its product. Accordingly, FDA must delay the approval of any subsequent ANDA containing a paragraph IV certification to the '769 patent until 180 days after Cobalt begins commercial marketing. FDA's approval of a paragraph IV ANDA would be arbitrary, capricious and contrary to law in violation of Cobalt's 180-day exclusivity.

> **3.    The Agency Must Construe The Forfeiture Provisions Consistent With The Statute As A Whole, As Well As Consistent With Congress' Purpose And Policy For Hatch-Waxman.**

When construing these provisions, FDA must be faithful to Congressional intent, *both based on the statute's plain language, as well as its purpose and intent.* "If the intent of Congress is clear, that is the end of the matter . . . ." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). The Supreme Court itself has cautioned that reviewing courts must look not only to the plain text, "but look to the provisions of the whole law, and to its object and policy" as well. *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 35 (1990) (citation and internal quotation marks omitted); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("It is a fundamental cannon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (internal quotations and citation omitted)), *aff'g*, 153 F.3d 155 (4th Cir. 1998); *McCarthy v. Bronson*, 500 U.S. 136, 139 (1991) (recognizing that "statutory language must always be read in its proper context"); *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 220-21 (1986); *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 285 (1956) (rejecting literal interpretation of words read in complete isolation from their context in the Act); *Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997) ("The literal language of a provision taken out of context cannot provide conclusive proof of congressional intent, any more than a word can have meaning without context to illuminate its use.").

Indeed, in *Public Citizen v. United States Department of Justice*, the Supreme Court made clear that "reliance on the plain language . . . alone is not entirely satisfactory." 491 U.S. 440, 452 (1989). The Court explained:

> Even though, as Judge Learned Hand said, "the words used, even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing," nevertheless "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." Looking beyond the naked text for guidance is perfectly proper when the result it apparently decrees is difficult to fathom or where it seems inconsistent with

Gary Buehler
Director, Office of Generic Drugs
October 17, 2007
Page 14

> Congress' intention, since the plain-meaning rule is "rather an axiom of
> experience than a rule of law, and does not preclude consideration of persuasive
> evidence if it exists."

*Id.* at 454-55 (citations omitted). Consequently, "[p]olicy evaluation is . . . part of the traditional judicial tool-kit that is used in applying the first step of *Chevron*". Antonin Scalia, *Judicial Deference to Administrative Interpretations of Law*, 1989 DUKE L.J. 511, 515 (1989) (stating that courts should look "not merely [to the] text and legislative history but also, quite specifically, [to a] consideration of policy consequences").

Policy evaluation is, in fact, particularly important because considering the policy behind a statute routinely "shed[s] new light on congressional intent, notwithstanding statutory language that appears superficially clear." *Natural Res. Def. Council, Inc. v. Browner*, 57 F.3d 1122, 1127 (D.C. Cir. 1995) (citation and quotation marks omitted). A review of Hatch-Waxman's purpose, language, and context makes clear that Congress intended the 180-day exclusivity period to incentivize early generic competition because generic competition is the only way to bring affordable medicines to market. But the only way that the 180-day exclusivity period operates as an incentive is if it truly provides the first-filer with a period of marketing exclusivity. Congress understood this and, consistent with its express intent, used language to carry out this goal. Consequently, it should not come as a surprise that the courts (and FDA) have recognized that the generic exclusivity provision must be interpreted and enforced:

- "in a manner consistent with 'the statute's interest in affording market access and incentives for both generic and non-generic makers,' and to maintain 'an incentive for the parties to fulfill the purposes of Hatch-Waxman'"; and

- to "avoid interpreting Hatch-Waxman so the decision on whether a generic applicant is entitled to exclusivity rests entirely in the patent holder's hands."

(FDA 02/06/01 Admin. Ruling in Docket No. 2000P-1446, at 5 (quoting *Mylan Pharms., Inc. v. Henney*, 94 F. Supp. 2d 36, 53-54 (D.D.C. 2000), *vacated as moot by, Pharmachemie B.V. v. Barr Labs.*, 276 F.3d 627 (D.C. Cir. 2002)).

FDA, as well as the courts, repeatedly have interpreted Hatch-Waxman's exclusivity provisions to effectuate Congress' purpose and intent, even where such interpretation went beyond the purportedly "plain language" of the statutory provision. For instance, as originally enacted, Hatch-Waxman provided that exclusivity will only be triggered by a court decision finding the patent-in-suit "invalid or not infringed." 21 U.S.C. § 355(j)(5)(B)(iv)(II). Despite the seemingly clear nature of the plain language, both FDA and the courts held that a court decision of patent unenforceability to be a triggering decision. *See* 21 C.F.R. § 314.107(c)(1)(ii). Similarly, FDA interprets the generic exclusivity provision to allow for the "selective waiver" of that exclusivity, despite the fact that the plain language of the exclusivity provision says nothing about such waivers. (*See* FDA 07/02/04 Admin. Ruling in Docket No. 2004P-0227). FDA does so in order to effectuate Congress' intent that the first-filer benefit from

Gary Buehler
Director, Office of Generic Drugs
October 17, 2007
Page 15

its market exclusivity, concluding that the exclusivity provision must be construed in a manner "favorable to those for whom a statutory benefit is chiefly intended." (*Id.* at 6-7). And as FDA recognized, "[a]llowing waiver and relinquishment helps maintain the value of the exclusivity for the beneficiary, strengthening the incentive to challenge patents and, thereby, promote competition." (*Id.* at 9). Significantly, FDA further acknowledged:

> Where, as here, statutory language compelling government action has the effect of benefiting specific private entities (in this case, granting 180 days of marketing exclusivity to eligible ANDA applicants), *judicial precedent … supports inferring from silence a legislative intent to allow an alternative course of action more favorable to the beneficiary of the government act* ….

(*Id.* at 4 (emphasis added)).

Applying the well-established principles of statutory construction here, as FDA must, no forfeiture event has occurred.

**B.    No Forfeiture Event Has Occurred Under The "Failure To Market" Or "Failure To Obtain Tentative Approval" Forfeiture Provisions Because The 30-Month Period Has Not Expired.**

**1.    Properly Construed, The 30-Month Period Referenced In Both Provisions Does Not Begin To Run Until Receipt Of The First-Filer's Paragraph IV Notice Letter.**

FDA appears to assume, without deciding or undertaking any analysis, that the 30-month period referenced in both the "failure to market" provision and "failure to obtain tentative approval" provision begins to run when the first applicant's ANDA is deemed acceptable for filing. Indeed, over *four* months ago, Cobalt asked for FDA's analysis of this very point, but never received a response from the Agency. FDA's assumption is wrong, and any such interpretation of these statutory provisions would be unlawful. As discussed below, under a proper and lawful analysis, the 30-month periods referenced in these provisions do not begin to run until receipt of the first-filer's notice letter, *i.e.*, upon receipt of the notice described in § 355(j)(2)(B). In this case, Bayer received Cobalt's paragraph IV notice letter on May 17, 2005, and thus the applicable the 30-month period has not yet expired.

As an initial matter, both the failure to market forfeiture provision and the tentative approval forfeiture provision reference a 30-month period. *See* 21 U.S.C. §§ 355(j)(5)(D)(i)(I)(aa)(BB), (IV). As FDA appears to acknowledge, those periods should and indeed must be construed the same. There is no indication in the statute or legislative history otherwise. And, in fact, treating them differently would undermine Congressional intent and lead to absurd results.

Gary Buehler
Director, Office of Generic Drugs
October 17, 2007
Page 16

With respect to the start of the relevant 30-month period, FDA must interpret the start of the 30-month period to be the date upon which the first-filer's notice letter is received in order to implement Congressional intent and avoid wildly inconsistent and absurd results. Any other interpretation would unlawfully strip the first-filer of its statutory right to generic market exclusivity—which is the critical *quid pro quo* that Congress created with the generic exclusivity period. *See Ind. Mich. Power Co. v. Dep't of Energy*, 88 F.3d 1272, 1276 (D.C. Cir. 1996) (rejecting agency's "treatment of th[e] statute" because it "is not an interpretation but a rewrite" and "destroys the *quid pro quo* created by Congress").

Congress intended for the failure to market forfeiture provision to balance the competing interests of first-filers, who should not be unfairly deprived of their statutory right to exclusivity (thus curtailing the incentive to undertake necessary patent challenges), and subsequent filers, who should not be unduly and indefinitely delayed by "parked" exclusivities. But FDA's interpretation could, and indeed would, strip the first-filer of its exclusivity if its litigation with the brand company takes more than 30 months to resolve. The following example illustrates exactly why this is so:

> The first-filer submits its paragraph IV ANDA on January 1, 2004. By letter dated March 1, 2004, FDA accepts that ANDA for filing as of January 2, 2004. The first-filer sends its notice letter on March 5, 2004, and the NDA-holder receives that notice on March 7, 2004. The NDA-holder brings suit in the U.S. District Court for the District of New Jersey within the 45-day period provided for by § 355(j)(5)(B)(iii), thus triggering a 30-month stay that does not expire until September 7, 2006. A subsequent paragraph IV ANDA filer submits an application in February 2004; sends notice; and is sued by the NDA-holder. The subsequent filer is, however, sued in the U.S. District Court for the Eastern District of Virginia because it is not subject to suit in New Jersey and, as many subsequent filers do, consented to suit only in this district. Both the first-filer and the subsequent applicant receive tentative approval in January 2005.

Under this real-world scenario, the first-filer could forfeit exclusivity if the FDA misconstrues the 30-month requirement of this forfeiture provision. Specifically, the first-filer cannot get final approval until the 30-month stay under § 355(j)(5)(B)(iii) expires. Without final approval, it obviously cannot launch its ANDA product. The subsequent filer will complete its litigation, all the way through the Federal Circuit, before the first-filer will be done at the district court level and before expiration of the 30-month stay under § 355(j)(5)(B)(iii).[2] Thus, if FDA attempts to

---

[2] According to Federal Judicial Caseload Statistics, the median time to trial in 2004 for cases filed in the District of New Jersey was 31.5 months compared to 9.9 months in the Eastern District of Virginia. The figures remain roughly the same for 2006: 30.7 months in New Jersey compared to 9.6 months in the Eastern District of Virginia. Thus, under the scenario above, the subsequent filer will be done with its litigation at the district court sometime in late 2004 or early 2005. It takes roughly a year for an appeal to be completed before the Federal Circuit. Accordingly, the subsequent filer would have a final court decision from which no appeal has been or can be taken (other than a petition to the Supreme Court for a writ of certiorari) sometime around late 2005 or early 2006, well before the first-filer's 30-month stay under § 355(j)(5)(B)(iii) expires in September 2006.

Gary Buehler
Director, Office of Generic Drugs
October 17, 2007
Page 17

construe the start of the 30-month period of § 355(j)(5)(D)(i)(I)(aa)(BB) as anything other than receipt of the paragraph IV notice letter, exclusivity could be forfeit solely because the first-filer would not have the legal right to begin marketing due to the 30-month approval stay under § 355(j)(5)(B)(iii). This result defies logic, common sense and, most importantly, Congressional intent. Congress did not intend the first-filer to lose its exclusivity in these circumstances, especially since this result does not advance either of the competing interests at stake here. Under well established law, FDA cannot lawfully interpret this forfeiture provision in a way that leads to such a patently absurd result. *See U.S. v. X-Citement Video*, 513 U.S. 64, 68-69 (1994) (rejecting the "most natural grammatical reading" of a statute to avoid "absurd" results); *Holy Trinity Church v. U.S.*, 143 U.S. 457, 459 (1892) ("If a literal construction of the words of a statute be absurd, the act must be so construed as to avoid the absurdity."); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998) (discussing prohibition against construing statutes in a way that leads to absurd results).

Furthermore, such an impermissible result also runs counter to FDA's own prior interpretations of the exclusivity provision. As discussed above, FDA interprets the generic exclusivity provision to allow for "selective waivers" even though the plain language of that provision says nothing about such waivers. (*See* FDA 07/02/04 Admin. Ruling in Docket No. 2004P-0227). Specifically, the Agency ruled that a "plain meaning" approach to reading the statutory language could not lawfully be applied in "as crabbed a fashion as the [the brand company] suggests. Rather, *courts seeking the plain meaning of a statutory provision consider statutory context, structure, and purpose, among other things.*" (*Id.* at 7-8 (emphasis added)). The Agency reached this inevitable conclusion because the statute must be applied *"to ensure that the beneficiary of the exclusivity ([such as] . . . an ANDA applicant that has challenged a listed patent) is able to realize as fully as possible the benefit Congress intended to confer as an incentive for the activity."* (*Id.* at 11 (emphasis added); *see also id.* at 4 ("Where, as here, statutory language compelling government action has the effect of benefiting specific private entities (in this case, granting 180 days of marketing exclusivity to eligible ANDA applicants), *judicial precedent . . . supports inferring from silence a legislative intent to allow an alternative course of action more favorable to the beneficiary of the government act.*").

So too here, FDA must interpret the 30-month period in a manner consistent with Congressional intent; in a manner that benefits the intended beneficiary of the exclusivity (here, the first-filer); and in a manner that avoids wildly absurd results. The only way to do so is to construe the 30-month period in § 355(j)(5)(D)(i)(I)(aa)(BB) and § 355(j)(5)(D)(i)(IV) to begin on the date that the notice under § 355(j)(2)(B) is received.

**2.    The 30-Month Period From Bayer's Receipt Of Cobalt's Paragraph IV Notice Letter Has Not Expired.**

Cobalt sent the requisite paragraph IV notice on May 12, 2005. The NDA-holder (Bayer Pharmaceuticals) and patent owner (Bayer AG) received that notice on May 16 and 17, 2005, respectively. Applying the only interpretation that squares with Congressional intent and avoids unfair and absurd results, the 30-month period for both forfeiture provisions does not

Gary Buehler
Director, Office of Generic Drugs
October 17, 2007
Page 18

expire until November 17, 2007, at the earliest. Cobalt thus has not forfeited its exclusivity under either provision. Significantly, because the 30-month period has not expired, any analysis of the forfeiture provisions at this juncture is premature and unnecessary.

**C.    No Failure To Market Forfeiture Has Occurred Because No Subsequent Applicant Has Tentative Approval; No Patent Information Has Been Withdrawn From The Orange Book; And Patent Litigation Is Otherwise Pending.**

Even if FDA attempts to employ some earlier date for the beginning of the 30-month period, the result does not change—no failure to market forfeiture has occurred for several independent reasons. First, no subsequent applicant has tentative approval now (or when FDA solicited its comments). This alone eliminates application of this provision in its entirety. Second, no patent information has been "withdrawn" from the Orange Book and the Agency cannot lawfully construe this provision to require anything less than actual withdrawal of patent information from the Orange Book. Third, patent litigation is pending. Each point is addressed, in turn, below.

**1.    The Failure To Market Forfeiture Provision Does Not—And Cannot—Apply Here Because No Subsequent Applicant Has Received Tentative Approval.**

Conspicuously absent from FDA's letter is the material fact that no subsequent applicant for acarbose has tentative approval at this time. The lack of tentative approval by a subsequent filer moots FDA's premature request for comment and forfeiture analysis, and is dispositive of the entire failure to market analysis because this provision does not come into play unless another applicant is tentatively approved.

Congress included several mechanisms in the failure to market provision to prevent an unfair forfeiture of the 180-day generic exclusivity period. For example, exclusivity is forfeit only if the first-filer fails to commence marketing by the "*later of*" two dates, rather than the "whichever is earlier" language found in the pre-MMA exclusivity triggering provisions. 21 U.S.C. § 355(j)(5)(D)(i)(I) (emphasis added). Section 355(j)(5)(D)(i)(I)(bb) requires "each of the patents with respect to which the first applicant submitted and lawfully maintained a certification qualifying the first applicant for the 180-day exclusivity period" to be addressed in at least one of the three ways provided. *Id.* This requirement, *inter alia*, ensures that the first-filer will not forfeit exclusivity under this provision until all of the relevant patents have been removed as obstacles to market entry. *Similarly, and most pertinent here, before an event under subclause (bb) becomes relevant to a forfeiture analysis, the subsequent paragraph IV filer must have "received tentative approval" of its ANDA. Id.* § 355(j)(5)(D)(i)(I)(bb) (emphasis added). This requirement, *inter alia*, ensures that the first-filer does not forfeit exclusivity under this provision unless and until another ANDA filer is actually ready for approval. The provision unambiguously applies if, and only if, the "other applicant has received tentative approval."

Gary Buehler
Director, Office of Generic Drugs
October 17, 2007
Page 19

Here, of course, no other applicant has received tentative approval. For this reason alone, the failure to market forfeiture provision does not and cannot apply here as a matter of law. And for good reason—because any other result would unfairly and absurdly deprive and strip Cobalt of its statutory entitlement to exclusivity, even though no other applicant is even ready for approval. Congress clearly did not intend this result, as evidenced by the plain language of the statute.

2. **The Failure To Market Forfeiture Provision Does Not Apply Because No Patent Information Has Been Withdrawn From The Orange Book.**

While conceding that the '769 patent remains in the Orange Book, FDA nonetheless suggests that a mere delisting request by the NDA-holder can satisfy the requirement that patent information be withdrawn under § 355(j)(5)(D)(i)(I)(bb)(CC). FDA is wrong as a matter of law, both on the plain language and Congress' purpose and intent for the statute. Merely requesting that a patent be "de-listed" does not satisfy the statutory requirement found in § 355(j)(5)(D)(i)(I)(bb)(CC).

To begin with, despite Cobalt's repeated requests, FDA has not provided any evidence of Bayer's alleged delisting request to date. As such, Cobalt cannot confirm the existence of such a request, much less evaluate its impact on Cobalt's exclusivity and whether it was a proper request that satisfies the statutory criteria for delisting. As a matter of sound administrative practice and fundamental notions of due process, FDA should not and cannot deprive a first-filer of its statutory entitlement to exclusivity based on the contents of a supposed delisting request that the Agency will not even divulge. The opportunity for abuse of process is manifest. For this reason alone, the Agency should not apply this provision.

But even if there were a de-listing request, FDA cannot lawfully interpret the statute in this manner. *See Ind. Mich. Power*, 88 F.3d at 1276 (rejecting agency's "treatment of th[e] statute" because it "is not an interpretation but a rewrite" and "destroys the *quid pro quo* created by Congress"). As the statute provides, unless a patent actually is "withdrawn" from the Orange Book, this statutory provision is not satisfied.

First, and most importantly, construing this provision to include the mere request for patent delisting impermissibly runs afoul of and conflicts with the plain language of the statute. The provision, on its face, requires that "[t]he patent information submitted under subsection (b) or (c) [be] *withdrawn* by the holder of the application approved under subsection (b)." 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(CC) (emphasis added). It says nothing about a mere request for the withdrawal of patent information. Plainly there is a significant and material substantive difference between asking to have information withdrawn and actually having that information withdrawn. FDA cannot ignore this clear language and material distinction. *See Mova*, 140 F.3d at 1068-74 (rejecting and invalidating FDA's interpretation of the 180-day exclusivity provisions in light of explicit statutory language to the contrary); *Purepac Pharm.*,

Gary Buehler
Director, Office of Generic Drugs
October 17, 2007
Page 20

354 F.3d at 884-85 (refusing to grant deference to FDA's action when it is "irreconcilable with the language and intent of the FDCA").

   This is true even where the result seems "absurd" to the Agency because, FDA would argue, "the delay of approval of subsequent ANDAs will never end." *Inwood Labs., Inc. v. Young*, 723 F. Supp. 1523, 1527 (D.D.C. 1989). In *Inwood*, FDA sought to condition generic exclusivity on whether the first-filer had been sued for patent infringement. *Id.* at 1525. The Agency argued that such a statutory interpretation was necessary because it was the only way to avoid a situation where the first-filer's exclusivity delayed approval of all subsequent applications. *Id.* at 1527. The court rejected FDA's interpretation, stating that although "th[e] problem warrants consideration by Congress," it "does not give the FDA or this Court a license to read into the present, clear language of section 355(j)([5])(B)(iv)(I) a requirement of a suit for patent infringement that is simply not there." *Id.* The D.C. Circuit echoed this conclusion a decade later in *Purepac Pharmaceutical Co. v. Friedman*, 162 F.3d 1201 (D.C. Cir. 1998). In that case, it was once again argued that FDA should require an infringement suit as a condition for receiving generic exclusivity. *Id.* at 1204. Once again, it was argued that such a requirement is necessary to prevent approval delays for subsequent ANDA filers:

> If a first applicant is never sued for patent infringement, it is possible that neither of two "triggers" for the running of the 180 days of market exclusivity commercial marketing or a judicial decision would ever occur. Without a lawsuit there would be no judicial decision. If the applicant never begins marketing its product, the 180 days would never run and all later generic applicants would be barred from bringing their products to market.

*Id.* at 1205. The D.C. Circuit rejected this as a basis for deviating from the plain language of the statute, which does not require the first-filer to be sued for patent infringement in order to obtain the generic exclusivity incentive. *Id.* at 1204-05.

   Here again, the plain language of that statute requires that the patent information be actually withdrawn from the Orange Book, not merely a request for withdrawal. FDA cannot lawfully override this language even if it believes that the plain language will lead to approval delays for subsequent ANDA filers. Had Congress intended for a mere request to satisfy this provision, it easily could have said so. That Congress did not do so speaks volumes about Congressional intent which, as discussed below, is fully consistent with its plain language.

   Second, FDA cannot permissibly construe § 355(j)(5)(D)(i)(I)(bb)(CC) as being satisfied by the mere request for patent delisting because doing so would allow brand companies to manipulate, and indeed eliminate, the generic exclusivity incentive. The D.C. Circuit already has rejected an interpretation of the generic exclusivity period under which "the patent holder could manipulate the system" as, among other things, inconsistent with Congressional intent. *Teva Pharms., USA v. FDA*, 182 F.3d 1003, 1009 (D.C. Cir. 1999); *id.* at 1011. Other courts have consistently reached the same conclusion, rejecting an FDA "interpretation [that] places the decision as to whether a generic manufacturer will be entitled to exclusivity entirely in the hands

Gary Buehler
Director, Office of Generic Drugs
October 17, 2007
Page 21

of the patent holder". *Mylan Pharms.*, 94 F. Supp. 2d at 54; *see also Inwood Labs.*, 723 F. Supp. at 1527 (striking down FDA's statutory interpretation because "[b]y subjecting the exclusivity entitlement to the caprices of the patent holder, the FDA's interpretation would seem to affect adversely the incentives that Congress sought to create in providing for 180 days of exclusivity for the manufacturers of generic drugs.").

In fact, Congress expressly enacted provisions, such as the declaratory judgment provisions, as part of the MMA precisely to prevent brand manipulation of the generic exclusivity period. *See* 149 Cong. Rec. S15,885 (Nov. 25, 2003) ("[W]hen generic applicants are blocked by a first generic applicant's 180-day exclusivity, the brand drug company could choose not to sue those other generic applicants so as to delay a final court decision that could trigger the 'failure to market' provision and force the first generic to market.") (statement of Sen. Kennedy); *see also* 35 U.S.C. § 271(e)(5), as amended ("[T]he courts of the United States *shall, to the extent consistent with the Constitution,* have subject matter jurisdiction in any action brought by such person under section 2201 of title 28 for a declaratory judgment that such patent is invalid or not infringed." (emphasis added)).

In sum, FDA cannot lawfully construe the requirement that patent information be "withdrawn" from the Orange Book to include the mere request for the withdrawal of such information. Such an interpretation would run contrary to the plain language of the statute, as well as Congressional intent, which most assuredly does not allow brand companies to control whether or not generic applicants receive the 180-day exclusivity incentive. In this case, information for the '769 patent admittedly has not been withdrawn or removed from the Orange Book. Quite the contrary, by FDA's own admission, it remains in the Orange Book to this day. Accordingly, for this reason as well, the failure to market provision simply does not and cannot apply here.

3.    **The Failure To Market Forfeiture Provision Also Does Not Apply Because Patent Litigation Is Pending.**

FDA cannot find a forfeiture under the failure to market provision because patent litigation over the '769 patent is pending; namely, a declaratory judgment action brought by Cobalt. On its face, the failure to market provision in § 355(j)(5)(D)(i)(I) is implicated only by the *"later of"* an event described under subparagraph (aa) and (bb). Subparagraph (bb), of course, includes the final resolution of "a declaratory judgment action," from which no appeal has been or can be taken, holding that the patent is invalid or not infringed. The provision thus applies only if the first applicant fails to market by the later of the 30-month period (which has not even run here, as discussed above) and resolution of a declaratory judgment action.

In this case, Cobalt has filed a declaratory judgment action against Bayer seeking, among other things, a judicial declaration that the listed '769 patent is invalid or not infringed.

Gary Buehler
Director, Office of Generic Drugs
October 17, 2007
Page 22

That action remains pending.  As long as that is the case, there can be no forfeiture under the failure to market provision.  For this reason as well, this provision does not apply here.[3]

**D.    A "Failure To Obtain Tentative Approval" Forfeiture Cannot Occur Where FDA Has Changed Or Reviewed The Requirements For Approval, Or Where FDA's Own Delays Cause The Delay In Approval.**

In its letter, FDA also suggests that a forfeiture may have occurred under § 355(j)(5)(D)(i)(IV) for failure to obtain tentative approval during the 30-month period.  To the extent FDA is considering finding a forfeiture of Cobalt's exclusivity on these grounds, such action would be arbitrary, capricious and contrary to law, even if the 30-month period had run (which it has not).  First, the facts of this case fall squarely within Congress' expressly mandated exception to this forfeiture provision.  Specifically, this provision does not apply where, as here, there is a change in or review of requirements for approval.  Second, FDA cannot lawfully forfeit Cobalt's exclusivity where, as here, the Agency's own delays caused and contributed to Cobalt's failure to obtain tentative approval.

**1.    The Failure To Obtain Tentative Approval Provision Does Not Apply Where FDA Changed Or Reviewed The Requirements For Approval.**

Section 355(j)(5)(D)(i)(IV) provides that exclusivity may be forfeited if the applicant fails to obtain tentative approval "unless the failure is caused by a change in or a review of the requirements for approval of the application imposed after the date on which the application is filed."  The reason for and purpose of this exception is one of fundamental fairness: to prevent penalizing ANDA applicants when FDA changes, or considers changing, the rules of the game.  That is precisely what occurred here.  FDA changed and/or reviewed the BE requirements for acarbose, and communicated those requirements to Cobalt only after Cobalt already conducted its pivotal BE study and submitted its ANDA.  For this reason alone, this forfeiture provision does not apply.

To begin, the discussion above demonstrates that this is not a situation in which Cobalt rushed its development in secret.  Quite the contrary, Cobalt repeatedly attempted to do

---

[3] Significantly, if at least one of the events under § 355(j)(5)(D)(i)(I)(bb) has not taken place with respect to the '769 patent, the Agency cannot simply look to § 355(j)(5)(D)(i)(I)(aa) for a possible forfeiture under this provision.  As noted, § 355(j)(5)(D)(i)(I) is implicated only by the "*later of*" an event described under subparagraph (aa) and (bb).  FDA cannot ignore subparagraph (bb) where, for example, there is no litigation involving a listed patent by declaring a forfeiture upon the occurrence of an event described in subparagraph (aa).  The courts do not uphold statutory interpretations that read statutory provisions out of the statute.  *See Mova*, 140 F.3d at 1069-70 (striking down FDA's so-called "successful-defense" requirement because "its practical effect is to write the commercial-marketing trigger out of the statute"); *Massachusetts v. U.S. Dep't of Transp.*, 93 F.3d 890, 896 (D.C. Cir. 1996) (rejecting an agency's statutory interpretation because it rendered superfluous other parts of the statute); *see also Cooper Indus. v. Aviall Servs., Inc.*, 543 U.S. 157, 165-66 (2004) (rejecting statutory construction that would have rendered part of the statute superfluous); *TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (refusing to adopt a statutory interpretation that would render statutory language "insignificant if not wholly superfluous") (citation and quotation marks omitted).  For at least this reason, any attempt by FDA to so construe the failure to market forfeiture provision would be unlawful.

Gary Buehler
Director, Office of Generic Drugs
October 17, 2007
Page 23

the right thing by addressing BE issues pre-submission. In August 2003, Cobalt and its CRO made a detailed written submission to the Agency regarding BE requirements for acarbose. That submission included a detailed study protocol. FDA ignored Cobalt's correspondence. Cobalt made yet another submission on March 5, 2004—this time with an even more detailed and refined BE study protocol. Once again, Cobalt heard nothing from FDA. After sixteen months, Cobalt reasonably assumed, as it was entitled to do, that its proposed BE study was sufficient to support an ANDA. Continuing to sit on its hands would have harmed not only Cobalt, but consumers and taxpayers who need an affordable generic version of this product.

In January 2005 (the day after Cobalt filed its ANDA), Cobalt received FDA's new requirement, purportedly responding to Cobalt's August 2003 correspondence. There, the Agency stated that Cobalt should, among other things, conduct an additional study before its pivotal BE study. FDA cannot seriously dispute that this constitutes a substantive change in the requirements for approval. Indeed, FDA called for a completely different study to be preformed prior to the pivotal BE study. By this time, of course, Cobalt already had completed its pivotal BE study and submitted its ANDA. While FDA may quibble because its letter was dated prior to the submission of Cobalt's ANDA, no one disputes that Cobalt received that letter the day after it filed its ANDA. Compounding the prejudice to Cobalt, FDA did not, as discussed above, even mention this new requirement, much less seek to enforce it, in the Agency's first BE deficiency issued June 30, 2005, but rather waited over a year later until August 2006. All told, FDA not only changed requirements, but delayed well over a year in enforcing that new requirement, all to Cobalt's detriment.

Cobalt respectfully submits that these facts and circumstances fall squarely within the Congressionally-mandated exception to the failure to obtain tentative approval forfeiture provision. Congress could not have intended to penalize an applicant, like Cobalt here, that attempted to seek the Agency's guidance; experienced substantial delay from the Agency in responding; had new approval requirements communicated to it the day after ANDA submission; and was forced to wait well over a year before FDA made clear that it would indeed enforce those new requirements even though the original BE study adequately established bioequivalence to the reference listed drug.

**2.     The Failure To Obtain Tentative Approval Provision Does Not Apply Where FDA's Own Delays Have Prevented Approval.**

The purpose of the tentative approval provision is to ensure that ANDA applicants actively work towards approval. Implicit in the plain language is, in fact, Congress' intent that forfeiture applies if, and only if, approval is delayed by the acts or omissions of the first-filer alone, and *not* the Agency. In other words, Congress did not enact that provision to punish first-filers for delays at the Agency, nor can the provision be lawfully construed in a manner that leads to such an absurd result. Indeed, any other result turns the statute on its head, and leads again to impermissibly inconsistent and absurd results. It would penalize first-filers and lead to numerous forfeitures based on circumstances that are completely outside and beyond the control of the first-filer. Consider, for example, the significant approval delays and backlogs that FDA already

Gary Buehler
Director, Office of Generic Drugs
October 17, 2007
Page 24

is experiencing due to increased ANDA filings and decreased Agency resources. FDA had a backlog of over 1,100 ANDAs at the end of fiscal year 2006, compared to 780 for 2005 and just 374 for 2001. (*See* CHAIN DRUG REVIEW 4-23-07, vol. 29, issue 8, *available at* 2007 WLNR 11400759). By June 2007, the backlog of pending ANDAs reached nearly 1,300 applications. (*See* CHAIN DRUG REVIEW 8-20-07, vol. 29, issue 14, *available at* 2007 WLNR 16535267). It defies logic to suggest that Congress could possibly have intended to forfeit a first-filer's hard-earned exclusivity in these circumstances based on Agency backlogs, or any other actions or events, that are clearly outside the control of the first-filer.

        In this case, Agency delay in granting Cobalt's approval came in two different areas:

        First, as discussed in detail above, not until August 8, 2006, *more than nineteen months after Cobalt submitted its ANDA*, did FDA reject Cobalt's BE study for failing to conduct the study first mentioned in a letter Cobalt received in January 2005 after filing its ANDA. Cobalt promptly responded to FDA on September 20, 2006, and submitted data from a study as requested by FDA. But even when Cobalt did so, FDA delayed another *nine months* (until June 8, 2007), before issuing another deficiency rejecting the data for failure to conduct the study before the pivotal BE study. Cobalt, for its part, promptly responded to that deficiency as well.

        All told, FDA delayed sixteen months in responding to Cobalt's pre-submission BE correspondence. When FDA finally did respond, those new requirements were not communicated until the day after Cobalt submitted its ANDA (and well after Cobalt conducted its pivotal BE study). FDA delayed *nineteen months* after Cobalt's ANDA submission before actually raising the new BE requirement on August 8, 2006. The Agency then delayed an additional *nine months* while the Agency evaluated the additional study that Cobalt conducted and submitted at the Agency's request. These delays add up to a significant portion of the 30 months Cobalt has to receive tentative approval and were wholly outside Cobalt's control. The Agency should not and indeed cannot lawfully seek to punish Cobalt for these delays.

        Second, as discussed above, approval of Cobalt's ANDA currently is being withheld because FDA has failed to conduct an inspection that the Agency has deemed necessary for receiving such approval. Specifically, according to FDA, Cobalt's acarbose ANDA is approvable, but for an inspection of Cobalt's CRO—an inspection that FDA, and FDA alone, is charged with initiating and conducting. But FDA has delayed inspecting the CRO for *years*, even though it has known about this CRO since at least August 2003, and certainly no later than the submission of Cobalt's ANDA in January 2005. FDA's admitted delays and failure to inspect the CRO violates not only the Agency's statutory mandate for reviewing and approving ANDAs, but also FDA's own internal policies and procedures.

        As part of its statutory mandate under the FFDCA and FDA's implementing regulations, FDA is obligated to review the contents of an ANDA, including the facilities identified for manufacturing and testing the product, such as the CRO that conducts the BE study, to ensure compliance with, among other things, cGMP requirements. This function, of

Gary Buehler
Director, Office of Generic Drugs
October 17, 2007
Page 25

course, is critical to the approval of an ANDA. If FDA does not timely review or otherwise inspect the CROs and other facilities identified in the ANDA, it can seriously delay, or even prevent, a timely approval—at least according to FDA in this instance. The Agency has developed and published its own Compliance Program Guidance Manual (CPGM) specifically for inspections of CROs that conduct BE studies for ANDAs (*See* FDA CPGM, Compliance Program 7348.001 – Bioresearch Monitoring: Human Drugs – In Vivo Bioequivalence). According to FDA's CPGM, "*[f]acilities where bioequivalence studies are conducted are to be inspected under this compliance program*." (*Id.* at 5 (emphasis added)).

To expedite the inspection process and identify when and where inspections are required for ANDAs, OGD has developed and published its own Manual of Policies and Procedures (MAPP) governing "Inspections of Clinical Facilities and Analytical Laboratories Conducting Bioequivalence Studies in ANDAs." *See* MAPP 5210.7 (Dec. 15, 2000). In general, a MAPP is a "written statement issued by CDER management to prescribe policies, responsibilities, or procedures to be applied within the Center in the conduct of its work or daily operations." (MAPP 4000.1, "Developing and Issuing Manuals of Policies and Procedures," at 2). The relevant MAPP emphasizes the importance of BE studies to approval of an ANDA, and sets forth the policies and procedures for identifying when an inspection of a CRO is necessary and should be initiated. (*See* MAPP 5210.7, at 1-3). Most pertinent here, the Agency's "Policy" states that OGD must request "a routine inspection of clinical facilities or analytical laboratories conducting BE studies included in an unapproved ANDA if: A clinical facility or analytical testing site is identified in the ANDA that has no inspection history". (*Id.* at 3). The process for initiating the inspection begins when the ANDA is accepted for filing. According to the MAPP, under the rubric of "Responsibilities and Procedures," "*[w]hen an ANDA is accepted for filing*," OGD must determine if any of the inspection criteria in this MAPP apply. (*Id.* at 4 (emphasis added)). If so, OGD must issue an inspection request and take the necessary steps to initiate an inspection of the facility by field personnel. (*Id.* at 4-5). Compliance with these policies and procedures ensures that the approval of an ANDA will not be unnecessarily delayed. In fact, as part of the FFDCA, Congress also contemplated and mandated that action on an application should not be delayed because of the delays or unavailability of field personnel to conduct things like inspections. Congress specifically directed that "[n]o action by the reviewing division may be delayed because of the unavailability of information from or action by field personnel unless the reviewing division determines that a delay is necessary to assure the marketing of a safe and effective drug." 21 U.S.C. § 355(j)(3)(F). The message and mandate from both Congress and FDA itself is clear—approvals should not be held up by things like inspections, and certainly not by FDA's failure to follow its own statutory obligations and procedures for initiating and completing such inspections.

Here, unfortunately, FDA repeatedly has violated its own statutory mandate, policies and procedures by failing to conduct a timely inspection of Cobalt's CRO. FDA has known about this CRO since at least August 2003 when Cobalt submitted a detailed BE study protocol. Cobalt's ANDA, submitted in January 2005, also repeatedly identified by name the CRO that conducted Cobalt's pivotal BE study. In multiple filings after submission, Cobalt also identified this CRO, and even submitted the additional study from that CRO. In over two years

Gary Buehler
Director, Office of Generic Drugs
October 17, 2007
Page 26

of substantive review, FDA never indicated or suggested that Cobalt would not be approvable because the CRO had not yet been inspected. Nor did FDA ever indicate that an inspection of the CRO was being delayed. In fact, Cobalt had every reason to believe that an inspection was imminent, given that FDA has in fact requested and initiated inspections of Cobalt's API supplier during the review process. And, of course, FDA itself even requested that Cobalt use the same CRO for its third BE study—once again leading Cobalt to believe that everything was under control. As it turns out, however, no such inspection of the CRO was ever requested or initiated by FDA. To make matters worse, FDA has clearly violated the Congressional mandate in § 355(j)(3)(F) by delaying action on Cobalt's ANDA by refusing to conduct the required inspection for at least a month.

In these circumstances, FDA cannot reasonably construe the failure to obtain tentative approval forfeiture provision to apply where, as here, the Agency's delay and admitted failure to inspect the CRO is responsible. To hold otherwise would effectively punish Cobalt for inspection delays that are completely outside its control. FDA therefore cannot lawfully forfeit Cobalt's exclusivity on these grounds.

## IV.  FDA Must Stay Approval Of All Subsequent Acarbose ANDAs Pending Resolution And Judicial Review Of These Issues Pursuant To 21 C.F.R. § 10.35(e).

### A.  Decision Involved And Action Required.

For the reasons stated above, FDA must delay approval of all subsequent acarbose ANDAs until the natural expiration of Cobalt's 180-day exclusivity. To the extent FDA is considering approving subsequent ANDAs based upon an alleged forfeiture of Cobalt's exclusivity, FDA must stay any and all agency action and approvals of subsequent acarbose ANDAs until and pending resolution and judicial review of all such issues, in order to prevent substantial and irreparable harm to Cobalt. *See* 21 C.F.R. § 10.35. Cobalt satisfies the requirements for such a stay.

### B.  Statement Of Grounds.

### 1.  Cobalt Will Suffer Irreparable Injury.

Cobalt faces imminent substantial and irreparable injury in the absence of a stay. No one can dispute that Cobalt is statutorily-entitled to the 180-day exclusivity for acarbose, as the first applicant to file a paragraph IV ANDA. Unless a stay is granted, subsequent applicants may attempt to circumvent Cobalt's exclusivity rights and seek immediate approval based on an unlawful interpretation and application of one or more MMA forfeiture provisions. Thus, Cobalt could lose its exclusivity rights, and with those rights, the reward that Congress intended for challenging the '769 patent. In fact, it is Cobalt's understanding that a subsequent applicant may receive approval imminently, despite Cobalt's exclusivity. The only way to prevent this irreparable harm is through a stay.

Gary Buehler
Director, Office of Generic Drugs
October 17, 2007
Page 27

### 2. Cobalt's Case Is Not Frivolous And Is Being Pursued In Good Faith.

As fully set forth herein above, Cobalt's case is not frivolous, and it is being pursued in good faith. Under the controlling statute, FDA must enforce Cobalt's exclusivity rights, which have not been forfeited.

### 3. Cobalt Has Demonstrated Sound Public Policy Grounds Supporting The Stay.

As discussed above, Congress designed Hatch-Waxman "to get generic drugs into the hands of patients at reasonable prices--fast." *Barr Labs.*, 930 F.2d at 76. To achieve that goal, Congress created the ANDA approval procedure. *See* 21 U.S.C. § 355(j)(2)(A). Congress also recognized that the only way for a generic company to market before patent expiration is to challenge the validity or scope of that patent in court. Such challenges are both risky and expensive. Congress, therefore, created the 180-day generic exclusivity period to "encourage generic drug makers to incur the potentially substantial litigation costs associated with challenging pioneer drug makers' patents . . . ." *Mylan*, 81 F. Supp. 2d at 33.

Here, Cobalt accepted the *quid pro quo* that Congress created with the exclusivity incentive and filed the first ANDA with a paragraph IV certification challenging the '769 patent. As a reward, Congress intended that Cobalt reap the benefits of 180-day exclusivity. Sound public policy requires FDA to safeguard that exclusivity and to preclude others from circumventing it based on unlawful interpretations of the forfeiture provisions.

### 4. The Delay Resulting From The Stay Is Not Outweighed By Public Health Or Other Public Interests.

"[T]he public's interest in the 'faithful application of the laws' outweigh[s] its interest in immediate access to [a competing] generic product." *Mova*, 140 F.3d at 1066. This is particularly true where, as here, the statutory scheme provides for a delay in approval of other ANDAs as an incentive to encourage the patent challenges necessary to bring lower-priced generic drugs to market quickly. The public interest therefore strongly supports a stay. Moreover, a temporary stay will not harm others or the public. There are no currently approved acarbose ANDAs. Subsequent applicants cannot claim harm from staying an approval to which they were never statutorily entitled in the first place.

## VI. Conclusion.

For all the reasons stated above, Cobalt is statutorily entitled to the 180-day exclusivity for all strengths of acarbose tablets. No forfeiture event has occurred with respect to that exclusivity. FDA therefore must delay approval of all subsequent acarbose ANDAs until the expiration of Cobalt's exclusivity. Until these issues are resolved and judicial review of any adverse Agency decision can occur, FDA must stay approval of all subsequent acarbose ANDAs.

Gary Buehler
Director, Office of Generic Drugs
October 17, 2007
Page 28

Very truly yours,

RAKOCZY MOLINO MAZZOCHI SIWIK LLP

William A. Rakoczy

Christine J. Siwik

cc (via e-mail):     Dawn Beto, *Cobalt Laboratories Inc.*
Elizabeth Dickinson, *Office of Chief Counsel*
Bob West, *Office of Generic Drugs*

# Declaration of William A. Rakoczy

*In support of Cobalt's Motion for
Temporary Restraining Order*

# Exhibit O



RAKOCZY
MOLINO
MAZZOCHI
SIWIK LLP

6 WEST HUBBARD STREET
SUITE 500
CHICAGO, IL 60610
www.rmmslegal.com

312-527-2157 main phone
312-527-4205 main fax

William A. Rakoczy
312.222.6301 telephone
312.222.6321 facsimile
wrakoczy@rmmslegal.com

Christine J. Siwik
312.222.6304 Direct Phone
312.222.6324 Direct Fax
csiwik@rmmslegal.com

November 6, 2007

**VIA FEDEX AND E-MAIL**

Gary Buehler
Director, Office of Generic Drugs
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
HFD-600, Metro Park North 4
7500 Standish Place, Room 286
Rockville, MD 20855
gary.buehler@fda.hhs.gov

Re: **Comments Regarding Cobalt's 180-Day Exclusivity For Acarbose Tablets (OGD Reference Number 07-1254)**

Dear Mr. Buehler:

On October 23, 2007, Upsher-Smith provided us with a copy of the comments that it submitted to the captioned docket on October 8, 2007. Because, as discussed below, those comments suggest that the Agency resolve questions of generic exclusivity on grounds not found in FDA's letter dated September 26, 2007, we contacted FDA. Specifically, we asked whether FDA intended to consider the arguments found in the Upsher-Smith letter and, if so, whether Cobalt would have the opportunity to respond. On October 24, 2007, the Agency asked Cobalt to submit a written response to the Upsher-Smith letter. As requested, on behalf of Cobalt Laboratories Inc. and Cobalt Pharmaceuticals Inc. ("Cobalt"), we respectfully submit the following comments.

As explained below, FDA cannot lawfully take the action Upsher-Smith suggests; namely, removing U.S. Patent No. 4,904,769 ("the '769 patent") from the Orange Book. Any attempt by the Agency to do so would require FDA to: (1) impermissibly abandon its long-held (and court-sanctioned) position that it lacks the expertise to evaluate substantive matters of patent law; and (2) unlawfully ignore controlling precedent issued by the U.S. Court of Appeals for the District of Columbia. Cobalt is statutorily entitled to 180 days of generic exclusivity and any attempt by the Agency to find otherwise would be arbitrary, capricious and contrary to law.

2007N-0417

C 2

Gary Buehler
Director, Office of Generic Drugs
November 6, 2007
Page 2

## BACKGROUND

Hatch-Waxman requires NDA holders to submit to FDA certain information with respect to any patent that claims the "drug" or a "method of using [the] drug" for which the NDA was submitted and for which a claim of patent infringement could reasonably be asserted against an unauthorized party. *See* 21 U.S.C. §§ 355(b)(1), (c)(2). Upon approval of the NDA, FDA publishes patent information for the approved drug in *Approved Drug Products with Therapeutic Equivalence Evaluations*, commonly known as the "Orange Book." *See* 21 U.S.C. § 355(j)(7)(A)(iii).

The reference listed drug at issue here is Bayer's prescription medication, Precose® (acarbose) Tablets 25 mg, 50 mg, and 100 mg. FDA first approved Precose® (acarbose) on September 6, 1995, pursuant to NDA No. 20-482, for, among other things, the treatment of type 2 diabetes. As required by statute, Bayer submitted information to FDA on one patent for listing in the Orange Book in connection with Precose® and NDA No. 20-482: the '769 patent. The '769 patent, which issued from the U.S. Patent and Trademark Office ("PTO") on February 27, 1990, expires on September 6, 2009.

According to Upsher-Smith, Bayer purportedly "disclaimed" the '769 patent in December 2006. (Upsher-Smith Ltr. at 1). To Cobalt's knowledge, however, no court has determined the effect of any purported disclaimer, or otherwise determined whether the '769 patent is enforceable or not. According to FDA, on or about April 16, 2007, Bayer also allegedly requested that that the '769 patent be "delisted" from the Orange Book. The Agency, to date, has refused to provide Cobalt with any evidence of such delisting request, despite Cobalt's requests for such evidence.

Cobalt filed the first paragraph IV ANDA for acarbose in January 2005 – nearly two years *before* Bayer's "disclaimer" of the '769 patent and more than two years *before* Bayer's purported "delisting" request. Accordingly, Cobalt is the "first applicant" for generic acarbose tablets and, as a result, is statutorily entitled to the 180-day generic marketing exclusivity for all strengths of this product. Cobalt's exclusivity will not be triggered until first commercial marketing by Cobalt. *See* 21 U.S.C. § 355(j)(5)(B)(iv)(I).

To date, information on the '769 patent remains listed in the Orange Book, as it lawfully must. As such, all ANDA applicants seeking to market a generic acarbose product prior to expiration of the '769 patent have been required to submit a paragraph IV certification to such patent. Any future ANDA applicants seeking to market such a product also would have to submit a paragraph IV certification to that patent in order to receive FDA approval prior to patent expiration.

## ANALYSIS

According to Upsher-Smith, FDA need not reach any of the MMA forfeiture issues set forth in the Agency's September 26, 2007 letter. Instead, Upsher-Smith argues that

Gary Buehler
Director, Office of Generic Drugs
November 6, 2007
Page 3

FDA should simply remove the '769 patent from the Orange Book, thus extinguishing Cobalt's statutory right to generic exclusivity. Simply put, FDA cannot lawfully remove the '769 patent from the Orange Book. First, undertaking the analysis outlined in Upsher-Smith's letter would require the Agency to undertake a substantive analysis of patent law. FDA, of course, long ago disavowed any expertise with respect to patent law and steadfastly has refused to take agency action that would require FDA to carry out any analysis of patent law. Having done so for nearly a decade, FDA cannot now lawfully change course -- particularly not since the courts have sanctioned the Agency's approach. Second, the D.C. Circuit already has spoken to this issue, ruling that FDA cannot lawfully remove a patent from the Orange Book after an applicant, like Cobalt here, has submitted a paragraph IV certification.

I.      **By Its Own Admission, FDA Lacks The Expertise Required To Undertake The Substantive Patent Law Analysis Necessary For Removing The '769 Patent From The Orange Book.**

        To accept Upsher-Smith's suggestion of removing the '769 patent from the Orange Book, FDA would have to conduct a substantive analysis that the Agency long ago disavowed the expertise to carry out. FDA would be required, both in the case at hand and in any future case, to interpret the substantive meaning and scope of all patent disclaimers. Among other things, the Agency would be required to determine whether the requirements of 37 C.F.R. § 1.321 have been satisfied. The Agency would, for example, need to analyze whether all of the claims had been disclaimed or just some; whether the disclaimer was of sufficient scope to cover all claimed inventions; whether all owners of the patent had executed proper disclaimers or whether someone else retained any rights to the patent; and whether the patent remains valid and enforceable against prospective generic competitors. FDA also would have to review documents submitted to the PTO and available on the PTO's Patent Application Information Retrieval (PAIR) system. But this is precisely the type of substantive, legal analysis that FDA has consistently found to be outside of its expertise. In fact, FDA has steadfastly taken the position that it lacks any expertise in any and all areas of patent law and in discerning the legal effect of patent orders and rulings. Consider just some of the representations that the Agency previously has made:

- "Indeed, FDA has consistently maintained that it has neither the resources nor the expertise to resolve patent issues." (Br. For The Federal Appellees at 21, *aaiPharma, Inc. v. Thompson*, No. 01-2113 (4th Cir.), dated Jan. 3, 2002, Ex. A).

- "FDA has explained at length that it has neither the expertise nor the resources to resolve complex patent issues and that its role in listing patents is purely ministerial. *See* 54 Fed. Reg. 28872, 28909-11 (July 10, 1989) (preamble to proposed regulations, showing that FDA has stressed from the beginning this very point). Two comments on FDA's proposal of 21 C.F.R. § 314.53 regarding the implementation of the Hatch-Waxman Amendments asserted that 'FDA should ensure that patent information submitted to the agency is complete and applies to a particular NDA.' 59 Fed. Reg. at 50345. In response, FDA reiterated that it

Gary Buehler
Director, Office of Generic Drugs
November 6, 2007
Page 4

does not have the resources or expertise to review patent information for its accuracy and relevance to an NDA." (Federal Defs.' Mem. In Supp. Of Its Mot. For Summ. J. at 24, *Alphapharm Pty Ltd. v. Thompson*, No. 03-2269 (D.D.C.), dated Mar. 12, 2004, Ex. B).

- "The FDCA delegates to FDA only a ministerial duty to list patents. FDA is not required to determine independently whether a patent meets the statutory criteria for listing. ... FDA's ministerial approach is also in accordance with the agency's lack of patent expertise, consistent with its public health mission, and supported by well-established case law." (Federal Defs.' Mem. In Supp. Of Its Mot. For Summ. J. at 16-17, *Alphapharm Pty Ltd. v. Thompson*, No. 03-2269 (D.D.C.), dated Mar. 12, 2004, Ex. B).

- "The FDA points out that the whole point of the Act's paragraph IV certification scheme is to let private parties sort out their respective intellectual property rights through patent infringement suits while the FDA focuses on its primary task of ensuring that drugs are safe and effective. This division of labor is appropriate *because the FDA has no expertise in making patent law judgments*." (Federal Defs.' Mem. In Supp. Of Its Mot. For Summ. J. at 25, *Alphapharm Pty Ltd. v. Thompson*, No. 03-2269 (D.D.C.), dated Mar. 12, 2004, Ex. B (emphasis added)).

- "FDA, in deciding to make an Orange Book listing, is *not* acting as a patent tribunal. It has no expertise—much less any statutory franchise—to determine matters of substantive patent law." (Federal Defs.' Mem. In Supp. Of Its Mot. For Summ. J. at 26, *Alphapharm Pty Ltd. v. Thompson*, No. 03-2269 (D.D.C.), dated Mar. 12, 2004, Ex. B).

- "It would be unduly burdensome, if not entirely impracticable, for FDA to devise a system that would enable it to evaluate the patent universe on an accurate, efficient, and iterative basis. To obligate FDA to conduct substantive patent reviews would, among other things, severely undercut FDA's ability to carry out its primary public health mission. Valuable, limited resources would have to be diverted from the complexities of the drug approval process to the economically-based patent quarrels of drug manufacturers. Thus, FDA's efforts would be shifted from an area in which the agency makes judgments based on its scientific and technical expertise to an area in which the agency has no stake or specialized experience—a transformation that contravenes reason." (Federal Defs.' Mem. In Supp. Of Its Mot. For Summ. J. at 31, *Alphapharm Pty Ltd. v. Thompson*, No. 03-2269 (D.D.C.), dated Mar. 12, 2004, Ex. B).

- "FDA's ministerial approach [to patent listing and delisting issues] is also in accordance with the agency's lack of patent expertise, consistent with its public health mission, and supported by well-established case law." (Federal Defs.'

Gary Buehler
Director, Office of Generic Drugs
November 6, 2007
Page 5

Opp'n To Pl.'s Mot. For A Stay at 3, *Alphapharm Pty Ltd. v. Thompson*, No. 03-2269 (D.D.C.), dated July 8, 2004, Ex. C).

- "In addition to the clear language of the statute, FDA interpreted the FDCA as granting it only a ministerial duty because the agency has from the beginning emphasized that it has neither the expertise nor the resources to resolve patent issues. The Fourth Circuit, in a recent decision, upheld FDA's interpretation for this very reason. *See aaiPharma Inc. v. Thompson*, 296 F.3d 227, 241 (4th Cir. 2002)." (Br. For The Federal Appellees at 20, *Apotex, Inc. v. Thompson*, No. 02-1295 (Fed. Cir.), dated Sept. 23, 2002, Ex. D).

- "The FDA points out that the whole point of the Act's paragraph IV certification scheme is to let private parties sort out their respective intellectual property rights through patent infringement suits while the FDA focuses on its primary task of ensuring that drugs are safe and effective. This division of labor is appropriate because the FDA has no expertise in making patent law judgments." (Br. For The Federal Appellees at 37-38, *Apotex, Inc. v. Thompson*, No. 02-1295 (Fed. Cir.), dated Sept. 23, 2002, Ex. D).

- "FDA, in deciding to make an Orange Book listing, is *not* acting as a patent tribunal. It has no expertise—much less any statutory franchise—to determine matters of substantive patent law. In making its decision to list a patent, therefore, it is entirely appropriate and reasonable for the FDA to rely on the patentee's declaration as to coverage, and to let the patent infringement issues play out in other, proper arenas, as is the clear intent of the Hatch-Waxman Amendments." (Br. For The Federal Appellees at 38, *Apotex, Inc. v. Thompson*, No. 02-1295 (Fed. Cir.), dated Sept. 23, 2002, Ex. D).

- "Indeed, FDA has consistently maintained that it has neither the resources nor the expertise to resolve patent issues. *See* 54 Fed. Reg. 28872, 28910-11 (1989) (preamble to proposed regulations); 59 Fed. Reg. at 50345 (cols. 2, 3) (preamble to final regulations in which FDA rejected two comments that asserted that 'FDA should ensure that patent information submitted to the agency is complete and applies to a particular NDA'). *See also id.* at 50342-43, 50349, 50352." (Br. For The Federal Gov't Def.'s-Appellees at 23-24, *Mylan Pharms., Inc. v. Thompson*, No. 01-1257 (Fed. Cir.), dated May 4, 2001, Ex. E).

- "The impact of Alphapharm's position, however, would be to force FDA to . . . mak[e] an independent determination regarding a patent's listing eligibility, in reliance on statements made by third parties about an unrelated issue in an unrelated context (e.g., about the scope of patent claims specified in a patent term extension application). For FDA to do so would result in an endless stream of third-party inquiries, decisions on patents by an agency without expertise in that area, and a lack of certainty and regularity in an already highly litigious arena.

Gary Buehler
Director, Office of Generic Drugs
November 6, 2007
Page 6

This would be the height of irrational agency decision-making." (Federal Defs.'
Reply In Supp. Of Their Mot. For Summ. J. And Opp'n To Pl.'s Cross-mot. For
Summ. J. at 3, *Alphapharm Pty Ltd. v. Thompson*, No. 03-2269 (D.D.C.), dated
May 7, 2004, Ex. F).

- "OGD lacks the expertise to make accurate determinations about the legal effect,
  such as estoppel, of representations relating to patents that are not embodied in a
  court decision." (Federal Defs.' Mem. In Opp'n To Pl.'s Mot. For Prelm. Inj. at
  12, *Teva Pharms. USA, Inc. v. FDA*, No. 05-1469 (D.D.C.), dated Aug. 25, 2005,
  Ex. G).

- "FDA lacks the expertise and, because it is not a party to the underlying case, all
  the facts necessary to evaluate whether a patentee's statements may or may not
  have estoppel effect, which makes any agency determination in this regard
  especially vulnerable to legal challenge. ... Thus, the estoppel approach requires
  FDA to make decisions outside its area of expertise based on FDA's interpretation
  of caselaw that has limited (if any) relevance to estoppel determinations." (Federal
  Defs.' Mem. In Opp'n To Pl.'s Mot. For TRO And/Or Prelim. Inj. at 12, *Apotex
  Inc. v. FDA*, No. 06-627 (D.D.C.), dated Apr. 18, 2006, Ex. H).

- "Indeed, by requiring FDA to draw fine distinctions on matters of civil procedure,
  in addition to making patent estoppel determinations, the district court's decision
  only exacerbates the burden on the agency of 'adjudicating the underlying reasons
  for a dismissal,' ... as to which the agency does not possess the relevant
  expertise." (Br. For The Federal Appellants at 27, *Teva Pharms. USA, Inc. v. FDA*,
  Nos. 05-5401 & 05-5460 (D.C. Cir.), dated Dec. 22, 2005, Ex. I).

- "The technical distinctions emphasized by the district court also will needlessly
  exacerbate FDA's already difficult task of administering generic exclusivity under
  the complex Hatch-Waxman regime. ... It is outside the agency's core function
  and expertise to make these nuanced determinations of civil procedure." (Br. For
  The Federal Appellants at 52, *Teva Pharms. USA, Inc. v. FDA*, Nos. 05-5401 & 05-
  5460 (D.C. Cir.), dated Dec. 22, 2005, Ex. I).

- "FDA has been candid about its lack of expertise in making patent estoppel
  determinations." (Reply Br. For The Federal Appellants at 26, *Teva Pharms. USA,
  Inc. v. FDA*, Nos. 05-5401 & 05-5460 (D.C. Cir.), dated Feb. 6, 2006, Ex. J).

- "To assess the status of the patent at issue in that case, OGD would have had to
  review pleadings, including briefs, exhibits, proposed orders, and patent law, as
  well as correspondence between the parties and court transcripts.
  * * *
  Review and analysis of the legal documents submitted by Teva would require OGD
  to follow a similar course in future cases. If OGD were to accept that a dismissal

Gary Buehler
Director, Office of Generic Drugs
November 6, 2007
Page 7

of a declaratory judgment action satisfies the court decision trigger, I believe that ANDA applicants would seek to have OGD make similar determinations concerning dismissals of non-declaratory judgment cases. These cases are far more numerous and may require analysis of documents other than court orders or decisions, which could place an unbearable burden upon OGD staff and would require a substantial use of OGD's limited resources. Also, OGD lacks the expertise to make accurate determinations about the legal effect, such as estoppel, of representations relating to patents that are not embodied in a court decision.

* * *

Because of OGD's lack of expertise in this area and the substantial resource drain entailed by such an undertaking, I decided that FDA would not adopt the interpretation of the court decision trigger proposed by Teva." (Decl. Of Douglas Sporn, Director of the Office of Generic Drugs (OGD) at 5-6, *Teva Pharms. USA, Inc. v. FDA*, No. 99-67 (D.D.C. Aug. 2, 1999), *available at* Joint Appendix at JA 110-11, *Teva Pharms. USA, Inc. v. FDA*, Nos. 99-5287 & 99-5342 (D.C. Cir.), dated Dec. 22, 1999, Ex. K).

- "FDA stated only that it did not treat the dismissal of Teva's suit . . . as a 'court decision' for purposes of the court decision trigger . . . . On remand, through the Sporn Declaration (JA 111), FDA explained why: because FDA lacks expertise in patent matters, and thus is not equipped to go beyond the fact of an order in a patent case." (Reply Br. For The Federal Appellant at 2, *Teva Pharms. USA, Inc. v. FDA*, Nos. 99-5287 & 99-5342 (D.C. Cir.), dated May 10, 2000, Ex. L).

- "Teva further contends that . . . FDA was only required to consider 'black letter patent law' and thus did not need patent law expertise. But how would FDA know this given its lack of expertise in patent matters?" (Reply Br. For The Federal Appellant at 3, *Teva Pharms. USA, Inc. v. FDA*, Nos. 99-5287 & 99-5342 (D.C. Cir.), dated May 10, 2000, Ex. L).

- "FDA explained that it did not have the requisite expertise in patent matters to go beyond the face of the California dismissal to determine the import of that order under patent law." (Reply Br. For The Federal Appellant at 6-7, *Teva Pharms. USA, Inc. v. FDA*, Nos. 99-5287 & 99-5342 (D.C. Cir.), dated May 10, 2000, Ex. L).

- "On remand, through the Sport Declaration (JA 111), FDA explained 'why' FDA did not look beyond the face of the order: because FDA lacks the expertise in patent matters to determine the import of the order under patent law." (Reply Br. For The Federal Appellant at 7-8, *Teva Pharms. USA, Inc. v. FDA*, Nos. 99-5287 & 99-5342 (D.C. Cir.), dated May 10, 2000, Ex. L).

- "The Sporn Declaration, in turn, then explained that, because of FDA's lack of expertise in patent law, FDA would not create an exception to the regulation for the

Gary Buehler
Director, Office of Generic Drugs
November 6, 2007
Page 8

California dismissal. . . . FDA is clearly acting properly by limiting itself to the review of the face of a 'court order or judgment,' so as not to range beyond its expertise in determining whether a court decision has determined that a patent is invalid, unenforceable, or not infringed." (Reply Br. For The Federal Appellant at 9, *Teva Pharms. USA, Inc. v. FDA*, Nos. 99-5287 & 99-5342 (D.C. Cir.), dated May 10, 2000, Ex. L).

- "In the instant case, by contrast, FDA must first 'interpret' the California dismissal in order to apply it, and it is FDA's lack of expertise in the patent arena that prevents FDA from embarking on that effort." (Reply Br. For The Federal Appellant at 11, *Teva Pharms. USA, Inc. v. FDA*, Nos. 99-5287 & 99-5342 (D.C. Cir.), dated May 10, 2000, Ex. L).

- "[Looking beyond the face of a court decision] would require FDA to make determinations regarding private patent litigation by analysis of, among other things, Federal Circuit case law on complex patent issues. FDA does not have the resources nor the expertise to do so. In fact, interpreting the same statutory provision at issue in this case, this Court recently rejected a similar attempt to impose such a burden on FDA. *Apotex, Inc. v. Shalala*, Civ. No. 99-729 (EGS) (Slip Op. June 16, 1999) . . . ." (FDA Mem. In Opp'n To Teva's Renewed Application For A TRO And Mot. For Prelim. Inj. at 2-3, *Teva Pharms. USA, Inc. v. FDA*, No. 99-67 (D.D.C.), dated Aug. 2, 1999, Ex. M).

- "A principal reason that FDA declined to adopt Teva's interpretation of the court decision trigger is that Teva's approach would require FDA to make similar determinations in future cases about private patent litigation that FDA does not have the resources nor the expertise to make. . . . FDA has consistently stated that it does not undertake this type of analysis, and that it does not have the expertise or the resources to adequately review and analyze these complex patent issues." (FDA Mem. In Opp'n To Teva's Renewed Application For A TRO And Mot. For Prelim. Inj. at 3-4, *Teva Pharms. USA, Inc. v. FDA*, No. 99-67 (D.D.C.), dated Aug. 2, 1999, Ex. M).

- "Hence, FDA decided not to adopt Teva's interpretation in large part because FDA is not required to make such patent determinations, and such an approach would be difficult to undertake and would result in poor use of FDA's scarce resources." (FDA Mem. In Opp'n To Teva's Renewed Application For A TRO And Mot. For Prelim. Inj. at 6, *Teva Pharms. USA, Inc. v. FDA*, No. 99-67 (D.D.C.), dated Aug. 2, 1999, Ex. M).

The courts, of course, have acknowledged FDA's lack of expertise in these areas and sanctioned the Agency's refusal to make such determinations. *See, e.g., Apotex, Inc. v. FDA*, 449 F.3d 1249, 1251-54 (D.C. Cir. 2006) (upholding FDA's refusal to substantively analyze a court decision to determine whether it satisfies the "court decision" trigger of 21 U.S.C.

Gary Buehler
Director, Office of Generic Drugs
November 6, 2007
Page 9

§ 355(j)(5)(B)(iv)); *Apotex, Inc. v. Thompson*, 347 F.3d 1335, 1347, 1352 (Fed. Cir. 2003) (upholding FDA's purely "ministerial" roll in listing and delisting disputes involving Orange Book patents, where the Agency had cited its lack of expertise in patent law); *aaiPharma Inc. v. Thompson*, 296 F.3d 227, 242 (4th Cir. 2002) (upholding FDA's refusal to list a patent in the Orange Book, citing the Agency's acknowledged lack of resources and "expertise to review patent information for its accuracy and relevance to the NDA"); *Mylan Pharms., Inc. v. Thompson*, 268 F.3d 1323, 1329 (Fed. Cir. 2001) (recognizing FDA's purely "ministerial," non-substantive roll in patent listing disputes); *Alphapharm Pty Ltd. v. Thompson*, 330 F. Supp. 2d 1, 7 (D.D.C. 2004) (upholding FDA's refusal to list a patent in the Orange Book, citing the Agency's statement that it "has no expertise in the field of patents, and, therefore, no basis for determining whether a use patent covers the use sought by the generic applicant").

Having successfully argued for nearly a decade that the Agency lacks expertise in areas such as patent law and civil procedure, and with the courts having sanctioned that approach time and again, FDA cannot lawfully change course now. *See, e.g., Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42, 57 (1983) (vacating agency's action as arbitrary and capricious for failure to supply a reasoned basis for changing course and recognizing that "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance"); *Bush-Quayle '92 Primary Comm. v. FEC*, 104 F.3d 448, 453-54 (D.C. Cir. 1997) (refusing *Chevron* deference when agency inconsistently interpreted the statute and failed to explain its departure from prior precedent); *Columbia Broad. Sys., Inc. v. FCC*, 454 F.2d 1018, 1026 (D.C. Cir. 1971) ("[W]hen an agency decides to reverse its course, it must provide an opinion or analysis indicating that the standard is being changed and not ignored, and assuring that it is faithful and not indifferent to the rule of law.").

FDA certainly cannot lawfully undertake the substantive patent law analysis that would be necessary to evaluate Upsher-Smith's request—let alone determine the substantive effects of a disclaimer on patent validity and enforcement. Consistent with its long-standing and court-sanctioned refusal to undertake substantive patent law analysis, FDA must reject Upsher-Smith's request that the Agency remove the '769 patent from the Orange Book. Any other action would be arbitrary, capricious and contrary to law.

**II.    Because Cobalt Has Filed A Paragraph IV Certification To The '769 Patent, The D.C. Circuit's Ruling In Simvastatin Precludes The Agency From Removing That Patent From The Orange Book.**

Upsher-Smith's delisting request does not raise a new issue or present a close call. It can, in fact, be quickly and easily dispatched because even if FDA believed for some reason that it now has the substantive patent law expertise to properly analyze a patent disclaimer, the Agency cannot lawfully remove the '769 patent from the Orange Book for the simple reason that the D.C. Circuit forbids it. But, of course, FDA already recognized this fact. Indeed, this recognition is precisely what led the Agency to ask for comments regarding whether the mere

Gary Buehler
Director, Office of Generic Drugs
November 6, 2007
Page 10

request for the withdrawal of patent information from the Orange Book satisfies Hatch-Waxman's requirement that a patent actually be "withdrawn" from the Orange Book.[1]

In connection with the drug simvastatin, FDA attempted to remove two patents from the Orange Book after ANDA applicants had submitted applications containing paragraph IV certifications to those patents. FDA justified its decision by citing to a regulation that permitted the Agency to remove patents unless litigation ensued as a result of the paragraph IV certification. Because there was no litigation over the two simvastatin patents, the Agency concluded that it could remove them from the Orange Book, even though doing so would deprive the first applicants of their statutory right to 180-day generic exclusivity.[2] The first applicants brought suit challenging FDA's decision. Both the district court and the D.C. Circuit struck down the Agency's attempt to delist the simvastatin patents as arbitrary, capricious and unlawful agency action. *See Ranbaxy Labs. Ltd. v. Leavitt*, 469 F.3d 120 (D.C. Cir. 2006), *aff'g*, 459 F. Supp. 2d 1 (D.D.C. 2006). In so ruling, the D.C. Circuit recognized, among other things, that FDA's delisting policy "diminishes the incentive for a manufacturer of generic drugs to challenge a patent listed in the Orange Book in the hope of bringing to market a generic competitor for an approved drug without waiting for the patent to expire," and that the Agency may not lawfully "change the incentive structure adopted by the Congress, for the agency is bound 'not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes.'" *Ranbaxy*, 469 F.3d at 126 (quoting *MCI Telecomms. Corp. v. AT & T Co.*, 512 U.S. 218, 231 n.4 (1994)).

FDA cannot ignore the *Ranbaxy* decision, which definitively prevents the Agency from removing the '769 patent from the Orange Book in light of Cobalt's paragraph IV certification to that patent. Any attempt by the Agency to disregard this precedent and remove the '769 patent would be arbitrary, capricious and contrary to law. Consequently, Upsher-Smith's request for delisting must be denied.[3]

## CONCLUSION

For all the reasons stated above and in Cobalt's October 17, 2007 comments, Cobalt is statutorily entitled to the 180-day exclusivity for all strengths of acarbose tablets. No forfeiture event has occurred with respect to that exclusivity and the '769 patent cannot lawfully be removed from the Orange Book. FDA therefore must delay approval of all subsequent acarbose ANDAs until the expiration of Cobalt's exclusivity. And until these issues are resolved

---

[1] For the reasons set forth in Cobalt's October 17, 2007 comments, FDA cannot lawfully find that a request to withdraw a patent from the Orange Book satisfies Hatch-Waxman's express requirement that patent information actually be "withdrawn" from the Orange Book. (*See* Cobalt's 10/17/07 Comments at 19-21).

[2] In simvastatin, one ANDA applicant filed the first paragraph IV certification to certain strengths of the product, while another company filed first to certain other strengths of the product.

[3] Even if FDA lawfully could follow the regulation and statutory interpretation struck down in *Ranbaxy*, the Agency still cannot remove the '769 patent from the Orange Book. As explained in Cobalt's October 17, 2007 comments, there is on-going litigation on the '769 patent. (*See* Cobalt's 10/17/07 Comments at 21-22).

Gary Buehler
Director, Office of Generic Drugs
November 6, 2007
Page 11

and judicial review of any adverse Agency decision can occur, FDA must stay approval of all
subsequent acarbose ANDAs. (*See* PSA 2007P-0414 submitted 10/24/07).

Very truly yours,

RAKOCZY MOLINO MAZZOCHI SIWIK LLP

William A. Rakoczy

Christine J. Siwik

Enclosures

cc:     Dawn Beto, *Cobalt Laboratories Inc.* (via e-mail w/o encls.)
        Elizabeth Dickinson, *Office of Chief Counsel* (via e-mail w/o encls.)
        Bob West, *Office of Generic Drugs* (via e-mail w/o encls.)