**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

<div style="overflow-x:auto">

| | |
|---|---|
| COBALT LABORATORIES, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 08-798 |
| ) | |
| FOOD AND DRUG ADMINISTRATION, ) | |
| *et al.*, ) | |
| ) | |
| Defendants. ) | |

</div>

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S
MOTION FOR A TEMPORARY RESTRAINING ORDER**

**INTRODUCTION**

Plaintiff, Cobalt Laboratories, Inc. ("Cobalt"), a generic drug manufacturer, filed this

motion against the U.S. Food and Drug Administration ("FDA")[1] challenging FDA's

implementation of certain of the drug approval provisions of the Federal Food, Drug, and

Cosmetic Act ("FCDA") with respect to Cobalt's generic version of Precose (a drug that helps

lower blood glucose in certain diabetes patients) because that means that Cobalt has forfeited

180 days of exclusivity to market its product free from competition by other generic versions of

Precose. FDA's implementation, however, is consistent with the plain language of the statute,

and Cobalt's arguments that this Court should consider policy concerns to reach a different

conclusion than that dictated by the plain language of the statute should be rejected.

In addition, Cobalt is not, nor does Cobalt claim it is, being barred entirely from the

marketplace. Rather, Cobalt's only claimed injury is the loss of 180 days of exclusivity (i.e., a

---

[1] Michael O. Leavitt, Secretary, U.S. Department of Health and Human Services ("HHS"),and Andrew C. von Eschenbach, Commissioner, FDA, are also named defendants.

temporary monopoly in the generic market), which constitutes merely an economic loss that is far

from the irreparable harm necessary to justify a temporary restraining order.  Nor has Cobalt

shown that the $9 million dollar loss it speculates will occur if Bayer does not launch its own

generic version of acarbose, threatens the existence of its business.  Indeed, Cobalt's President

studiously avoids putting its projected financial loss in the context of total corporate sales.  For

all of these reasons, Cobalt's motion for a temporary restraining order ("Pl. TRO Mem.") should

be denied.

## BACKGROUND

I.    Statutory And Regulatory Framework

    A.    NDAs

Under the FDCA, pharmaceutical companies seeking to market "pioneer" or "innovator"

drugs must first obtain FDA approval by filing a new drug application ("NDA") containing

extensive scientific data demonstrating the safety and effectiveness of the drug.  21 U.S.C.

§§ 355(a), (b).  An NDA applicant must also submit information on any patent that claims the

drug, or a method of using the drug, and for which a claim of patent infringement could

reasonably be asserted against an unauthorized party.  21 U.S.C. §§ 355(b)(1), (c)(2).  FDA must

publish the patent information it receives, and does so both in print and electronically, in the

Orange Book.  Id.; see also 21 C.F.R. § 314.53(e).

    B.    ANDAs

The Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-

Waxman Amendments"), codified at 21 U.S.C. § 355 and 35 U.S.C. §§ 156, 271, and

282, permits manufacturers to submit abbreviated new drug applications ("ANDAs") requesting

approval of generic versions of approved drug products.  21 U.S.C. § 355(j).  The Hatch-Waxman Amendments were intended to balance encouraging innovation in the development of new drugs with accelerating the availability to consumers of lower cost alternatives to innovator drugs.  See H.R. Rep. No. 98-857 (Part I), 98th Cong., 2d Sess. at 14-15 (1984), reprinted in 1984 U.S.C.C.A.N. 2647-48; see also, e.g., Tri-Bio Labs., Inc. v. United States, 836 F.2d 135, 139 (3d Cir. 1987).

   ANDA applicants need not submit clinical data to demonstrate the safety and efficacy of the generic product, as in an NDA.  See 21 U.S.C. § 355(j).  Rather, an ANDA relies on FDA's previous findings that the product approved under the NDA is safe and effective, and the FDCA sets forth in detail the information an ANDA must contain.  See 21 U.S.C. § 355(j)(2)(A).  Among other items, an ANDA must include information showing that the generic drug product is bioequivalent to the pioneer drug product.  21 U.S.C. §§ 355(j)(2)(A)(iv), (j)(4)(F); 21 C.F.R. §§ 314.127(a)(6)(i), 314.94(a)(7).  A drug is considered to be bioequivalent if "the rate and extent of absorption of the drug do not show a significant difference from the rate and extent of absorption of the listed drug . . .," 21 U.S.C. §  355(j)(8)(B)(i), and FDA has significant discretion in determining appropriate methodologies to demonstrate bioequivalence. See 21 U.S.C. § 355(j)(8)(C); see also 21 C.F.R. § 320.21(b)(2); 21 C.F.R. §§ 320.24(a), (b).

   1.    Patent protections and 180-day exclusivity

   The timing for approval of ANDAs depends, in part, on statutory patent protections afforded to the innovator drug.  Among other things, an ANDA must contain one of four specified certifications for each patent that "claims the listed drug" or claims "a use for such

listed drug for which the applicant is seeking approval." 21 U.S.C. § 355(j)(2)(A)(vii).[2]

This certification must state one of the following:

(I)   that the required patent information relating to such patent has not
been filed;
(II)  that such patent has expired;
(III) that such patent will expire on a particular date; or
(IV) that such patent is invalid or will not be infringed by the drug for
which approval is being sought.

21 U.S.C. § 355(j)(2)(A)(vii).  If an applicant wishes to challenge the validity of a patent, or to

claim that the patent would not be infringed by the product covered by the ANDA, the applicant

must submit a certification pursuant to paragraph IV of this provision.  See 21 U.S.C.

§ 355(j)(2)(A)(vii)(IV).[3]  The applicant must also provide notice of its so-called "paragraph IV

certification" to the NDA holder and the patent owner explaining the factual and legal basis for

the applicant's opinion that the patent is invalid or not infringed.  21 U.S.C. § 355(j)(2)(B).

The filing of a paragraph IV certification "for a drug claimed in a patent or the use of

which is claimed in a patent" is an act of infringement.  35 U.S.C. § 271(e)(2)(A).  This enables

the NDA holder and patent owner to sue the ANDA applicant.  If such a suit is brought within 45

days of the date notice of the certification was received by the patent owner or NDA holder, FDA

must stay approval of the ANDA for 30 months from that date (commonly referred to as the "30-

---

[2]  FDA has defined the "listed drug" to mean the approved new "drug product." 21
C.F.R. § 314.3(b).

[3]  If a certification is made under paragraph I or II indicating that patent information
pertaining to the drug or its use has not been filed with FDA or that the patent has expired, the
ANDA may be approved immediately.  21 U.S.C. § 355(j)(5)(B)(i).  A paragraph III certification
indicates that the ANDA applicant does not intend to market the drug until after the applicable
patent has expired, and approval of the ANDA may be made effective on the expiration date.  21
U.S.C. § 355(j)(5)(B)(ii).

month stay"), unless a final court decision is reached earlier in the patent case or the court orders

a longer or shorter period. 21 U.S.C. § 355(j)(5)(B)(iii). If no action is brought within the

requisite 45-day period, FDA may approve an ANDA with a paragraph IV certification effective

immediately, provided that other conditions for approval have been met. 21 U.S.C.

§ 355(j)(5)(B)(iii); 21 C.F.R. § 314.107(f)(2).

In certain circumstances, the statute provides an incentive and reward to generic drug

manufacturers that expose themselves to the risk of patent litigation. It does so by granting a

180-day period of marketing exclusivity (*vis-à-vis* other ANDA applicants) to the manufacturer

who is first to file an ANDA containing a paragraph IV certification to a listed patent, provided

certain conditions are met. 21 U.S.C. § 355(j)(5)(B)(iv); see Teva Pharm. Indus. v. Crawford,

410 F.3d 51, 52 (D.C. Cir. 2005); Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1064 (D.C. Cir.

1998); Mylan Pharm., Inc. v. Henney, 94 F. Supp. 2d 36, 40 (D.D.C. 2000), vacated as moot sub

nom. Pharmachemie B.V. v. Barr Labs., Inc., 276 F.3d 627 (D.C. Cir. 2002). The statutory

provision governing 180-day exclusivity provides:

> If the application contains a certification described in subclause (IV) of
> paragraph (2)(A)(vii) and is for a drug for which a previous application
> has been submitted under this subsection [containing] such a certification,
> the application shall be made effective not earlier than one hundred and
> eighty days after-
>
>> (I) the date the Secretary receives notice from the applicant under
>> the previous application of the first commercial marketing of the
>> drug under the previous application, or
>>
>> (II) the date of a decision of a court in an action described in clause
>> (iii) holding the patent which is the subject of the certification to be
>> invalid or not infringed,
>
> whichever is earlier.

21 U.S.C. § 355(j)(5)(B)(iv).[4]  Thus, under the statute, an ANDA applicant with a patent

certification that is "previous" to all others for that patent may become eligible for a 180-day

exclusivity period.  During that period, it can market its product and approvals of other ANDAs

for the same product are held in abeyance.  This 180-day exclusivity is triggered by the earlier of

(i) the ANDA applicant's first commercial marketing of the drug (the "commercial marketing

trigger"), or (ii) a decision of a court finding the patent at issue invalid or not infringed (the

"court decision trigger").  Id.

            2.     Forfeiture Provisions

        The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (the

"MMA")[5] recently amended the FDCA, in part, by adding provisions that describe sets of

conditions under which an ANDA applicant previously eligible for 180-day exclusivity could

lose that eligibility.  See 21 U.S.C. § 355(j)(5)(D).  The Act provides that a 180-day exclusivity

period described in 21 U.S.C. § 355(j)(5)(B)(iv) "shall be forfeited by a first applicant if a

forfeiture event occurs with respect to that first applicant."  21 U.S.C. § (j)(5)(D)(ii).  The

forfeiture events are the failure to market; the withdrawal of an application; an amendment of a

certification; the failure to obtain tentative approval; and an agreement with another applicant,

the listed drug application holder, or a patent owner.  21 U.S.C. § 355(j)(5)(D)(i).

        The failure to market forfeiture provisions, which are the provisions relevant to this case,

_____

        [4] Courts have observed that the word "continuing" as it appears in the statute reflects a
typographical error and should probably be read as "containing."  See Purepac Pharm. Co. v.
Friedman, 162 F.3d 1201, 1203 n.3 (D.C. Cir. 1998); Mova, 140 F.3d at 1064 n.3; see also 21
C.F.R. §§ 314.107(c)(1) & (2).

        [5] Public Law 108-173, Stat. 2066 (Dec. 8, 2003).

state that a first applicant will forfeit exclusivity if it fails to market its drug by a certain date:

>(I)  FAILURE TO MARKET. – The first applicant fails to market the drug
>by the later of –
>
>>(aa)  the earlier of the date that is –
>>    (AA)  75 days after the date on which the approval of the
>>application of the first applicant is made effective under subparagraph
>>(B)(iii); or
>>    (BB)  30 months after the date of submission of the
>>application of the first applicant; or
>>
>>(bb)  with respect to the first applicant or any other applicant
>>(which other applicant has received tentative approval), the date that is 75
>>days after the date as of which, as to each of the patents with respect to
>>which the first applicant submitted and lawfully maintained a certification
>>qualifying the first applicant for the 180-day exclusivity period under
>>subparagraph (B)(iv), at least 1 of the following has occurred:
>>    (AA)  In an infringement action brought against that applicant
>>with respect to the patent or in a declaratory judgment action brought by
>>that applicant with respect to the patent, a court enters a final decision
>>from which no appeal (other than a petition to the Supreme Court for a
>>writ of certiorari) has been or can be taken that the patent is invalid or not
>>infringed.
>>    (BB)  In an infringement action or a declaratory judgment
>>action described in subitem (AA), a court signs a settlement order or
>>consent decree that enters a final judgment that includes a finding that the
>>patent is invalid or not infringed.
>>    (CC)  The patent information submitted under subsection (b)
>>or (c) is withdrawn by the holder of the application approved under
>>subsection (b).

21 U.S.C. § 355(j)(5)(D)(i)(I).

Application of these forfeiture provisions requires a series of analyses based on the timing

of specific events.  The statute directs that a forfeiture event occurs when the first applicant fails

to market the drug by the later of two dates.  One of these dates is calculated under section (aa)

by determining the earlier of a date that is either 75 days after the first applicant's ANDA is

approved (subsection (AA)) or 30 months after the date of submission of the first applicant's

ANDA (subsection (BB)).  The second date is calculated under section (bb) by determining the date that is 75 days after the occurrence of at least one of three enumerated events.  These events include, very generally, when a court enters a final decision that the patent is invalid or not infringed (subsection (AA)), a court signs a settlement order or consent decree entering final judgment that includes a finding that the patent is invalid or not infringed (subsection (BB)), or the patent information for the listed drug is withdrawn by the NDA holder (subsection (CC)).

II.    Procedural History

    A.    Acarbose NDA and ANDAs

    Bayer's NDA for Precose (acarbose) 25-mg and 50-mg tablets was approved on September 6, 1995; the 100-mg strength was approved on May 29, 1997.  Precose helps to lower blood glucose in patients with type 2 diabetes mellitus.  Bayer submitted U.S. Patent Number 4,904,769 ("the '769 patent") to FDA for listing in the Orange Book for all strengths of Precose tablets.  By letter dated April 16, 2007, Bayer requested that the '769 patent be delisted from the Orange Book, and on September 25, 2007, FDA published the delisting in the Orange Book.[6]

    FDA accepted Cobalt's acarbose ANDA for filing on March 22, 2005.[7]  Cobalt's ANDA

_____

    [6] In its April 16, 2007, letter, Bayer informed FDA that the assignee of interest for the '769 patent, Bayer Healthcare AG, had filed a statutory disclaimer under 35 U.S.C. § 253, disclaiming all issued claims to the '769 patent, and that the filed disclaimer had been published by the U.S. Patent and Trademark Office on February 27, 2007.  Bayer therefore requested that the '769 patent be delisted from the Orange Book.

    [7] Cobalt's ANDA was initially stamped as received by the FDA document room on January 14, 2005.  After reviewing the application to determine whether it was sufficiently complete to permit a substantive review, as described in 21 C.F.R. § 314.101(b), FDA refused to receive Cobalt's ANDA for reasons enumerated in a March 9, 2005, letter to Cobalt.  On March 22, 2005, FDA concluded that Cobalt's response to the March 9 letter rendered the ANDA acceptable for filing.

contained a paragraph IV certification to the '769 patent, and was the first ANDA referencing Precose to contain a paragraph IV certification.  Over the course of its consideration of Cobalt's ANDA, FDA sent Cobalt a number of letters describing scientific deficiencies in the application, and Cobalt responded to these deficiencies.  The final step in the application review involved inspection of the Australian facility used by Cobalt to conduct the bioequivalence studies, which facility had never been previously inspected by FDA and which, under FDA's routine practice, FDA did not plan to inspect until it had determined that the studies conducted at the facility were otherwise acceptable to support approval of the ANDA.  On December 11, 2007, after conducting an off-site data audit, FDA determined that the facility used by Cobalt was acceptable.  FDA approved Cobalt's ANDA on May 7, 2008.

FDA accepted Roxane Laboratories Inc.'s ("Roxane") ANDA for acarbose tablets for filing on August 31, 2006.  Roxane's ANDA also contained a paragraph IV certification to the '769 patent.  Roxane's ANDA was also approved on May 7, 2008.

B.     Exclusivity Forfeiture Docket

FDA established a public docket to give acarbose ANDA applicants and other interested parties an opportunity to provide FDA with comments regarding application of the new MMA forfeiture provisions to Cobalt's eligibility for exclusivity.  See Sept. 26, 2007, Letter from Robert L. West to ANDA applicants (attached to Ex. D to Rakoczy Decl. with Pl. TRO Mem.). On October 24, 2007, Cobalt filed a petition for an emergency stay of action, pursuant to 21 C.F.R. § 10.35(e), requesting that FDA stay approval of any subsequent ANDAs for acarbose until Cobalt's 180-day exclusivity period expires.  See Oct. 24, 2007, Letter from William A. Rakoczy to Division of Dockets Management (attached hereto as Ex. A).

9

FDA responded to Cobalt's inquiries regarding its eligibility for 180-day exclusivity by letter dated May 7, 2008.[8]  See May 7, 2008, Letter from Gary J. Buehler to William A. Rakoczy ("FDA Forfeiture Resp.," attached hereto as Ex. B, and attached as Ex. D to Rakoczy Decl. with Pl. TRO Mem.).  FDA explained that Cobalt had initially been eligible for exclusivity because it filed the first ANDA with a paragraph IV certification, but that Cobalt forfeited its eligibility under 21 U.S.C. § 355(j)(5)(D)(i)(I).  Id. at 5.  FDA elaborated that application of the forfeiture provisions requires a series of analyses based on the timing of specific events:

> The statute directs that a forfeiture event occurs when the first applicant fails to market the drug by the later of two dates.  One of these dates is calculated under item (aa) [21 U.S.C. § 355(j)(5)(D)(i)(I)(aa)] by determining the earlier of a date that is either 75 days after the first applicant's ANDA is approved (subitem (AA)) or 30 months after the date of submission of the first applicant's ANDA (subitem (BB)).  Cobalt's ANDA is being approved on May 7, 2008; the 75 day period would expire on July 21, 2008.  Cobalt submitted a substantially complete ANDA containing a paragraph IV certification on March 22, 2005; 30 months from that was September 22, 2007.  September 22, 2007 is earlier than July 21, 2008.  Therefore, September 22, 2007, controls for the analysis of item (aa).

> The statute directs that we look to the later of the dates under items(aa) and (bb) of [21 U.S.C. § 355(j)(5)(D)(i)(I)].  Item (bb) states that the occurrence of at least one of the enumerated events as to a first applicant or any other applicant will begin a 75-day period leading to possible forfeiture of exclusivity.  These events include, very generally, when a court enters a final decision that the patent is invalid or not infringed, a court signs a settlement order or consent decree entering final judgment that includes a finding that the patent is invalid or not infringed, or the patent information for the listed drug is withdrawn by the NDA holder.  . . .  In this case, the relevant event under [21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)] is that the NDA holder for Precose requested on April 16, 2007, that the '769 patent be delisted from the Orange Book.  This triggered the start of the 75-day period under [21 U.S.C.

---

[8] On the same day, FDA also denied Cobalt's petition for a stay, for the reasons provided in FDA's forfeiture response letter.

§ 355(j)(5)(D)(i)(I)(bb)(CC)], which begins when the patent information submitted to the agency is withdrawn by the holder of the NDA. . . . In this case, the date that is 75 days after the NDA holder withdrew the information on the '796 patent, i.e., April 16, 2007, was June 30, 2007.

Forfeiture under [21 U.S.C. § 355(j)(5)(D)(i)(I)] occurs if a first applicant fails to market by the later of the dates under item (aa) or (bb). The September 22, 2007, date under section 355(j)(5)(D)(i)(I)(aa) is the later date, therefore it is the date that controls. Cobalt forfeited its 180-day exclusivity on September 22, 2007, because it did not begin to market its acarbose product by that date.

Id. at 6-8.[9]

In its response letter, FDA rejected comments suggesting that the forfeiture event described in 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(CC) applies only if a patent is withdrawn as a result of a counterclaim by the ANDA applicant in patent infringement litigation (as contemplated by 21 U.S.C. § 355(j)(5)(C)(ii)), concluding that the text of the applicable provision indicates without qualification that 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb) is applicable to all types patent withdrawals. FDA Forfeiture Resp. at 8.

FDA also determined that Cobalt did not forfeit its exclusivity under the failure to obtain tentative approval provision, which provides that an ANDA applicant forfeits exclusivity if it fails to obtain tentative approval with 30 months of filing its ANDA, unless that failure is "caused by a change in or a review of the requirements for approval of the application imposed

---

[9] FDA also noted that "[e]ven if FDA were to calculate the forfeiture event under [21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)] from the date the delisting of the '796 patent information was published (which we do not believe is supported by the statutory language), Cobalt would still forfeit exclusivity. If the agency were to use the September 25, 2007, publication date as the date the patent was withdrawn, the date that is 75 days later is December 9, 2007. This date under item (bb) is later than the September 22, 2007 date under item (aa); therefore the later date as between items (aa) and (bb) would be December 9, 2007. Cobalt did not market its acarbose product by December 9, 2007, so even under this analysis, it has forfeited 180-day exclusivity." FDA Forfeiture Resp. at 8, n.14.

after the date on which the application is filed."  21 U.S.C. § 355(j)(5)(D)(i)(IV).  In this case, FDA changed the requirements for Cobalt's in vivo bioequivalence study and thus, FDA concluded that Cobalt did not forfeit its exclusivity pursuant to 21 U.S.C. § 355(j)(5)(D)(i)(IV). FDA Forfeiture Resp. at 11.

      C.      Bioequivalence Citizen Petition and Petition for Stay

On November 9, 2007, Cobalt filed another petition for an emergency stay, as well as a citizen petition, both requesting that FDA refrain from approving any ANDA for acarbose unless and until the ANDA applicant conducts in vivo bioequivalence tests and studies.  See Nov. 9, 2007 Letter from William A. Rakoczy to Division of Dockets Management, at 2 (attached as Ex. C ); Nov. 9, 2007 Letter from William A. Rakoczy to Division of Dockets Management.  Cobalt also requested that FDA refuse to grant any ANDA applicant an in vivo bioequivalence waiver. See id.

Under the Food and Drug Administration Amendments Act of 2007 ("FDAAA")[10], FDA must "take final agency action on a petition not later than 180 days after the date on which the petition is submitted."  21 U.S.C. § 355(q)(1)(F).  In accordance with this requirement, FDA responded to Cobalt's citizen petition by letter dated May 7, 2008 – 180 days after Cobalt submitted the petition.[11]  See May 7, 2008, Letter from Janet Woodcock to William A. Rakoczy

---

[10] Public Law 110-85, 121 Stat. 823 (Sept. 27, 2007).

[11] Cobalt's repeated assertions that FDA "ambushed" it with administrative rulings without any prior notice are ridiculous.  It was Cobalt's own citizen petition that triggered the 180-day FDAAA clock, and Cobalt was well aware that its ANDA was approvable but for FDA's resolution of the issues raised in Cobalt's petition concerning bioequivalence studies; FDA's January 15, 2008, letter told Cobalt such explicitly.  See Jan. 15, 2008, Letter from Gary J. Buehler to Strategic Bioscience Corp. (Cobalt's U.S. agent) (attached hereto as Ex. D).  Thus, it requires no great imagination to foresee that once FDA resolved the bioequivalence issues,

(attached as Ex. E).  FDA explained that under 21 U.S.C. § 355(j)(8)(C) and 21 C.F.R. § 320.24,

FDA has the discretion to accept in vitro studies for a non-systemically absorbed drug product

such as acarbose when FDA finds that such studies are a scientifically valid method of

determining bioequivalence.  See id. at 6.  FDA concluded, "[i]n the case of a generic acarbose

that has the same quality and quantity of active and inactive ingredients as Precose, we

recommend in vitro, rather than in vivo, testing for establishing bioequivalence."  Id.

Cobalt filed its complaint and motion for a temporary restraining order on May 8, 2008,

challenging only FDA's legal interpretation of the forfeiture provisions and not FDA's scientific

determination on the appropriateness of in vitro bioequivalence data.

## ARGUMENT

I.    Legal Standard

In order to obtain a temporary restraining order, like a preliminary injunction, a party

must demonstrate that:  (1) it has a substantial likelihood of success on the merits; (2) it will

suffer irreparable injury in the absence of preliminary relief; (3) other interested parties will not

be substantially injured if the requested relief is granted; and (4) granting such relief would serve

the public interest.  See Katz v. Georgetown Univ., 246 F.3d 685, 687-88 (D.C. Cir.  2001); see

also Biovail Corp. v. FDA, 448 F. Supp. 2d 154, 160 (D.D.C. 2006).  The likelihood of success

requirement is the most important of these factors.  Id.  Furthermore, the extraordinary relief

Cobalt seeks is demonstrably not to preserve the status quo, but to obtain far-reaching mandatory

relief by requiring FDA to revoke an already-issued ANDA approval.  Such an action would also

require that Roxane, who, according to Cobalt, has already launched its product, see Pl. TRO

_____

FDA would approve Cobalt's ANDA, and of course resolve any questions of exclusivity.

Mem. at 31, halt marketing, thereby further upsetting the status quo.  This extraordinary request

for relief presents an additional and very high hurdle for Cobalt.  A court's power to issue such

an order "should be sparingly exercised."  Mylan Pharm., Inc. v. Shalala, 81 F. Supp.2d 30, 36

(D.D.C. 2000) ("Mylan (terazosin)"); see also Dorfmann v. Boozer, 414 F.2d 1168, 1173 (D.C.

Cir. 1969); see generally Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); Bristol-Myers

Squibb Co. v. Shalala, 923 F. Supp. 212, 215 (D.D.C. 1996).

II.      Cobalt Is Not Entitled To A Temporary Restraining Order

As shown below, Cobalt has failed to satisfy any of the four elements – a substantial

likelihood of success on the merits, irreparable injury, a showing that other interested parties will

not be substantially injured by the requested relief, and a showing that granting relief would serve

the public interest – needed to obtain a temporary restraining order.  FDA appropriately denied

Cobalt's citizen petitions and approved Roxane's ANDA.  All of Cobalt's purported injuries are

"merely economic" and clearly not irreparable; whatever injury Cobalt were to avoid by

obtaining a TRO would be visited upon Roxane; and granting the requested relief would harm

the public by unnecessarily delaying it access to cheaper acarbose by 180 days.  All of Cobalt's

arguments to the contrary simply lack merit.

A.      Cobalt Is Not Likely to Succeed On The Merits Because FDA Followed the Law
        and Properly Determined That Cobalt Forfeited Its Exclusivity

FDA's administrative decisions are subject to review by the Court under the

Administrative Procedure Act ("APA"), and may be disturbed only if "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  This

standard is highly deferential to the agency.  Citizens to Preserve Overton Park, Inc. v. Volpe,

401 U.S. 402, 416 (1971). "There is a presumption in favor of the validity of the administrative action." Bristol-Myers, 923 F. Supp. at 216. Under this "arbitrary and capricious" standard, agency action must be upheld if the action is rational, based upon relevant factors, and within the agency's authority. Motor Vehicle Mfrs. Ass'n of the United States, Inc., v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42-42 (1983); see also Overton Park, 401 U.S. at 416; AT&T Corp. v. FCC, 349 F.3d 692, 698 (D.C. Cir. 2003). Further, "under this narrow scope of review, 'the court is not empowered to substitute its judgment for that of the agency.'" Bristol-Myers, 923 F. Supp. at 216 (quoting Overton Park, 401 U.S. at 416); see also Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 ("the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."). In applying the arbitrary and capricious standard, the court reviews the administrative record assembled by the agency and does not undertake its own fact finding. See, e.g., Camp v. Pitts, 411 U.S. 138, 142 (1973).

When the Court is reviewing an agency's construction of statutory provisions, it is governed by the two-step analysis of Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984). First, the Court must inquire "whether Congress has directly spoken to the precise question at issue;" if Congress's intent is clear, the Court "must give effect to [such] unambiguously expressed intent." Id. at 842-43. Formulated another way, the Court must initially decide "whether the statute unambiguously forbids the Agency's interpretation." Barnhart v. Walton, 535 U.S. 212, 218 (2002) (emphasis added). Chevron deference is appropriate when "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long

15

period of time all indicate that Chevron provides the appropriate legal lens through which to view the legality of the Agency interpretation here at issue." Barnhart, 535 U.S. at 222. This Circuit has held that deference is particularly appropriate in the drug approval context because of "the complexity of the statutory regime" and "FDA's expertise." Mylan v. Thompson, 389 F.3d 1272, 1280 (D.C. Cir. 2004).

Accordingly, the D.C. Circuit has repeatedly given Chevron deference to FDA's interpretation of the FDCA's generic drug provisions, as well as the agency's own implementing regulations. See, e.g., Novartis Pharmaceuticals Corp. v. Leavitt, 435 F.3d 344, 349 (D.C. Cir. 2006) ("We have held on a number of occasions that FDA interpretations of the FDCA receive deference, as do its interpretations of its own regulations unless plainly erroneous or inconsistent with the regulations."); Mylan v. Thompson, 389 F.3d at 1281; Purepac Pharm. Co. v. Thompson, 354 F.3d 877, 883 (D.C. Cir. 2004); Serono Labs., Inc. v. Shalala, 158 F.3d 1313, 1319, 1320 (D.C. Cir. 1998) (citing Auer v. Robbins, 519 U.S. 452, 461 (1997)).

Because FDA has not yet promulgated regulations implementing the new exclusivity forfeiture provisions, FDA must regulate directly from the FDCA to determine whether ANDA applicants are entitled to exclusivity. See FDA Forfeiture Resp. at 4. As explained above, supra at 9-11, and in FDA's response letter, FDA walked through the applicable statutory provisions and concluded that Cobalt forfeited its exclusivity because it failed to begin marketing its product within 75 days of the NDA holder, here Bayer, withdrawing information on the '769 patent. See 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(CC).

It is well settled canon that "[t]he preeminent canon of statutory interpretation requires us to 'presume that [the] legislature says in a statute what it means and means in a statute what it

says there.'" BedRoc Ltd., LLC v. United States, 541 U.S. 176, 183 (2004) (citations omitted);

see also Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992) (same); Qi-Zhuo v.

Meissner, 70 F.3d 136, 140 (D.C. Cir. 1995). "Extremely strong, this presumption is rebuttable

only in the 'rare cases [in which] the literal application of a statute will produce a result

demonstrably at odds with the intention of its drafters.'" Nat'l Public Radio, Inc. v. FCC, 254

F.3d 226, 230 (D.C. Cir. 2001) (quoting United States v. Ron Pair Enterp., Inc., 489 U.S. 235,

242 (1989)). While Cobalt argues vigorously that policy considerations should be incorporated

into, and trump, the plain language of the forfeiture provision of the statute, see Pl. TRO Mem. at

16-17, elsewhere in the same memorandum it argues with equal vigor, and correctly, that the

"plain language" of the statute controls and that neither "the FDA or [a] Court [have] license to

read into the present, clear language of [the Hatch-Waxman provisions] a requirement ... that is

simply not there." Id. at 25. As Cobalt makes clear in this argument, such policy interpretations

are for Congress to address. Id. Here, as this court has explained, "because the statute is clear,

and the FDA's application of the statute is consistent with the plain meaning of the statute, it's

decision cannot be considered arbitrary, capricious, or contrary to law." Teva Pharms. v. FDA,

355 F. Supp. 2d 111, 118 (D.D.C. 2004).

FDA concluded that Cobalt had not forfeited its exclusivity under the failure to obtain

tentative approval provision because, unlike in the failure to market provision, there is an

exception in the failure to obtain tentative approval provision that essentially stops the clock.

That provision provides that a forfeiture event occurs when "[t]he first applicant fails to obtain

tentative approval of the application within 30 months after the date on which the application is

filed, unless the failure is caused by a change in or a review of the requirements for approval of

the application imposed after the date on which the application is filed." 21 U.S.C.

§ 355(j)(5)(D)(i)(IV) (emphasis added). In this case, Cobalt itself submitted the citizen petition that caused FDA to delay approving any acarbose ANDAs so FDA could consider the appropriate methodology for establishing bioequivalence for acarbose products. FDA concluded that Cobalt's failure to obtain tentative approval within 30 months was caused, in part, by a change in bioequivalence requirements.[12]

FDA did conclude, however, that Cobalt forfeited its exclusivity under the failure to market provisions because there is no exception for delays leading to forfeiture under those forfeiture provisions, regardless of who "caused" the delay. Cobalt nonetheless argues that because FDA concluded that the delay in obtaining tentative approval did not cause Cobalt to forfeit its exclusivity under one provision while the delay in obtaining final approval did cause Cobalt to forfeit its exclusivity under a different provision, FDA's decision is "arbitrary, capricious, and unlawful." Pl. TRO Mem. at 21. Cobalt is mistaken. There is no language in the statute that marries the forfeiture provisions in the manner argued by Cobalt. FDA was simply abiding by the plain language of the statute – a delay that does not result in forfeiture under 21

---

[12] As noted in FDA's forfeiture response letter, this forfeiture provision does not "permit either FDA or an ANDA applicant to comb through the ANDA review records and decide whether, had the review been conducted differently, the application could have received an approval or tentative approval before the forfeiture occurred. The review order for the very large number of ANDAs, amendments, and supplements is established through internal policies and established practice. In 2007, for example, with a total staff of approximately 210, FDA's Office of Generic Drugs (OGD) issued approval, tentative approval, not approvable, or refuse to receive letters on 1,893 ANDAs, in addition to approving or not approving 3,429 chemistry supplements. OGD does not give preferential treatment to ANDAs that are eligible for 180-day exclusivity and are, therefore, subject to the potential forfeiture of that exclusivity. To do so would draw scarce resources away from the review of other applications that may, for example, have been submitted earlier and have been waiting longer in the review queue. FDA Forfeiture Resp. at 11, n.18.

18

U.S.C. § 355(j)(5)(D)(i)(IV) may very well result in forfeiture under 21 U.S.C.

§ 355(j)(5)(D)(i)(I).  Despite Cobalt's numerous arguments to the contrary, because the plain

language of statute controls here, Cobalt must overcome a very high burden to show to that a

different reading is appropriate.  See, e.g., Nat'l Public Radio, Inc. v. FCC, 254 F.3d 226, 230

(D.C. Cir. 2001) (plaintiff's "burden in rebutting the presumption created by clear language is

onerous").

      Cobalt also takes issue with FDA's determination of the date on which Bayer withdrew

the information on the '769 patent.  Pl. TRO Mem. at 24-26.  The specific statutory provision

reads: "The patent information submitted under subsection (b) or (c) is withdrawn by the holder

of the application approved under subsection (b) [i.e., Bayer, the NDA holder]."  21 U.S.C.

§ 355(j)(5)(D)(i)(I)(bb)(CC).  By letter dated April 16, 2007, Bayer requested that FDA delist the

'769 patent from the Orange Book, which is the only way an NDA holder can "withdraw" patent

information.  It would be impossible for Bayer to actually remove the patent from the Orange

Book – as Cobalt well knows – because the Orange Book is a listing that FDA is statutorily

required to maintain.  Cobalt contends that there is a "significant and material distinction"

between a patent that is "withdrawn by the holder of the application" and a "mere 'request for

patent listing' such as Bayer made" in this case.  Pl. TRO Mem. at 24.  However, Cobalt does not

– because it cannot – explain how these two things differ or offer any authority for its argument.

Thus, FDA's conclusion that a request to withdraw the patent constitutes a withdrawal of the

patent information by the NDA holder within the meaning of the FDCA, 21 U.S.C.

§ 355(j)(5)(D)(i)(I)(bb)(CC), is the only logical reading of that provision.

      Cobalt notes that as of the date it filed its TRO, the '769 remained listed in the Orange

Book.  See Pl. TRO Mem. at 14.  As FDA explained, however,

> The publication of the request for patent delisting in the Orange Book was accompanied by an annotation reading "Patent number 4904769 listed on all products of NDA 20482 Precose (Acarbose) was requested to be delisted by the sponsor on 4/16/2007.  This patent has remained listed because, under section 505(j)(5)(D)(i) of the Act, a first applicant may retain eligibility for 180-day exclusivity based on a paragraph IV certification to this patent for a certain period."  Because immediate removal of patent information from the Orange Book upon withdrawal of the patent information by the NDA holder could result in ANDA applicants withdrawing corresponding patent certifications prematurely and thus undermining a first applicant's exclusivity, FDA will leave information related to withdrawn patents in the Orange Book until it has determined that any related 180-day exclusivity has expired.  In this case, the patent information was retained in the Orange Book until the agency could resolve these complex issues and respond to Cobalt's questions regarding its eligibility for 180-day exclusivity.

FDA Forfeiture Resp. at 7, n.13.  Because FDA left the '769 patent in the Orange Book to assure that Cobalt did not prematurely lose its eligibility for exclusivity, Cobalt's attempt to characterize FDA's actions as a mistake are disingenuous at best.

Cobalt does not, and indeed cannot, cite any support for its argument that 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(CC) requires that the patent no longer appear in the Orange Book listings.  None of the cases that Cobalt claims support its argument that FDA's reading impermissibly leads to a system that can easily be manipulated by an NDA holder discuss the MMA forfeiture provisions, and thus Cobalt's reliance on those cases is misplaced.  See Pl. TRO Mem. at 23-29.  Congress did in fact trigger one piece of one of the forfeiture provisions on actions taken by a NDA holder, to the benefit of the consuming public (who do not have to wait for the lower drug prices brought by generic competition while one generic company enjoys 180 days of exclusivity based on a patent that the patent owner itself has renounced).  Moreover, as

explained in FDA's response letter, even if the forfeiture calculations are done using the date

FDA published the delisting, September 25, 2007, as the date the patent information was

withdrawn by the NDA holder, Cobalt would still have forfeited its exclusivity by failing to

being marketing its product by December 9, 2007.  See FDA Forfeiture Resp. at 8, n.14.

FDA acknowledges that its need to inspect the Australian facility where Cobalt's

bioequivalency studies were conducted lead to a delay in approving Cobalt's ANDA.  That delay

was not, as Cobalt contends, two years or longer, but rather was just over two months.  FDA's

ordinary practice is not to inspect a facility until it has determined that the studies conducted at

that facility are otherwise acceptable to support approval of an ANDA.  See FDA Forfeiture

Resp. at 3.  More importantly, however, the statute does not take into consideration the reason for

the delay in calculating the date which triggers the running of the forfeiture period.  Thus, both

FDA and this Court are compelled to apply the forfeiture provisions by simply calculating the

timing of specific events enumerated in the statute.

Cobalt asserts that under 21 U.S.C. § 355(j)(3)(F), "FDA should not have withheld

Cobalt's approval based upon this inspection [of the Australian facility]."  Pl. TRO Mem. at 22.

The provision cited by Cobalt, however, provides that an approval should not be delayed

"because of the unavailability of information from or action by field personnel unless the

reviewing division determines that a delay is necessary to assure the marketing of a safe and

effective drug." 21 U.S.C. § 355(j)(3)(F) (emphasis added).  Here, the facility Cobalt used to

conduct its bioequivalency studies had never been previously inspected by FDA, and thus an

inspection was necessary to assure the safety and effectiveness of Cobalt's acarbose product.  See

FDA Forfeiture Resp. at 3, n.5.

21

In sum, the plain language of the statute provides that Cobalt has forfeited its 180 days of marketing exclusivity by failing to begin marketing within 75 days of the date on which the innovator, Bayer, withdrew the '769 patent.

      B.     Cobalt Will Not Suffer Irreparable Harm Without Injunctive Relief

Courts insist that only irreparable harm justifies the issuance of a preliminary injunction. "The *sine qua non* of granting any preliminary injunctive relief is a clear and convincing showing of irreparable injury to the plaintiff." Experience Works, Inc. v. Chao, 267 F. Supp. 2d 93, 96 (D.D.C. 2003). Because Cobalt is not likely to succeed on the merits, Cobalt "would have to make a very substantial showing of severe irreparable injury" to prevail on its motion. Nat'l Pharm. Alliance v. Henney, 47 F. Supp. 2d 37, 41 (D.D.C. 1999); see also Apotex, Inc. v. FDA, 2006 U.S. Dist. LEXIS 20894, *54 (D.D.C. Apr. 19, 2006). "Irreparabilty of injury is a very high standard." Bristol-Myers, 923 F. Supp at 220. The injury alleged must be certain, great, actual, and imminent, Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985), and it must be "more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff." Mylan (terazosin), 81 F. Supp. 2d at 42 (quoting Gulf Oil Corp. v. Dep't. of Energy, 514 F. Supp. 1019, 1026 (D.D.C. 1981)).

It is well settled that mere economic loss in and of itself does not constitute irreparable harm. Wisconsin Gas, 758 F.2d at 674; Apotex, 2006 U.S. Dist. LEXIS 20894, *53; Mylan (terazosin), 81 F. Supp. 2d at 42; Bristol-Myers, 923 F. Supp. at 220. "Mere injuries, however substantial, in terms of money, time and energy necessarily expended" are inadequate. Wisconsin Gas, 758 F.2d at 674 (quoting Virginia Petroleum Jobbers Ass'n v. FPC, 259 F.2d 921, 925 (D.C. Cir. 1958)); see also Sandoz, Inc. v. FDA, 439 F. Supp. 2d 26, 32 (D.D.C. 2006)

(holding that Sandoz failed to carry its burden of demonstrating irreparable harm because the claimed injury was "merely economic") (internal quotations omitted); Apotex, 2006 U.S. Dist. LEXIS 20894, *54-*57 (same). Even irrecoverable economic loss does not rise to the level of irreparable harm unless the financial injury is "serious in terms of its effect on the plaintiff." Gulf Oil, 514 F. Supp. at 1026; see also Apotex, 2006 U.S. Dist. LEXIS 20894, *54; Experience Works, Inc., 267 F. Supp. 2d at 96 ($21.1 million reduction in funding is serious financial blow, but one frequently faced by other similar entities, and not an economic loss that threatens survival of the business); Sociedad Anonima Viña Santa Rita v. Dep't of Treasury, 193 F. Supp. 2d 6, 14 (D.D.C. 2001) ("financial harm alone cannot constitute irreparable injury unless it threatens the very existence of the movant's business"); Mylan (terazosin), 81 F. Supp. 2d at 42-43.

Notwithstanding this well-established doctrine, mere economic loss is precisely the type of harm that Cobalt alleges it will suffer in the absence of a TRO. See Pl. TRO Mem. at 30-35. In its attempt to demonstrate irreparable harm, Cobalt alleges, in general terms, that "[i]f deprived of exclusivity, Cobalt believes that its profitability and market share will plummet dramatically." Id. at 31. Cobalt's alleged "profitability" loss would not cause its business to collapse, let alone have a severe detrimental impact. Allegations of lost sales and a lost opportunity to gain certain market advantages are a far cry from the required demonstration of a "serious" and "irretrievable" loss that "would significantly damage its business above and beyond a simple diminution in profits." Mylan Pharm. Inc. v. Thompson, 139 F. Supp. 2d 1, 27 (D.D.C. 2001), rev'd on other grounds, 268 F.3d 1323 (Fed. Cir. 2001); Mylan (terazosin), 81 F. Supp. 2d at 42. Cobalt has failed to even allege, much less demonstrate, that its alleged smaller

market position would result in economic injury "sufficiently large in proportion to [its] operations that the loss of the amount of money involved would also cause extreme hardship to [its] business, or even threaten destruction of [its] business." Gulf Oil, 514 F. Supp. at 1025. Thus, the alleged loss of potential sales that may result from competition with other generic versions of acarbose do not constitute irreparable harm. See Amtote Int'l, Inc. v. PNGI Charles Town Gamming LLP, 998 F. Supp. 674, 678 (N.D. W. Va. 1998) (citing Wisconsin Gas, 758 F.2d at 674) ("Such extraordinary circumstances have been found to exist if the denial of injunctive relief would likely cause the business to collapse."); see also Varicon Int'l v. Office of Personnel Mgmt., 934 F. Supp. 440, 447-48 (D.D.C. 1996) (finding no irreparable harm due to lost contract where movant's revenue would decline by 10%); TGS Tech., Inc. v. United States, Civ. No. 92-0062, 1992 U.S. Dist. LEXIS 195, at *10 (D.D.C. Jan. 14, 1992) (finding no irreparable harm where lost contract constituted 20% of movant's business).

The cases that Cobalt claims support its contention that the loss of exclusivity alone suffices to show irreparable harm actually belie this argument. Pl. TRO Mem. at 32. In Mova, for example, the district court granted a preliminary injunction both because Mova would be harmed by the loss of its exclusivity and because "Mova's small size put it at a particular disadvantage." Mova, 140 F.3d at 1066 n.6. The D.C. Circuit affirmed, noting that both of those factors sufficed to show a "severe economic impact to Mova." Id.; see also Bracco Diagnostics v. Shalala, 963 F. Supp. 20, 28-29 (D.D.C. 1997) (finding that FDA's disparate treatment of plaintiff and its competitor's products during the approval process, as well as plaintiff not being the first approved, demonstrated irreparable harm). Furthermore, this is not a case in which Cobalt is being denied entrance into the market to compete with other generic companies, as in

24

Torpharm, Inc. v. Shalala, 1997 U.S. Dist. LEXIS 21983, *13-*15 (D.D.C. Sept. 15, 1997).

Rather, Cobalt must simply enter the market at the same time as any other company with an approved acarbose ANDA.

Nor does the likelihood that Cobalt's alleged money damages may not be recovered from the government translate into irreparable harm. This court has held that "the injury must be more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff. Under this standard, it is apparent that [plaintiff] will not suffer irreparable harm even if the monetary loss is irretrievable." Gulf Oil Corp. v. Dep't of Energy, 514 F. Supp. 1019, 1025 (D.D.C. 1981); see also Sandoz, 439 F. Supp. 2d at 31-32 (same). Cobalt's claim of being unable to collect lost revenue from FDA simply does not suffice to establish irreparable harm.

Because Cobalt has not shown that it will suffer an irretrievable loss that would significantly damage its business, its allegations fall well short of the showing necessary to support a finding of irreparable injury.

C.     The Requested Relief Will Not Serve The Public

Finally, Cobalt has also failed to show that any potential harm to its interests in the absence of injunctive relief outweighs the potential harm to other parties, or that the entry of the relief it seeks would further the public interest – the third and fourth requirements for preliminary injunctive relief. Although FDA has no commercial stake in the outcome of this litigation, FDA is the government agency charged with implementing the statutory scheme governing exclusivity and the approval of generic drugs. As such, FDA's interest coincides with the public interest. See Serono Labs. Inc. v. Shalala, 158 F.3d 1313, 1326 (D.C. Cir. 1998); Mylan (terazosin), 81 F. Supp. 2d at 44-45.

In enacting the Hatch-Waxman Amendments, "Congress sought to get generic drugs into the hands of patients at reasonable prices – fast." In re Barr Labs., Inc., 930 F.2d 72, 76 (D.C. Cir. 2006). Moreover, "the public has a well-recognized interest in receiving generic competition to brand-name drugs as soon as possible, and a delay in the marketing of [the generic] drug could easily be against the public interest in reduced prices." Apotex Inc. v. FDA, 508 F. Supp. 2d 78, 88 (D.D.C. 2007). Giving Cobalt 180 days of exclusivity after Cobalt forfeited its exclusivity by failing to being marketing its product within 75 days of the NDA-holder withdrawing the '769 patent from the Orange Book unnecessarily delays competition for generic acarbose for at least 180 days. This harms both Roxane, the other generic drug manufacturer with an ANDA that is ready for approval and the public, who benefit from competition by lower generic drug prices.

As explained above, FDA's interest and the public's interest are the same. See Serono, 158 F.3d at 1326 (determining that the public interest is "inextricably linked" to Congress's purpose in passing the Hatch-Waxman Amendments). FDA must implement the statutory scheme governing exclusivity determinations and the approval of generic drugs. For the reasons stated above, FDA has concluded that Cobalt forfeited its exclusivity under the plain language of the statute, 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb), and that in vitro studies properly establish bioequivalence. Because Cobalt has failed to establish that it has any rights at issue that are being threatened, public interest "would be better served by denying [Cobalt's] motion." Boehringer Ingelheim Corp. v. Shalala, 993 F. Supp. 1, 3 (D.D.C. 1997).

## CONCLUSION

For the foregoing reasons, Cobalt's motion for a temporary restraining order should be denied.

Of Counsel:                                    Respectfully submitted,

JAMES C. STANSEL                               GREGORY G. KATSAS
Acting General Counsel                         Acting Assistant Attorney General

GERALD F. MASOUDI                              C. FREDERICK BECKNER III
Associate General Counsel                      Deputy Assistant Attorney General
Food and Drug Division
                                               EUGENE M. THIROLF
ERIC M. BLUMBERG                               Director
Deputy Chief Counsel, Litigation

SHOSHANA HUTCHINSON
Associate Chief Counsel, Litigation            _____
U.S. Dept. of Health & Human Services          GERALD C. KELL
Office of the General Counsel                   Senior Trial Counsel
5600 Fishers Lane, GCF-1                        Office of Consumer Litigation
Rockville, MD  20857                            U.S. Department of Justice
301-827-8579                                    P.O. Box 386
                                               Washington, D.C. 20044
                                               Tel:  202-514-1586
                                               Fax: 202-514-8742
                                               gerald.kell@usdoj.gov

May 9, 2008

# EXHIBIT

# A



6 WEST HUBBARD STREET
SUITE 500
CHICAGO, IL 60610
www.rmmslegal.com

312-527-2157 main phone
312-527-4205 main fax

William A. Rakoczy
312.222.6301 telephone
312.222.6321 facsimile
wrakoczy@rmmslegal.com

Christine J. Siwik
312.222.6304 Direct Phone
312.222.6324 Direct Fax
csiwik@rmmslegal.com

October 24, 2007

Division of Dockets Management
U.S. Food and Drug Administration
Department of Health and Human Services
5630 Fishers Lane, Room 1061
Rockville, MD 20855

## EMERGENCY PETITION FOR STAY OF ACTION

On behalf of Cobalt Laboratories Inc. and Cobalt Pharmaceuticals Inc. ("Cobalt"), the undersigned respectfully submit this petition requesting that the Agency stay approval of any and all subsequent abbreviated new drug applications ("ANDAs") for Acarbose Tablets 25 mg, 50 mg, and 100 mg until after the natural expiration of Cobalt's 180-day exclusivity under 21 U.S.C. § 355(j)(5)(B)(iv), in order to prevent substantial and irreparable harm to Cobalt. *See* 21 C.F.R. § 10.35; 21 U.S.C. § 355. The basis for this petition is set forth below, and in Cobalt's comment, dated October 17, 2007, submitted to the Office of Generic Drugs ("OGD") under reference number OGD #07-1254, which comment is incorporated by reference herein.[1]

As required by 21 C.F.R. § 10.20, we include an original and 4 copies of this emergency petition for stay of agency action.

### A.    Decision Involved And Action Required.

This petition pertains to all subsequent ANDAs for acarbose tablets in any strength, all of which are subject to Cobalt's 180-day exclusivity. FDA must delay approval of all subsequent acarbose ANDAs until the natural expiration of Cobalt's 180-day exclusivity, which remains intact and has not been triggered or otherwise forfeited. Such relief is necessary

---

[1] Cobalt previously and properly submitted this Emergency Petition for Stay of Action as part of its comment, dated October 17, 2007, submitted to OGD under reference number OGD #07-1254. At the express request of OGD, Cobalt is hereby re-submitting its petition to Dockets Management.

2007P- 0414

PSA 1

Division of Dockets Management
U.S. Food and Drug Administration
October 24, 2007
Page 2

to prevent substantial and irreparable harm to Cobalt. *See* 21 C.F.R. § 10.35. Cobalt satisfies the requirements for such a stay.

**B.    Statement Of Grounds.**

**1.    Cobalt Will Suffer Irreparable Injury.**

Cobalt faces imminent substantial and irreparable injury in the absence of a stay. Cobalt indisputably submitted the first ANDA for acarbose tablets in all strengths with a so-called "paragraph IV certification" to the only Orange Book-listed patent for the brand product, Precose® Tablets:  U.S. Patent No. 4,904,769 ("the '769 patent")—for which information remains listed in the Orange Book, as it lawfully must. As such, Cobalt is the "first applicant" entitled by statute to the critical 180-day generic marketing exclusivity that Congress created as a reward and incentive for undertaking the risk and expense of launching the first challenge to a listed patent. *See* 21 U.S.C. § 355(j)(5)(B)(iv). Cobalt's exclusivity begins to run upon commercial marketing of its ANDA product. Because Cobalt has not yet commercially marketed its product, Cobalt's exclusivity remains intact and has not been triggered. Nor, for the reasons stated in Cobalt's comment submitted to OGD under reference number OGD #07-1254, has Cobalt otherwise forfeited its exclusivity. Accordingly, all subsequent paragraph IV acarbose ANDAs remain subject to, and cannot be approved prior to the expiration of, Cobalt's exclusivity. Any attempt by FDA to approve a subsequent ANDA in the face of Cobalt's exclusivity would be arbitrary, capricious, an abuse of discretion and contrary to law, in violation of both the Federal Food, Drug, and Cosmetic Act and the Administrative Procedure Act.

Unless a stay is granted, subsequent applicants may attempt to circumvent Cobalt's exclusivity rights and seek immediate approval based on an unlawful interpretation and application of one or more of the forfeiture provisions added to Hatch-Waxman by the 2003 Medicare Prescription Drug, Improvement, and Modernization Act, Pub. L. No. 108-173, 117 Stat. 2066 (2003). Thus, Cobalt could lose its exclusivity rights, and with those rights, the reward that Congress intended for challenging the '769 patent. In fact, it is Cobalt's understanding that a subsequent applicant may be seeking approval imminently, despite Cobalt's exclusivity. The only way to prevent this irreparable harm is through a stay.

**2.    Cobalt's Case Is Not Frivolous And Is Being Pursued In Good Faith.**

Cobalt's case is not frivolous, and it is being pursued in good faith. Under the controlling statute, FDA must enforce Cobalt's exclusivity rights, which have not been triggered or forfeited.

Division of Dockets Management
U.S. Food and Drug Administration
October 24, 2007
Page 3

### 3.   Cobalt Has Demonstrated Sound Public Policy Grounds Supporting The Stay.

Congress designed Hatch-Waxman "to get generic drugs into the hands of patients at reasonable prices--fast." *In re Barr Labs.*, 930 F.2d 72, 76 (D.C. Cir. 1991).   To achieve that goal, Congress created the ANDA approval procedure.   *See* 21 U.S.C. § 355(j)(2)(A).   Congress also recognized that the only way for a generic company to market before patent expiration is to challenge the validity or scope of that patent in court.   Such challenges are both risky and expensive.   Congress, therefore, created the 180-day generic exclusivity period to "encourage generic drug makers to incur the potentially substantial litigation costs associated with challenging pioneer drug makers' patents . . . ." *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 33 (D.D.C. 2000); *see also Teva Pharms. USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324, 1328 (Fed. Cir. 2005) (stating that 21 U.S.C. § 355(j)(5)(B)(iv) "provides an economic incentive for generic manufacturers to challenge the validity of listed patents and to 'design around' patents to find alternative, non-infringing forms of patented drugs"), *abrogated on other grounds by MedImmune, Inc. v. Genentech, Inc.*, 127 S. Ct. 764 (2007); *Apotex, Inc. v. Shalala*, 53 F. Supp. 2d 454, 461 (D.D.C. 1999) (noting that the "purpose of the exclusivity incentive and the entire ANDA regime is to make available more low cost generic drugs"); 64 Fed. Reg. 42873, 42877 (Aug. 6, 1999) (acknowledging that the 180-day period is "the incentive created by Congress for ANDA applicants to challenge patents").

Here, Cobalt accepted the *quid pro quo* that Congress created with the exclusivity incentive and filed the first ANDA with a paragraph IV certification challenging the '769 patent. As a reward, Congress intended that Cobalt reap the benefits of 180-day generic market exclusivity.   Sound public policy requires FDA to safeguard that exclusivity and to preclude others from circumventing it based on unlawful interpretations of the forfeiture provisions.

### 4.   The Delay Resulting From The Stay Is Not Outweighed By Public Health Or Other Public Interests.

"[T]he public's interest in the 'faithful application of the laws' outweigh[s] its interest in immediate access to [a competing] generic product." *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998).   This is particularly true where, as here, the statutory scheme provides for a delay in approval of other ANDAs as an incentive to encourage the patent challenges necessary to bring lower-priced generic drugs to market quickly.   The public interest therefore strongly supports a stay. Moreover, a temporary stay will not harm others or the public.   There are no currently approved acarbose ANDAs.   Subsequent applicants cannot claim harm from staying an approval to which they were never statutorily entitled in the first place.

### C.   Conclusion.

Cobalt is statutorily entitled to the 180-day exclusivity for all strengths of acarbose tablets.   No triggering or forfeiture event has occurred with respect to that exclusivity.

Division of Dockets Management
U.S. Food and Drug Administration
October 24, 2007
Page 4


FDA therefore must delay approval of all subsequent acarbose ANDAs until the expiration of Cobalt's exclusivity.[2]

Respectfully submitted,

RAKOCZY MOLINO MAZZOCHI SIWIK LLP

William A. Rakoczy

Christine J. Siwik

*Counsel for Cobalt Laboratories Inc. and Cobalt Pharmaceuticals Inc.*

cc (via e-mail):    Dawn Beto, *Cobalt Laboratories Inc.*
Gary Buehler, Director, *OGD*
Elizabeth Dickinson, *Office of Chief Counsel*
Bob West, *OGD*
David Read, *OGD*

---

[2] Because this petition "relates solely to the timing of the approval of an application pursuant to [21 U.S.C. § 355]( j)(5)(B)(iv)," this petition for emergency stay is exempt from the requirements found in 21 U.S.C. § 355(q). 21 U.S.C. § 355(q)(4)(A).

# EXHIBIT

# B



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Food and Drug Administration
Rockville, MD 20857

William A. Rakoczy, Esq.
Rakoczy, Molino, Mazzochi & Siwik, LLP
6 West Hubbard St.
Suite 500
Chicago, IL 60610

Dear Mr. Rakoczy:

This letter addresses the eligibility of Cobalt Pharmaceuticals, Inc. (Cobalt) for 180-day exclusivity for acarbose tablets, for which it has submitted abbreviated new drug application (ANDA) No. 77-532. We are responding to issues raised in submissions to the Food and Drug Administration (FDA) from Cobalt and others (see attached listing) regarding the applicability to this ANDA of the exclusivity and forfeiture provisions in section 505(j) of the Federal Food, Drug, and Cosmetic Act (FDCA or Act).[1]  The statutory provisions at issue were enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (the MMA), Pub. L. 108-173, 117 Stat. 2066 (Dec. 8, 2003).

After considering the facts and applicable law, we have concluded that Cobalt was eligible for 180-day exclusivity for acarbose tablets as a first applicant, but for the reason described below, has forfeited that eligibility. Because no applicant is eligible for 180-day exclusivity, FDA may approve any ANDA for acarbose tablets that is otherwise eligible for approval.

    I.      Factual Background

          A.      Bayer's New Drug Application for Precose

Precose 25-mg and 50-mg tablets were approved on September 6, 1995. The 100-mg strength of Precose tablets was approved on May 29, 1997. Bayer submitted U.S. Patent No. 4,904,769 (the '769 patent) to FDA for listing in FDA's *Approved Drug Products with Therapeutic Equivalence Evaluations* (the Orange Book) for all strengths of Precose tablets. On April 16, 2007, Bayer requested that the '769 patent be delisted from the Orange Book.[2]  On September 25, 2007, FDA published the request for delisting in the Orange Book.

---

[1] You have requested that FDA explain Cobalt's eligibility for 180-day exclusivity and the application of the forfeiture provisions to its ANDA. As we have previously stated, it is FDA's practice to make decisions on eligibility for 180-day exclusivity in the context of specific ANDAs that are otherwise eligible for approval. This approach is necessary because of the many factors that may influence eligibility for exclusivity up to the time an application is ready for approval (e.g., patent expiration, patent delisting, failure to obtain a tentative approval within 30 months, withdrawal of ANDA) and could thus render a premature eligibility determination incorrect. When the agency makes an approval decision with respect to an ANDA, it will inform an applicant affected by exclusivity that, for example, it is (1) a first applicant and entitled to exclusivity, (2) a first applicant that has forfeited its exclusivity, (3) eligible only for a tentative approval because one or more first applicants are eligible for 180-day exclusivity, or (4) eligible for approval because a first applicant has forfeited its exclusivity. Today, FDA is approving ANDAs held by Cobalt and by Roxane Laboratories, Inc. (Roxane) for acarbose tablets; therefore, we are explaining our conclusions regarding 180-day exclusivity for these products.

[2] By letter dated April 11, 2007, to FDA's Drug Information Service Branch, Cobalt raised questions regarding the patent information that was published in the Orange Book for Precose. Pursuant to 21 CFR 314.53(f), Cobalt

## B.    Cobalt's Abbreviated New Drug Application for Acarbose Tablets

Cobalt's ANDA was initially stamped as received by the FDA document room on January 14,
2005. FDA reviewed the application to determine whether it was sufficiently complete to permit
a substantive review, as described under 21 CFR 314.101(b). On March 9, 2005, FDA refused to
receive Cobalt's ANDA for several reasons, which were enumerated in a letter to the company.
On March 22, 2005, FDA received Cobalt's response to the refusal to receive letter, and the
ANDA was found acceptable for filing, with a receipt date of March 22, 2005. The Cobalt
ANDA contained a paragraph IV certification to the '769 patent, which is the only patent at issue
in this matter. Cobalt was the first applicant to submit an ANDA referencing Precose that
contained a paragraph IV certification to a patent listed for that drug. Cobalt provided notice of
its paragraph IV certification to the NDA holder and patent owner, as required. No patent
infringement action was initiated by the NDA holder or patent owner within the 45-day period
following receipt of Cobalt's notice of paragraph IV certification. On October 17, 2007, Cobalt
brought a declaratory judgment action against the patent owner and NDA holder (*Cobalt*
*Pharmaceuticals Inc. v. Bayer Aktiengesellschaft*, No. 07CV5875 (N.D. Ill. filed Oct. 17, 2007)).
The court granted Cobalt's notice of voluntary dismissal, without prejudice, on February 20,
2008.[3]

Cobalt's ANDA contained in vivo bioequivalence studies, which had been conducted before
Cobalt received FDA's bioequivalence recommendations.[4] The bioequivalence
recommendations for acarbose were sent by FDA to Cobalt on January 6, 2005, and contained
information related to both in vivo and in vitro methodologies. The bioequivalence data Cobalt
submitted with its ANDA were deficient. Over the course of its consideration of Cobalt's
ANDA, the agency sent Cobalt a number of letters describing deficiencies in the application.
Cobalt responded to these deficiencies. The last step of the application review involved

---

disputed the accuracy of the Precose patent information and requested that FDA require the New Drug Application
(NDA) holder (Bayer) to correct the patent information to reflect the grant of a patent term extension to the '769
patent which extended the patent expiration date from February 27, 2007, to September 6, 2009. On April 12, 2007,
FDA's Office of Drug Information forwarded a redacted copy of Cobalt's correspondence to Bayer and requested a
prompt response. On April 16, 2007, Bayer informed FDA that the assignee of interest of the '769 patent, Bayer
Healthcare AG, had filed a statutory disclaimer under 35 U.S.C. 253, disclaiming all issued claims of the '769
patent, and that the filed disclaimer had been published by the USPTO on February 27, 2007. Bayer further stated
that "[i]n view of this disclaimer, the NDA-holder Bayer Pharmaceuticals Corporation hereby requests that the '769
patent be de-listed from the Orange Book."

[3] We note that Cobalt initiated its declaratory judgment action regarding the '769 patent well after the PTO had
published the disclaimer to all claims of the '769 patent by its assignee and on the same day that it submitted its first
comment to the docket established by FDA on September 26, 2007, regarding certain legal/regulatory issues that
pertain to generic drug applications for acarbose tablets.

[4] On September 5, 2003, Cobalt had written to the Office of Generic Drugs (OGD) seeking guidance on the
development of bioequivalence criteria for acarbose tablets. Acarbose is a non-systemically absorbed
oligosaccharide that reversibly inhibits α-glucosidases. Its mechanism of action is not by means of systemic
absorption, rather its antihyperglycemic action is by means of enzyme inhibition in the intestines. Conventional
bioequivalence criteria for systemically absorbed products therefore would not apply to acarbose. Because of these
factors, and due to other priorities, OGD did not provide bioequivalence guidance for acarbose until January 6,
2005. ANDA applicants are not required to await product-specific guidance from FDA before they begin their
bioequivalence studies; however, the information provided in such guidance may be useful to the applicant and
prevent the need for additional studies should those conducted by the applicant not be acceptable for establishing
bioequivalence.

inspection of the Australian facility used by Cobalt to conduct the bioequivalence studies, which had not previously been inspected and which FDA did not plan to inspect until it had determined that the studies conducted at the facility were otherwise acceptable to support approval of the ANDA. On December 11, 2007, after conducting an off-site data audit, FDA determined that the Australian facility used by Cobalt was acceptable.[5]

On October 24, 2007, Cobalt submitted an "Emergency Petition for Stay of Action" requesting that FDA stay approval of any subsequent ANDAs for acarbose tablets until Cobalt's 180-day exclusivity expires (Docket 2007P-0414).[6] Sixteen days later, on November 9, 2007, Cobalt submitted a Citizen Petition and another Emergency Petition for Stay of Action challenging as inadequate and inappropriate the in vitro bioequivalence recommendations FDA had provided to Cobalt in January 2005, and requesting that agency stay approvals of all ANDAs until they contain adequate in vivo bioequivalence data (Docket 2007P-0448).[7] These November 2007 petitions appear to have been based on the assumption that other ANDA applicants had chosen to conduct in vitro bioequivalence studies, rather than in vivo bioequivalence studies such as those conducted by Cobalt.

The issues raised in Cobalt's petition triggered a reassessment of appropriate in vitro and in vitro bioequivalence methodologies for acarbose tablets. This assessment was conducted by staff from the Office of Generic Drugs and from the Office of Clinical Pharmacology with input from the Division of Metabolism and Endocrine Products. While it reviewed the question whether the methods used by Cobalt and other applicants were adequate to establish bioequivalence for acarbose, FDA delayed approval of the acarbose ANDAs. FDA determined, as required by section 505(q) of the Act, that such a delay was necessary to protect the public health. The agency has completed its review of the bioequivalence issues, and is responding to your petitions on that issue in a separate letter. Because both in vitro and in vivo methods may be appropriate for establishing bioequivalence for acarbose products, FDA may approve Cobalt's ANDA and ANDAs containing appropriate in vitro bioequivalence data.

## II.    Abbreviated New Drug Applications and 180-day Exclusivity

Under the Drug Price Competition and Patent Term Restoration Act of 1984 (Hatch-Waxman Amendments), an NDA applicant must submit information for each patent that claims the drug or method of using the drug that is the subject of the NDA and for which "a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the

---

[5] OGD requests an inspection of clinical facilities or analytical laboratories conducting BE studies included in an unapproved ANDA if there is a question about the quality or integrity of the data submitted in an ANDA; or if a clinical facility or analytical testing site is identified in the ANDA that has no inspection history, was classified "official action indicated" on its last inspection, or has not been inspected within the past 3 years; or a clinical facility and/or analytical laboratory is performing a non-conventional BE study for which it has never been inspected (e.g., a study using pharmacodynamic endpoints to assess bioequivalence). The inspection of the Australian facility was necessitated by the fact that it had no inspection history as well as the non-conventional nature of the BE study.

[6] The docket number was changed to FDA-2007-P-0249 as a result of FDA's transition to its new docketing system (Regulations.gov) in January 2008.

[7] The docket number was changed to FDA-2007-P-0418 as a result of FDA's transition to its new docketing system (Regulations.gov) in January 2008.

3

manufacture, use, or sale of the drug" (sections 505(b)(1) and (c)(2) of the Act). FDA publishes this patent information in the Orange Book.

An applicant must include in its ANDA one of the following certifications with respect to each patent for the listed drug it references:

> (I) that such patent information has not been filed (a paragraph I certification),
>
> (II) that such patent has expired (a paragraph II certification),
>
> (III) of the date on which such patent will expire (a paragraph III certification), or
>
> (IV) that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted (a paragraph IV certification).

Section 505(j)(2)(A)(vii).[8]  See also 21 CFR 314.94(a)(12)(i)(A). An applicant submitting a paragraph IV certification to a listed patent must provide the NDA holder and the patent owner notice of its patent certification, including a description of the legal and factual basis for its assertion that the patent is invalid or not infringed (section 505(j)(2)(B) of the Act). If the NDA holder or patent owner initiates a patent infringement action against the ANDA applicant within 45 days of receiving the required notice, approval of the ANDA generally will be stayed for 30 months from the date of the notice or such shorter or longer time as the court might order (section 505(j)(5)(B)(iii) of the Act).

The MMA exclusivity provisions, like those in the Hatch-Waxman Amendments, provide the first applicant(s) to submit a paragraph IV certification challenging a patent — and thus undertake the risk of litigation — an incentive in the form of the opportunity to be the only generic drug manufacturer to compete with the innovator for a 180-day period. The requirements for obtaining and retaining this 180-day exclusivity period are described at sections 505(j)(5)(B)(iv) and 505(j)(5)(D) of the Act.

Section 505(j)(5)(D) describes a significant new feature of 180-day exclusivity under the MMA in the form of a set of conditions under which an ANDA applicant loses — or forfeits — eligibility for 180-day exclusivity. These are the provisions at issue in this matter.

      A.     Cobalt's Eligibility for 180-day Exclusivity

Cobalt's ANDA 77-532 was the first ANDA that contained a paragraph IV certification to a listed patent for Precose. Because this ANDA was submitted after December 8, 2003, 180-day exclusivity for ANDAs referencing Precose is governed by section 505(j)(5)(D) of the FDCA, as amended by Title XI of the MMA (*see* section 1102(b) of the MMA). FDA has not yet promulgated regulations implementing these new statutory provisions; until it does so, it will regulate directly from the statute in determining whether ANDA applicants are entitled to exclusivity.

---

[8]  The Act provides only one circumstance in which an ANDA applicant need not certify to a listed patent: "if with respect to the listed drug referred to in clause (i) information was filed under subsection (b) or (c) of this section for a method of use patent which does not claim a use for which the applicant is seeking approval under this subsection," the applicant can submit "a statement that the method of use patent does not claim such a use" (referred to as a "section viii statement") (section 505(j)(2)(A)(viii); see also 21 CFR 314.94(a)(12)(iv)).

The MMA established a new set of forfeiture events under which an applicant previously eligible for 180-day exclusivity could lose that eligibility. These provisions are quite complex and, because of the value of 180-day exclusivity, are of substantial interest to regulated industry. In recognition of this interest, and to obtain the benefit of comment from interested parties on the interpretation and application of the new provisions in specific factual settings, we are establishing public dockets to receive comments on certain MMA issues. Because of the complex regulatory issues related to Cobalt's eligibility for exclusivity, we solicited comments on the matter from acarbose ANDA applicants and established a public docket to receive comments from other interested persons.[9] In considering the applicability of the MMA forfeiture and exclusivity provisions to the acarbose ANDAs, we have considered the views of Cobalt and the other parties submitting comments.

### B.    Forfeiture of Exclusivity

After considering the Cobalt ANDA in light of the MMA forfeiture provisions, we have determined that ANDA 77-532 for acarbose tablets is no longer eligible for 180-day exclusivity. The Act provides that the 180-day exclusivity period described in section 505(j)(5)(B)(iv) "shall be forfeited by a first applicant if a forfeiture event occurs with respect to that first applicant" (section 505(j)(5)(D)(ii) of the Act). Cobalt has forfeited its exclusivity because a forfeiture event as to the '769 patent has occurred under section 505(j)(5)(D)(i)(I) of the Act ("Failure to Market"). We also have analyzed forfeiture of Cobalt's exclusivity under section 505(j)(5)(D)(i)(IV) of the Act ("Failure to Obtain Tentative Approval"). This letter discusses the application of each provision in turn.

### 1.    Cobalt has Forfeited Exclusivity for Failure to Market

Under section 505(j)(5)(D)(i)(I) of the Act, a forfeiture event arises whenever any of the following occurs:

(I) FAILURE TO MARKET .--The first applicant fails to market the drug by the later of--
   (aa)    the earlier of the date that is--
      (AA)    75 days after the date on which the approval of the application of the first applicant is made effective under subparagraph (B)(iii); or
      (BB)    30 months after the date of submission of the application of the first applicant; or
   (bb)    with respect to the first applicant or any other applicant (which other applicant has received tentative approval), the date that is 75 days after the date as of which, as to each of the patents with respect to which the first applicant submitted and lawfully maintained a certification qualifying the

---

[9] Comments were initially submitted to OGD in response to OGD's correspondence # 07-1254 of September 26, 2007 (attached), which had solicited comment on legal and regulatory issues. The public docket was assigned docket number 2007N-0417. The docket number was changed to FDA-2007-N-0445 as a result of FDA's transition to its new docketing system (Regulations.gov) in January 2008. FDA has used a similar process to solicit comments on exclusivity issues related to granisitron hydrochloride injection (Docket 2007N-0389) and ramipril capsules (Docket 2007N-0382).

> first applicant for the 180-day exclusivity period under subparagraph
> (B)(iv), at least 1 of the following has occurred:
>
> (AA) In an infringement action brought against that applicant with
> respect to the patent or in a declaratory judgment action brought by
> that applicant with respect to the patent, a court enters a final
> decision from which no appeal (other than a petition to the
> Supreme Court for a writ of certiorari) has been or can be taken
> that the patent is invalid or not infringed.
>
> (BB) In an infringement action or a declaratory judgment action
> described in subitem (AA), a court signs a settlement order or
> consent decree that enters a final judgment that includes a finding
> that the patent is invalid or not infringed.
>
> (CC) The patent information submitted under subsection (b) or (c) is
> withdrawn by the holder of the application approved under
> subsection (b).

Section 505(j)(5)(D)(i)(I).

Application of these forfeiture provisions requires a series of analyses based on the timing of specific events. The statute directs that a forfeiture event occurs when the first applicant fails to market the drug by the later of two dates. One of these dates is calculated under item (aa) by determining the earlier of a date that is either 75 days after the first applicant's ANDA is approved (subitem (AA)) or 30 months after the date of submission of the first applicant's ANDA (subitem (BB)).[10] Cobalt's ANDA is being approved on May 7, 2008; the 75 day period would expire on July 21, 2008. Cobalt submitted a substantially complete ANDA containing a paragraph IV certification on March 22, 2005; 30 months from that was September 22, 2007. September 22, 2007 is earlier than July 21, 2008. Therefore, September 22, 2007, controls for the analysis of item (aa).

The statute directs that we look to the later of the dates under items(aa) and (bb) of section 505(j)(5)(D)(i)(I). Item (bb) states that the occurrence of at least one of the enumerated events as to a first applicant or any other applicant[11] will begin a 75-day period leading to possible

---

[10] Section 505(j)(5)(D)(i)(I)(aa)(BB) states that the 30-month period should be calculated from the date of "the submission of the application of the first applicant." In applying the MMA 180-day exclusivity provisions, FDA considers the date an ANDA containing a paragraph IV certification is submitted to be the date the ANDA is "received" pursuant to 21 CFR 314.101(b). Both this regulation, and the definition of "first applicant" at section 505(j)(5)(B)(iv)(II)(bb) of the Act, require that the ANDA containing the paragraph IV certification be substantially complete, meaning it is sufficiently complete to permit a substantive review. When an ANDA containing a paragraph IV certification is determined, upon review, to have been substantially complete as of the day it was submitted to FDA, it will be deemed to have been received as of the date it was submitted (i.e., date-stamped by the appropriate FDA mail-room). When OGD sends the applicant a refusal to receive letter describing the additional information that must be submitted to render an ANDA substantially complete, the ANDA is deemed received on the day the information necessary to find the application substantially complete was submitted.

[11] Item (bb) looks to the occurrence of any of the enumerated events "with respect to the first applicant or any other applicant (which other applicant has received tentative approval)." This language reasonably anticipates that a first applicant will not forfeit its exclusivity unless another applicant has met the technical and substantive requirements for approval of its ANDA. There are, however, applications not eligible for tentative approval (i.e., because there are no unexpired patents, 30-month stay, or exclusivity) that may otherwise be ready for final approval. As to these applications — for which there are no barriers to marketing but the first applicant's eligibility for 180-day

6

forfeiture of exclusivity. These events include, very generally, when a court enters a final decision that the patent is invalid or not infringed, a court signs a settlement order or consent decree entering final judgment that includes a finding that the patent is invalid or not infringed, or the patent information for the listed drug is withdrawn by the NDA holder. To date, no action for infringement of the '769 patent has been brought against Cobalt or any subsequent applicant. As noted in the background on Cobalt's ANDA above, on October 17, 2007, Cobalt filed an action for declaratory judgment of non-infringement and invalidity of the '769 patent. This case has been voluntarily dismissed without prejudice. No court has entered a final judgment of invalidity or non-infringement, and no court has signed a settlement order or consent decree entering final judgment of invalidity or non-infringement. Therefore, neither of the litigation-related events factor into the forfeiture analysis. In this case, the relevant event under section 505(j)(5)(D)(i)(I)(bb) of the Act is that the NDA holder for Precose requested on April 16, 2007, that the '769 patent be delisted from the Orange Book. This triggered the start of the 75-day period under section 505(j)(5)(D)(i)(I)(bb)(CC) of the Act, which begins when the patent information submitted to the agency is withdrawn by the holder of the NDA.

On April 16, 2007, FDA received a letter from Bayer Pharmaceuticals Corporation advising the Agency that all issued claims of the '796 patent had been disclaimed by the patent assignee of interest.[12] Accordingly, Bayer requested that the '796 patent be delisted from the Orange Book for the Precose NDA 20-482. The request for patent delisting was noted in the Orange Book on September 25, 2007.[13] Under section 505(j)(5)(D)(i)(I)(bb) of the Act, the applicable date for calculating whether a failure to market forfeiture event has occurred is 75 days after the patent information is withdrawn by the NDA holder. In this case, the date that is 75 days after the NDA holder withdrew the information on the '796 patent, i.e., April 16, 2007, was June 30, 2007.

Forfeiture under section 505(j)(5)(D)(i)(I) of the Act occurs if a first applicant fails to market by the later of the dates under item (aa) or (bb). The September 22, 2007, date under section 505(j)(5)(D)(i)(I)(aa) is the later date, therefore it is the date that controls. Cobalt forfeited its

---

exclusivity — forfeiture of a first applicant's exclusivity will have the effect of permitting immediate approval and marketing of generic products. Therefore, in applying section 505(j)(5)(D)(i)(I), the agency will look both to whether there are other applicants that have received tentative approval and whether there are other applicants that have met the requirements for approval under section 505(j) and would be eligible for final approval with the forfeiture of the first applicant's exclusivity. We note, for example, that Roxane's ANDA for acarbose was not eligible for tentative approval on the basis of a 30-month stay or (upon withdrawal of the '769 patent) an unexpired patent blocking final approval.

[12] See footnote 2.

[13] The publication of the request for patent delisting in the Orange Book was accompanied by an annotation reading "Patent number 4904769 listed on all products of NDA 20482 Precose (Acarbose) was requested to be delisted by the sponsor on 4/16/2007. This patent has remained listed because, under section 505(j)(5)(D)(i) of the Act, a first applicant may retain eligibility for 180-day exclusivity based on a paragraph IV certification to this patent for a certain period." Because immediate removal of patent information from the Orange Book upon withdrawal of the patent information by the NDA holder could result in ANDA applicants withdrawing corresponding patent certifications prematurely and thus undermining a first applicant's exclusivity, FDA will leave information related to withdrawn patents in the Orange Book until it has determined that any related 180-day exclusivity has expired. In this case, the patent information was retained in the Orange Book until the agency could resolve these complex issues and respond to Cobalt's questions regarding its eligibility for 180-day exclusivity. We interpret the NDA holder's request for patent delisting to constitute withdrawal of the patent information under section 505(j)(5)(D)(i)(I)(bb)(CC) of the Act.

180-day exclusivity on September 22, 2007, because it did not begin to market its acarbose product by that date.[14]

We have considered and rejected the argument made in comments to FDA's docket that eligibility for 180-day exclusivity following the NDA holder's voluntary withdrawal of its patent should be governed not by the MMA forfeiture provisions, but by the rule established in *Ranbaxy Labs., Ltd. v. Leavitt*, 469 F.3d 120 (D.C. Cir. 2006). *Ranbaxy* held that FDA may not condition the delisting of a patent on the existence of patent litigation, and thus deprive an ANDA applicant that had submitted the first ANDA to contain a paragraph IV certification of a period of marketing exclusivity for which it would otherwise be eligible (see 469 F.3d at 125-26). These comments argue that the forfeiture event described in section 505(j)(5)(D)(i)(I)(bb)(CC) of the Act applies only if the withdrawal of a patent is pursuant to the process described at section 505(j)(5)(C)(ii) of the Act. Section 505(j)(5)(C)(ii) contemplates that, as a result of a counterclaim by the ANDA applicant in patent infringement litigation, a court may issue an order requiring that patent information be corrected or deleted. Only in that situation, the argument goes, would the withdrawal of patent information trigger the statutory forfeiture provision.

We do not find this argument persuasive. First, the Ranbaxy court noted that the decisions rendered by the FDA and the district court had been made pursuant to the Act "as it stood before the MMA and, because the MMA was not made retroactive ... this decision is also geared to the Act pre-MMA" (469 F.3d at 122). Therefore, the court did not purport to render a decision on patent delisting and exclusivity under the MMA. The effect of patent delisting on eligibility for 180-day exclusivity is expressly addressed by the plain language of section 505(j)(5)(D)(i)(I) of the Act. We agree with the comment that, if a patent were withdrawn by the NDA holder as a result of a counterclaim by an ANDA applicant, a first applicant's continued eligibility for 180-day exclusivity would be governed by section 505(j)(5)(D)(i)(I); however, the scope of the patent delisting forfeiture provision is much broader. Section 505(j)(5)(D)(i)(I)(bb)(CC) applies to more than just those patents withdrawn as a result of a counterclaim; on its face, it applies when "[t]he patent information ... is withdrawn by the holder of the [NDA]." Therefore, FDA reads the plain language of 505(j)(5)(D)(i)(I)(bb)(CC) to apply whenever a patent is withdrawn (or requested to be "delisted") by the NDA holder.

That section 505(j)(5)(D)(i)(I)(bb) of the Act is broadly applicable to all patent withdrawals is apparent from the text of the provision. Unlike subitems (AA) and (BB) of section 505(j)(5)(D)(i)(I)(bb), which begin with "[i]n an infringement action ...," and thus anticipate events occurring in the context of litigation, subitem (CC) contains no prefatory language suggesting that it applies only in the context of infringement litigation. Moreover, subitem (CC) does not refer to section 505(j)(5)(C)(ii) of the Act, i.e., the counterclaim provision, nor does section 505(j)(5)(C)(ii) refer to subitem (CC). Because subitem (CC) is not limited by its terms

---

[14] Even if FDA were to calculate the forfeiture event under section 505(j)(5)(D)(i)(I)(bb) of the Act from the date the delisting of the '796 patent information was published (which we do not believe is supported by the statutory language), Cobalt would still forfeit exclusivity. If the agency were to use the September 25, 2007, publication date as the date the patent was withdrawn, the date that is 75 days later is December 9, 2007. This date under item (bb) is later than the September 22, 2007 date under item (aa); therefore the later date as between items (aa) and (bb) would be December 9, 2007. Cobalt did not market its acarbose product by December 9, 2007, so even under this analysis, it has forfeited 180-day exclusivity.

to a particular context in which the patent withdrawal occurs, it applies whenever an NDA holder withdraws a patent.

In addition to being consistent with the plain language of section 505(j)(5)(D)(i)(I) of the Act, there are a number of additional considerations that support the application of the statutory forfeiture provisions whenever a patent is withdrawn by the NDA holder. The forfeiture provisions are structured such that, even if a patent is withdrawn as a direct result of an ANDA applicant's counterclaim seeking such withdrawal, the first applicant will have only the period contemplated under the appropriate "failure to market" period of section 505(j)(5)(D)(i)(I) within which to begin commercial marketing and use its exclusivity. Given this time-limited period of eligibility for exclusivity even when the patent delisting is a direct result of an ANDA applicant's efforts, it would make little sense to provide a potentially longer period of eligibility for exclusivity (i.e., until the first applicant's exclusivity has been triggered and run or the patent expires) when the NDA holder withdraws the patent voluntarily or for reasons unrelated to an ANDA applicant's counterclaim in patent litigation (e.g., because of a decision by the patent owner or NDA holder that the patent does not claim the approved drug product or its use, or as part of an FTC settlement). Therefore, FDA sees no basis for applying the forfeiture provision of 505(j)(5)(D)(i)(I) only in cases when a patent is withdrawn pursuant to an ANDA applicant's counterclaim in a patent infringement case.

<div style="text-align:center">

2.      Cobalt has not Forfeited under the Failure to Obtain Tentative
        Approval Forfeiture Provision

</div>

The MMA also established that an ANDA applicant forfeits exclusivity if it fails to obtain a tentative approval within a given period of time. Under this provision, a forfeiture event occurs when:

> [t]he first applicant fails to obtain tentative approval of the application within 30 months after the date on which the application is filed, unless the failure is caused by a change in or a review of the requirements for approval of the application imposed after the date on which the application is filed.

section 505(j)(5)(D)(i)(IV).

A "first applicant" is "an applicant that, on the first day on which a substantially complete application containing a [paragraph IV certification] is submitted for approval of a drug, submits a substantially complete application that contains and lawfully maintains a [paragraph IV certification]" (section 505(j)(5)(B)(iv)(II)(bb) of the Act). The term "tentative approval" means notification to an applicant by FDA that an ANDA "meets the requirements of [505(j)(2)(A)], but cannot receive effective approval because there is [a patent or period of exclusivity protecting the listed drug]" (section 505(j)(5)(B)(iv)(II)(dd) of the Act).

To calculate the start of the 30-month period under this forfeiture provision, it is reasonable to use the date that qualifies the applicant as a first applicant for 180-day exclusivity purposes: the date the ANDA is sufficiently complete to permit a substantive review.[15] A first applicant's

---

[15] We note that, in contrast, the failure to market provision at section 505(j)(5)(D)(i)(I)(aa)(BB) of the Act calculates the 30-month period from the date of "submission," rather than the date the application is "filed." The exclusivity

<div style="text-align:center">9</div>

ANDA must be a "substantially complete application" (section 505(j)(5)(B)(iv)(II)(bb)). A "substantially complete application" is an application that "on its face is sufficiently complete to permit substantive review and contains all the information required by [section 505(j)(2)(A)]" (section 505(j)(5)(B)(iv)(II)(cc)). The first applicant's submission of an ANDA that is determined to be sufficiently complete to permit review establishes eligibility for the benefits of 180-day exclusivity, and carries with it the requirement that — to maintain that eligibility — the first applicant must work diligently to obtain a tentative approval before the 30-month period expires.

Cobalt's ANDA was sufficiently complete to permit review and was received[16] on March 22, 2005. Therefore, the date that would be used to calculate both whether Cobalt was a first applicant for 180-day exclusivity purposes and the date from which the 30-month forfeiture period would begin to run is March 22, 2005, as that is the date upon which the ANDA both contained a paragraph IV certification and was determined to be substantially complete. The 30-month period began on March 22, 2005, and ended on September 22, 2007. Cobalt had not received either a tentative approval or an approval as of that date.

The failure to obtain tentative approval provision requires that an applicant obtain a tentative approval within 30 months after the date on which the application is filed, unless that failure is "caused by a change in or a review of the requirements for approval of the application imposed after the date on which the application is filed" (section 505(j)(5)(D)(i)(IV)). Congress has recently clarified this provision in the FDA Amendments Act, Pub. L. 110-85, 121 Stat. 823 (Sept. 27, 2007) (FDAAA), in which it provided that for an applicant eligible for 180-day exclusivity (such as Cobalt), if "approval of the application was delayed because of a petition, the 30-month period under such subsection is deemed to be extended by a period of time equal to the period beginning on the date on which the Secretary received the petition and ending on the date of final agency action on the petition (inclusive of such beginning and ending dates) .…" (section 505(q)(1)(G) of the Act).[17] We note that no petition related to acarbose was submitted until November 9, 2007, when Cobalt itself submitted a citizen petition and petition for stay regarding the appropriate methodology for establishing bioequivalence for acarbose products.

---

provisions appear to use the terms "submit" and "file" interchangeably; there is no evidence that Congress intended a difference in meaning between these latter two terms. Because both terms are used in the context of "first applicant" status, we will interpret the terms to refer to the time that the agency has determined ANDA to be sufficiently complete to permit substantive review. If we interpreted the term "submission" in this context to mean the date the ANDA is date-stamped by FDA, regardless of whether the application is found to have been reviewable, an applicant whose ANDA cannot be reviewed without the submission of additional information would find its failure to market period under section 505(j)(5)(D)(i)(I)(aa)(BB) to have begun to run even before the agency could begin a substantive review of the application.

[16] FDA's regulations use the term "filed" in the context of the processing and review of new drug applications (NDAs); in the context of ANDAs, FDA uses the term "received" or "received for substantive review" to refer to the action described in the Act as filing (see 21 CFR 314.101).

[17] FDAAA further clarifies that section 505(j)(5)(D)(i)(IV) gives a first applicant 30 months in which to obtain either tentative approval or approval. Section 505(q)(1)(G) of the Act, added by FDAAA, provides that as to a first applicant's ANDA, if *"approval"* of the application was delayed because of a petition, the 30-month period under such subsection [section 505(j)(5)(D)(i)(IV)] is deemed to be extended by a period of time equal to the period beginning on the date on which the Secretary received the petition and ending on the date of final agency action on the petition …" (emphasis added). Thus, section 505(j)(5)(D)(i)(IV) also applies when the first applicant is eligible for a final approval, but not for a tentative approval. The absence of patent or exclusivity protection that would necessitate a tentative — rather than final — approval, does not exempt a first applicant from the requirement that it show that its application meets the scientific and technical requirements of 505(j) within 30 months of filing.

After reviewing Cobalt's ANDA, we have concluded that a change in bioequivalence requirements resulted in a delay in obtaining a tentative approval.[18] Cobalt's failure to obtain a tentative approval within 30 months was caused — in part — by the agency's change in or review of the bioequivalence requirements; specifically, by a change in the reference listed drug[19] against which Cobalt was to conduct its bioequivalence study. Orange Book Preface at x-xi. Throughout the relevant period, FDA identified the 100-mg strength tablet in the Orange Book as the drug product to be used in a bioequivalence study. Cobalt initially conducted its bioequivalence study using that strength of the drug, but was informed by FDA on August 8, 2006, that its in vivo bioequivalence using the 100 mg strength was not acceptable. After further study by Cobalt, it relied upon a different strength of acarbose tablets for its in vivo bioequivalence study. This change in requirements for bioequivalence data necessitated a longer review of the Cobalt ANDA.[20] Therefore, because FDA changed the requirements for the bioequivalence study, Cobalt did not forfeit its exclusivity pursuant to section 505(j)(5)(D)(i)(IV) of the Act.

3.      The 30-Month Periods in Sections 505(j)(5)(D)(i)(I) and (IV) do not Begin to Run with Receipt of the First Applicant's Notice Letter

You assert that FDA must interpret the two 30-month periods described in the MMA forfeiture provisions as beginning not from the date the application is submitted or filed, but rather from the date the NDA holder and patent owner receive the first applicant's notice of paragraph IV certification. Cobalt's argues that this reading alone is consistent with congressional intent. We disagree. As we have stated elsewhere in this response, although there is some ambiguity created by the use of the term "submission" in section 505(j)(5)(D)(i)(I)(aa)(BB) and "filed" in section 505(j)(5)(D)(i)(IV) to identify what appears to have been intended to be the same event, that ambiguity can be easily resolved in a manner that is both consistent with the agency's use of these terms in the review of ANDAs and with the statutory scheme. You ask that we forgo this reading — one that reasonably reconciles the provisions — in favor of an interpretation entirely unmoored from statutory language. Congress, you assert, did not intend the 30-month periods to run from the date the first applicant's application is complete and FDA may begin its review; rather you would have it begin possibly months later, with receipt of notice of a paragraph IV certification.

---

[18] Under section 505(j)(5)(D)(i)(IV), exclusivity is forfeited "unless" there has been a review of or change in requirements that has delayed approval or tentative approval of the ANDA. The statute does not permit either FDA or an ANDA applicant to comb through the ANDA review records and decide whether, had the review been conducted differently, the application could have received an approval or tentative approval before the forfeiture occurred. The review order for the very large number of ANDAs, amendments, and supplements is established through internal policies and established practice. In 2007, for example, with a total staff of approximately 210, OGD issued approval, tentative approval, not approvable, or refuse to receive letters on 1,893 ANDAs, in addition to approving or not approving 3,429 chemistry supplements. OGD does not give preferential treatment to ANDAs that are eligible for 180-day exclusivity and are, therefore, subject to the potential forfeiture of that exclusivity. To do so would draw scarce resources away from the review of other applications that may, for example, have been submitted earlier and have been waiting longer in the review queue.

[19] A reference listed drug (RLD) means the listed drug identified by FDA as the drug product upon which an applicant relies in seeking approval of its abbreviated application (see 21 CFR 314.3(b)).

[20] Applicants who waited to conduct their bioequivalence studies until they had received FDA's recommendations used a methodology that permitted use of the 100 mg RLD identified in the Orange Book.

You are correct that the 30-month stay period in section 505(j)(5)(B)(iii) begins with the receipt of notice of a paragraph IV certification; however, there is nothing in the statutory language or the way the stay of approval and forfeiture provisions interrelate that necessitates the significant divergence from the statutory text that you suggest. When Congress intended to measure events from the receipt of notice of paragraph IV certification, it specifically said so. Section 505(j)(5)(B)(iii) of the Act states that if a patent infringement action is initiated within the 45-day period following notice of a paragraph IV certification "the approval shall be made effective upon the expiration of the thirty-month period beginning on the date of the receipt of the notice provided under paragraph (2)(B)(i) or such shorter or longer period as the court may order...." Moreover, the result of interpreting the statute as written, i.e., possibly different dates for termination of the 30-month stay and the running of a forfeiture period, are not absurd, as is suggested by Cobalt.

### III.    Conclusion

After consideration of the Cobalt ANDA, the applicable law, and the comprehensive and thoughtful comments submitted by interested parties, we have concluded that Cobalt was eligible for 180-day exclusivity for the '769 patent, but that exclusivity was forfeited under the failure to market forfeiture provisions at section 505(j)(5)(D)(i)(I) of the Act. Because Cobalt has forfeited 180-day exclusivity, FDA may approve any ANDA for acarbose tablets that is otherwise ready to be approved.

Sincerely,

Gary Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research

Attachments

cc:    Docket No. FDA-2007-P-0249
       Docket No. FDA-2007-N-0445

12

## **Correspondence on 180-Day Exclusivity Issues for Acarbose Tablets**

April 11, 2007:  Letter from William Rakoczy to Gary Buehler, Director, Center for Drug Evaluation and Research (CDER) and Sheldon Bradshaw, Associate General Counsel/FDA Chief Counsel.

April 11, 2007:  Letter from William Rakoczy to Drug Information Services Branch and Mary Ann Holovac, Director, Drug Information, CDER.

April 16, 2007:  Letter from Barbara Shimel, Director, Patents & Licensing, Bayer Health Care to Mary Ann Holovac.

June 4, 2007:  Letter from William Rakoczy to Elizabeth Dickinson, Office of Chief Counsel.

September 26, 2007:  Letter from Gary Buehler to ANDA Applicants.

September 28, 2007:  Letter from Elizabeth Ernst, Director, DRA-Multisource Products, Roxane Laboratories, Inc. to Gary Buehler.

October 8, 2007:  Letter from Sean Mahoney, Intellectual Property Counsel, Upsher-Smith Laboratories, Inc. to Cecelia Parise, Office of Generic Drugs.

October 16, 2007:  Letter from Marc Goshko Executive Director, Teva Parenteral Medicines to Gary Buehler.

October 17, 2007:  Letter from William Rakoczy and Christine Siwik to Gary Buehler.

October 17, 2007:  Letter from William Rakoczy and Christine Siwik to Gary Buehler.

October 26, 2007:  Letter from Mark Shaw, Vice-President, Regulatory Affairs and Compliance, Impax Laboratories, Inc. to Gary Buehler.

November 6, 2007:  Letter from William Rakoczy and Christine Siwik to Gary Buehler.

November 13, 2007:  Letter from Brian Malkin, Frommer, Lawrence & Haug LLP to Cecelia Parise, Office of Generic Drugs.

December 3, 2007:  Letter from Mark Shaw to Division of Dockets Management and Gary Buehler.

March 24, 2008:  Letter from William Schultz and Andrew Goldfarb, Zuckerman Spaeder LLP to ANDA 78-470.

(Note: Some of these submissions were made as controlled correspondence to ANDAs that were not approved at the time of submission.  Therefore they were not included in the public dockets.)

14



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Food and Drug Administration
Rockville, MD  20857

**SENT VIA TELEFAX**

Reference Number:  OGD #07-1254

Dear ANDA Applicant:

We are writing to solicit comment on certain legal/regulatory issues that pertain to generic drug applications for Acarbose Tablets.  This letter is being sent to all applicants with pending abbreviated new drug applications (ANDAs) for Acarbose Tablets, and is being posted on FDA's web-site at http://www.fda.gov/cder/ogd/index.htm#New.

The reference listed drug (RLD) for Acarbose Tablets is Precose Tablets, the new drug application (NDA) held by Bayer Pharmaceuticals (Bayer).  There is one patent listed for Acarbose Tablets, U.S. Patent No. 4,904,769 (the '769 patent), which expires on September 6, 2009.  As you probably are aware, for it appears on the "Paragraph IV list" on FDA's website, at least one ANDA for Acarbose Tablets containing a paragraph IV certification was received by the agency on March 22, 2005.  By virtue of this filing, at least one applicant became eligible for 180-day generic drug exclusivity.

As you know, the agency makes determinations regarding 180-day exclusivity only when it is in the position to either approve an application that may be eligible for 180-day exclusivity, or to act on a subsequent applicant's ANDA as to which final approval may be delayed by another application's eligibility for exclusivity.

As of the date of this letter, which is more than 30 months from March 22, 2005, no first applicant's ANDA has been approved.  Also, on April 16, 2007, Bayer requested that the '769 patent be "delisted" as to Precose, i.e., they withdrew the patent information.  On September 26, 2007, FDA indicated in its "Approved Drug Products with Therapeutic Equivalence Evaluations" (the Orange Book), available on FDA's website at http://www.accessdata.fda.gov/scripts/cder/ob/docs/patexclnew.cfm?Appl_No=0204828Product_No=001 &table1=OB_Rx, that the request to delist this patent had been submitted on April 16, 2007.

To determine whether any ANDA referencing Precose is eligible for final approval, the agency must consider how the 180-day generic drug exclusivity forfeiture provisions at section 505(j)(5)(D) of the Federal Food, Drug, and Cosmetic Act (the Act) apply to this set of facts.  As part of the process for making such a determination, we are seeking your views regarding the applicability of sections 505(j)(5)(D)(i)(IV) -- failure to obtain tentative approval within 30 months -- and 505(j)(5)(D)(i)(I)(aa)(BB) -- failure to market by 30 months.  We also are interested in your views regarding the applicability of section 505(j)(5)(D)(i)(I)(bb)(CC) -- relating to the delisting of a patent.

We are asking that you submit your comments to us by close of business on Wednesday, October 10, 2007. Please include the OGD Reference Number listed above in your correspondence.

If you have any questions regarding this correspondence, please contact Cecelia M. Parise, Regulatory Policy Advisor to the Director, Office of Generic Drugs, at 240-276-9310.

Sincerely,

Gary J. Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

/s/
----------------------
Robert L. West
9/26/2007 10:39:25 AM
for Gary Buehler

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

```
 /s/
---------------------
Gary Buehler
5/7/2008 06:11:59 PM
```

# EXHIBIT

# C



6 WEST HUBBARD STREET
SUITE 500
CHICAGO, IL 60610
www.rmmslegal.com

312-527-2157 main phone
312-527-4205 main fax

**William A. Rakoczy**
312.222.6301 telephone
312.222.6321 facsimile
wrakoczy@rmmslegal.com

November 9, 2007

**VIA MESSENGER**

Division of Dockets Management
Food and Drug Administration
Department of Human and Health Services
Room 1061
5630 Fishers Lane
Rockville, MD 20852

### CITIZEN PETITION

On behalf of Cobalt Laboratories Inc. and Cobalt Pharmaceuticals Inc. (collectively, "Cobalt"), the undersigned hereby submits this Citizen Petition, in quadruplicate, pursuant to 21 U.S.C. § 355(j) of the Federal Food, Drug, and Cosmetic Act, as well as 21 C.F.R. § 10.20, § 10.30, and § 320.1 *et seq.*

### A.    *ACTION REQUESTED*

Petitioner Cobalt respectfully requests that the Office of Generic Drugs of the U.S. Food and Drug Administration ("FDA") make the determination that no abbreviated new drug application ("ANDA") submitted under 21 U.S.C. § 355(j) and referencing Bayer's NDA No. 20-482 for Precose® (acarbose) shall be granted final agency approval unless and until such an ANDA contains sufficient evidence data to establish bioequivalency in accordance with 21

2007P-0448                              CP1

Division of Dockets Management
November 9, 2007
Page 2

U.S.C. § 355(j), 21 C.F.R. § 320.21, and 21 C.F.R. § 320.23. Specifically, Petitioner requests

that FDA:

1. require all applicants submitting an ANDA referencing Bayer's NDA No. 20-482 for Precose® (acarbose) to conduct the required *in vivo* bioequivalence tests and studies comparing the proposed generic product to Precose®, the reference listed drug;

2. refrain from granting any *in vivo* bioequivalence waiver for any ANDA referencing Bayer's NDA No. 20-482 for Precose® (acarbose); and

3. require that the results of such tests and studies establish the *in vivo* bioequivalence of any generic Precose® product sufficient to permit final approval of any such ANDA pursuant to 21 U.S.C. § 355(j)(8)(A)(ii) and 21 C.F.R. § 320.21.

## B.    STATEMENT OF GROUNDS

An ANDA applicant must establish, *inter alia*, that its proposed drug product is

"bioequivalent" to the reference listed drug ("RLD"). *See* 21 U.S.C. § 355(j)(2)(A)(iv).[1]

Demonstrating bioequivalence to the RLD referenced in the application is, in fact, critical to

obtaining FDA approval: "A major premise underlying the [Hatch-Waxman Amendments] is

that bioequivalent drug products are therapeutically equivalent, and therefore, interchangeable."

---

[1] A generic drug product is "bioequivalent" when:

(i) the rate and extent of absorption of the drug do not show a significant difference from the rate and extent of absorption of the listed drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses; or

(ii) the extent of absorption of the drug does not show a significant difference from the extent of absorption of the listed drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses and the difference from the listed drug in the rate of absorption of the drug is intentional, is reflected in its proposed labeling, is not essential to the attainment of effective body drug concentrations on chronic use, and is considered medically insignificant for the drug.

21 U.S.C. § 355(j)(8)(B).

Division of Dockets Management
November 9, 2007
Page 3

(FDA, *Approved Drug Products with Therapeutic Equivalence Evaluations*, p. vii (27th ed. 2007)).

I.   **Acarbose ANDA Applicants Cannot Obtain An *In Vivo* Bioequivalence Waiver Under FDA's Regulations.**

In most instances, an ANDA applicant must demonstrate *in vivo* bioequivalence (BE) of its generic product to the RLD. In certain limited instances, an ANDA applicant may request a biowaiver, which eliminates the requirement that an applicant submit evidence demonstrating the *in vivo* bioequivalence of its generic drug product to the RLD. *See* 21 C.F.R. §§ 320.21(b)(2) and 320.22(a). For solid, oral dosage forms, FDA may grant a biowaiver to an ANDA applicant only in the following circumstances:

> FDA shall waive the requirement for the submission of evidence measuring the in vivo bioavailability or demonstrating the in vivo bioequivalence of a solid oral dosage form (other than a delayed release or extended release dosage form) of a drug product determined to be effective for at least one indication in a Drug Efficacy Study Implementation [DESI] notice or which is identical, related, or similar to such a drug product under § 310.6 of this chapter unless FDA has evaluated the drug product under the criteria set forth in § 320.33, included the drug product in the Approved Drug Products with Therapeutic Equivalence Evaluations List, and rated the drug product as having a known or potential bioequivalence problem. A drug product so rated reflects a determination by FDA that an in vivo bioequivalence study is required.

21 C.F.R. § 320.22(c). Precose®, approved in 1995, has not been the subject of a DESI notice, nor is it "identical, related, or similar to such a drug product under [21 C.F.R.] § 310.6." Consequently, this regulation does not provide any legal basis for granting a biowaiver of *in vivo*

Division of Dockets Management
November 9, 2007
Page 4

bioequivalence requirements to an ANDA applicant seeking FDA approval to market a generic

acarbose product.[2]

**II.     Acarbose ANDA Applicants Cannot Obtain A Bioequivalence Waiver Under FDA's**
         ***Guidance For Industry.***

    **A.     Criteria For Receiving A Biowaiver Under FDA's Guidance.**

        FDA has issued a *Guidance for Industry* concerning the waiver of *in vivo*

bioavailability and bioequivalence studies for immediate-release solid oral dosage forms. (*See*

*Guidance for Industry:  Waiver of In Vivo Bioavailability and Bioequivalence Studies for*

*Immediate-Release Solid Oral Dosage Forms Based on a Biopharmaceutics Classification*

*System* (Aug. 2000) ("*Biowaiver Guidance*")). The *Biowaiver Guidance* discusses FDA's

Biopharmaceutics Classification System ("BCS") for immediate-release ("IR") solid oral dosage

form drug products. The BCS groups IR solid oral dosage forms into one of four categories,

based on the aqueous solubility and intestinal permeability of the drug substance:

          Class 1:  High Solubility – High Permeability
          Class 2:  Low Solubility – High Permeability
          Class 3:  High Solubility – Low Permeability
          Class 4:  Low Solubility – Low Permeability

(*Biowaiver Guidance* at 1-2). Additionally, the drug substance is classified as having either

rapid or slow dissolution properties. (*Id.* at 2). If an IR drug substance qualifies as a Class 1

drug substance (*i.e.*, it has high aqueous solubility and high intestinal permeability) and has rapid

dissolution properties, it may be eligible for a biowaiver under 21 C.F.R. § 320.22(e). (*Id.*).

---

[2] The biowaiver provisions of 21 C.F.R. § 320.22(b) do not apply to solid, oral dosage forms. Further, § 320.22(d) permits a biowaiver for different strength products where the specified criteria are satisfied; where an application contains evidence that the drug product is "shown to meet an in vitro test that has been correlated with in vivo data"; or to a reformulated product that contains different color, flavor, or preservatives where the specified criteria are met. 21 C.F.R. § 320.22(d). It thus is inapplicable here.

Division of Dockets Management
November 9, 2007
Page 5

Otherwise, it is not eligible and FDA has no discretion to waive *in vivo* bioequivalence requirements.

The *Biowaiver Guidance* contains standards by which to evaluate and identify the solubility and permeability classification of an IR solid oral dosage form of a drug.

The solubility class boundary is based on the highest dose strength of an IR drug substance. (*Id.*). According to FDA, a drug substance is considered "highly soluble" when "the highest dose strength is soluble in 250 ml or less of aqueous media over the pH range of 1-7.5." (*Id.*; *see also id.* at 3).

The permeability class boundary is based on the extent a drug substance is absorbed in humans. "In the absence of evidence suggesting instability in the gastrointestinal tract," a drug substance is considered "highly permeable" when "the extent of absorption in humans is determined to be 90% or more of an administered dose based on a mass balance determination or in comparison to an intravenous reference dose." (*Id.*; *see also id.* at 4-7). Several different methods can be used to determine the gastric permeability of an IR drug substance under the BCS guidelines. Pharmacokinetic mass balance studies using radiolabeled or unlabeled, stable isotopes of a drug substance "can be used to document the extent of absorption of a drug." (*Id.* at 4). Oral bioavailability studies, using an intravenously-administered reference, also can be used to verify absorption of a drug substance. If pharmacokinetic studies in humans are insufficient, however, additional tests may be used to determine the permeability of a drug substance from the gastrointestinal tract. These include: "(1) in vivo intestinal perfusion studies in humans; (2) in vivo or in situ intestinal perfusion studies using suitable animal models; (3) in vitro permeation studies using excised human or

Division of Dockets Management
November 9, 2007
Page 6

animal intestinal tissues; or (4) in vitro permeation studies across a monolayer of cultured epithelial cells." (*Id.*).

**B.    Acarbose Does Not Satisfy The Criteria For Receiving A Biowaiver Under FDA's Guidance.**

Bayer currently sells acarbose under the trade name Precose® in the United States as 25, 50, and 100 mg tablets. Bayer sells acarbose in Europe under the name Glucobay™ as 50 and 100 mg tablets, and in Canada under the name Prandose® as 50 and 100 mg tablets. The Glucobay™ product monograph contains a more thorough listing of physical and pharmacokinetic data than the prescribing information for Precose® and has been used to evaluate acarbose in view of the *Biowaiver Guidance* and BCS guidelines found therein.

**1.    Scientific Literature On Acarbose.**

Bayer published the most recent product monograph for Glucobay™ in May 2006. The product monograph discloses the action and clinical pharmacology of acarbose, indications and clinical use of acarbose, contraindications thereof, interactions of acarbose with other drugs, adverse reactions of patients to acarbose in clinical studies, dosage and administration of acarbose, pharmaceutical information regarding acarbose, and information for the patient. The product monograph describes acarbose as having solubility in water of approximately 140 g/100 mL at 20° C. (*See* Product Monograph for Glucobay™ (Acarbose Tablets) at 16 (May 30, 2006), Exhibit A hereto). In addition, it states that acarbose is absorbed from an oral dose as 1-2% active drug, while 51% is excreted in the feces as unabsorbed radiolabeled acarbose. (*See id.* at 3). And "89% of the dose was recovered in the urine as active drug within 48 hours" when acarbose was given intravenously. (*Id.* at 4).

Division of Dockets Management
November 9, 2007
Page 7

Several reports have published studies on the pharmacokinetics of acarbose. Comparison of areas under the plasma concentration-time curves ("AUC") after oral administration with those resulting from intravenous administration showed the acarbose from oral dosing has only about 0.6% systemic availability of the unchanged drug as compared to the intravenous dose. (*See* J. Puetter, *Studies on the Pharmacokinetics of Acarbose in Humans*, in ENZYME INHIBITORS 139, 149 (U. Brodbeck ed., 1980), Exhibit B hereto). A later study reported a systemic availability of 1.58% after oral dosage compared to the same dose administered intravenously. (*See* J. Pütter et al., *Pharmacokinetics of acarbose*, in PROCEEDINGS OF FIRST INTERNATIONAL SYMPOSIUM ON ACARBOSE 38, 45 (W. Creutzfeldt ed., 1982), Exhibit C hereto). A summary of pharmacokinetic data was published in 1988. (*See* Stephen P. Clissold & Clive Edwards, *Acarbose: A Preliminary Review of its Pharmacodynamic and Pharmacokinetic Properties, and Therapeutic Potential*, 35 DRUGS 214, 225-26 (1988), Exhibit D hereto).

Additional studies examined the pharmacokinetics (absorption, metabolism, excretion) of acarbose in humans, rats, and dogs via oral and intravenous administration (IV) (intraduodenal administration was also tested in rats) of radiolabeled acarbose. After IV administration, "the radioactivity was excreted renally almost completely (~94% of the dose) in all species investigated." (*See* H.J. Ahr et al., *Pharmacokinetics of Acarbose*, 39 ARZNEIM.-FORSCH./DRUG RES. 1254, 1256 (1989), Exhibit E hereto). After oral administration, the majority of acarbose was excreted in feces (80% in rats and in dogs, 51% in humans), with renal excretion 14.5% in rats, 8% in dogs, and 35% in humans. (*Id.*). In rats who were administered acarbose via the bile duct (intraduodenally), only 15.9% was absorbed as determined by urine excretion analysis. (*Id.* at 1256-57). The amount of unchanged acarbose excreted was 0.3% in

Division of Dockets Management
November 9, 2007
Page 8

rats, 3.4% in dogs, and 1.7% in humans. (*Id.* at 1257). This is indicative of a very low

absorption for unchanged acarbose. (*Id.* at 1257). AUC studies measured from plasma levels

were also undertaken. AUC values for unchanged acarbose after oral administration was only

1.4% that of the value recorded after intravenous administration in healthy male volunteers. (*Id.*

at 1258).

　　　　A later study reported results of mass balance studies with radiolabeled $^{14}$C-

acarbose. "Urinary excretion data suggest[ed] that approximately 35% of a dose was absorbed,"

but most of the radiolabeled carbon was excreted as metabolites. (*See* Julia A. Balfour & Donna

McTavish, *Acarbose: An Update of its Pharmacology and Therapeutic Use in Diabetes

Mellitus*, 46 DRUGS 1025, 1037 (1993), Exhibit F hereto). Moreover, approximately 50% of the

radiolabeled acarbose was recovered in feces. (*Id.*).

　　　　**2.　　Acarbose Does Not Qualify For An *In Vivo* Bioequivalence Waiver.**

　　　　As reported in the product monograph, the solubility of acarbose in water is 140

g/100 mL at 20° C. As 100 mg is a significantly smaller amount than the 140 g capable of

dissolving in 100 mL of water, the highest dose strength of acarbose would dissolve in 250 mL

of water. Therefore, acarbose could possibly meet the description of a "highly soluble drug

substance," as set forth in the *Biowaiver Guidance*. Significantly, however, the mass balance

studies do not establish acarbose as a "high permeability drug," as set forth in the *Biowaiver

Guidance*. Quite the contrary, all available data and information suggests that acarbose is a low,

not high, permeability drug.

　　　　Each of the mass balance studies reported approximately 35% of radiolabeled

carbon collected in urine. This indicates 35% of the total dose was permeable through the

Division of Dockets Management
November 9, 2007
Page 9

intestine, but mostly as metabolites. Further, the same reports recorded about 50% of radiolabeled carbon collected in fecal matter as part of unchanged acarbose. Excretion of the drug substance in feces indicated it never permeated the gastrointestinal tract. Therefore, it is not possible for 90% or more of an acarbose dose to be permeable through the intestine, as required by the *Biowaiver Guidance*. After intravenous administration of a dose of acarbose, 89-94% of the dose was recovered as the active drug in urine. But AUC values after oral administration were only approximately 0.7-2.0% as compared to after intravenous administration. In other words, the mean systemic availability of unchanged acarbose after oral administration is only 0.7-2.0%, far below 90% of the administered dose. These AUC studies further support the conclusion that acarbose is a low permeability drug.

Consequently, as evaluated by the reported scientific data, in view of the BCS guidelines, acarbose is at best a highly soluble, low permeable drug substance. Therefore, acarbose is categorized as a Class 3 drug, rather than a Class 1 drug, rendering it ineligible for a biowaiver of *in vivo* bioequivalence studies. Any ANDA applicant seeking approval of a generic acarbose product therefore must conduct *in vivo* bioequivalence studies, and may not seek or qualify for a biowaiver.[3]

## IV. Conclusion.

For the reasons cited above, Petitioner requests that FDA:

---

[3] An IR drug product is considered "rapidly dissolving" when "no less than 85% of the labeled amount of the drug substance dissolves within 30 minutes, using *U.S. Pharmacopeia* (USP) Apparatus 1 at 100 rpm (or Apparatus II at 50 rpm) in a volume of 900 ml or less in each of the following media: (1) 0.1 N HCl or Simulated Gastric Fluid USP without enzymes; (2) a pH 4.5 buffer; and (3) a pH 6.8 buffer or Simulated Intestinal Fluid USP without enzymes." (*Biowaiver Guidance* at 2-3; *see also id.* at 7-8). The available scientific literature does not establish that acarbose is rapidly dissolving, within *Biowaiver Guidance* definition. Even if acarbose were "rapidly dissolving," it nevertheless is ineligible for a biowaiver because it is a Class 3 drug.

Division of Dockets Management
November 9, 2007
Page 10

1.  require all applicants submitting an ANDA referencing Bayer's NDA No.
    20-482 for Precose® (acarbose) to conduct the required *in vivo*
    bioequivalence tests and studies comparing the proposed generic product
    to Precose®, the reference listed drug;

2.  refrain from granting any bioequivalence waiver for any ANDA
    referencing Bayer's NDA No. 20-482 for Precose® (acarbose); and

3.  require that the results of such tests and studies establish the *in vivo*
    bioequivalence of any generic Precose® product sufficient to permit final
    approval of any such ANDA pursuant to 21 U.S.C. § 355(j)(8)(A)(ii) and
    21 C.F.R. § 320.21.

### C.    ENVIRONMENTAL IMPACT

Under 21 C.F.R. § 25.31(a), this petition qualifies for a categorical exemption
from the requirement to submit an environmental assessment.

### D.    ECONOMIC IMPACT

According to 21 C.F.R. § 10.30(b), economic impact information is to be
submitted only when requested by the Commissioner following review of the petition.

### E.    CERTIFICATION

Pursuant to 21 C.F.R. § 10.30(b), the undersigned certify, that, to the best
knowledge and belief of the undersigned, this petition includes all information and views on
which the petition relies, and that it includes representative data and information known to the
petition that are unfavorable to the petition. Pursuant to 21 U.S.C. § 355(q)(1)(H), I certify that,
to my best knowledge and belief: (a) this petition includes all information and views upon which
the petition relies; (b) this petition includes representative data and/or information known to the
petitioner which are unfavorable to the petition; and (c) I have taken reasonable steps to ensure
that any representative data and/or information which are unfavorable to the petition were

Division of Dockets Management
November 9, 2007
Page 11

disclosed to me. I further certify that the information upon which I have based the action requested herein first became known to the party on whose behalf this petition is submitted on or about the following date: October 2007. If I received or expect to receive payments, including cash and other forms of consideration, to file this information or its contents, I received or expect to receive those payments from the following persons or organizations: Cobalt. I verify under penalty of perjury that the foregoing is true and correct as of the date of the submission of this petition.

Very truly yours,

RAKOCZY MOLINO MAZZOCHI SIWIK LLP

William A. Rakoczy

*Counsel for Cobalt Laboratories Inc. and Cobalt Pharmaceuticals Inc.*

Enclosures
cc:    Dawn Beto, Cobalt Laboratories Inc.

# EXHIBIT

# D



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Food and Drug Administration
Rockville, MD  20857

Strategic Bioscience Corporation
U.S. Agent for Cobalt Pharmaceuticals, Inc.
Attention: James Parker, Ph.D.
93 Birch Hill Road
Stow, MA  01775

<div style="text-align:center">

Re:    Notification of delay of approval
ANDA 77-532

</div>

Dear Dr. Parker:

We are writing regarding your pending abbreviated new drug application (ANDA) referencing
Bayer's NDA No. 20-482 for Precose (acarbose).  As described in greater detail below, we are
notifying you in accordance with 21 U.S.C. 355(q)(1)(B) that, upon reviewing a citizen petition
(Petition) and Petition for Stay of Action (PSA) submitted by Rakoczy, Molino, Mazzochi and
Siwik on behalf of Cobalt Laboratories, Inc. and Cobalt Pharmaceuticals, Inc. (Docket No.
2007P-0448/PSA1) regarding methods for establishing bioequivalence for acarbose products, we
have determined under 21 U.S.C. 355(q)(1)(A) that a delay in the approval of your pending
ANDA is necessary to protect the public health.

## I.    Statutory Background

On September 27, 2007, the Food and Drug Administration Amendments Act of 2007 was
enacted (Public Law 110-85) (FDAAA).  Section 914 of FDAAA amends section 505[1] of the
Federal Food, Drug, and Cosmetic Act (the Act) by adding new subsection (q), which took effect
on the date of enactment.  New subsection 505(q) governs citizen petitions and petitions for stay
of agency action that request that the Food and Drug Administration (FDA) take any form of
action relating to a pending application submitted under section 505(b)(2) or (j) of the Act.[2]

In particular, section 505(q)(1)(A)[3] of the Act provides that FDA may delay approval of a
pending application because of a request to take any form of action relating to the application
submitted in writing pursuant to 21 CFR 10.30 or 10.35 if FDA determines, upon reviewing the
petition, that a delay is necessary to protect the public health.  Under section 505(q)(1)(B) of the
Act,[4] if FDA determines that a delay is necessary with respect to a pending application, FDA
must provide to the applicant, not later than 30 days after making such determination, (1)
notification of the fact that a determination has been made, (2) if applicable, information
regarding any clarification or additional data that the applicant should submit to the docket on

---

[1] 21 U.S.C. 355.

[2] 21 U.S.C. 355(b)(2) or (j).

[3] 21 U.S.C. 355(q)(1)(A).

[4] 21 U.S.C. 355(q)(1)(B).

the petition to allow FDA to review the petition promptly, and (3) a brief summary of the specific substantive issues in the Petition which are the basis for the determination.

## II.     Petition and PSA

Petitioner has submitted a Petition and PSA pursuant to 21 CFR 10.30 and 10.35, respectively, requesting that FDA refuse to approve any ANDA referencing Precose until such ANDA contains sufficient evidence to establish bioequivalence[5] to the reference listed drug. The petitioner specifically requests that FDA 1) require all ANDA applicants to conduct *in vivo* bioequivalence tests, 2) refrain from granting any *in vivo* bioequivalence waivers, and 3) require that results from the bioequivalence studies establish the *in vivo* bioequivalence to Precose sufficient to permit final approval of the ANDA "pursuant to 21 U.S.C. § 355(j)(8)(A)(ii) and 21 C.F.R. § 320.21." Petition at 2. The Petition and PSA were submitted on November 9, 2007 (copies of these submissions are available through the Division of Dockets Management).

## III.    Notification of Delay of Approval, Statement of Substantive Issues, and Request for Information

In response to the Petition and PSA, we are undertaking a review of the methodologies used to show bioequivalence for acarbose products. We have not yet completed our substantive assessment of the merits of the arguments and supporting information contained in the Petition and PSA submitted on behalf of Cobalt. We also have not found that either petition may be summarily denied as described in section 505(q)(1)(E) (which would allow denial of a petition that was submitted with the primary purpose of delaying approval of an ANDA and does not on its face raise valid scientific or regulatory issues). Therefore, the agency must determine whether approval of any acarbose ANDAs pending when the Petition and PSA were submitted must be delayed to protect the public health. To make this determination the agency will consider whether, if the ANDAs were approved before the agency completed the substantive review of the issues in the Petition and PSA, and it turned out on further review that petitioner's arguments against approval were meritorious, the presence on the market of drug products that did not meet the requirements for approval could negatively affect the public health. If, after undertaking this

---

[5] Section 505(j)(8) of the Act (21 U.S.C. 355(j)(8)) provides

(B) A drug shall be considered to be bioequivalent to a listed drug if -

    (i) the rate and extent of absorption of the drug do not show a significant difference from the rate and extent of absorption of the listed drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses; or

    (ii) the extent of absorption of the drug does not show a significant difference from the extent of absorption of the listed drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses and the difference from the listed drug in the rate of absorption of the drug is intentional, is reflected in its proposed labeling, is not essential to the attainment of effective body drug concentrations on chronic use, and is considered medically insignificant for the drug.

(C) For a drug that is not intended to be absorbed into the bloodstream, the Secretary may establish alternative, scientifically valid methods to show bioequivalence if the alternative methods are expected to detect a significant difference between the drug and the listed drug in safety and therapeutic effect.

analysis, we conclude that the public health could be negatively affected, the agency will conclude that a delay "is necessary to protect the public health" and will delay approval of pending acarbose ANDAs.

The Petition and PSA submitted by Cobalt raise issues regarding the acceptable methodology for establishing bioequivalence for acarbose products referencing Bayer's Precose. As described in the Precose labeling,

> Acarbose is a complex oligosaccharide that delays the digestion of ingested carbohydrates, thereby resulting in a smaller rise in blood glucose concentration following meals. As a consequence of plasma glucose reduction, PRECOSE® reduces levels of glycosylated hemoglobin in patients with type 2 diabetes mellitus. Systemic non-enzymatic protein glycosylation, as reflected by levels of glycosylated hemoglobin, is a function of average blood glucose concentration over time.

> ...

> In contrast to sulfonylureas, PRECOSE® does not enhance insulin secretion. The antihyperglycemic action of acarbose results from a competitive, reversible inhibition of pancreatic alpha-amylase and membrane-bound intestinal alpha-glucoside hydrolase enzymes. Pancreatic alpha-amylase hydrolyzes complex starches to oligosaccharides in the lumen of the small intestine, while the membrane-bound intestinal alpha-glucosidases hydrolyze oligosaccharides, trisaccharides, and disaccharides to glucose and other monosaccharides in the brush border of the small intestine. In diabetic patients, this enzyme inhibition results in a delayed glucose absorption and a lowering of postprandial hyperglycemia.

The Petition and PSA specifically challenge an *in vitro* methodology recommended by the Office of Generic Drugs (OGD) to establish bioequivalence for certain acarbose products, which in OGD's judgment would be adequate to establish bioequivalence for certain acarbose products. OGD had provided recommendations to sponsors regarding both *in vitro* and *in vivo* bioequivalence studies.

Sections 505(j)(2)(A)(iv) and (j)(4)[6] of the Act require that an ANDA contain sufficient information to show that the drug proposed in the application is bioequivalent to the listed drug. Sufficient evidence of bioequivalence (i.e., that the rate and extent of absorption of the generic drug do not show a significant difference from the rate and extent of absorption of the listed drug), in addition to other information, is required under the Act to ensure that the findings of safety and effectiveness for the listed drug can be relied upon to approve the drug product described in the ANDA. If, as asserted by the Petitioner, the bioequivalence methodology used by the ANDA applicants is inadequate, the ANDA will not meet the requirements for approval under section 505(j). An ANDA that does not meet the bioequivalence requirements in section 505(j) of the Act does not contain sufficient evidence to ensure that the generic drug is safe and effective.

---

[6] 21 U.S.C. 355(j)(2)(A)(iv) and (j)(4).

3

We therefore have determined under section $505(q)(1)(A)(ii)$[7] of the Act that a delay in the approval or tentative approval of your ANDA is necessary to protect the public health while FDA assesses the merits of the Petition and PSA and reviews the methodologies used by ANDA sponsors to demonstrate bioequivalence for acarbose products to determine whether they are adequate. We are notifying you of our determination in accordance with section $505(q)(1)(B)$ and $(C)$[8] of the Act.

At this time, we are not requesting that you submit any clarification or additional data to the Petition and PSA docket pursuant to section $505(q)(1)(B)(ii)$ of the Act.[9] If you have any information regarding the issues raised in the Petition and PSA that you would like us to consider in our review of the Petition and PSA, please submit the information to the Division of Dockets Management under Docket No. 2007P-0448/CP1 and PSA1.

If you have any questions regarding this letter, please contact Cecelia Parise, Regulatory Policy Advisor to the Director, Office of Generic Drugs, at 240-276-9310.

Sincerely,

Gary J. Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research

---

[7] 21 U.S.C. 355(q)(1)(A)(ii).

[8] 21 U.S.C. 355(q)(1)(B) and (C).

[9] 21 U.S.C. 355(q)(1)(B)(ii).

4

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

/s/
----------------------
Gary Buehler
1/15/2008 03:49:30 PM

# EXHIBIT

# E



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

Food and Drug Administration
Rockville MD 20857

William A. Rakoczy
Rakoczy Molino Mazzochi Siwik, LLP                          MAY    7   2008
6 West Hubbard Street
Suite 500
Chicago, IL 60610

Re: Docket No. FDA-2007-P-0418

Dear Mr. Rakoczy:

This letter responds to your citizen petition (Petition) and petition for stay of action
(PSA), dated November 9, 2007, submitted on behalf of Cobalt Laboratories Inc. and
Cobalt Pharmaceuticals Inc. (Cobalt).[1] The Petition asks the Food and Drug
Administration (FDA or Agency) to (1) require all applicants submitting an abbreviated
new drug application (ANDA) referencing Bayer's new drug application (NDA) 20-482
for Precose (acarbose) to conduct in vivo bioequivalence tests and studies comparing the
proposed generic product to Precose, the reference listed drug (RLD); (2) refrain from
granting any in vivo bioequivalence waiver for any ANDA referencing Bayer's NDA 20-
482 for Precose (acarbose); and (3) require that the results of such tests and studies
establish the in vivo bioequivalence of any generic Precose product sufficient to permit
final approval of any such ANDA pursuant to 21 U.S.C. 355(j)(8)(A)(ii) and 21 CFR
320.21. The PSA requests that FDA stay approval of any ANDA for acarbose tablets,
unless and until such ANDA contains sufficient evidence and data from in vivo
bioequivalence testing. As explained in this response, your Petition is granted in part and
denied in part, and your PSA is denied.[2]

**I.    Background**

**A.    Precose**

Precose (acarbose) tablets (NDA 20-482) were initially approved on September 6, 1995.
Precose is approved as monotherapy as an adjunct to diet to lower blood glucose in
patients with type 2 diabetes mellitus whose hyperglycemia cannot be managed on diet
alone. Precose may also be used in combination with a sulfonylurea when diet plus either
Precose or a sulfonylurea do not result in adequate glycemic control. Also, Precose may
be used in combination with insulin or metformin.

The active ingredient in Precose is acarbose, an oligosaccharide isolated from cultures of
the gram-positive actinobacteria. Acarbose reversibly inhibits α-glucosidases, which are

---

[1] This Petition and PSA were originally assigned docket number 2007P-0448/CP1 & PSA1. The number
was changed to FDA-2007-P-0418 as a result of FDA's transition to its new docketing system
(Regulations.gov) in January 2008.

[2] Today we are approving two ANDAs for generic versions of acarbose, including Cobalt's ANDA.

enzymes responsible for the breakup of starch into simpler sugar molecules. Glucosidases are present in the brush-border on the small intestinal mucosa. Acarbose delays the digestion of ingested carbohydrates, thereby resulting in a smaller rise in blood glucose concentration following meals. As a consequence of plasma glucose reduction, acarbose reduces levels of glycosylated hemoglobin in patients with type 2 diabetes mellitus. In healthy subjects, acarbose is shown to be poorly absorbed, with systemic bioavailability of less than 2 percent (0.5 to 1.7%). Acarbose is metabolized exclusively within the gastrointestinal (GI) tract by intestinal bacteria and digestive enzymes. According to the labeling for Precose, less than 2 percent of the oral dose was recovered in urine, consistent with low bioavailability of the drug. Because acarbose acts locally within the GI tract, this low systemic availability is therapeutically desired.

### B.    Summary of Statutory and Regulatory Basis for ANDA Approval

The Drug Price Competition and Patent Term Restoration Act of 1984 (Public Law 98-417) (the Hatch-Waxman Amendments) created section 505(j) of the Federal Food, Drug, and Cosmetic Act (the Act) (21 U.S.C. 355(j)), which established the current ANDA approval process. To obtain approval, an ANDA applicant is not required to submit evidence to establish the clinical safety and effectiveness of the drug product; instead, an ANDA relies on FDA's previous finding that the RLD[3] is safe and effective. Under the Hatch-Waxman Amendments, to rely on a previous finding of safety and effectiveness, an ANDA applicant must demonstrate, among other things, that its generic drug[4] is bioequivalent to the RLD.[5] In addition, a drug product described in an ANDA generally must contain the same active ingredient,[6] conditions of use,[7] route of administration, dosage form, strength,[8] and (with certain permissible differences) labeling[9] as the RLD, unless a petition for certain changes is approved by the Secretary[10] (section 505(j)(2)(A),

---

[3] A reference listed drug or RLD is "the listed [i.e., approved] drug identified by FDA as the drug product upon which an applicant relies in seeking approval of its abbreviated application" (21 CFR 314.3). RLDs are identified in FDA's *Approved Drug Products With Therapeutic Equivalence Evaluations*, which is generally known as the *Orange Book.*

[4] For purposes of this response, the term *generic drug* refers to new drug products for which approval is sought in an ANDA submitted under section 505(j) of the Act.

[5] See, e.g., section 505(j)(2)(A)(iv) of the Act (requiring "information to show that the new drug is bioequivalent to the listed drug referred to in clause (i) [i.e., listed drug]..."); 21 CFR 314.3 (defining *reference listed drug*); 21 CFR 314.94(a)(7) (requiring, as part of ANDA content and format, information to show that the drug product is bioequivalent to the reference listed drug upon which the applicant relies); 21 CFR 314.127(a)(6)(i)(providing that FDA will refuse to approve an ANDA if information submitted is insufficient to show that the drug product is bioequivalent to the listed drug referred to in the ANDA); and the Orange Book, Introduction at x (defining *reference listed drug*).

[6] See, e.g., 21 CFR 314.94(a)(5).

[7] See, e.g., 21 CFR 314.94(a)(4).

[8] See, e.g., 21 CFR 314.94(a)(6).

[9] See, e.g., 21 CFR 314.94(a)(8).

[10] An applicant may submit an ANDA for a drug that has a different active ingredient, route of administration, dosage form, or strength from the RLD if the applicant has submitted a petition to the

Docket No. 2007-P-0418

(j)(2)(C), and (j)(4) of the Act). Drug products that meet the approval requirements under section 505(j) and are both bioequivalent and pharmaceutically equivalent[11] to the RLD are considered by FDA to be therapeutically equivalent to the RLD. Therapeutically equivalent drugs generally may be substituted for each other with the expectation that the substituted product will produce the same clinical effect and safety profile when used according to the labeling.[12]

The statute, regulations, and case law give FDA and ANDA applicants considerable flexibility in determining how this requirement for establishing bioequivalence can be met. Section 505(j)(8)(B)(i) of the Act states that a generic drug is bioequivalent to the RLD if the following conditions exist:

> . . . the rate and extent of absorption of the drug do not show a significant difference from the rate and extent of absorption of the listed drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses . . . [13]

However, section 505(j)(8)(C) of the Act recognizes that different approaches may apply to locally acting, nonsystemically absorbed drug products. It states the following:

> For a drug that is not intended to be absorbed into the bloodstream, the Secretary may establish alternative scientifically valid methods to show bioequivalence if the alternative methods are expected to detect a significant difference between the drug and the listed drug in safety and therapeutic effect.

FDA's regulations similarly reflect the flexibility that FDA has in choosing the appropriate methods to establish bioequivalence for particular drug products. In 21 CFR 320.1(e), FDA defines bioequivalence (in part) as follows:

> . . . the absence of a significant difference in the rate and extent to which the active ingredient or active moiety . . . becomes available at the site of

---

Agency (known as a *suitability petition*) requesting permission to file such an application and has received the Agency's approval (see section 505(j)(2)(C) of the Act and 21 CFR 314.93).

[11] Pharmaceutically equivalent drug products have the same dosage form and contain the same amounts of the same active drug ingredient and meet the same compendial or other applicable standard of identity, strength, quality, and purity, including potency and, where applicable, content uniformity, disintegration times, and/or dissolution rates. They do not necessarily contain the same inactive ingredients and may also differ in characteristics such as shape, scoring, release mechanism, and, within certain limits, labeling (see 21 CFR 320.1 and the Orange Book, Introduction at p. vii).

[12] See the Orange Book, Introduction at p. vii.

[13] See also 21 CFR 320.1(e) and 320.23(b).

Docket No. 2007-P-0418

> drug action when administered at the same molar dose under similar
> conditions in an appropriately designed study.

Although an ANDA applicant is required to submit "[e]vidence demonstrating that the
drug product that is the subject of the [ANDA] is bioequivalent to the reference listed
drug[,]"[14] the regulations explicitly permit submission of "information to show that the
drug product is bioequivalent to the reference listed drug which would permit FDA to
waive the submission of evidence demonstrating in vivo bioequivalence. . . "[15]

The regulations similarly make clear that although in vivo studies may be the preferred
method to demonstrate bioequivalence in many cases, it is not the only permissible
method. On the contrary, under the regulations, "bioequivalence may be demonstrated
by several in vivo and in vitro methods." The regulations provide the following:

> FDA may require in vivo *or in vitro testing, or both,* to measure the
> bioavailability of a drug product or establish the bioequivalence of specific
> drug products [emphasis added]. . . . The selection of the method used to
> meet an in vivo or in vitro testing requirement depends upon the purpose
> of the study, the analytical methods available, and the nature of the drug
> product. Applicants shall conduct bioavailability and bioequivalence
> testing using the most accurate, sensitive, and reproducible approach
> available among those set forth in paragraph (b) of this section. The
> method used must be capable of measuring bioavailability or establishing
> bioequivalence, as appropriate, for the product being tested.[16]

FDA regulations at 21 CFR 320.24 describe these methods in descending order of
accuracy, sensitivity, and reproducibility. They include (1) in vivo pharmacodynamic
effect studies, (2) clinical trials, (3) in vivo animal studies, and (4) in vitro studies.[17] In
addition, as under section 505(j)(8)(C) of the Act, § 320.24(b)(6) of the regulations states
that FDA has the flexibility to use "[a]ny other approach deemed adequate by FDA to . . .
establish bioequivalence." Similarly, the waiver provisions of the regulations provide
that waivers of in vivo bioequivalence may be given in many specific situations and, even
if none of those situations are present, in vivo bioequivalence may be waived "for good
cause . . . if waiver is compatible with the protection of the public health."[18]

Ultimately, under the statute and regulations, the choice of study design is based on the
ability of the design to compare the drug delivered by the two products at the particular
site of action of the drug. The courts that have considered FDA's bioequivalence
methodologies have also consistently upheld FDA's scientific discretion in this regard

---

[14] 21 CFR 320.21(b)(1).

[15] 21 CFR 320.21(b)(2).

[16] 21 CFR 320.24(a).

[17] 21 CFR 320.24.

[18] 21 CFR 320.22(e).

4

Docket No. 2007-P-0418

(see, e.g., *Schering Corp. v. FDA*, 51 F.3d 390 at 397-400 (3rd Cir. 1995); *Fisons Corp. v. Shalala*, 860 F. Supp. 859 (D.D.C. 1994); *Bristol Myers Squibb Co. v. Shalala*, 923 F. Supp. 212 (D.D.C. 1996)). As the *Bristol Myers Squibb* court noted, FDA has been given "the discretion to determine whether in vitro, or in vivo bioequivalence studies, or both, are required for the approval of generic drugs under the abbreviated application process" (*id.* at 217). Thus, bioequivalence for different types of drug products can be shown in different ways.

For absorbed and systemically acting drug products, the rate and extent of systemic absorption is usually the most sensitive, accurate, and reliable indicator of the rate and extent to which the active ingredient becomes available at the site of drug action. The determination of bioequivalence of drug products whose primary mechanism of action depends on systemic absorption, therefore, usually rests on a pharmacokinetic comparison of drug and/or metabolite concentrations in an accessible biologic fluid, such as blood, after administration of a single dose of each drug product to healthy volunteers.

For locally acting, nonsystemically absorbed or low bioavailability oral drug products, such as acarbose, however, a traditional in vivo bioequivalence study comparing rate and extent of absorption of the active ingredient into the bloodstream would be of limited utility. Instead, other designs would be preferable to determine the rate at which a locally acting, nonsystemically absorbed drug product becomes available at the site of drug action. For such drugs, a showing that the active ingredient or therapeutic ingredient in the proposed generic drug reaches the site of action at a rate and extent that is not significantly different from that of the RLD, along with satisfaction of the other requirements for ANDA approval, may permit FDA to conclude that the proposed generic drug can be expected to behave the same way in the body as the RLD.

## II.   Discussion

You request that FDA require all applicants submitting an ANDA referencing Bayer's NDA 20-482 for Precose (acarbose) to conduct in vivo bioequivalence tests and studies comparing the proposed generic product to Precose and to refrain from granting any such ANDA an in vivo bioequivalence waiver. You also ask the Agency to require that the results of such tests and studies establish the in vivo bioequivalence of any generic Precose product sufficient to permit final approval of any such ANDA pursuant to section 505(j)(8)(A)(ii) and § 320.21.

### A.   Permissibility of In Vitro Bioequivalence Testing

In making your case for FDA to require in vivo bioequivalence tests for all ANDA applicants referencing Precose and to refrain from granting any biowaivers, you suggest that there are only two potential bases to grant a waiver for acarbose and assert that both would be inappropriate for FDA to use in this case. The first theory is that FDA is waiving in vivo bioequivalence under 21 CFR 320.22(c). This regulation permits a waiver of in vivo bioequivalence testing for (1) certain drug products that were determined to be effective in a Drug Efficacy Study Implementation (DESI) notice or (2)

Docket No. 2007-P-0418

a drug product that is identical, related, or similar to such a DESI drug. You argue that acarbose was never the subject of a DESI notice and is not identical, related, or similar to a DESI drug (Petition at 3-4).

Your second theory is that FDA is waiving in vivo bioequivalence under the Biopharmaceutics Classification System (BCS). FDA's guidance for industry on *Waiver of In Vivo Bioavailability and Bioequivalence Studies for Immediate-Release Solid Oral Dosage Forms Based on a Biopharmaceutics Classification System* (BCS Guidance)[19] provides recommendations for requesting a waiver of in vivo bioavailability and bioequivalence studies for systemically acting solid oral dosage forms. In the case of ANDAs, the BCS Guidance recommends that applicants obtain biowaivers for Class 1 substances (i.e., rapidly dissolving, immediate-release test products containing highly soluble and highly permeable drug substances), provided that the reference listed drug product is also rapidly dissolving and the test product exhibits similar dissolution profiles to the reference listed drug product. You theorize that we consider acarbose to be a Class 1 drug substance, and we would grant a biowaiver on this basis. You then assert that acarbose does not meet the qualifications for a BCS biowaiver because it is a Class 3 substance (high solubility and low permeability) under the BCS Guidance (Petition at 8-9).

We have not relied on either of your two asserted theories, yet we have nonetheless concluded that in vitro studies are appropriate to establish bioequivalence for acarbose under certain circumstances. Acarbose was not a DESI product (or a similar or related product) and we do not consider it to be a Class 1 drug substance. Rather, we consider it to be a Class 3 drug substance. However, the BCS Guidance does not address the bioequivalence criteria for drugs that do not act systemically (i.e., do not act following absorption into the bloodstream).[20] Therefore, its status as a Class 3 drug substance is not dispositive. You claim that FDA has no discretion to waive in vivo bioequivalence for any reason other than your two asserted theories. We disagree. Under section 355(j)(8)(C) of the Act and § 320.24 of the regulations, FDA has the discretion to accept in vitro studies for a nonsystemically absorbed drug product such as acarbose when such studies are determined to be a scientifically valid method of determining bioequivalence (see, e.g., *Bristol-Myers Squibb Co.,* 923 F. Supp. 212 (D.D.C. 1996)).[21]

---

[19] Available on the Internet at http://www.fda.gov/cder/guidance/index.htm.

[20] For a systemically acting drug, high solubility and high permeability results in the drug's complete absorption and high bioavailability at the site of action. Thus for systemically acting drugs, the BCS Guidance identifies highly soluble, highly permeable drugs as Class 1 and appropriate for biowaiver. However, for drugs that act locally in the GI tract, such as acarbose, it is the poor permeability that generally assures no loss of bioavailability due to absorption. For this reason, these drugs may be appropriate for in vitro testing under certain circumstances, even though they are not Class 1 drugs as described in the BCS Guidance.

[21] Even if a waiver of in vivo bioequivalence is required before we can accept in vitro studies, as described in section II.B of this response, for certain acarbose drug products such a waiver is compatible with the public health under 21 CFR 320.22(e) and therefore permissible and appropriate.

Docket No. 2007-P-0418

After receiving your Petition and considering all of the submissions in the petition docket, FDA carefully examined all of our recommendations for demonstrating bioequivalence for a generic acarbose and Precose. Although you established bioequivalence for your generic acarbose tablets using in vivo bioequivalence testing, we do not believe that such in vivo testing is required. Given that the drug product acts locally in the GI tract and is not systemically absorbed, we believe that the appropriate criteria for establishing bioequivalence for acarbose may be in vitro testing or in vivo testing with a pharmacodynamic endpoint, depending on the similarity of the formulations of the test and reference products. In the case of a generic acarbose with active and inactive ingredients that are qualitatively and quantitatively the same as Precose, we recommend in vitro, rather than in vivo, testing for establishing bioequivalence.

### B.    Appropriate Circumstances for In Vivo or In Vitro Bioequivalence Testing

We find that in vitro testing is an appropriate means of demonstrating bioequivalence between a generic acarbose and Precose under certain circumstances. Specifically, for evaluating the bioequivalence of generic acarbose oral tablets, FDA recommends either in vitro or in vivo studies, depending on the similarity of the formulations of the test and reference products. If the test product formulation is qualitatively ($Q_1$) (i.e., contains all of the same active and inactive ingredients) and quantitatively ($Q_2$) the same as the RLD with respect to active and inactive ingredients, the bioequivalence of all tablet strengths can be established based solely on comparative dissolution (in vitro study). If the test product formulations are not qualitatively ($Q_1$) and quantitatively ($Q_2$) the same as Precose with respect to inactive ingredients, bioequivalence needs to be established by conducting a study with pharmacodynamic endpoints (in vivo study).[22]

A comparison of in vitro dissolution profiles in multiple media, along with a regulatory determination of formulation similarity (i.e., $Q_1/Q_2$), is an appropriate method for evaluating the bioequivalence of generic acarbose oral tablets based on the following factors:

- Acarbose is poorly absorbed with systemic bioavailability of less than 2 percent, and it acts locally in the GI tract. This low permeability assures minimal loss of bioavailability due to absorption.
- The rate and extent of drug release to the site of action is affected by the in vivo dissolution of the acarbose tablets, in addition to gastric emptying and GI motility.
- High solubility and relatively fast dissolution ensure that this product forms a solution and stays in solution, before it reaches the site of action (small intestine). Therefore, once dissolved, local distribution of acarbose in the GI tract should be similar for a test (generic) product and the RLD.

---

[22] A generic acarbose will be considered $Q_1/Q_2$ if (1) the amount of any excipient is no more than ± 5% different from the corresponding excipient in Precose, and (2) the total weight of the test product tablet is no more than ± 5% different from the total weight of the Precose tablet.

Docket No. 2007-P-0418

If the two products are $Q_1/Q_2$, then the only possible difference that would affect the bioavailability at the site of action in the GI tract is the rate of dissolution, a property that can be measured accurately in vitro. Once dissolved, the local distribution of acarbose in the GI tract should be similar for a test (generic) product and Precose.

In cases where a generic acarbose is not $Q_1/Q_2$, it is possible that different excipients or different amounts of an excipient may interact with the mechanism of the drug to inhibit glucosidases. Dissolution testing would not be adequate to ensure that there is no unique interaction between an excipient and the mechanism of action of the active ingredient. Therefore, in those circumstances, we recommend an in vivo bioequivalence study. The in vivo study would use a pharmacodynamic endpoint to determine whether differences in the type or amounts of excipients between the generic product and Precose affect bioavailability.[23] The most appropriate endpoint for such a study would be change in blood glucose concentrations because acarbose works by delaying digestion of ingested carbohydrates, thereby resulting in a smaller rise in blood glucose concentration following meals.

In cases where an in vivo study is needed, FDA recommends a pilot study first be conducted to determine the appropriate dose for the pivotal bioequivalence study and to determine the appropriate number of study subjects needed to provide adequate statistical power to establish bioequivalence in the pivotal study. The pilot study should use the RLD (Precose tablets) given with 75 grams of sucrose, and should identify the lowest possible dose that will yield a pharmacodynamic response statistically significantly different from the control at alpha=0.05 (two-sided), equivalent to alpha=0.025 (one-sided). This approach ensures that a significant glucose-lowering pharmacodynamic response is obtained that is not near the plateau of the dose-response curve. A response near the plateau would exhibit decreased sensitivity to delivered dose differences between products. The first dose tested is recommended to be a Precose 25-milligram (mg) tablet. If treatment with this dose does not elicit a measurable response relative to the control, it may be necessary to repeat the study with multiples of the 25-mg strength, beginning with two 25-mg tablets. The treatments to establish the appropriate dose can be studied in the same group of subjects, with a 1-week washout between each treatment, until the optimal dose for the pivotal study is identified.

## III.    Request for Stay

In the PSA, you request that FDA stay approval of any ANDA for acarbose tablets unless and until such ANDA contains sufficient evidence and data from in vivo testing to establish bioequivalence in accordance with 21 U.S.C. 355(j), 21 CFR 320.21, and 21 CFR 320.23 (PSA at 1). You reiterate the position in your Petition that FDA may not waive the requirement for the submission of evidence demonstrating in vivo

---

[23] Because acarbose is not intended to be systemically absorbed and has very low bioavailability following oral administration, a traditional pharmacokinetic study that measures blood levels of the active ingredient over time would be of limited value in comparing the formulations of two acarbose oral products.

Docket No. 2007-P-0418

bioequivalence (PSA at 2). You state that Cobalt faces irreparable injury in the absence of a stay and that your request is not frivolous and is being pursued in good faith (PSA at 3).

FDA's regulation at 21 CFR 10.35(e) sets out the standard for review of a petition for stay of action as follows:

> The Commissioner may grant or deny a petition, in whole or in part; and may grant such other relief or take such other action as is warranted by the petition. The Commissioner may grant a stay in any proceeding if it is in the public interest and in the interest of justice. The Commissioner shall grant a stay in any proceeding if all of the following apply:
> (1) The petitioner will otherwise suffer irreparable injury.
> (2) The petitioner's case is not frivolous and is being pursued in good faith.
> (3) The petitioner has demonstrated sound public policy grounds supporting the stay.
> (4) The delay resulting from the stay is not outweighed by public health or other public interests.

As stated in the regulation, the Commissioner shall grant a stay if all four of these criteria apply.

We need not address your irreparable harm argument[24] or whether your request is not frivolous and is being pursued in good faith because we have determined that you have failed to (1) demonstrate public policy grounds for the stay and (2) show that the delay would not be outweighed by public health or other public interests.

## A.    Sound Public Policy Grounds Do Not Support the Stay

You have not demonstrated that sound public policy grounds exist in support of the stay. You maintain that granting the stay will ensure that FDA follows the required approval criteria for ANDAs. You also assert that without in vivo bioequivalence testing of a generic acarbose product, there may be safety concerns (PSA at 3).

Your argument assumes that FDA has not complied with the requirements of the statute or regulations for approval of a generic acarbose. We disagree. As explained in section I.B of this response, FDA has flexibility to establish appropriate tests for the demonstration of bioequivalence. In the case of acarbose, as explained in section II.B, it is appropriate to permit in vitro dissolution testing for certain generic acarbose ANDAs (if they also demonstrate that the product is $Q_1/Q_2$ to Precose). For all other generic

---

[24] We note, however, that you have not demonstrated that you would suffer irreparable harm. Indeed, you do not describe any harm that you would suffer as a result of denying your PSA. You merely assert that it would be unlawful for FDA to waive in vivo bioequivalence requirements for acarbose and that we cannot force Cobalt to compete with applicants that have not conducted in vivo bioequivalence testing.

Docket No. 2007-P-0418

acarbose products, in vivo testing is appropriate. You have not described any specific safety concerns that may be associated with FDA's approach to bioequivalence testing. In addition, you have not described any safety issues that may result from our acceptance of in vitro bioequivalence testing in the limited circumstances described above. We note that although Cobalt sought FDA's advice on the appropriate bioequivalence testing for generic acarbose, you did not wait for a response before you began your in vivo bioequivalence testing. You were under no obligation to await FDA's advice in this matter; however, had you done so, you would have been advised that in vivo bioequivalence testing was unnecessary for products that are $Q_1/Q_2$ to Precose.

### B.   Delay Would Be Outweighed by Public Health or Other Public Interests

You claim that the public's interest in appropriate application of the generic approval requirements outweighs its interest in immediate access to a competing generic product. You also claim that a temporary stay will not harm others because Cobalt is entitled to 180-day generic exclusivity (PSA at 3).

Based on the circumstances in this case, we conclude that the delay necessitated by the stay is outweighed by countervailing public health interests in approving acarbose ANDAs. As discussed previously in section III.A, your argument assumes that ANDA applicants are not complying with applicable statutory and regulatory requirements and the Agency's approval standards will be found inadequate. However, FDA expects ANDA applicants to meet applicable statutory and regulatory standards, as explained in detail in section II of this response. In addition, we note that Cobalt is not entitled to 180-day exclusivity.[25]

Moreover, delaying approval of ANDAs would frustrate the public policies underlying the Hatch-Waxman Amendments and the Food and Drug Administration Amendments Act of 2007 (Public Law 110-85), among others.[26] One of the purposes of the Hatch-Waxman Amendments is to foster the availability of low-cost alternatives to previously approved drugs. This public policy goal would be frustrated if FDA were to grant this requested stay and treat pending ANDAs differently than other approved drug products.

### IV.   Conclusion

As discussed above, FDA's decision to permit the use of in vitro dissolution studies for establishing bioequivalence for generic acarbose oral tablets when the test and reference products are $Q_1$ and $Q_2$ is appropriate scientifically and in accordance with the Act and our regulations. Therefore, your request that all ANDA applicants conduct in vivo

---

[25] See response in Docket No. 2007-P-0249 issued today.

[26] Section 914 of the Food and Drug Administration Amendments Act of 2007 (FDAAA), 121 Stat. 953, adds new section 505(q) of the Act (21 U.S.C. 355(q)) and applies to certain citizen petitions and petitions for stay of action regarding the approval standards for generic drugs. Section 505(q)(1)(F) requires the Agency to respond to citizen petitions and petitions for stay of action such as yours no later than 180 days after submission.

10

Docket No. 2007-P-0418

bioequivalence testing is denied. Consistent with that decision, your request that in vivo bioequivalence waivers not be granted to ANDA applicants also is denied. However, because FDA has determined that in vivo bioequivalence testing is required if the test product is not $Q_1$ and $Q_2$ to the reference product, your request that ANDA applicants conduct in vivo bioequivalence testing is granted in part. In conclusion, the Petition is granted in part and denied in part. Your PSA is denied because you have failed to demonstrate that (1) sound public policy grounds support a stay and (2) delay is not outweighed by public health or other public interests.

Sincerely,

Janet Woodcock, M.D.
Director
Center for Drug Evaluation and Research

11