## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| COBALT LABORATORIES INC., *et al.*, | ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 08-CV-798 (RBW) |
| FOOD AND DRUG ADMINISTRATION, *et al.*, | ) ) | |
| Defendants. | ) ) | |

## INTERVENOR-APPLICANT ROXANE LABORATORIES' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO COBALT'S MOTION FOR TEMPORARY RESTRAINING ORDER

### <u>INTRODUCTION</u>

Intervenor-applicant Roxane Laboratories, Inc. ("Roxane") files this opposition to Cobalt Laboratories Inc. and Cobalt Pharmaceuticals, Inc.'s ("Cobalt") motion for a temporary restraining order ("TRO"). Cobalt seeks an order directing defendants Food and Drug Administration, Michael O. Leavitt, and Andrew C. von Eschenbach (collectively, "FDA") to stay or withdraw its grant of final approval to Roxane's abbreviated new drug application ("ANDA") for acarbose in 25 mg, 50 mg, and 100 mg tablets and to order an immediate recall on any acarbose product shipped or sold by Roxane, while Cobalt would be permitted to remain on the market and lock in customers for many months – possibly years – in the future.

Cobalt's petition does not meet the standards required to secure emergency relief. First and most importantly, Cobalt is unlikely to succeed on the merits of its claim that FDA's decision to approve the Roxane acarbose ANDA was arbitrary, capricious or otherwise unlawful. FDA's decision to approve Roxane's ANDA follows directly from the plain language of the Federal Food, Drug & Cosmetic Act ("FFDCA").

In addition, Roxane would be severely harmed by a 10-day restraining order while Cobalt has not identified any harm that it would incur of its motion were denied and it ultimately prevailed on the merits. If the Court grants the 10-day restraining order which Cobalt seeks, Cobalt would be permitted to contract with customers and establish relations that would cost Roxane profits for months, or even years, after expiration of the restraining order. On the other hand, if Cobalt's motion is denied and it ultimately prevails on the merits, it will force Roxane off the market and it will have the monopoly in the generic market that it seeks for the duration of the 180-day exclusivity period. Accordingly, the balance of harms plainly favors Roxane. Finally, a TRO would not serve the public interest because it would lessen the competition for the generic drug at issue in this case. Accordingly, the Court should deny Cobalt's request for relief.

## **BACKGROUND**

### **The FFDCA and Hatch-Waxman Amendments**

FDA's lawful actions in this case must be considered in the context of the statutory scheme established by Congress. Accordingly, Roxane briefly summarizes the relevant provisions of the FFDCA.

Many courts have reviewed the language, structure, congressional purposes, and history of the Drug Price Competition and Patent Term Restoration Act of 1984 ("Hatch-Waxman Amendments"). *See, e.g., Teva Pharms., USA, Inc. v. FDA*, 182 F.3d 1003, 1004-05 (D.C. Cir. 1999); *Mylan Pharm., Inc. v. Thompson*, 268 F.3d 1323, 1325-27 (Fed. Cir. 2001). As originally enacted, the Hatch-Waxman Amendments sought to strike a balance between protecting the incentives for pharmaceutical innovation and encouraging generic competition to provide lower cost versions of branded drugs as early as possible. *See, e.g., Abbott Labs, Inc. v. Young*, 920

F.2d 984 (D.C. Cir. 1990) (*citing* H.R. Rep. No. 98-857 (Pt. 1), 98th Cong., 2d Sess. 14, 15, reprinted in 1984 U.S.C.C.A.N. 2647, 2648); *see also* 54 Fed. Reg. 28872, 28874 (July 10, 1989).

New Drugs and Patent Information Requirements

Before marketing a new drug in the United States, a manufacturer must submit a New Drug Application ("NDA") to FDA, and FDA must approve it. 21 U.S.C. § 355(a). Once approved, new drugs generally are referred to as brand name drugs because they are marketed under a trade name or trademark for the drug product rather than the chemical name for the active ingredient in the drug product.

An NDA must contain technical data to show that it is safe and effective for its proposed uses. 21 U.S.C. § 355(b)(1). In addition, an NDA applicant is required to submit to FDA information on each patent that claims the drug or a method of using the drug that is the subject of the NDA. *Id.* FDA approves a new drug only if it determines, based on evidence submitted by the manufacturer, that the drug is safe and efficacious for its proposed uses. 21 U.S.C. § 355(d).

Once FDA approves an NDA, it publishes the patent information submitted by the brand name drug manufacturer in its publication, the Approved Drug Products with Therapeutic Equivalence Evaluations (known as the "Orange Book"). 21 U.S.C. § 355(b)(1). The Orange Book includes an index of drug products by trade or established name as well as drug patent and exclusivity information. 21 C.F.R. § 314.53.

Generic Drugs and Patent Certification Requirements

A generic drug is a version of a brand name drug that is generally sold without a trade name or trademark for the drug product. As with an NDA, before marketing a generic drug in

1801220.1

the United States, a manufacturer must submit an ANDA to FDA, and FDA must approve it. 21

U.S.C. § 355(a). An ANDA applicant must show that its generic drug is "bioequivalent" to the

previously approved brand name drug – that is, that the generic version reaches the site of action

in the body at the same rate and extent as the listed drug under similar conditions. 21 U.S.C.

§ 355(j)(8)(B). FDA has issued regulations and scientific guidance on how an applicant can

demonstrate bioequivalence. *See, e.g.*, 21 C.F.R. Part 320; FDA's Guidance for Industry:

Bioavailability and Bioequivalence Studies for Orally Administered Drug Products – General

Considerations (March 2003); FDA's Draft Guidance for Industry – Bioequivalence

Recommendations for Specific Products (May 2007).

Generic drugs typically are sold at a significant price discount compared to their brand

name counterparts. *United States v. Generix Drug Corp.*, 460 U.S. 453, 455 n.1 (1983); *Mova

Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1063 (D.C. Cir. 1998). Generic drugs represent an

increasing portion of the medicines used in the United States. The introduction of a generic drug

as an alternative to a brand name drug typically results in a dramatic reduction in the brand name

drug's market share, particularly within the first six months.

A generic drug manufacturer seeking FDA approval for a generic version of a brand

name drug product listed in the Orange Book must file one of four certifications with FDA. The

type of certification relevant here is a certification that the patent claiming the brand name drug

is invalid or will not be infringed by the manufacture, use, or sale of the generic drug for which

the ANDA is submitted. 21 U.S.C. § 355(j)(2)(A)(vii)(IV); 21 C.F.R. § 314.50(i). This

certification is commonly referred to as a "Paragraph IV certification."

In order to encourage generic market entry, the first ANDA applicant to file an ANDA

with a Paragraph IV certification is eligible for a 180-day period in which it is the only ANDA

1801220.1

applicant allowed to market, pursuant to an approved ANDA, a generic version of the brand name product. This is commonly referred to as "the 180-day exclusivity period." Specifically, if an ANDA with a Paragraph IV certification "is for a drug for which a first applicant has submitted an application containing such a certification," the later-filed ANDA "shall be made effective on the date that is 180 days after" the first applicant has commenced marketing. 21 U.S.C. § 355(j)(5)(B)(iv).

Forfeiture of Generic Exclusivity

In 2003, Congress enacted the Medicare Prescription Drug Improvement and Modernization Act of 2003 ("MMA"), which substantially amended the provisions of the Hatch-Waxman Amendments pertaining to generic exclusivity. See Pub. L. 108-173, tit. XI. Congress endeavored to restore, in the face of changing industry practices, the carefully struck balance between encouraging competition to provide patients with earlier access to lower cost generic drug and preserving incentives for innovation. In particular, Congress sought to prevent the practice whereby generic firms eligible for 180 days of generic exclusivity fail to timely market their drug products, thus blocking and delaying effective approval of other ANDAs and depriving the market of the competition that yields lower cost versions of the drug. To address this issue, Congress added section 355(j)(5)(D) to the FFDCA, providing six "forfeiture events" by which an ANDA applicant that might otherwise qualify for 180 days of protection from competition by other generic manufacturers could lose its eligibility for such exclusivity. The loss of 180-day exclusivity is triggered when any one of the forfeiture events occurs.

The forfeiture event that applies in this case is the first one listed among the six that Congress provided for – a so-called "Failure to Market" event. A "Failure to Market" exclusivity forfeiture occurs when the first applicant fails to commence commercial marketing

by the later of two dates. 21 U.S.C. § 355(j)(5)(D)(i)(I).

The first date for determining the "later" date is the earlier of two fixed dates – either 75 days after the date FDA gives effective approval to the first applicant (a date which has not yet occurred in this case, given that FDA just approved Cobalt's ANDA on May 7, 2008); or the date that is 30 months after the first applicant submitted its ANDA (September 22, 2007 in this case). *See* 21 U.S.C. § 355(j)(5)(D)(i)(I)(aa) ("Item (aa)").

The second date to use in determining the "later" date is the date 75 days after one of the following three events has occurred for each of the patents for which an applicant (either the first applicant or another applicant with tentative approval) filed an application containing a paragraph IV certification. The three events are:

> (AA) In an infringement action brought against that applicant with respect to the patent or in a declaratory judgment action brought by that applicant with respect to the patent, a court enters a final decision from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken that the patent is invalid or not infringed.

> (BB) In an infringement action or a declaratory judgment action described in subitem (AA), a court signs a settlement order or consent decree that enters a final judgment that includes a finding that the patent is invalid or not infringed.

> (CC) The patent information submitted under subsection (b) or (c) is withdrawn by the holder of the application approved under subsection (b).

21 U.S.C. § 355(j)(5)(D)(i)(I)(bb) ("Item (bb)"). Here, subitems (AA) and (BB) do not apply because there was no infringement action or declaratory judgment action with respect to the '769 patent. As discussed *infra*, subitem (CC) does apply because Bayer withdrew the patent information for the '769 patent on April 16, 2007.

If the circumstances arise that cause the first applicant to forfeit its 180-day exclusivity period, no other applicant may receive generic exclusivity for that drug, and FDA shall approve

1801220.1

any eligible application that has otherwise met the statutory requirements.  21 U.S.C.

§ 355(j)(5)(D)(iii).  As noted above, such approval "shall be made effective *immediately*" unless

that applicant was sued by the patent holder for infringement, which did not occur in this case.

21 U.S.C. § 355(j)(5)(B)(iii) (emphasis added).  On May 7, 2008, the FDA issued a decision in

which it announced that Cobalt had forfeited its 180-day exclusivity on September 22, 2007.

**Factual Background**

About 90% of the 21 million Americans with diabetes suffer from Type II (non-insulin-

dependent) diabetes, a condition in which the body does not produce enough insulin or its cells

ignore the insulin.  Insulin is necessary to carry glucose obtained from food to the body's cells.

Acarbose is a drug used to treat Type II diabetes.  It helps diabetes patients regulate blood sugar

levels by delaying the digestion of ingested carbohydrates, thereby resulting in a smaller rise in

blood glucose concentrations after meals.

On September 6, 1995, FDA approved Bayer Pharmaceuticals' new drug application

(NDA No. 20-482) for acarbose tablets under the brand name Precose®.  As part of that

application, Bayer submitted to FDA information about a patent, patent number 4904769 ("the

'769 patent"), that Bayer had obtained for Precose®.[1]  As required by statute, FDA listed such

patent information in the Orange Book.  *See* http://www.accessdata.fda.gov/scripts/cder/ob/

docs/patexclnew.cfm?Appl_No=020482&Product_No=001&table1=OB_Rx (on-line version of

Orange Book) ("Orange Book Precose® Data").  Bayer sales of Precose® are in the range of $35

million to $40 million annually.

On March 22, 2005, FDA received from Cobalt the first substantially complete ANDA

for a generic version of Precose®.  Cobalt's ANDA also contained a Paragraph IV certification

---

[1] The '769 patent had an original expiration date of February 27, 2007.  The expiration date was later extended to
September 6, 2009.

1801220.1

for acarbose tablets, making it presumptively eligible for 180 days of generic exclusivity upon approval. Bayer did not sue Cobalt for patent infringement.

On August 30, 2006, Roxane submitted its ANDA for acarbose tablets. Declaration of Lesli L. Paoletti, Associate Director of Marketing, Roxane Labs., Inc. ¶ 4 ("Paoletti Declaration" or "Paoletti Decl.").[2] Roxane included a Paragraph IV certification that the '769 product was invalid, not infringed, and unenforceable. *Id.* at ¶ 6. Bayer did not sue Roxane for patent infringement. *Id.*

On December 20, 2006, Bayer filed with the United States Patent and Trademark Office a notice of disclaimer for all claims in the '769 patent. *See* http://www.uspto.gov/go/og/2007/week09/patdisc.htm (notice posted on Feb. 27, 2007). Consistent with that action, on April 16, 2007, Bayer requested that FDA withdraw the '769 patent from the Orange Book. FDA noted that request in the Orange Book section of its website. *See* Orange Book Precose® Data; Telefax from Gary J. Buehler, Director, Office of Generic Drugs, Ref. No. OGD #07-1254 (Sept. 26, 2007).

In August 2007, Roxane's application was proceeding through the regulatory review process at FDA and all pending questions from FDA had been answered. Paoletti Decl. ¶ 10. From the Agency's response and communications regarding Roxane's acarbose ANDA, Roxane reasonably believed that FDA would soon approve the application for marketing, and prepared to market at the earliest possible time should the first Paragraph IV filer forfeit its exclusivity by failing to market its product on or before September 22, 2007. *Id.* Indeed, Roxane believed that it might even enjoy a period during which it was the sole acarbose generic on the market. *Id.* ¶ 13.

---

[2] Roxane is submitting the Paoletti Declaration to the Court under seal because it contains highly confidential commercial information.

1801220.1

Accordingly, between August and October 2007 Roxane proceeded with commercialization activities, investing over $1 million to prepare commercial inventory for launch. *Id.* ¶ 12. The manufactured product has expiration dating of 24 months. *Id.* ¶ 13. This substantial preparatory activity is common practice in the generic industry; indeed, it is necessary so that a generic manufacturer is able to have product to launch at the time of approval. Even if Cobalt began marketing in time to receive its 180-day exclusivity, Roxane would be able to enter the market no later than March 20, 2008 (180 days after September 22, 2007), leaving sufficient time to sell the product manufactured in August 2007 before it got too close to its expiration date. *Id.* at ¶ 14.

By September 22, 2007, 30 months after the filing of Cobalt's ANDA for acarbose, FDA had not given Cobalt marketing approval for its ANDA, and therefore Cobalt had not commenced marketing acarbose tablets.

On September 26, 2007, FDA's Office of Generic Drugs sent out a letter soliciting input from generic applicants about how to apply the FFDCA's exclusivity forfeiture provisions to the circumstances involving acarbose. In a brief letter on September 28, Roxane explained that a forfeiture event had occurred on September 22. On March 24, 2008, with FDA's approval, Roxane sent a supplemental confidential correspondence to the Agency explaining the statutory basis for the September 22 forfeiture event and why prompt approval of Roxane's acarbose ANDA should occur. On May 7, 2008, FDA issued a decision ruling that Cobalt had forfeited its 180-day exclusivity because, as provided in the FFDCA, Bayer had withdrawn the patent upon which the exclusivity depended and Cobalt had not marketed its product by September 22, 2007.

On November 9, 2007, about six weeks *beyond* its 30-month deadline to market its product or forfeit its exclusivity, Cobalt filed its citizen petition arguing that FDA may not

1801220.1

approve an acarbose ANDA that does not contain data demonstrating *in vivo* bioequivalence to the reference listed drug, Precose®.[3] Cobalt simultaneously petitioned FDA to stay approval of any acarbose ANDAs without such data. The practice of filing citizen petitions on the eve of a product approval is an increasingly common practice at FDA.[4] FDA often delays approval of the product that is the subject of the petition while it responds to the petition.

On January 15, 2008, FDA informed Roxane that the Agency would not grant final approval on ANDA No. 78-470 until it considered and resolved the issues raised by the Cobalt Petition. Under section 355(q) of the FFDCA, which Congress enacted in the fall of 2007 to curb citizen petition abuses, FDA was required to rule on the Cobalt Petition within 180 days of its submission, a period that ended May 7, 2008.

On May 7, 2008, FDA denied the Cobalt Petition and confirmed that a 180-day exclusivity forfeiture event occurred on September 22, 2007. Also on May 7 FDA granted final approval to the acarbose ANDAs of both Roxane and Cobalt.

On May 8, 2008, Cobalt filed this action. It seeks a temporary restraining order to stay FDA's decision to approve the Roxane ANDA and to require FDA to order a recall of any acarbose product shipped or sold by Roxane.

## ARGUMENT

Courts weigh four factors in deciding whether to grant a preliminary injunction or temporary restraining order: (1) whether there is a substantial likelihood that the movant will succeed on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not

---

[3] On March 24, 2008, Roxane sent a second piece of controlled correspondence demonstrating why FDA should deny the Cobalt Petition.

[4] *See, e.g.*, Comments of the Staff of the Bureau of Competition and of Policy Planning of the Fed'l Trade Comm'n, Docket No. 99N-2497, Mar. 2, 2000, at 6 (noting that "our observation of the pharmaceutical industry shows that existing product holders have an incentive to block generic entrants and may do so by raising concerns about a potential generic entrant's drug application before the FDA. . . . The effect of such a petition could be to delay FDA approval of a rival drug application, even if the petition is not ultimately upheld.")

1801220.1

granted; (3) whether the injunction will substantially injure other interested parties; and (4) whether the public interest would be furthered by the injunction. *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998); *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 36 (D.D.C. 2000); *accord Mylan Pharms., Inc. v. Thompson,* 207 F. Supp. 2d 476, 483-84 (N.D. W. Va. 2001). These four factors "interrelate on a sliding scale and must be balanced against each other." *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998). As demonstrated below, Cobalt cannot satisfy the test for a TRO or preliminary injunction because it is highly unlikely to succeed on the merits, the balance of harms weighs against relief, and the requested relief would not further the public interest.

## I.    COBALT'S CASE ON THE MERITS IS EXTREMELY WEAK

### A.    Under the Plain Language of the FFDCA, Cobalt Forfeited Its 180-Day Exclusivity.

Cobalt is unlikely to prevail on its challenge to FDA's decision to approve Roxane's ANDA because FDA properly ruled that a 180-day exclusivity forfeiture occurred on September 22, 2007. As a result, there was no available exclusivity to keep Roxane's ANDA off the market. Under the plain language of the FFDCA, FDA is correct that Cobalt forfeited its generic exclusivity for acarbose under section 355(j)(5)(D)(i)(I) when it failed to begin marketing by September 22, 2007. Accordingly, FDA correctly decided that it is statutorily precluded from awarding 180-day exclusivity for acarbose, and that, if no other barriers to final approval existed, it was required to give final marketing approval to Roxane's approvable ANDA "immediately." *See* 21 U.S.C. §§ 355(j)(5)(D)(iii) & 355(j)(5)(B)(iii).

It is axiomatic that FDA and the Court must give effect to the intent of Congress as expressed in the plain meaning of the FFDCA. *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842-43 (1984) (If "Congress has directly spoken to the precise

question at issue," the court and the agency "must give effect to the unambiguously expressed intent of Congress"). A reviewing court "must presume that a legislature says in a statute what it means and means in a statute what it says .... When the words of a statute are unambiguous ... judicial inquiry is complete." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (citations and quotations omitted). Here, as FDA concluded in its May 7, 2008 decision, the plain meaning of section 355(j)(5)(D)(i) compels the conclusion that no generic exclusivity is available for any generic manufacturer of acarbose, triggering FDA's proper decision to approve Roxane's acarbose ANDA.

As indicated above, 180-day exclusivity is lost when *any* of the six "Forfeiture Events" in section 355(j)(5)(D)(i) occurs. The only forfeiture provision that FDA has applied here is Forfeiture Event (I), entitled "Failure to Market." 21 U.S.C. § 355(j)(5)(D)(i)(I). To decide when an exclusivity forfeiture occurred under Forfeiture Event (I), FDA was required to determine the later date of two measuring dates by applying section 355(j)(5)(D)(i)(I)(aa) and section 355(j)(5)(D)(i)(I)(bb). As we will explain below and as FDA concluded in its decision, that later date is September 22, 2007. When Cobalt did not market its product by September 22, 2007, it forfeited its 180-day exclusivity, opening the door to Roxane and other generic applicants to market their products once they were approved.

### 1. September 22, 2007 is the operative date under 21 U.S.C. § 355(j)(5)(D)(i)(I)(aa).

The applicable date under item (aa) is September 22, 2007, which is 30 months after Cobalt submitted its ANDA. *See* 21 U.S.C. § 355(j)(5)(D)(i)(I)(aa)(BB). Cobalt was not able to secure effective approval from the Agency and did not begin marketing its acarbose product by September 22, 2007.

1801220.1

Section 355(j)(5)(D)(i)(I)(aa)(AA) would come into play only if the approval date was earlier than September 22, 2007. Since FDA had not yet granted effective approval to Cobalt's ANDA by September 22, 2007, however, section 355(j)(5)(D)(i)(I)(aa)(AA) does not come into play. Regardless of the approval date for Cobalt's ANDA, as FDA concluded in its decision, September 22, 2007 will be the earlier date under item (aa).

### 2.    June 30, 2007 is the operative date under 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb).

Having correctly concluded that September 22, 2007 was the applicable date under item (aa), the FDA was then required to identify the operative date under item (bb). That provision identifies three events for making such a determination, but here only one of those events has occurred: the delisting of the '769 patent. *See* 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(CC) ("subitem (CC)"). Cobalt's Paragraph IV certification relating to the '769 patent had been the basis for Cobalt's 180-day exclusivity. On April 16, 2007, Bayer asked that the '769 patent be delisted.[5]

Under the plain language of subitem (CC), the withdrawal of patent information occurred upon the unilateral action of Bayer as the NDA holder. Thus, Bayer's withdrawal of the patent information started the 75-day period clock under item (bb). That 75-day period expired on June 30, 2007.

Subitem (CC) is simple and unambiguous. It says the precipitating event occurs when "the patent information submitted under subsection (b) or (c) *is withdrawn by the holder of the application approved under subsection (b).*" (emphasis added). As FDA found in its decision, since Bayer withdrew its patent on April 16, 2007, the applicable date under subitem (CC) is June 30, 2007.

---

[5] As indicated, *supra*, this request followed Bayer's November 2006 notice to the PTO that it was disclaiming all claims in the '769 patent.

1801220.1

Therefore, FDA correctly concluded that the later date under section 355(j)(5)(D)(i)(I) is September 22, 2007, and that Cobalt forfeited its exclusivity as of that day.

**B.**    **Each of Cobalt's Arguments Should Be Rejected as Contrary to the Plain Meaning of the Act.**

Cobalt makes three arguments to support its claim that FDA erred in denying it exclusivity. As we demonstrate below, each argument should be rejected.

**1.**    **Under the Plain Language of the Market Forfeiture Provision, the Cause of Cobalt's Inability to Obtain Approval in 30 Months Is Irrelevant.**

Cobalt argues that "FDA delay cannot cause an exclusivity forfeiture." Cobalt Mem. at 20-23. Under the plain meaning of the statute, the cause of the delay is irrelevant.

As discussed above, under the Failure to Market prong of the applicable forfeiture provision, Cobalt was required to market its product "30 months after the date of submission of the application of the first applicant." 21 U.S.C. § 355(j)(5)(D)(i)(I)(aa)(BB). Recognizing that there is nothing in this provision that states that the 30-month deadline must be tolled if FDA was responsible for a delay in approving Cobalt's product, Cobalt attempts to import a clause from an entirely different forfeiture provision of the statute into the Failure to Market forfeiture provision. Under Forfeiture Event IV, Failure to Obtain Tentative Approval, a forfeiture will occur if an applicant fails to obtain tentative approval "unless the failure is caused by a change in or a review of the requirements for approval of the application imposed after the date on which the application is filed." 21 U.S.C. § 355(j)(5)(D)(i)(IV). Cobalt argues that that provision should apply to Forfeiture Event I, section 355(j)(5)(D)(i)(I). The problem with this argument is that the "unless" clause does not appear in the Forfeiture Event I (Failure to Market) provision. And the fact that it appears in another forfeiture provision is a strong indication that Congress did

14

not intend that FDA take into account any change in the review requirements in implementing

that provision.

### 2. Under the Plain Language of the Patent Delisting Provision, Bayer Withdrew Its Patent on April 16, 2007.

As we demonstrate below, the language and meaning of the provisions of the FFDCA

that are relevant to this case are plain and dispositive.  However, even if the Court were to find

that the forfeiture provision at issue were ambiguous, under *Chevron* Step Two the Court should

defer to a reasonable interpretation by FDA of the technical Hatch-Waxman provisions of the

FFDCA. *See Chevron*, 467 U.S. at 844 (1984); *see also Sigma-Tau Pharms., Inc. v. Schwetz*,

288 F.3d 141, 146 (4th Cir. 2002) (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512

(1994)); *Zeneca, Inc. v. Shalala*, 213 F.3d 161, 170 (4th Cir. 2000) (same); *Community Nutrition

Inst. v. Young*, 476 U.S. 974, 980 (1986) (reversing court of appeals and upholding agency

interpretation of FFDCA)

#### a. The Effective Date of Bayer's Withdrawal of Its Patent Information Was April 16, 2007.

Cobalt contends that FDA's interpretation of subitem (CC) – that a "withdrawal" of

patent information occurred when Bayer requested that the patent information for the disclaimed

'769 patent be removed from the Orange Book – is inconsistent with the "plain language of the

statute."  In fact, it is Cobalt's interpretation that departs substantially from the plain text of

subitem (CC).

As noted above, a subitem (CC) event occurs when patent information "*is withdrawn by

the holder*" of the NDA.  Cobalt insists that the "withdrawal of patent information" by a patent

holder must mean actual removal of the information from the Orange Book.  Cobalt Mem. at 24,

25 (contending the statute "requires that the patent information be actually withdrawn from the

1801220.1

Orange Book"). This reading is flawed in two respects. First, subitem (CC) does not mention or refer to the Orange Book (either directly or by its formal name, "Approved Drug Products with Therapeutic Equivalence Evaluations"). Second, FDA, not the patent holder, controls what patent information is listed in or removed from the Orange Book. *See* 21 U.S.C. §355(b). In short, the core problem with Cobalt's view of subitem (CC) is that it demands that the actual language – "withdrawn by the holder" – be read as "withdrawn from the Orange Book by FDA."

Here, months after Bayer had formally disclaimed the '769 patent before the Patent and Trademark Office, it asked FDA to remove the patent information from the Orange Book. FDA reasonably interpreted Bayer's request as a "withdrawal of patent information" by the NDA holder. The Court should reject Cobalt's interpretation that such "withdrawal" cannot be effective until FDA acts, because such interpretation departs fundamentally from the statutory language.

Moreover, examination of provisions using the word "withdrawn" (and variations thereof) in other forfeiture events defined in section 355(j)(5)(D)(i) confirms that the triggering event described in subitem (CC) occurs on the date that the NDA holder notifies FDA that it is withdrawing the patent information – in this case, April 16, 2007. Two other forfeiture provisions also concern actions by an applicant to withdraw information. *See* 21 U.S.C. § 355(j)(5)(D)(i)(II) & (III). Under section 355(j)(5)(D)(i)(II), forfeiture occurs either when the "*first applicant withdraws* the application" (emphasis added) or when "the Secretary considers the application to have been withdrawn as a result of a determination by the Secretary that the application does not meet the requirements for approval under paragraph (4)." By casting withdrawal in alternative terms – one of which requires a determination by a party (FDA) *other than* the applicant – the plain meaning of the first clause ("the first applicant withdraws the

application") is that it does *not* require any action or determination by FDA or any other party. Similarly, Congress's decision not to refer expressly to such agency (or court) action in subitem (CC) further supports the conclusion that the NDA holder's unilateral withdrawal of patent information becomes effective without the need for any such agency or court action.

The third forfeiture event, section 355(j)(5)(D)(i)(III), is also similar to subitem (CC) and the first forfeiture alternative in section 355(j)(5)(D)(i)(II). That is, a forfeiture event occurs if "*the first applicant . . . withdraws* the certification for all of the patents with respect to which that applicant submitted a certification qualifying the applicant for the 180-day exclusivity period." 21 U.S.C. § 355(j)(5)(D)(i)(III) (emphasis added). This section makes no reference to a requirement that a third party – such as FDA or a court – must approve or direct such withdrawal.

In short, subitem (CC) means what it says, and it was triggered on April 16, 2007, when Bayer withdrew its patent. Contrary to Cobalt's argument, FDA had no authority to read into subitem (CC) a restriction on an NDA holder's ability to withdraw patent information that Congress simply did not provide. *See, e.g.*, *Mova*, 140 F.3d at 1069 (prohibiting FDA from conditioning generic exclusivity on an applicant's successful defense of patent infringement litigation where FFDCA contains no such requirement); *Inwood Labs, Inc. v. Young*, 723 F. Supp. 1523, 1526 (D.D.C. 1989) (invalidating FDA rule requiring first ANDA applicant with Paragraph IV certification to be sued by the patent holder to qualify for exclusivity where suit requirement not included in the statutory provisions at issue).

> b.    FDA's Application of Subitem (CC) Is Consistent with
>       Congressional Policy.

Cobalt claims that FDA's interpretation of subitem (CC) places too much control over 180-day exclusivity in the hands of NDA holders. *See* Cobalt Mem. at 26. First, Cobalt relies on

1801220.1

court decisions that occurred years before the 2003 enactment of the MMA. Second, FDA's action here is both consistent with the plain meaning of the statute and with congressional policy reflected in the Hatch-Waxman Amendments. Congress did not provide that the failure to market within 30 months of submitting an application will *always* cause a forfeiture. Instead, the forfeiture only occurs when an application fails to market within a certain time period *and* one of three other events occurs. Two of the events involve resolution of patent litigation; the event relevant here involves the withdrawal of the patent by the brand manufacturer.

It is understandable that Congress concluded that the withdrawal of the patent could trigger a forfeiture. The entire basis of the 180-day exclusivity was to provide an incentive for the generic manufacturer to challenge the brand manufacturer's patents. But this incentive is costly, since during the exclusivity only one ANDA-approved drug is permitted on the market and generic drug prices will be higher during this period of time. Thus, in the Failure To Market forfeiture provision, Congress made the policy choice that when withdrawal of patent information occurs, removing the cause of costly litigation, it was reasonable to require the ANDA applicant to gain marketing approval in 30 months or forfeit 180-day exclusivity.[6]

> c.  Cobalt's Reliance on the *Ranbaxy* Case Is Misplaced.

Cobalt's effort to glean support from *Ranbaxy Laboratories Ltd. v. Leavitt*, 469 F.3d 120 (D.C. Cir. 2006) can be readily dismissed. *Ranbaxy* simply has no application here. As the *Ranbaxy* court itself stated, "the decisions of the FDA and of the district court were made pursuant to the Act as it stood before the MMA and, because the MMA was not made retroactive, § 1102(b)(1), 117 Stat. at 2460, this decision is also geared to the Act pre-MMA."

---

[6] Indeed, where withdrawal of the patent occurs more than 30 months from the submission of the ANDA, Congress provided an additional 75-day window to the ANDA applicant after the withdrawal of patent information to secure final approval and commence marketing before forfeiting exclusivity. 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb).

1801220.1

469 F.3d at 122.  Since Cobalt agrees the statutory provisions added by the MMA apply here, *see* Cobalt Mem. at 6 n.2, its reliance on *Ranbaxy* is misplaced.

Once again, Cobalt's argument is inconsistent with the plain meaning of the statute. Cobalt argues that subitem (CC) applies only when an NDA holder withdraws a patent in connection with a counterclaim in patent litigation.  Cobalt Mem. at 29.  Subitem (CC) does not refer to or mention the counterclaim provision (section 355(j)(5)(c)(ii)), nor does it refer to infringement actions.  Thus, Cobalt's attempt to import into the unambiguous words of subitem (CC) a requirement of a court order resulting from a section 355(j)(5)(c)(ii) must fail.

### 3.    The Reference in the Failure to Market Forfeiture Provision to "Any Other Applicant" with "Tentative Approval" Has No Application to this Case.

Cobalt also argues that there is no forfeiture for Failure to Market because no subsequent applicant received tentative approval.  Cobalt Mem. at 29-30.  The problem with this argument is that the language referring to a "subsequent applicant" has no application to this case.  Section 355(j)(5)(D)(bb) states that "with respect to the first applicant *or* any other applicant (which other applicant has received tentative approval)" (emphasis supplied), the forfeiture period is 75 days after one of three events.  Under this provision, one of the three forfeiture events need occur with regard to *either* the first applicant *or* any other applicant.  The forfeiture events described in (AA) and (BB) involve patents suits by the patent holder which may be against either the first applicant or a subsequent applicant.  Thus, the term "subsequent applicant" does come into play with regard to events (AA) and (BB).  But forfeiture event (CC), the withdrawal of the patent by the brand company, can involve only the first applicant, and subsequent applicants can not trigger the forfeiture event.  Thus, the application of the term "any other applicant" does not come into play in this case.  Here, FDA found that the first applicant (Cobalt) had not marketed

its product 75 days after Bayer withdraw its patent. That fully satisfies (bb) with respect to forfeiture event (CC). The term "any other applicant" has no relevance to this case.

## II.    The Balance of Harms Weighs Against Granting Cobalt's Demand for Emergency Relief.

### A.    Roxane Will Suffer Substantial Irreparable Harm If a TRO Is Entered.

Cobalt requests that the Court stay FDA's grant of final approval to Roxane's acarbose ANDA. Cobalt's requested relief, if granted, will block Roxane from marketing its product but will enable Cobalt to market its now-approved acarbose product without generic competition while the TRO is in effect. Roxane would suffer both immediate and lasting irreparable harm that outweighs any harm Cobalt may suffer if relief is denied.

Roxane will suffer irrecoverable short-term and long-term economic loss from a TRO. As the Paoletti Declaration explains, the harm stems from significant and lasting losses of market share that will likely occur if Cobalt but not Roxane is able to sell acarbose in the next 10 days, and, in addition, from 10 days of lost sales that are attributable to the TRO. The Paoletti Declaration quantifies and explains the basis for the estimate of lost profits. *See* Paoletti Decl. ¶¶ 15-19.

Immediately upon receiving approval for its acarbose ANDA on May 7, Roxane began intensive commercialization activities, including executing contracts with purchasers and preparing product for distribution. Roxane estimates that by close of business on May 8, it had secured supplier contracts accounting for approximately 65% of the generic market.[7]

Roxane will be substantially harmed if, after securing its supplier contracts to begin the flow of lower cost generic acarbose into the marketplace, Roxane is precluded from selling

1801220.1

during the 10-day TRO while Cobalt is allowed to continue marketing. Should that occur, Roxane estimates that it will suffer losses because it will lose a substantial percentage of its customer volume to Cobalt. *Id.* ¶ 19. This will cause lasting competitive injury to Roxane, measured as the difference between a year of profits at the higher market share and a year of profits at the lower share. *Id.*

Moreover, by delaying by 10 days Roxane's ability to begin its commercial marketing, Roxane will lose 10 days of sales and profits that the company would have had when selling at full capacity. The Paoletti Declaration provides the amount of those lost profits and the basis for the estimate. *Id.* ¶¶ 17-18.

### B.  Cobalt Has Not Demonstrated Any Irreparable Harm.

Cobalt is unlikely to prevail on the merits of its claim and its motion for a temporary restraining order should be denied for that reason alone. In addition, Cobalt has not demonstrated that it will suffer any irreparable harm if a TRO does not issue and it later prevails on the merits of its lawsuit. Cobalt's basic argument is that during the 180-day period of exclusivity to which it believes it is entitled, it will obtain the "benefits that flow to the first generic market entrant." Cobalt Mem. at 30-34. This is certainly true *if* Cobalt is entitled to the 180-day exclusivity, an issue that the court will determine when it decides the merits of this case. Cobalt fails to explain how the denial of a temporary restraining order would injure its ability to form market relationships during the 180-day exclusivity period that it would obtain by prevailing on the merits of this action.

The sole issue that the court must address with respect to irreparable injury is whether Cobalt would be injured during a 10-day temporary restraining order. Of course, if the Court

---

[7] Roxane estimates that 80% to 90% of the acarbose market will convert to generic sales. For purposes of calculating losses causing irreparable injury during a 10-day TRO Roxane has used the conservative estimates of its

1801220.1

ultimately rules against Cobalt on the merits, then there can be no injury since Cobalt was not legally entitled to relief that would block Roxane from marketing its product.

Thus, the only question with respect to irreparable injury is whether Cobalt will be injured if it prevails on the merits and is awarded the 180-day exclusivity, during which time Roxane and all other generic competitors would be blocked from marketing generic products. In that case, however, Cobalt will have 180 days to market its product free of generic competition, and thus to gain all the advantages of market exclusivity that it has discussed. As a result, there would be no injury to Cobalt from denial of its motion for a temporary restraining order.

## III.    The Public Interest Would Not be Served by a TRO or Injunction.

Granting the requested emergency injunction in this case is contrary to the public interest. The public will benefit greatly from Roxane's immediate entry to the market. If the Court upholds FDA's decision here, Roxane (and perhaps other generic companies with the acarbose ANDAs that may receive final approval) will break Precose®'s extended monopoly in the marketplace, thereby providing consumers access to lower cost versions of this drug. This is one of the central economic and public health benefits Congress sought to create through the Hatch-Waxman Amendments. *See Serono Labs.*, 158 F.3d at 1326; *Mead Johnson Pharm. Grp. v. Bowen*, 838 F.2d 1332, 1333 (D.C. Cir. 1988). By contrast, the public interest will be harmed if the Court, contrary to the FFDCA and FDA's considered scientific judgment, requires FDA to stay effective approval for Roxane, thereby continuing the Precose® extended market monopoly.

The FFDCA is structured to give incentives to companies to file ANDAs so that generic drugs are brought to market as soon as possible. If the court enjoins FDA from giving effective approval to other ANDAs while it reviews FDA's May 7th actions, the incentive for generic

---

market share (65%) and the generic share of the total acarbose market (80%).

companies to move quickly to bring a generic drug to market in the hopes of obtaining 180-day exclusivity will be undermined. Consumers would be harmed by this result.

## **CONCLUSION**

For the foregoing reasons, Roxane respectfully requests that the Court deny Cobalt's motion for a temporary restraining order.

Dated: May 9, 2008                                Respectfully submitted,

William B. Schultz (DC Bar No. 218990)
Andrew N. Goldfarb (DC Bar No. 455751)
Sasha W. Miller (DC Bar No. 474325)
Lisa Barclay (DC Bar No. 486282)
Zuckerman Spaeder LLP
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036-5802
(202) 778-1800 (telephone)
(202) 822-8106 (facsimile)

*Attorneys for Roxane Laboratories, Inc.*

1801220.1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 9th day of May, 2008, a copy of Intervenor-Applicant Roxane Laboratories Inc.'s Opposition to Cobalt's Motion for Temporary Restraining Order, exhibits thereto and materials in support thereof, and a proposed order, were transmitted by e-mail and first class mail to the following:

E. Anthony Figg
Daniel L. Shores
Rothwell, Figg, Ernst & Manbeck, P.C.
1425 K Street, NW
Suite 800
Washington, DC 20005
(202) 783-6040 (phone)
(202) 783-6031 (fax)
efigg@rfem.com

William A. Rakoczy
Christine J. Siwik
Rakoczy Molino Massochi Siwik LLP
6 West Hubbard Street,
Suite 500
Chicago, IL 60610
(312) 527-2157 (phone)
(312) 527-4205 (fax)
wrakoczy@rmmslegal.com

*Counsel for Plaintiff*

Gerald Kell
Office of Consumer Litigation
Civil Division
US Department of Justice
PO Box 386
Washington, DC 20044
202-514-1586 (phone)
Gerald.Kell@usdoj.gov

Shoshana Hutchinson
Office of the Chief Counsel
Food and Drug Administration
GCF-1
5600 Fishers Lane
Rockville, MD 20857
301-827-8579 (phone)
shoshana.hutchinson@fda.hhs.gov

*Counsel for Federal Defendant*

 

Andrew N. Goldfarb

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
)
COBALT LABORATORIES INC., *et al.*,             )
)
Plaintiffs,              )
)
v.                                              )         Case No. 08 CV 798 (RBW)
)
FOOD AND DRUG ADMINISTRATION, *et al.*,         )
)
Defendants.              )
_____)

## ORDER

Upon consideration of Cobalt's Motion for a Temporary Restraining Order ("Motion"),
all materials submitted in support of and in opposition to the Motion, and counsel for the parties
and the intervenor-applicant having been heard, and entire record in this case, it is hereby

ORDERED that the Motion is DENIED.


Dated:  May ____, 2008


_____
United States District Court Judge